# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

EQUALITY FLORIDA; FAMILY
EQUALITY; M.A., by and through
his parent AMBER ARMSTRONG;
ZANDER MORICZ; LINDSAY
MCCLELLAND, in her personal
capacity and as next friend and
parent of JANE DOE; RABBI AMY
MORRISON and DR. CECILE
HOURY; DAN and BRENT
VANTICE; LOURDES CASARES
and KIMBERLY FEINBERG;
LINDSEY BINGHAM SHOOK; and
ANITA HATCHER POWDERLY,

                Plaintiffs,

      v.

RONALD D. DESANTIS, in his
official capacity as Governor of
Florida; FLORIDA STATE BOARD
OF EDUCATION; THOMAS R.
GRADY, BEN GIBSON,
MONESIA BROWN, ESTHER
BYRD, GRAZIE P. CHRISTIE,
RYAN PETTY, and JOE YORK, in
their official capacities as members
of the Board of Education;
RICHARD CORCORAN, in his
official capacity as Commissioner of
Education of Florida; FLORIDA
DEPARTMENT OF EDUCATION;
SCHOOL BOARD OF MANATEE
COUNTY; SCHOOL BOARD OF
SARASOTA COUNTY; SCHOOL
BOARD OF MIAMI-DADE
COUNTY; ST. JOHNS COUNTY

Civil Action No. _____

**COMPLAINT**

**JURY DEMAND**

SCHOOL BOARD; and JACKSON
COUNTY SCHOOL BOARD,

Defendants.

## **INTRODUCTION**

1.      Florida House Bill 1557 (widely known as the "Don't Say Gay" law) is an unlawful attempt to stigmatize, silence, and erase LGBTQ people in Florida's public schools.  It seeks to do so by imposing a sweeping, vague ban covering any instruction on "sexual orientation and gender identity," and by constructing a diffuse enforcement scheme designed to maximize the chilling effect of this prohibition.

2.      Through H.B. 1557, Florida would deny to an entire generation that LGBTQ people exist and have equal dignity.  This effort to control young minds through state censorship—and to demean LGBTQ lives by denying their reality—is a grave abuse of power.  The United States Supreme Court has repeatedly affirmed that LGBTQ people and families are at home in our constitutional order.  The State of Florida has no right to declare them outcasts, or to treat their allies as outlaws, by punishing schools where someone dares to affirm their identity and dignity.

3.      H.B. 1557 piles one violation on top of another.  It offends principles of free speech and equal protection by seeking to censor discussions of sexual orientation or gender identity that recognize and respect LGBTQ people and their families.  It offends due process by using broad and vague terms to define its

prohibitions—thus inviting discriminatory enforcement and magnifying its chilling effect on speech. And it arises from discriminatory purposes and outdated sex-based stereotypes that offend deeply rooted constitutional and statutory requirements.

4.    To start, the law is clearly the product of animus towards Florida's LGBTQ community. The bill's sponsor in the Senate has stated that the law is meant to prohibit discussion of sexual orientations and gender identities that do not comport with Florida's supposed "core belief systems and values." He has also stated that the bill is intended to prevent students "coming out in school" to their peers from being treated as "celebrities." The premise of these statements is fear that LGBTQ students might live their true identities in school and be met with acceptance rather than state-sanctioned hostility targeting their protected characteristics.

5.    This legislative purpose is reflected in H.B. 1557's statutory structure. By its plain terms, H.B. 1557 subjects school districts to the threat of costly litigation if "school personnel" or "third parties" provide "classroom instruction" on "sexual orientation" or "gender identity" for students K-3, or where such instruction is not "age-appropriate or developmentally appropriate according to state standards." The meaning of "classroom instruction" on "sexual orientation" and "gender identity" is subject to intractable uncertainty and disagreement, yet the statute's drafters made a considered choice not to include definitions for any of these terms. The State need not even adopt "standards" until one year after the law goes into effect. But from

the very outset, any parent can file suit if they believe that a school has violated these expansive, nebulous prohibitions.  In this respect, H.B. 1557 recruits every parent as a roving censor, armed with a legal warrant to sue schools for damages whenever they believe a teacher, a student, or any "third party" has provided any "classroom instruction" that may be perceived as relating to "sexual orientation" or "gender identity."  The potential for arbitrary and discriminatory enforcement here is self-evident—and it reflects a choice designed to maximize the law's *in terrorem* effects. H.B. 1557 thus operates in a manner antithetical to reasonable requirements of an age or developmentally appropriate education, instead creating a scheme in which parents can use the threat of litigation over vague statutory terms to menace school boards and intimidate teachers into offering a skewed, discriminatory curriculum.

6.     While the law's statutory text is broad and vague, and its enforcement mechanism is deliberately diffuse, its ultimate objective is clear:  H.B. 1557 seeks to discourage, deter, and ban any discussion of LGBTQ identities in public schools, while permitting discussion of heterosexuality and non-LGBTQ identities.  In so doing, the State promotes a discriminatory dogma in which the only "appropriate" families, students, and teachers are straight and cisgender ones.

7.     Indeed, the law's vagueness and enforcement mechanisms are key to helping it achieve this discriminatory goal: nobody knows exactly what the statutory language covers, but everybody knows that the law's purpose is to prohibit any

discussion of LGBTQ people and that any aggrieved parent can file a burdensome lawsuit against the local school district, so the safest thing to do in order to avoid liability is for schools to prohibit any acknowledgment that LGBTQ people exist.

8.     To appreciate how this dynamic will unfold in practice, just consider how students, teachers, parents, guests, and school personnel might navigate these common questions:  Can a student of two gay parents talk about their family during a class debate about civics?  Can that student paint a family portrait in art class?  Can a lesbian student refer to their own coming out experience while responding to a work of literature?  Can a transgender student talk about their gender identity while studying civil rights in history class?  What if that occurs in homeroom, or during an extracurricular activity with a faculty supervisor, or in an op-ed in the faculty-supervised school newspaper?  Are teachers allowed to respond if students discuss these aspects of their identities or family life in class?  If so, what can they say?  Do those same limits apply if a teacher intervenes where a student is being bullied or beaten (or mistreated at home) based on their sexual orientation or gender identity?  What if students address aspects of LGBTQ identity in essays for which teachers must provide grades and feedback?  Speaking of which, can a history teacher educate their students about the history of LGBTQ rights?  Can a government teacher discuss *Obergefell v. Hodges*, 576 U.S. 644 (2015)?  Can an English teacher make note of queer themes or plots—and can they assign books in which one of the characters (or

their families, or a side character) is LGBTQ?  Does the librarian have to remove every book with LGBTQ characters or references?  More simply, can a gay or transgender teacher put a family photo on their desk?  Can they refer to themselves and their spouse (and their own children) by the proper pronouns?  What do they do if a student's same-sex parents visit the class together on career day, or ask to join a field trip?  Are those parents forbidden from speaking to the class, on the theory that their very presence somehow instructs students on "sexual orientation"?

9.     These questions only scratch the surface of the censorial regime (and the legal quagmire) that H.B. 1557 inflicts on teachers, students, parents, and so many others.  By design, H.B. 1557 raises many questions and offers no answers, even as it works an extraordinary government intrusion on the free speech and equal protection rights of students, teachers, and parents in public schools.

10.     One might even ask: would it violate H.B. 1557 for a teacher to discuss with their students *this very lawsuit* and the public controversy surrounding H.B. 1557?  Under the plain language of the law, the answer might well be "yes."

11.     The law's vagueness—and its corresponding potential for unequal and discriminatory enforcement—is made clear by applications that its drafters clearly did *not* see as violations.  A teacher who refers to a student's "mom" and "dad," or who presumes the normalcy of opposite-sex attraction while teaching literature, is "instructing" students on "sexual orientation" if H.B. 1557's language is taken at

face value.  But the State of Florida clearly has no problem with such run-of-the-mill references to the sexual orientation of non-LGBTQ people.  Similarly, a coach who tells the football team to play like "men," or a teacher who tells students that gender is fixed at birth, has most certainly undertaken to "instruct" their students on "gender identity."  But here, too, H.B. 1557's drafters surely see no problem.  Or consider a still more commonplace example: if a teacher referred to his *opposite-sex* spouse by name, the sponsors of H.B. 1557 would see no issue, but if a teacher referred to his *same-sex* spouse by name, the sponsors of H.B. 1557 might think he broke the law.

12.    By design, H.B. 1557 uses vague terms to create a statutory structure in which anyone who discusses or acknowledges any aspect of LGBTQ identity must fear running afoul of the law, while it is simply taken for granted that discussing heterosexuality or cisgender identity in school settings is perfectly fine.

13.    The effect of H.B. 1557 is thus to chill the rights of teachers, students, and officials, who, like any rational person, will avoid the danger zone created by a state-mandated censorship code.  And H.B. 1557 amplifies its chilling effect by empowering parents to sue school boards, the members of which will similarly be motivated to avoid lawsuits by quelling or punishing any potentially risky speech.

14.    All of this is intentional.  The goal of H.B. 1557 is not to ensure that instruction on human sexuality is age-appropriate: Florida law *already* does that by requiring that teachers who address "human sexuality" must "[p]rovide instruction

and material that is appropriate for the grade and age of the student." Fla. Stat. § 1003.46(2)(d). Moreover, efforts to narrow H.B. 1557 to apply to instruction about sexuality or sex acts were repeatedly shot down in the Legislature. So too were efforts to clarify that the law prohibits discussion of *any* sexual orientation and gender identity, not just discussion of LGBTQ identities and issues.

15.     The law as adopted is thus discriminatory: it aims at sexual orientations and gender identities that *differ from* heterosexual and cisgender identities. Florida's lawmakers apparently believe such identities do not have any place in the public school environment—even though gay and transgender students, families, teachers, and officials are part of our public schools (and their communities).

16.     The harmful effects of H.B. 1557 are already manifest in public schools across Florida. Faced with the law's vague prohibitions and threat of litigation, teachers and school administrators have said that they will remove LGBTQ references from the curriculum and no longer foster or participate in discussions that touch upon LGBTQ issues. LGBTQ students and parents are unsure about whether they can express or discuss their identities, and they worry about detention or other possible discipline or exclusion that may result if they do. The subordination and erasure of LGBTQ life that H.B. 1557 seeks to achieve has already begun—and it has already imposed concrete harms on countless children and families in Florida.

17.    H.B. 1557 places Plaintiffs and countless others in danger.  LGBTQ students already face disproportionality high risks to their mental and physical health.   The law not only stigmatizes and silences those vulnerable students, exacerbating risks to their welfare, but also threatens school officials who foster a safe and inclusive environment for them—as they are required to do for all students under the Board of Education's Code of Ethics.  Moreover, H.B. 1557 erases other LGBTQ members of the school community and parents, to the detriment of all.

18.    H.B. 1557 serves no legitimate pedagogical purpose.  It is motivated by animus against LGBTQ students, families, and teachers of Florida, and those who would accept and support them in schools.  By design and in effect, H.B. 1557 will "humiliate[] … children now being raised by same-sex [and other LGBTQ] couples," and will make it "even more difficult for [them] to understand the integrity and closeness of their own family and its concord with order families in their community and in their daily lives." *United States v. Windsor*, 570 U.S. 744, 772 (2013).

19.    H.B. 1557 thus reflects an effort by the state to use its power over public schools to demean and deny the existence of people whom the Supreme Court has repeatedly held to be protected.  It has no place in a free democratic society.

20.    For the reasons set forth herein, the Court should declare that H.B. 1557 violates the First and Fourteenth Amendments to the United States Constitution, and

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title

IX"), and enjoin its implementation and enforcement.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

1343 because this action arises under the United States Constitution, 42 U.S.C.

§ 1983, and Title IX.

22.     This Court has personal jurisdiction over Defendants, and venue is

proper in this District pursuant to 28 U.S.C. § 1391(b) and (e), because Defendants

are public officials in the State of Florida, are sued in their official capacities, and

certain Defendants maintain their principal headquarters in this District.  Defendants

reside within this District and/or perform official duties within Florida.

23.     There is an actual and justiciable controversy between Plaintiffs and

Defendants because H.B. 1557 constitutes an immediate infringement on the

constitutional and statutory rights of Plaintiffs.

## PARTIES

**I.     Plaintiffs**

24.     Plaintiffs are organizations, students, parents, and teachers who are

already being harmed and will continue to be harmed by H.B. 1557.

Organizations

25.     Equality Florida.  Plaintiff Equality Florida is a non-profit, public

interest organization based in St. Petersburg, Florida.  Its goal is to secure equal

rights and protections for the LGBTQ community in Florida, and it is the state's largest LGBTQ rights advocacy group, with more than 400,000 members. Equality Florida brings this action in its own capacity and in an associational capacity on behalf of its members. Its members include LGBTQ students attending Florida public schools, LGBTQ parents whose children attend Florida public schools, non-LGBTQ students who support LGBTQ equality and who attend Florida public schools, LGBTQ teachers who teach in Florida public schools, and non-LGBTQ teachers who support equality and teach in Florida public schools.

26.    In furtherance of its mission—which includes fighting discrimination against LGBTQ Floridians—Equality Florida has opposed the passage of H.B. 1557. Equality Florida's mission also includes the Safe and Healthy School Project, which aims to create a culture of inclusion while countering the bullying, harassment, social isolation, and bigotry that increase risk factors for LGBTQ students.

27.    Family Equality.  Plaintiff Family Equality is a nationwide non-profit, public interest organization headquartered in New York, New York, with more than 900 individuals on its email list in Florida.  It brings this action in its own capacity.

28.    Family Equality's mission is to advance legal and lived equality for LGBTQ families and those who wish to form them, including by ensuring that families have the support they need in schools.  It fulfills its mission by providing resources to and holding events for the LGBTQ community, and through

-11-

programming, lobbying, and advocacy work.  Family Equality recently adopted a new strategic plan that included as a strategic priority protecting LGBTQ families and youth from discrimination in schools as well as increasing presence in southern states, including Florida.

Students

29.    M.A.  Plaintiff M.A. is a 17-year-old sophomore at Manatee School for the Arts, a public charter school in Palmetto, Florida.  He lives with his mother, grandparents, and cousin.[1]

30.    M.A. has known that he is gay since a very early age.  However, he did not come out to his family and friends until middle school.  At the time, his mother could tell that he was struggling.  She found out M.A. was gay by reading chats he was having with others online on his video game console.

---

[1] Looking to its plain text and legislative history, H.B. 1557's applicability to charter schools is unclear—a circumstance that itself will have a chilling effect on those schools' LGBTQ communities.  While charter schools are generally exempt from the Florida Early Learning-20 Education Code, they must comply with "statutes pertaining to student health, safety, and welfare."  Fla. Stat. § 1002.33(16)(a)(5).  H.B. 1557 purports to relate to students' "mental, emotional, or physical health or well-being."  It also amends Fla. Stat. § 1001.42(8), a section titled "Student Welfare" containing provisions relating to "health, safety, and other matters relating to the welfare of students." Fla. Stat. Ann. § 1001.42(8)(a).  Finally, Governor DeSantis conducted the bill signing ceremony at a charter school, and his Press Secretary has stated that the law will apply in charter schools.  In light of these considerations, while there are good arguments that H.B. 1557 does not apply in charter schools, the State may take the position that it does—a threat that is causing the very injuries identified in this Complaint.

31.     M.A.'s mother was very supportive and told him that she loved him no matter what, and all he needed to do was be truthful and open with her.   His grandparents were also supportive, even though they are conservative.

32.     Sadly, M.A.'s father was a different story.   When M.A. was younger, his father told his mother that if their son was gay he "was never going to love him." After M.A.'s mother told his father about M.A.'s sexual orientation, his father initially expressed acceptance, but eventually terminated contact with him and is no longer a part of his life.

33.     While M.A. had a (mostly) supportive family, coming out was difficult. He worried that people around him didn't understand what being gay actually meant. He had anxiety attacks at school, and his grades began to suffer.   But after his mother found him a private counselor, he became empowered to identify his needs in school and at home, and to advocate for himself and other LGBTQ students.

34.     In eighth grade, M.A. decided to start a Gay-Straight Alliance ("GSA") because he knew how important his family's support had been for him and he couldn't imagine what it was like for others who lacked that support.   However, when M.A. and his teacher-advisor submitted their application, the school's administration rejected it, claiming that the school's bylaws barred the GSA and the creation of "non-academic organizations," even though there was no such written policy in place and other non-curricular student organizations existed.   It took two

years and the threat of legal action with the help of a local advocacy group to get the school to finally permit M.A. and his advisor to start the club.

35.     Today, M.A. is the president of his school's GSA, which typically has between 15 and 30 members and creates a welcoming space for other LGBTQ students and their allies.  As his mother put it, M.A. "found his voice" through the GSA.

36.     Since starting the GSA, M.A.'s grades have improved significantly and he is taking college-level classes.  M.A. also participates in Mock Trial and in Manatee Teen Court as a student attorney.

37.     <u>Zander Moricz.</u>  Plaintiff Zander Moricz is an 18-year-old senior at Pine View School, a public gifted magnet school in Osprey, Florida.  His parents are divorced and he mainly lives with his mother and younger brother.

38.     Moricz has known he is gay since middle school.  At the time, he felt as though he had to constantly hide who he truly was.  He would modify his speech and physical gestures and modulate his interests to try to avoid being perceived as gay.  He dreaded going to gym class because the boys would tease him in the locker room and call him names like "pussy" and "faggot."  Living in this closeted adolescence was deeply debilitating for Moricz at an important time in his life.  He never felt like he fit in or belonged at his school.

39.     Moricz transferred to Pine View School in sixth grade; he came out as gay during his freshman year.  At the time, Moricz wanted to run for president of the freshman class and be a leader for his peers, but he wanted to run only if he could do so without being in the closet.  Moricz ultimately decided to run, with support from a friend, and came out to his school and the broader community in the process.  To his surprise, Moricz won.  He has remained class president for four years.

40.     At home, Moricz's family was not at first accepting of his sexuality.  It took many difficult conversations for him to feel safe and accepted.  But school was different.  Moricz has had warm and accepting teachers and friends who embraced him for who he is, and he has had many opportunities at school to express who he is and take pride in his identity.

41.     Moricz's ability to be himself at school has allowed him to succeed academically.  He has a 5.06 GPA and has taken nearly every Advanced Placement course his high school has offered.  He currently serves as the president of his local Model UN chapter.  In Model UN, he has won multiple international and national awards, grown his own chapter, and led the largest in-person conference in the club's history.  The prior president of Moricz's chapter was also openly gay and served as a role model for Moricz, inspiring him to be himself at school.

42.     Moricz is also the Head Debate Captain of the Pine View Speech and Debate Club.  He won first place in the Florida Gulf Coast Catholic Forensics League Tournament in the Public Form category two years in a row.

43.     <u>Jane Doe.</u>  Plaintiff Jane Doe is a fifth-grader at a Florida public school. Doe lives half of the time with her mother (Plaintiff Lindsay McClelland) and her siblings and stepfather in Brandon, Florida.  She lives the other half of the time with her father.

44.     From around age two, when Doe started expressing herself, it was clear that although she was assigned male at birth, Doe identified as a girl.  Doe would regularly tell her parents "I am a girl."  When she started to choose her own clothes and toys, she immediately gravitated towards feminine clothing, nail polish, and dolls.  She was also drawn to wearing her mother and grandmother's shirts, and sought to style them as dresses in order to express herself.  On a family trip to Busch Gardens, when Doe was a young child, she was enamored with the female characters, like Abby Cadabby of *Sesame Street*.  And when Doe discovered the Disney movie *Frozen*, she was obsessed with the lead princesses, Elsa and Anna.

45.     For McClelland, this was all a huge shock.  McClelland is a former Command Security Analyst for the United States Marine Corps who grew up in a small town outside of Washington D.C. and was entirely unfamiliar with matters of transgender gender identity.

46.     At first, McClelland tried to satisfy Doe by allowing her to wear dress-up costumes in the house as part of a game.  But it quickly became apparent that "dress-up" would not be enough for Doe to feel like herself.

47.     When Doe was two, her parents bought boys' clothes—and traditionally masculine toys like trucks and airplanes—for Christmas.  As Doe opened her presents on Christmas morning, she looked deflated and sad because she didn't relate to any of the toys "Santa" had brought.  McClelland saw that Doe did not have the same light and joy her sons had that Christmas morning.

48.     From that point forward, McClelland realized that she had to embrace who her daughter was.  And that is what she did.  For Doe's fourth birthday, the family threw Doe a Rapunzel-themed party and gifted her a Dorothy dress from *The Wizard of Oz*.  Doe was ecstatic.  At another party, she wore a princess head garland and twirled with joy.

49.     As the family started to allow Doe to be herself, they experienced backlash from their community.  The family belonged to a large Baptist church in their neighborhood.  McClelland and her husband were Bible school teachers and involved in community activities at the church.  At a young age, Doe attended Easter morning church services in a dress.  Soon after, the ministry reached out and encouraged the family to participate in a form of conversion therapy for Doe.  They shared pamphlets on how to "fix" and "change" people like Doe.  But McClelland

knew that there was nothing about Doe that needed "fixing," and she told the church that she would not be participating in their efforts to change or convert Doe.  As a result, the family was ostracized from their church community.

50.    At the time, McClelland did not know anyone in her community grappling with these issues, so she turned to support networks online.  She found a private Facebook group for parents of transgender children, and other parents shared resources with her.  McClelland also found an organization in Tampa that provided health and wellness support to LGBTQ individuals, where she learned about the consequences of not supporting a transgender child, which include a high risk of mental health issues, drug abuse, and even suicide.

51.    After speaking with her husband and Doe's father, McClelland decided it was best for Doe's development and safety to allow her to socially transition to a girl in preschool.  Since then, Doe has used female pronouns and presented as female at school.  Each year, before the start of school, McClelland speaks with both Doe's new classroom teacher and the school principal about how to ensure the classroom will be a safe environment for Doe.  She informs the teacher of the use of proper pronouns for Doe (she/her) and discusses how best to mitigate any bullying, name calling, or teasing throughout the school year.

52.    Despite these efforts, Doe is fearful of being "outed" or bullied.  Indeed, even with some support from the school, issues have still arisen.  For example, in

Doe's after-school program when she was younger, which took place at her school, the teacher required Doe to be the last or first to use the bathroom to ensure no other girls were in the bathroom with her.  This experience ostracized Doe.

53.   As she gets older, Doe struggles with how to safely and comfortably navigate her identity in school.  Last year, as a fourth grader, Doe came out to her peers at school as transgender.  And in January 2022, Doe legally changed her name to conform to her gender identity.  Doe wants to live and be her authentic self, a self she has understood and expressed since she was a toddler.  But in doing so, she has already faced bullying, name calling, and ostracization.  Students have told Doe that she "looks like a boy," and have used her name given at birth to taunt and tease her. Doe does not have a single close friend at school anymore.

Parents

54.   Amy Morrison and Cecile Houry.  Plaintiffs Rabbi Amy Morrison and Dr. Cecile Houry are a lesbian couple in a domestic partnership. They have been together for about a year.

55.   Morrison is a Rabbi at a local temple and Houry works for the City of Miami Beach, managing the Police Department's grants and victim services unit. They live together with their two children.

56.   Morrison gave birth to her son in 2014.  He is currently in the second grade at Miami Children's Museum Charter School.  Houry's daughter was placed

with her as a foster child when she was six days old and legally adopted by Houry a year later.   Houry's daughter is currently in preschool and will be entering kindergarten at Miami Children's Museum Charter School next year.

57.   Morrison and Houry have raised their children to embrace Morrison's "As You Are" mindset that she espouses in her role as a Rabbi.  The children see nothing unique or particularly important about telling someone "My other mom played basketball with me," because they have always been open about their families.

58.   Morrison teaches that all individuals should be celebrated—not just accepted—for who they are.  The children have no qualms about talking about their two moms because that is the life that they have always known; they haven't been taught to expect or idealize any other family structure.

59.   These beliefs carry into life at school, where Morrison and Houry's children talk openly about family.  Morrison's son has a picture of the four of them hanging up in his classroom—and on multiple occasions, he has been asked to create drawings of his family, which have included a portrait of his two moms and his sister.

60.   <u>Dan and Brent VanTice.</u>  Plaintiffs Dan and Brent VanTice are a gay couple who have been together for twenty years and married for fifteen.  They live in Saint Johns, Florida, and are the parents of two first-grade boys who go to public

school in the area.   Dan is an IT consultant and Brent is a financial services executive.

61.    The VanTices are active members of Equality Florida. They are invested in their community, having fought to overturn Florida's bans on gay marriage and gay adoption.  They always knew that they wanted to have a family.

62.    When the VanTices first decided to adopt, adoption by gay couples was illegal in Florida.  As a result, they went to great lengths and expense to work with an adoption agency based in California.  Later, after the adoption ban in Florida was overturned, they also began to work with an agency in Florida.  In the summer of 2014, they were informed that they would be able to adopt not one but two children. The VanTices were present at both births and have been raising their two sons, who were born just eight weeks apart, ever since.  They are committed to their family.

63.    The VanTices have always worked hard to communicate to their children that families come in many shapes and sizes, and that their family is no different than any other.  They have spoken openly, freely, and lovingly about their family.

64.    <u>Lourdes Casares and Kimberly Feinberg.</u>  Plaintiffs Lourdes Casares and Kimberly Feinberg are a lesbian couple who have been together for over seventeen years.  They married in 2016 when marriage became legal in Florida.

Casares is a clinical psychologist and psychoanalyst, and Feinberg is an anesthesiologist. They live in Miami-Dade County.

65.    Casares and Feinberg have a child who is in K-3 at a public school in Miami-Dade County. Both parents are very active in and value the school community, and Feinberg serves on the school's PTA.

66.    <u>Lindsey Bingham Shook.</u> Plaintiff Lindsey Bingham Shook is a heterosexual woman who lives with her partner and their daughter, a first-grader at a public elementary school in Miami, Florida. She is an editorial director for a magazine. She is active in the community and involved in numerous non-profit organizations in the Florida area.

67.    Shook's daughter has expressed no specific sexual orientation or gender identity. Shook wants her daughter to learn about the diversity of families in her community and to have empathy for all forms of families and identities.

<u>Teachers</u>

68.    <u>Anita Hatcher Powderly.</u> Plaintiff Anita Hatcher Powderly is a veteran middle-school English teacher at a public school in Grand Ridge, Florida, where she grew up.

69.    Hatcher Powderly approaches her classroom instruction honestly and openly and has discussed issues related to the LGBTQ community—for example, while explaining the relevance of LGBTQ identity and history to the literature and

authors she teaches, and while engaging with students who relate to literature through their own experiences with LGBTQ identity and family.  In these and other respects, she has had organic conversations driven by her students related to the LGBTQ community.

70.     In light of the passage of H.B. 1557, Hatcher Powderly fears not only that her curriculum is in danger, but also that she lacks any guidance about what she can and cannot do in the classroom.  She worries that many of her students will no longer have a critical space to express themselves and obtain support.  And she fears that the quality of her pedagogy (and of her students' education) will suffer.

## II.    Defendants

71.     Defendant Ronald D. DeSantis is the Governor of Florida.  Governor DeSantis is responsible for signing H.B. 1557 into law and for taking care that the laws be faithfully executed as the Chief Executive of Florida.  Fla. Const., art. IV, § 1.  Governor DeSantis is sued in his official capacity.

72.     Defendant Florida State Board of Education is the chief implementing and coordinating body of K-12 public education in Florida.  It supervises the state's public education system and the head of the Department of Education.  Fla. Const., art. IX, § 2; Fla. Stat. § 20.15(1).  The Board of Education has authority to implement the provisions of law conferring duties upon it for the improvement of the state system of public education, including to adopt comprehensive educational

objectives, approve plans for cooperation with other public agencies in the development of rules and enforcement of laws for which it and such agencies are responsible, enforce systemwide education goals and policies, and adopt and periodically review and revise the Sunshine State Standards, which are the core content of the curricula to be taught in the state in K-12 public schools. Fla. Stat. §§ 1001.02-.03, 1003.41. Under H.B. 1557, the Board of Education is required to review and approve or reject any recommendation of a special magistrate as to whether a school district is in compliance with the law, and to adopt rules necessary to implement the foregoing procedure. *Id.* § 1001.42(8)(c)(7)(b)(I). The Board of Education is the recipient of federal financial assistance.

73.     Defendant Thomas R. Grady is the Chairman of the Board of Education, and Defendant Ben Gibson is Vice Chairman. Defendants Monesia Brown, Esther Byrd, Grazie P. Christie, Ryan Petty, and Joe York are members. All are sued in their official capacities as members of the Board of Education.

74.     Defendant Richard Corcoran is the Commissioner of Education of Florida appointed by the Board of Education to serve as the Executive Director of the Department of Education. Fla. Const., art. IX, § 1; Fla. Stat. § 20.15(2). As such, he is the chief educational officer of the state and responsible for assisting the Board of Education in enforcing compliance with the mission and goals of the education system; he also supports the Board of Education in general administration.

Fla. Stat. § 1001.10.   Along with the Board of Education, the Commissioner is charged with assigning the divisions of the Department of Education with such powers, duties, responsibilities, and functions as are necessary to ensure the greatest possible coordination, efficiency, and effectiveness of education for students in K-20 education.   *Id.* § 20.15(5).   The Commissioner is required, as needed, to develop and submit proposed revisions of the Sunshine State Standards to the Board of Education for adoption.   *Id.* § 1003.41.   Under H.B. 1557, the Commissioner is responsible for appointing a special magistrate to make a recommendation as to whether a school district is in compliance with the law.   Corcoran is sued in his official capacity as Commissioner of Education.

75.     Defendant Florida Department of Education is the administrative agency that is responsible for implementing Florida's education policies and programs, under the implementation direction of the Board of Education.   Fla. Stat. §§ 20.15, 1001.20.   Under H.B. 1557, the Department of Education is responsible for reviewing and updating, as necessary, school counseling frameworks and standards, educator practices and professional conduct principles, and any other student services, personnel guidelines, standards, or frameworks in accordance with the requirements of the act.   The Department of Education is the recipient of federal financial assistance.

76.     Defendant School Board of Manatee County is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The School Board of Manatee County operates Manatee School for the Arts, which Plaintiff M.A. attends.   Its powers and duties include implementing H.B. 1557.   *See id.* § 1001.42(8).

77.     Defendant School Board of Sarasota County is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The School Board of Sarasota County operates Pine View School, which Plaintiff Moricz attends.  Its powers and duties include implementing H.B. 1557. *See id.* § 1001.42(8).

78.     Defendant School Board of Miami-Dade County is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The School Board of Miami-Dade County operates Miami Children's Museum Charter School, which the children of Plaintiffs Morrison and Houry attend or will attend next year; the school attended by the child of Plaintiffs Casares and Feinberg; and the school attended by the child of Plaintiff Shook.  Its powers and duties include implementing H.B. 1557.  *See id.* § 1001.42(8).

79.     Defendant St. Johns County School Board is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The St. Johns County School Board operates the school attended by the children of Plaintiffs Dan and

Brent VanTice.  Its powers and duties include implementing H.B. 1557.  *See id.*

§ 1001.42(8).

80.    Defendant Jackson County School Board is a district school board

organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The Jackson County

School Board operates the school where Plaintiff Hatcher Powderly is employed as

a teacher.   Its powers and duties include implementing H.B. 1557.   *See id.*

§ 1001.42(8).

## STATEMENT OF FACTS

**I.     Florida's commitment and obligation to provide a meaningful education for all students, and school districts' efforts to meet it**

81.    Florida has long affirmed the importance of providing all students with

an education that will prepare them to live in a free democratic society—a principle

that stands in stark, unmistakable tension with the goals underlying H.B. 1557.

82.    Article IX of the Florida Constitution proclaims that "[t]he education

of children is a fundamental value of the people of the State of Florida," and it is

therefore "a paramount duty of the state to make adequate provision for the education

of all children residing within its borders."  Fla. Const. art. IX, § 1.  As the Florida

Supreme Court has recognized, "this education provision was placed in our

constitution in recognition of the fact that education is absolutely essential to a free

society under our governmental structure."  *Bush v. Holmes*, 919 So.2d 392, 405

(Fla. 2006) (quoting *Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles*, 680 So.2d 400, 405 (Fla. 1996) (Overton, J., concurring)).

83.   The Supreme Court has affirmed the central role of public schools as "the nurseries of democracy." *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021). Education "is the very foundation of good citizenship" and "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

84.   The "classroom is peculiarly the marketplace of ideas," a place where our children are "trained through that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (citation omitted). Schools thus have an obligation to protect even "unpopular ideas," *Mahanoy*, 141 S. Ct. at 2046, and to ensure that students have access to a diversity of information that will prepare them "for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members," *Bd. of Educ. v. Pico*, 457 U.S. 853, 868 (1982) (plurality op.).

85.   In keeping with this longstanding commitment to "academic freedom," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967), the First Amendment protects students' "right to receive information and ideas," *Pico*, 457 U.S. at 867 (quoting

*Stanley v. Georgia*, 394 U.S. 557, 564 (1969)). Moreover, "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'" *Mahanoy*, 141 S. Ct. at 2044 (quoting *Tinker*, 393 U.S. at 506).

86.   Florida guarantees that "all K-12 public school students are entitled to a uniform, safe, secure, efficient, and high quality system of education, one that allows students the opportunity to obtain a high quality education" that is "made available without discrimination on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status." Fla. Stat. § 1002.20(1), (7).

87.   The Board of Education, through the Department of Education, has also adopted rules to ensure "Educational Equity." Under Section 6B-1.0001 of the Code of Ethics, "The educator values the worth and dignity of every person, the pursuit of truth, devotion to excellence, acquisition of knowledge, and the nurture of democratic citizens. Essential to the achievement of these standards are the freedom to learn and to teach and the guarantee of equal opportunity for all." Fla. Admin. Code r. 6A-10.081(1)(a).

88.   Educators are required to "make reasonable effort to protect the student from conditions harmful to learning and/or to the student's mental and/or physical health and/or safety"; to "not unreasonably deny a student access to diverse points of view"; to "not harass or discriminate against any student on the basis of … sex, … [or] sexual orientation"; and to "make reasonable effort to assure that each student

is protected from harassment or discrimination." *Id.* r. 6A-10.081(2).  In addition, "institutions have an affirmative duty" "to create an educational and work environment free of harassment on the basis of … sex." *Id.* r. 6A-19.008.

89.    Florida's representatives and education officials thus have recognized for many years that public schools and educators have a commitment and duty to promote the meaningful education of all students, without discrimination, and to ensure that Florida's students are prepared to live and flourish in a free democracy.

## II.    Florida schools' inclusivity efforts for the LGBTQ community

90.    In recent years, local school districts have aspired to make Florida's promise of a meaningful education real for a historically excluded and disadvantaged group: LGBTQ students.

91.    For instance, Plaintiff M.A.'s school district in Manatee County has adopted an "Equity, Diversion, and Inclusion Policy" that requires "equal opportunity and access in relation to all stakeholders: students, families, and staff … by valuing, acknowledging, recognizing, and celebrating everyone in our school system" regardless of "gender, sex, gender identity, gender expression, [or] sexual orientation."  The school board has implemented policies to, among other things, "[s]elect and develop instructional materials that are historically accurate and represent the experiences of the diverse school community," and "interrupt and dismantle harmful or inequitable practices and policies and eliminate implicit and

explicit biases."[2]  Manatee County has also adopted a policy of Non-Discrimination and Access to Equal Educational Opportunity that prohibits discrimination and harassment on the basis of sexual orientation, transgender status, and gender identity, and requires educational programs "be designed to meet the varying needs of all students."  Specifically, curriculum content must be considered in light of its potential "bias based upon the protected classes" and supplemented to fairly depict the contribution of different groups "toward the development of human society."[3]

92.    Similarly, the Broward County School District has sought to "promote safer schools and create more welcoming and affirming learning environments" for LGBTQ students, those perceived to be LGBTQ, and their allies.  As an example, Broward County requires an "inclusive curriculum" that must at least include literature written by LGBTQ authors, history including LGBTQ public figures, discussions of families including same-sex parents and relevant topics encompassing the diversity of LGBTQ young people, and recognition of national LGBTQ events.[4]

---

[2] School District of Manatee County Policy Manual, po9142 (last revised Nov. 9, 2021), https://go.boarddocs.com/fl/mancofl/Board.nsf/Public.

[3] School District of Manatee County Policy Manual, po2260 (last revised Nov. 9, 2021), https://go.boarddocs.com/fl/mancofl/Board.nsf/Public.

[4] Broward County Public Schools, "Lesbian, Gay, Bisexual, Transgender, Questioning + Critical Support Guide" at iv, 4-5 (2012), https://www.browardschools.com/cms/lib/FL01803656/Centricity/Domain/13475/BCPS%20LGBTQ%20Critical%20Support%20Guide%20Edition%20III%202020FinalRev2421.pdf.

Broward County has also adopted an anti-bullying policy that prohibits bullying and harassment based on sexual orientation, gender identity, and gender expression.[5]

93.     The Palm Beach County School District has supported LGBTQ youth by requiring an inclusive curriculum that covers, among other things, the history and social movements of LGBTQ people, discussions of families that include same-sex parents/caregivers, and relevant topics encompassing the diversity of LGBTQ young people.  It also has adopted an Anti-Bullying Roundtable and Strategic Plan, which includes safe environments for all students and staff.[6]

94.     These measures have helped to create an inclusive environment for LGBTQ students that is critical to meeting their educational needs.[7]  They have also promoted the safety and acceptance of LGBTQ students, who are uniquely at risk of harassment, depression, and other negative educational experiences because of their sexual orientation or gender identity.  *See infra* Part IV.

---

[5] *Id.* at 5-6.

[6] The School District of Palm Beach County LGBTQ+ Critical Support Guide ("Palm Beach Guide") at 5-6 (2d ed. 2021), https://p14cdn4static.sharpschool.com/UserFiles/Servers/Server_270532/File/Curriculum/Middle%20&%20HS/LGBTQ_Critical_Support_Guide_SDPBC_v02_2021.pdf.

[7] *See, e.g.*, National Education Association of the United States of America, 2018-2019 NEA Resolutions at 3, 23 (Mar. 7-9, 2019), http://ra.nea.org/wp-content/uploads/2019/05/Resolutions_Summary_of_Winter_Committee_Meeting_Actions_2019.pdf (recommending that schools adopt "inclusive educational programs that address the unique needs and concerns" of LGBTQ students).

### III.   H.B. 1557 was enacted to undercut these developments, harm LGBTQ students, and stifle speech

95.     H.B. 1557 seeks to undo all of this.  Although it is formally entitled the "Parental Rights in Education Act," it is popularly and more accurately known as Florida's "Don't Say Gay" law.  H.B. 1557 is avowedly aimed at eliminating, and already has begun to eliminate, any recognition or discussion of LGBTQ persons in public schools.

<u>Vague Statutory Text</u>

96.     In relevant part, H.B. 1557 amends Section 1001.42 to add new subsection 8(c)(3), which provides:

> Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards.

97.     The law does not define the subject matter of the speech it seeks to prohibit.  Nowhere does it even attempt to define its operative terms.  "Classroom instruction" is left undefined, as are "sexual orientation" and "gender identity."[8]  Nor does the law define the actors whose speech is restricted: "school personnel" could span from teachers to principals to guidance counselors, while "third parties"

---

[8] Adding to its intended vagueness, the Preamble to H.B. 1557 states that it is a bill "prohibiting classroom *discussion* about sexual orientation or gender identity."  (Emphasis added.)

ostensibly reaches anyone outside of the school personnel context, including parents and other family members (and perhaps even students).

98.     The law's prohibitions expressly apply in grades K-3.  But despite the statements of many of the law's supporters, they do not stop there.  H.B. 1557 applies to any grade where "classroom instruction" is "not age-appropriate or developmentally appropriate in accordance with state standards."  As with its other core provisions, the law does not define what those "state standards" are.  The law instead leaves students, educators, and others guessing about "school counseling frameworks and standards; educator practices and professional conduct principles; and any other student services personnel guidelines, standards, or frameworks," which the Department of Education is not required to "review and update" until June 30, 2023—a year after the law goes into effect.

99.     In the meantime, any parent with a "concern" about a violation of H.B. 1557 may sue their school district for court costs and attorneys' fees, subject only to the requirement to give 30 days' notice.  Notably, H.B. 1557 places no limit on when parents can sue school districts, and legislators rejected an amendment that would allow districts to recover costs and fees if they prevail.  This means that parents will be able to file suit long before the Department of Education must provide any guidance as to the meaning of certain aspects of the law, with little repercussion.  Going forward, it will be "open season" on Florida school boards, who will find

themselves under the constant threat of paying legal fees and costs if they do not accede to any parent's demand to remove content, quell discussion, or ban curricula that the parent views as implicating H.B. 1557.

100.   H.B. 1557's vagueness gives rise to a host of intractable interpretive questions that further invite discriminatory enforcement and broad censorship.

101.   Indeed, the list of unanswerable questions is virtually endless.

102.   For example, does H.B. 1557 require the removal of all library books with LGBTQ characters or families, or those with discussion of LGBTQ history? What about book fairs (attended by third parties) that have books with same-sex families or reference LGBTQ issues?   Some parents have already requested catalogues of their school's library materials, no doubt intending to challenge any materials that hint at LGBTQ issues or people as prohibited under the new law.[9]

103.   Another question that is likely to present itself in short order is whether H.B. 1557 bans teachers from participating in Gay-Straight Alliances.  The statutory text is decidedly unclear.  But, anticipating the passage of H.B. 1557, some parents have already sought information about teachers who are affiliated with GSAs.

104.   Equally intractable questions will arise on a daily basis.  To pose just a few of them:   Does the law prohibit students from asking—or teachers from

---

[9] H.B. 1557 is hardly the first instance of an effort to ban books that touch on LGBTQ persons and issues.  *See, e.g.*, Matt Lavietes, "From book bans to 'Don't Say Gay' bill, LGBTQ kids feel 'erased' in the classroom," NBC NEWS (Feb. 20, 2022), https://www.nbcnews.com/nbc-out/out-news/book-bans-dont-say-gay-bill-lgbtq-kids-feel-erased-classroom-rcna15819.

answering—questions about their families, or other families?  Can students ask—and teachers answer—questions about historical events involving LGBTQ people?  Would H.B. 1557 ban a teacher from discussing gay-rights' decisions, like *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), where the Court held that LGBTQ persons cannot be discriminated against in employment?  If a student writes a paper in which they discuss their gender identity or sexual orientation—and relate it to their argument—could a teacher not grade it?  If the teacher did grade it, would they be prohibited from commenting on any aspect of the paper or discussing it with the student, thus leaving LGBTQ students at a systematic educational disadvantage?

105.   Another deeply troubling context is school bullying.  Does H.B. 1557 prohibit teachers from addressing LGBTQ issues that regularly arise in student-on-student bullying, for instance where the victim is gay or transgender and the bullying is partly the result of anti-LGBTQ prejudice?

106.   Parents are also affected.  What does the law require when parents come to talk to students about their jobs and one mentions their same-sex or transgender partner?  Can a student's LGBTQ parents come into the classroom at all?  Can a kindergarten student draw a picture of their LGBTQ parents?  If they do, can the teacher grade it?  Can the teacher post it on the board with other students' drawings, or are students with same-sex parents excluded from such classroom projects?

107.    Because H.B. 1557 was deliberately written to be vague and terrifying, all in service of discriminatory purposes, none of these questions are answerable by reference to either the text of the statute or any standard interpretive principle.  The law instead uses sweeping language that fails to provide notice to a reasonable person of what is prohibited, while inviting arbitrary and abusive enforcement.

Discriminatory Purpose

108.    The future of public education in Florida under this regime is apparent. It is one that goes backwards in time to an era of discrimination and abandons Florida's duty—and many school districts' efforts—to provide a meaningful and inclusive education for all students.  Presented with vague prohibitions under the threat of litigation, schools and educators will be chilled from discussing or even referencing LGBTQ people, and LGBTQ students will be stigmatized, ostracized, and denied the educational opportunities that their non-LGBTQ peers receive.

109.    That is precisely what the Florida lawmakers who supported and passed this law intended.  Indeed, in statements reminiscent of what was said in Congress about the so-called Defense of Marriage Act in 1996, legislators and Governor DeSantis have been crystal-clear about their goal of eliminating any discussion about LGBTQ identities and issues from public schools.  Just as legislators' statements evidenced DOMA's aim to interfere "with the equal dignity of same-sex marriages,"

*Windsor*, 570 U.S. at 771-72, the statements here reflect a clear hostility and disapproval of LGBTQ students, parents, and teachers.

110.   For example, the sponsor of the bill in the Senate, Senator Dennis Baxley, openly admitted that the law is intended to prohibit discussions about sexual orientation and gender identity of LGBTQ students.  He warned that "everybody now is all about coming out when you're in school" and there is a "concern" about "kids trying on different kinds of things they hear about and different kinds of identities and experimenting."   Senator Baxley added that "parents are very concerned about the departure from the core belief systems and values."  He also claimed that "75% of people … agree with me that there's something wrong with how we're emphasizing this and all of a sudden overnight [students] are a celebrity when they felt like they were nobody."  These statements reveal an overt purpose of discriminating against LGBTQ people and their families, and an express desire to impose censorship in hopes of stamping out any recognition of LGBTQ identity.

111.   Were there any doubt, when Senator Baxley was asked if the reason for the bill is that "there seems to be a big uptick in the number of children who are coming out as gay or experimenting and therefore we need to not discuss it in the younger grades," he responded: "[W]e know there are social inputs into how people act and what they decide to do so, yeah, that's part of our concern for the well-being of our children."   As another senator observed, Senator Baxley's comments are

-38-

"what the court points to and quotes as a prima facie case, on its face, of invidious discrimination for what we have targeted and we have selected as a protected class."[10]

112.   In other contexts, Senator Baxley has explained that H.B. 1557 is designed to prevent discussion of LGBTQ families.  At a Senate hearing on February 8, 2022, Republican Senator Travis Hutson gave the example of a math problem that includes the details that "Sally has two moms or Johnny has two dads."  Senator Baxley said that is "exactly" what the bill aims to prevent.

113.   H.B. 1557's sponsor in the House, Republican Joe Harding, has also been forthcoming about the law's discriminatory focus on LGBTQ students and issues.  Representative Harding justified the bill on the basis that talking about sexual orientation and gender identity could result in students "hav[ing] one identity in school and one at home because the school encourages that kind of behavior."[11]

114.   Other supporting legislators have been equally candid that H.B. 1557 is intended to bar discussions of gay, lesbian, and bisexual orientations and transgender

---

[10] Kelly Hayes, "'Gay is not a permanent thing': Legislature passes bill to restrict LGBTQ topics in elementary schools," Florida Politics (Mar. 9, 2022), https://floridapolitics.com/archives/505744-gay-is-not-a-permanent-thing-legislature-sends-controversial-parental-rights-bill-to-governor/.  Consistent with his discriminatory aim behind H.B. 1557, in 2018 Senator Baxley told his constituents: "I know some districts where there's a big infestation of homosexuals that are pushing their agenda…."

[11] Kirby Wilson, "Republicans made changes to 'don't say gay' bill.  LGBTQ advocates aren't buying it," TAMPA BAY TIMES (Feb. 18, 2022), *available at* https://www.tampabay.com/news/florida-politics/2022/02/17/republicans-made-changes-to-dont-say-gay-bill-lgbtq-advocates-arent-buying-it/.

identities, *i.e.*, anything besides the heterosexual and cisgender identities that they believe are aligned with "core belief systems and values."

115.   For instance, in voicing support for the bill, Representative Juan Fernandez-Barquin claimed: "We have children as young as six years old being taught the radical leftist gender theory and that is frightening."[12]  Senator Ileana Garcia also suggested that discussions of sexual orientation should be prohibited because "'gay' is not a permanent thing.  'LGBT' is not a permanent thing."[13]

116.   The premise of H.B. 1557 is that if schools and educators ignore the realities and concerns of their LGBTQ students, those students will be discouraged or deterred from being who they are, and will instead be heterosexual, cisgender members of society, as the State of Florida would apparently prefer them to be.

117.   This effort to wipe out LGBTQ identity constitutes illegal discrimination, plain and simple.

118.   Governor DeSantis, in turn, has left zero question that this is the reason for H.B. 1557.  As he has explained: "We've seen instances of students being told by different folks in school, 'Oh, don't worry.  Don't pick your gender yet.  Do all

---

[12] Kelly Hayes, "'We are in distress': House passes LGBTQ instruction bill despite pleas from Democrats," Florida Politics (Feb. 24, 2022), https://floridapolitics.com/archives/500337-we-are-in-distress-house-passes-lgbtq-instruction-bill-despite-pleas-from-democrats/.

[13] Kelly Hayes, "'Gay is not a permanent thing': Legislature passes bill to restrict LGBTQ topics in elementary schools," Florida Politics (Mar. 9, 2022), https://floridapolitics.com/archives/505744-gay-is-not-a-permanent-thing-legislature-sends-controversial-parental-rights-bill-to-governor/.

this other stuff.'" He voiced his support for the bill because he does not approve of "injecting these concepts about choosing your gender" in schools.[14]

119. Governor DeSantis also made clear that the bill's limitation on "sexual instruction" does not apply to instruction on heterosexuality and cisgender identities. Rather, he asked rhetorically, "How many parents want their kids to have transgenderism or something injected into classroom instruction?"[15]

120. Governor DeSantis's press secretary, Christine Pushaw, confirmed this understanding. She called H.B. 1557 an "Anti-Grooming Bill" and said that "If you're against the Anti-Grooming Bill, you are probably a groomer or at least you don't denounce the grooming of 4-8 year old children."[16] Charitably read, Pushaw's statement implied that even discussing LGBTQ issues or acknowledging LGBTQ people's existence entices students to "become" LGBTQ; less charitably and perhaps more accurately read, it is a gross assertion that school personnel who discuss LGBTQ issues with students are akin to molesters.[17]

---

[14] Li Cohen, "Florida advances 'Don't Say Gay' bill that would bar LGBTQ discussions in schools," CBS News (Feb. 18, 2022), https://www.cbsnews.com/news/florida-dont-say-gay-bill-lgbtq-schools-senate-committee/.

[15] CBS News, "Florida Governor DeSantis defends controversial 'Don't Say Gay' bill" (Mar. 5, 2022), https://www.cbsnews.com/news/florida-governor-desantis-defends-dont-say-gay-bill/.

[16] Christina Pushaw, Twitter (Mar. 4, 2022), https://twitter.com/ChristinaPushaw/status/1499886619259777029?s=20&t=fQ_lD_5k_d5IyT1jT7bo1Q.

[17] Monica Hesse, "Fans of Florida's 'Don't Say Gay' bill have a new favorite word: 'grooming,'" WASHINGTON POST (Mar. 12, 2022), https://www.washingtonpost.com/lifestyle/2022/03/12/florida-dont-say-gay-bill/.

121.   Pushaw's statements were echoed by other supporters of H.B. 1557, who grasped the bill's discriminatory intent.  For instance, the Florida Family Policy Council, a group that lists as a core issue "LGBT Agenda & Transgenderism," has called H.B. 1557 the "Don't turn my son into a daughter bill."[18]

122.   Were there any lingering doubt as to the punitive and discriminatory intent behind H.B. 1557, on March 10, shortly before he signed the bill into law, Governor DeSantis again stated that "[i]n the state of Florida, we are not going to allow them to inject transgenderism into kindergarten."  He added, "[w]e don't want transgenderism in kindergarten and first grade classrooms."[19]

123.   Governor DeSantis has not expressed concerns about students identifying as cisgender (or heterosexual) at any age.

124.   The mentality behind these statements is clear: discussions about LGBTQ people are wrong and must be prohibited because the mere recognition of LGBTQ existence will make otherwise heterosexual and cisgender children more likely to be gay and transgender.  It is also a direct statement to LGBTQ children that you are not normal and if you can't change, you should hide your identity.  H.B. 1557 is not even a dog whistle; it is an open declaration of discrimination against

---

[18] Florida Family Policy Council, "About FFPC," https://www.flfamily.org/about-ffpc; Florida Family Policy Council, "Legislative Session Week 7 of 9 – February 25, 2022" (Feb. 25, 2022), https://www.flfamily.org/uncategorized/week-7-of-9-insiders-report-legislative-session.

[19] Fox News, "DeSantis slams 'woke' Disney after CEO condemns parents' rights bill" (Mar. 11, 2022), https://video.foxnews.com/v/6300358476001#sp=show-clips.

LGBTQ children and children with LGBTQ parents.  A law whose purpose is to prevent people from being LGBTQ is not only ridiculous, unscientific, and at odds with reality; it is also offensive and unconstitutional.  *See Obergefell*, 576 U.S. at 661 ("[P]sychiatrists and others [have] recognized that sexual orientation is both a normal expression of human sexuality and immutable.").

<u>Doubling Down on Discrimination</u>

125.   The discriminatory purpose of H.B. 1557 is further shown by the repeated refusal of lawmakers to adopt language that might mitigate the bill's widely recognized discriminatory and chilling effects.

126.   Representative Carlos Smith introduced Amendment No. 703365 to replace "sexual orientation or gender identity" with "sexual activity."  That amendment failed.

127.  Senator Jeff Brandes (a Republican) similarly proposed several amendments to replace "sexual orientation or gender identity" with "human sexuality or sexual activity."  He stated: "If the intent of this bill isn't to marginalize anyone, let's make sure we aren't."  But his amendments failed.  Senator Baxley commented that Senator Brandes's amendments would "significantly gut" the bill's intent—once again confirming that his goal was to marginalize LGBTQ people.

128.   Senator Lauren Book proposed Amendment No. 755282 to clarify that "'classroom instruction' does not include instruction or discussion relating to"

-43-

"Family structures," "Objective historical events," "Bullying prevention," "Discussions between students," and "Questions asked by students and any answer." That amendment failed.

129.   Senator Randolph Bracy and Representative Marie Paule Woodson proposed Amendments Nos. 734244 and 600607, respectively, to clarify that the law "does not apply to any discussion between a student who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBTQ and their peers." Those amendments failed.

130.   Senator Tina Polsky proposed Amendment No. 290096 to clarify that "sexual orientation" "means an individual's heterosexuality, homosexuality, or bisexuality," and "gender identity" means "gender-related identity, appearance or behavior, regardless of whether such … is different from that traditionally associated with an individual's physiology or assigned sex at birth." That amendment failed.

131.   Senator Gary Farmer proposed Amendment No. 175814 to amend a different provision of the Florida Education Code that requires health education to "teach[] the benefits of monogamous heterosexual marriage," by striking the word heterosexual. Fla. Stat. § 1003.46(2)(a). That amendment failed.

132.   Representative Driskel introduced Amendment No. 194533 to require a court to "award reasonable attorney fees and court costs" to prevailing school districts. That amendment failed.

133.   The fact that these amendments failed further demonstrates the law's true purpose.  H.B. 1557 is not about prohibiting "classroom instruction" on "sexual orientation" and "gender identity" that is not "age-appropriate or developmentally appropriate."   Florida law *already* requires that health education, including instruction on "human sexuality," "[p]rovide instruction and material that is appropriate for the grade and age of the student."  Fla. Stat. § 1003.46(2)(d).[20]

134.   H.B. 1557 is intended to (and will) stifle discussion about LGBTQ people, families, and issues, in response to lawmakers' stated concerns about LGBTQ persons and issues having any presence in schools.

135.   The discriminatory purpose of H.B. 1557 is further apparent from a persistent pattern of efforts by the current Legislature and Governor to use the legislative process to ostracize and harm LGBTQ people.

136.   In December 2021, Governor DeSantis's administration took down a Department of Education web page that provided anti-bullying resources to help promote safe school environments and address high rates of suicide after a right-wing online publication, the Florida Capital Star, raised questions with the

---

[20] This same provision, as noted, requires that instruction on human sexuality "[t]each the benefits of monogamous heterosexual marriage," Fla. Stat. § 1003.46(2)(a), and in passing H.B. 1557 lawmakers refused to strike "heterosexual" from this text.

Department about the inclusion of links to resources for LGBTQ young people.[21] That page was restored after the LGBTQ-related references were removed.

137.   Last year, Governor DeSantis line-item vetoed all LGBTQ-related funding from the budget, including money earmarked for mental health programming to support survivors of the Pulse night club massacre, to house homeless LGBTQ children, and for Orlando's LGBTQ community center.

138.   For the last three legislative sessions, Representative Anthony Sabatini has introduced a bill that would criminalize parents who allow gender-affirming surgeries for transgender youth.  Governor DeSantis has pledged his support for such a bill if it reaches his desk, because he is opposed to "chemical castration of minors."

139.   Florida lawmakers have also passed a law that prohibits transgender girls and women from playing on girls' and women's sports teams in public schools.

140.   H.B. 1557 is merely the latest in this sequence of discriminatory laws.

141.   And H.B. 1557 itself reflects a longer history in which opponents of LGBTQ rights have used narratives of "depravity" and "grooming" to try to justify altering the school environment in ways meant to discriminate against LGBTQ people.[22]

---

[21] Brody Levesque, "Florida's DeSantis attacks LGBTQ youth by removing website resource," Los Angeles Blade (Dec. 6, 2021), https://www.losangelesblade.com/2021/12/06/floridas-desantis-attacks-lgbtq-youth-by-removing-website-resource/.

[22] See, e.g., Clifford Rosky, Anti-Gay Curriculum Laws, 117 COLUM. L. REV. 1461 (2017).

142.   During a press conference on March 28, 2022, Governor DeSantis seized these narratives, stating falsely that critics of the bill "support sexualizing kids in kindergarten" and "enabling schools to, quote, transition students to a, quote, different gender without the knowledge of the parent."[23]

## IV.   H.B. 1557 will inevitably harm the LGBTQ community and in fact is already doing so

143.   H.B. 1557's discrimination against the LGBTQ members of Florida's public schools is plain.  In purpose and effect, it denies their existence, demeans their families, and demands their silence.  It thus "generates a feeling of inferiority as to [their] status in the community that may affect their hearts and minds in a way unlikely ever to be undone."  *Brown*, 347 U.S. at 494.  By denying to LGBTQ students, teachers, and families "full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society," Florida violates equal protection principles.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  *Cf. Obergefell*, 576 U.S. at 670 ("It demeans gays and lesbians for the State to lock them out of a central institution of the Nation's society.").

144.   H.B. 1557 is especially pernicious because it will invariably harm, and already is harming, a group that has faced heightened mental and physical risks.  As

---

[23] Ryan Dailey, "DeSantis signs bill on how schools handle sexual orientation, gender identity," PALM COAST OBSERVER (Mar. 28, 2022), https://www.palmcoastobserver.com/article/desantis-signs-bill-on-how-schools-handle-sexual-orientation-gender-identity.

President Biden recognized in condemning the law, H.B. 1557 is "designed to target and attack the kids who need support the most—LGBTQI+ students, who are already vulnerable to bullying and violence just for being themselves."[24]

145.   The Trevor Project's 2021 National Survey on LGBTQ Youth Mental Health found that 42% of LGBTQ youth seriously considered attempting suicide in the last year.  72% of respondents reported symptoms of generalized anxiety disorder in the last two years.  62% reported symptoms of major depressive disorder in the last two weeks.  And nearly half wanted counseling from mental health professionals but did not receive it.[25]

146.   With respect to Florida schools, specifically, the Gay, Lesbian and Straight Education Network's ("GLSEN") 2019 National School Climate Survey found that the school climate in Florida is "not safe" for most LGBTQ secondary school students, even before enactment of H.B. 1557.[26]  94% of respondents heard students use "gay" in a negative way, 80% heard other homophobic remarks (*e.g.*,

---

[24] Anthony Izaguirre, "White House denounces Florida GOP over 'Don't Say Gay' bill," ASSOCIATED PRESS (Feb. 8, 2022), https://apnews.com/article/education-florida-73ffe14f403d95e0cc09f2804d0d9ffe.  The American Academy of Child and Adolescent Psychiatry has likewise asserted that H.B. 1557 "blocks teachers and educators from talking about LGBTQ+ issues and undermines existing protections for LGBTQ+ youth and families in schools."  American Academy of Child & Adolescent Psychiatry, "Florida's 'Don't Say Gay or Trans' Law Stigmatizes LGBTQ+ Youth and Families" (Mar. 18, 2022), https://www.aacap.org/AACAP/zLatest_News/Floridas_Dont_Say_Gay_or_Trans_Law_Stigmatizes_LGBTQ_Youth_Families.aspx.

[25] The Trevor Project, "National Survey on LGBTQ Youth Mental Health 2021," https://www.thetrevorproject.org/survey-2021/?section=Introduction.

[26] Gay, Lesbian and Straight Education Network, "2019 State Snapshot: School Climate for LGBTQ Students in Florida," https://www.glsen.org/sites/default/files/2021-01/Florida-Snapshot-2019.pdf.

"fag") or negative remarks about gender expression, and 72% heard negative remarks about transgender people.  Roughly 10% of respondents were victims of physical assault based on their sexual orientation or gender expression, and only 28% of LGBTQ students who reported incidents of verbal or physical harassment or assault said it resulted in effective staff intervention.

147.   Students also described an environment of disparate treatment, where 31% were disciplined for public displays of affection that did not result in similar action for non-LGBTQ students, and 57% of transgender students were unable to use the bathroom aligned with their gender.  Just 9% of students reported attending a school with a comprehensive anti-bullying and harassment policy that included specific protections based on sexual orientation and gender identity and expression, 15% were taught positive representations of LGBTQ people, history, or events, and only a mere 3% reported receiving LGBTQ-inclusive sex education at school.

148.   Similarly, the Youth Risk Behavior Survey—which is conducted by the CDC and managed by the Florida Department of Education to monitor priority health-risk behaviors that contribute substantially to the leading causes of death, disability, and social problems among youth—found that for the first time since sexual orientation was added in 2013, there has been an increase in suicidal attempts for LGBTQ youth.  There was no corresponding shift among heterosexual and cisgender peers.

149.   Lurking beneath these statistics is a sobering fact: LGBTQ students will suffer—and some of them will likely die—if this policy is allowed go into effect.

150.   Indeed, ample research in neuroscience, social science, and education have demonstrated that threats based on social identity affect the health and education of students.   Put simply, making children feel unsafe causes lasting damage to their physical health, brain development, and learning.   And that is precisely why school districts have responded with the kinds of affirming and accepting measures that H.B. 1557 is designed to stamp out.

151.   LGBTQ students who are taught an inclusive curriculum are less likely to hear homophobic remarks or remarks about gender expressions.  They perform better academically and are more likely to pursue post-secondary education.  They are also significantly more likely to have classmates who are somewhat or very accepting of LGBTQ people.[27]   LGBTQ youth who have a trusted adult at school have higher levels of self-esteem.[28]   And affirming transgender and non-binary youth by respecting their pronouns is associated with lower rates of attempting suicide.[29]

---

[27] Kosciw, J. G., Clark, C.M., Truong, N. L. & Zongrone, A. D., Gay, Lesbian, and Straight Education Network, The 2019 National School Climate Survey (2020), https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf.

[28] Dessel, A.B., Kulick, A., Wernick, L.J., & Sullivan, D., "*The importance of teacher support: Differential impacts by gender and sexuality,*" 56 Journal of Adolescence 136-144 (2017), https://www.sciencedirect.com/science/article/abs/pii/S0140197117300192.

[29] The Trevor Project, "National Survey on LGBTQ Youth Mental Health 2021," https://www.thetrevorproject.org/survey-2021/?section=Introduction.

152.   In short, LGBTQ students with inclusive educational environments receive a more equal and fair education; they are less likely to suffer discrimination, stigma, and harm; and they are more likely to report positive health outcomes.

153.   H.B. 1557 thus will not just stigmatize and mark as "lesser" LGBTQ students—a serious injury in itself.  It also will create and exacerbate environments where LGBTQ students are more likely to do poorly in school, experience bullying and harassment, and suffer higher risks to their mental and physical health.  Indeed, a GLSEN survey found that in states with laws widely known as "No Promo Homo" laws, like H.B. 1557, students were more likely to hear homophobic remarks from school personnel, staff were far less effective in handling reported incidents of harassment or assault, and schools were less likely to have LGBTQ-related resources (such as comprehensive harassment policies, supportive school personnel, and Gay-Straight Alliances).[30]

154.   By banning discussions about LGBTQ students and issues and erasing LGBTQ students from their schools, H.B. 1557 will cause serious, irreparable, and immediate harm to students.  Beyond that, H.B. 1557 discriminates against LGBTQ parents, teachers, and other school personnel by denying their existence and ability to speak and participate freely in schools.  And it injures non-LGTBQ persons who

---

[30] Gay, Lesbian, and Straight Education Network, The 2009 National School Climate Survey, https://www.glsen.org/sites/default/files/2020-11/2009%20National%20School%20Climate%20Survey%20Full%20Report.pdf.

desire (for themselves or their children) an environment that is free of discrimination and provides for an open education.

155.   The experiences of the student, parent, teacher, and organizational Plaintiffs in this case reflect that these harms are already occurring and will continue to occur absent judicial relief.

### A.   Harm to Students

156.   The student Plaintiffs have already witnessed first-hand the impact of H.B. 1557 on their LGBTQ peers.  Passage of this law has led to an environment where recognition of and discussion about LGBTQ persons and issues is chilled or silenced completely; LGBTQ students are relegated to second-class status; and LGBTQ students are unable to obtain as good an education as other students.

157.   For instance, M.A. has been actively trying to increase teacher education and support at his school for those teachers who either are not inclined or do not know how to be supportive of LGBTQ students.  About a month ago, he drafted and submitted a proposal to establish a "Committee on Classroom Practices" related to LGBTQ students.  The committee would consist of students and teachers and be charged with creating guidelines for teachers on how to respond to common problems for LGBTQ students.

158.   M.A. recognizes that there is little chance that this proposal will be considered, let alone implemented, as a result of the new law.  M.A.'s GSA teacher-

advisor has already warned that she could potentially lose her job for adjusting pronouns to respect a student's gender identity.  M.A.'s teacher-advisor is hardly alone in this regard: already, some counties have updated their gender-diverse guidelines to require teachers to require parental consent before honoring a student's request to use different pronouns than those aligned with their gender assigned at birth.[31]

159.   M.A. knows that as his teachers face consequences, they will be afraid to do anything that could potentially violate the law, including acknowledging and helping LGBTQ students.  Indeed, M.A. now fears that the very existence of the GSA that he fought for two long years to establish is at risk.

160.   Similarly, Moricz's teachers have said they will need to remove their images of support, including pride flags and rainbows in the classroom.  These insignia have always indicated to Moricz that he was in a safe and welcoming space.

161.   Moricz's teachers have also discussed the need to alter and change their curriculums.  For instance, last year during a discussion on the role of chromosomes in gender identity, Moricz's Biology teacher explained the difference between sex and gender.  These discussions were meaningful to Moricz's development and education.  Likewise, in his Government class this year, Moricz has discussed H.B.

---

[31] *See, e.g.*, Liz Crawford, "Sarasota County Schools updates gender diverse guidelines for Florida's new parental rights law," 10 Tampa Bay WTSP (Mar. 29, 2022), https://www.wtsp.com/article/news/local/sarasotacounty/sarasota-county-schools-gender-diverse-guidelines-florida-parental-rights-law/67-aaa93bd7-bd0d-476c-88e9-33920b33d32f.

1557 and the risks already facing LGBTQ youth, as well as issues like LGBTQ representation in government.  Moricz fears that as a result of H.B. 1557, these discussions and lessons will no longer be permitted, and his education will suffer.

162.   M.A. shares these worries.  In his creative writing class, he often writes about issues related to his sexual identity and sexual orientation more generally.  For instance, he wrote about H.B. 1557 and how it would impact his life. Now it is unclear whether he would be able to write such an essay.  M.A. is also working on a project in which he was instructed to write a "rant" about an issue that he cares about. He is writing a response to those who say that gay marriage should be illegal, including by doing significant legal research into the history of gay marriage.  Here, too, he worries that his education will be stymied by H.B. 1557.  Similarly, in his Biology class, M.A.'s peers recently asked what it meant to be transgender.  His teacher explained in an accepting way that she was happy and comfortable in her body but some people are not, and everyone should be.  M.A. believes that this conversation would no longer be possible.

163.   For these reasons, on March 4, 2022, M.A. sent a letter to his state senator explaining why the senator should not vote for the bill.  He explained:

> History is consistent with common sense: it demonstrates that students must feel safe and affirmed, while laws and statutes must not unreasonably abridge their individual rights at school.  Lawmakers are tasked with making sure legal statutes are in place to protect student rights.  But when lawmakers remove those rights, like forcing

> developing children to not communicate their own experiences with their peers, they neglect to fulfill their duties.  It's a further disservice when teachers, including school counselors who have a confidentiality obligation, have to tell the students' parents what they don't want out in public.

164.   Doe is just 11 years old, yet she too has already felt the impact of the new law.  When McClelland explained the new law to Doe at a high level, Doe asked McClelland if she is going to be okay.  McClelland did not know how to respond.

165.   McClelland and her family are deeply concerned that H.B. 1557 will operate to stigmatize Doe in school, leading to bullying and ostracization.  McClelland is also worried that she will no longer be able to have conversations at the start of each school year with teachers and school officials to try to mitigate the risk to her child, and to make sure she can feel safe and worthy and learn like every other student.

166.   The VanTices also worry about their sons' safety and well-being—both physically and emotionally.  They fear that the bill will empower and embolden anyone—students, other parents, and even school officials—who might want to bully or ostracize their children because of their parents' sexual orientation.

167.   As a heterosexual parent, Shook fears the impact H.B. 1557 will have on her daughter's education.  She wants her daughter to be taught that all families are valid and that she can grow up to be herself and be accepted in school, no matter her sexual orientation or gender identity.  H.B. 1557 will prevent that from occurring.

168.   Indeed, just a few weeks ago, Shook's daughter hoped to bring to school a picture of herself marching in the Miami Pride parade. She thought this would be a good contribution to a lesson about women's history month.  But Shook's daughter's teacher suggested that would not be a good idea in light of H.B. 1557, so she brought in another picture instead.  Shook is already feeling the chilling effect that H.B. 1557 has on her daughter's classroom environment.

169.   In light of H.B. 1557, Equality Florida's members have reported an uptick in the number of LGBTQ students experiencing harmful language or physical attacks from other members of the school community.  In most incidents, students report that the school does little, if anything, to respond.  Moreover, Equality Florida has learned that a transgender student at one school has been told by their principal that they are not allowed to talk about being transgender with other students.

**B.    Harm to Parents and Families**

170.   H.B. 1557 is also harming LGBTQ parents, who are being excluded from their children's education and stigmatized in front of their children.  Many of these parents fear that the lessons they have taught their children about acceptance and inclusion will be undermined by a school environment of discrimination.

171.   For instance, when Dan VanTice was preparing to testify in front of the Florida State Senate regarding the impact of H.B. 1557 on his family, his son came up to him and asked if he was going to be able to talk about his family with his

friends at school.  Dan had to honestly answer that he wasn't sure, but that was why he was testifying against the bill.

172.   Days later, on Valentine's Day 2022, while Brent VanTice was driving their sons to school, the boys were discussing their excitement to pass out homemade Valentines to their friends.  Brent jokingly asked one of his sons if he was going to say that his favorite Valentine was his Daddy.  His son responded that he couldn't talk about his Daddy at school anymore because of the bill.

173.   The VanTices know that H.B. 1557 will impact their sons' abilities to fully participate in their school curriculum.  For example, every year the boys are asked to bring in a picture of their family and to talk about their family with their teacher and peers.  This is part of the way that their children, like many young children, build community at school—by talking and sharing stories about their family.  Similarly, their sons have been asked to bring in their favorite book and, on multiple occasions, they have brought in *Daddy, Papa, and Me*, a story about a toddler who happens to have gay parents.  As a result of H.B. 1557, the VanTices believe that their sons' participation in assignments like these will be limited, since their teacher will not be able to engage with their family experience.  Children with heterosexual parents will continue to express themselves, bond with their peers, and build community through their families, but the VanTices' sons will be left out.

174.   The VanTices also fear that the bill will prevent them from being able to authentically present themselves when engaging in school activities, such as visiting or presenting to their children's class or attending school-wide events or PTO meetings, and that it will empower and embolden others to discriminate against them.

175.   Casares and Feinberg worry about how the bill will impact their child's interactions with their classmates and their own ability to participate in the school's curriculum.  For example, at the beginning of each school year since starting public school, their child has been asked to introduce their family to the class, whether through a picture or a family tree.  This year, their child was instructed to do a project in which they were to write down two things they wanted their teacher to know about them and two things they wanted their peers to know about them.  Immediately, their child decided that they wanted to share with the teacher the fact that they have two moms.  Casares and Feinberg fear that, as a result of H.B. 1557, their child will be made to feel excluded if their teacher has no ability to engage on the child's home and personal life.  They also fear that this will impede their child's ability to form meaningful and important relationships at school.

176.   Similarly, Casares and Feinberg fear that they will not be able to fully interact with their child's teacher and school community, as they believe that teachers, staff, and administrators will be fearful and unable to fully communicate

with them on the same terms as opposite-sex parents.  This will not only impact their involvement as classroom parents, but also Feinberg's role in the PTA.  They believe that this will limit the effectiveness of their relationships with school staff and administrators, as well as the parent community, and will broadly undermine their ability to be included in regular class and school-wide activities.

177.   Morrison and Houry also fear the impact H.B. 1557 will have on their children.  Right now, their children are comfortable and accepted at school, but Morrison and Houry are aware that things are likely to change.  They fear that their children's openness will not be embraced by their teachers or peers, and that their children will be stigmatized at school and otherwise.  They also fear that their children will be made to feel that the differences in families are negative rather than positive, and that their children's voices could be silenced.  They are concerned that because of the bill, the curriculum for their children will have to be changed, and children will no longer receive education on the normalcy and value of differences, whether it be about families or any other aspects of life.

178.   Moreover, Morrison and Houry fear that their role in the school community could be curtailed by H.B. 1557.  They have always been open about their sexuality and their acceptance of others, but they worry that their lived value of acceptance will be seen as divisive and risky rather than uniting.  They fear that

others will not know what they can and cannot talk about and that, as a result, any attempts to be honest about who they are will be avoided or potentially silenced.

### C.    Harm to Teachers and Other School Personnel

179.    Many Plaintiffs have recognized the harm that H.B. 1557 is already inflicting on teachers and on teachers' ability to provide a welcoming and inclusive environment that is safe for LGBTQ students.

180.    Hatcher Powderly, a middle-school teacher, is deeply concerned about the impact that H.B. 1557 will have on her ability to teach her students and express ideas in the classroom, and she fears that the law will have a striking impact on what she is permitted to teach and discuss.  For example, Hatcher Powderly often assigns independent reading to her students and lets them choose their own genre or authors. If she has a student who plans to read a book by an LGBTQ author or related to LGBTQ subject matter, she fears that she will be vulnerable to a lawsuit or school discipline.  Similarly, Hatcher Powderly often gives her students the opportunity to write about individual experiences, and she fears that the bill might limit her ability to respond or engage with any student who writes about anything related to the LGTBQ community.

181.    Given the vagueness of H.B. 1577's proscriptions, which can be enforced through a suit by any parent, Hatcher Powderly fears that almost anything she says could be turned against her.  She does not know how she will be able to

teach without constant fear of losing her job, which would have irreparable consequences for her.

182.   Hatcher Powderly is also deeply concerned about the impact the bill will have on her students.  For example, two of the students at her school this year in sixth grade came out to their peers and chose to use different names in school than at home.  Because of H.B. 1557, students may fear to be their true selves—and she may be prohibited from supporting them without risking her job (even if her goal is to prevent bullying, protect their welfare, and answer appropriate questions).

183.   As a middle-school teacher, Hatcher Powderly is deeply aware of the impact that these developments will have on students' mental health, as well as the ability of the other students to learn about tolerance and how to become effective members of a diverse society.  Hatcher Powderly fears that H.B. 1557 will limit her effectiveness in the classroom to the detriment of her students' education.

184.   Equality Florida's membership includes teachers in Florida public schools, including Hatcher Powderly.  Some of these teachers have LGBTQ students they would like to support, including through service as faculty advisors for GSAs or other student clubs—and also through the protection of LGBTQ students from bullying and harassment (which requires discussing LGBTQ identities and issues with students).  But these teachers feel they must refrain from doing so because they are concerned about violating H.B. 1557 and being disciplined or fired.  Some

teachers have reported that they avoid engaging LGBTQ students all together because they fear what might happen as a result. Those that do engage have already faced consequences; for instance, one teacher who affirmed an LGBTQ student by informing the class that bullying about sexual orientation or gender identity is unacceptable is being harassed online by parents.

185.   Equality Florida's membership also includes LGBTQ teachers who are afraid to identify themselves as LGBTQ or discuss LGBTQ issues because they are concerned about violating H.B. 1557. Some LGBTQ teachers reasonably fear that acknowledging the existence of a same-sex or transgender partner or spouse to students would be considered a violation of H.B. 1557 and could result in discipline.

186.   Finally, Equality Florida's membership includes school counselors in Florida public schools. Counselors have reported that they are afraid to talk with LGBTQ youth because they are concerned that they will lose their licensure or will be sued in a personal capacity simply for trying to hear from an LGBTQ student what their needs are. This fear has created an immense barrier in counselors' ability to do their jobs and provide students with access to necessary mental health services.

### D.   Harm to Organizational Plaintiffs

187.   Equality Florida and Florida Equality's members are experiencing harm as a result of H.B. 1557, as set forth above.

188.   The organizations themselves are also suffering injury to their mission and by virtue of the need to divert resources to combat an unjust law.

189.   Equality Florida has been on the frontlines in fighting against the passage of H.B. 1557 to protect its LGBTQ members.  In doing so, the organization has already diverted significant resources and time.  For example, Equality Florida has run ads in the state against H.B. 1557, costing the organization $90,000.  It has also organized a phone bank program, a massive ad buy for cable television spots and on social media, and numerous lobby days at the state legislature to fight against passage of the bill.

190.   Already, Equality Florida has noticed many respects in which its efforts have been impacted by H.B. 1557: there is now a "paralysis" among school district leadership, which has become hesitant to engage in Equality Florida programming.

191.   Indeed, multiple school employees who had previously agreed to speak on panels for Equality Florida have had to cancel after school leadership made it clear that they would not participate in a conference organized by Equality Florida. School members have expressed fears as to whether GSAs will be able to remain in existence, and some schools have prevented GSAs from forming in the first place.

192.   Equality Florida's educational mission is also directly implicated by H.B. 1557.  Equality Florida organized a Safe and Healthy School Project, which aims to create a culture of inclusion while countering the bullying, harassment, social

isolation, and bigotry that are risk factors for LGBTQ students.  This project offers free resources to educators, students, parents, and supporters.  It is the only statewide LGBTQ initiative focused on providing support and guidance to school districts.

193.   As part of its Safe and Healthy School Project, Equality Florida has compiled materials for educators in Florida outlining policies and steps schools can take to ensure LGBTQ students are adequately supported.  It also hosted the "All Together Now" conference, which one District Superintendent described as "about recognizing that we must move beyond the culture of indifference when it comes to securing LGBTQ safe learning environments. Policies and lip service get you nowhere without action."

194.   Equality Florida has learned that, already, in anticipation of the law being enacted and going into effect, half of the school districts with LGBTQ support guides removed their guidance or stopped the development of guidance.

195.   Thus, the enactment of H.B. 1557 significantly changes what, if anything, Equality Florida can do in schools across the state.

196.   Family Equality's mission is also directly impacted by H.B. 1557, as the law materially changes what, if anything, Family Equality can provide to Florida schools to fight discrimination of LGBTQ families and youth.  For example, Family Equality has a "Book Nook," which provides a comprehensive list of the best

LGBTQ books for children of all ages, including pre-K through third grade.[32] Family Equality fears that many of these books would not be permitted if H.B. 1557 is enacted.

197.   Additionally, Family Equality has diverted and will have to divert many resources to address the impact of the bill.  Already, Family Equality has diverted resources away from other campaigns nationwide to focus on fighting the impact of H.B. 1557.  Family Equality has disseminated multiple "Action Alerts" to inform individuals on their mailing list about the impact of the bill and leadership has spent time and resources promoting the potential impact of the bill via op-eds, lobbying, and social media.  Once the bill is in effect, Family Equality will have to develop specific resources for Florida families as to how the bill might impact them and what they can do to try to ensure that their families are as safe and supported as possible.

## CAUSES OF ACTION

### COUNT I

**Due Process Clause of the Fourteenth Amendment
to the United States Constitution: Vagueness
(Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs against all Defendants)**

198.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

---

[32] Family Equality, LGBTQ+ Books for Parents and Children, https://www.familyequality.org/family-support/lgbtq-books/.

199.   A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  These requirements have particular weight when the law threatens to impinge on First Amendment rights.

200.   H.B. 1557 is void for vagueness and thereby violates Plaintiff's Fourteenth Amendment rights facially and as applied by Defendants.

201.   As to Plaintiffs M.A., Moricz, and Doe, and Equality Florida, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what students can and cannot say and do while participating in "classroom instruction" (a term that is itself vague), and because it invites arbitrary and discriminatory enforcement.

202.   Similarly, as to Plaintiffs McClelland, Dan and Brent VanTice, Casares and Feinberg, Morrison and Houry, Shook, and Equality Florida, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what parents can and cannot say and do in the course of "classroom instruction" (a term that is itself vague), and because it invites arbitrary and discriminatory enforcement.

203.   As to Plaintiff Hatcher Powderly and Equality Florida, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what teachers can and cannot say and do during "classroom

instruction" (a term that is itself vague), and because it invites arbitrary and discriminatory enforcement.

204.   As to Plaintiffs Equality Florida and Family Equality, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what the law permits and prohibits, and because it invites arbitrary and discriminatory enforcement.

205.   H.B. 1557 prohibits "[c]lassroom instruction" by "third parties" on "sexual orientation" and "gender identity" in K-3, and otherwise in any context where it is not "age-appropriate" and "developmentally appropriate" in accordance with unspecified "state standards" that may go into effect long after the law does. These key terms are all ambiguous and undefined.  The vagueness of these terms has a chilling effect on the behavior and speech of students, including Plaintiffs M.A., Moricz, Doe, and Equality Florida because they are unable to determine what the law does and does not prohibit; they are uncertain about what they are legally able to say and do in class; and they hesitate to speak or participate in class out of fear of violating the law and facing discipline from their school.

206.   The law also has a chilling effect on the behavior and speech of parents, including Plaintiff McClelland, Dan and Brent VanTice, Casares and Feinberg, Morrison and Houry, Shook, and Equality Florida because they are likewise unable

to determine what the law does and does not prohibit, and they are uncertain about what they are legally able to say and do in the classroom or school.

207.   The vagueness and ambiguity of the law also have a chilling effect on the behavior and speech of LGBTQ teachers, including Plaintiff Hatcher Powderly and Equality Florida, because they are likewise unable to determine what the law does and does not prohibit, and they are uncertain about what they are legally able to say and do while teaching in school, for fear of violating the law.

208.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable injury, including violations of their rights under the Fourteenth Amendment to due process.

209.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered damages to be determined according to proof at trial.

## COUNT II

**Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution: Discrimination
(Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., Moricz, Doe, Dan
and Brent VanTice, Casares, Feinberg, Morrison, Houry, Equality Florida,
and Family Equality against all Defendants)**

210.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

211.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides: "No State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

212.   Defendants have deprived Plaintiffs of the rights, privileges, or immunities secured by the Equal Protection Clause because Defendants, without sufficient justification, have treated Plaintiffs differently from other similarly situated persons based on their sex, sexual orientation, gender, gender identity, and transgender status.

213.   H.B. 1557 was enacted with an invidiously discriminatory purpose and results in discriminatory and disparate effects, and thus violates the Fourteenth Amendment rights of Plaintiffs facially and as applied by Defendants.

214.   Comments by the legislative sponsors of the Act, other legislators, and Governor DeSantis all confirm that H.B. 1557 was enacted, at least in part, with the unlawful purpose to discriminate against LGBTQ people.  The public record reflects a purpose to target, demean, belittle, and harass LGBTQ individuals and families, with the intent and effect of depriving them of full advantage of the academic and extracurricular opportunities provided by the school environment.  It also reflects an effort to impose state-selected (but demonstrably outmoded and offensive) gender stereotypes as the dominant ideology and controlling rule of public education in Florida—a form of improper sex stereotyping prohibited by the Constitution.

215.   In addition, H.B. 1557 is simply the latest in a long line of anti-LGBTQ laws that the Florida legislature and Governor have passed or attempted to pass in recent memory, further illustrating and confirming its invidiously discriminatory purpose.  H.B. 1557 also follows in the footsteps of decades of "No Promo Homo" and "Don't Say Gay" laws and has the same aim, which it achieves by imposing vague and broad proscriptions that invite—and indeed are already causing—discriminatory enforcement only against discussions of LGBTQ persons and issues.

216.   Although the law has not yet taken effect, Plaintiffs have nonetheless already suffered a stigmatic injury and ostracization from passage of the law, and from the imprimatur of discrimination by Defendants.  These injuries have been accompanied by changes that are substantially likely to encompass further material, educational, and other injuries to Plaintiffs in their school and personal lives.

217.  For example, H.B. 1557 has already stigmatized and singled out LGBTQ students such as Plaintiffs M.A., Moricz, Doe, and Equality Florida as inferior and unequal in public school settings; encouraged teachers and other students to view LGBTQ students as different and inferior and effectively condoned bullying and harassment by others; interfered with the healthy development and socialization of LGBTQ students; and harmed their health and well-being.

218.   H.B. 1557 disparately harms LGBTQ students such as Plaintiffs M.A., Moricz, Doe, and members of Equality Florida and denies such students equal educational opportunities based on their LGBTQ orientation or identity.

219.   H.B. 1557 also disparately harms LGBTQ teachers, such as members of Equality Florida, and LGBTQ parents including Plaintiffs Dan and Brent VanTice, Casares, and Feinberg based on their LGBTQ orientation or identity.

220.   In addition, as to Plaintiffs Dan and Brent VanTice, Casares and Feinberg, Morrison and Houry, and LGBTQ parent members of Equality Florida, H.B. 1557 violates the equal protection right to marry on the "same terms and conditions as opposite-sex couples." *Obergefell*, 576 U.S. at 676; *see also id.* at 667 ("A third basis for protecting the right to marry is that it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education."); *Pavan v. Smith*, 137 S. Ct. 2075, 2078 (2017).  The purpose and effect of H.B. 1557 is that LGBTQ married couples will be treated differently and worse than non-LGBTQ married couples in important aspects of their interactions with Florida's public schools, and that the children of LGBTQ married couples will similarly suffer discrimination and disadvantage in Florida's public schools as compared to all other children.

221.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, Dan and Brent VanTice, Casares, Feinberg, Morrison,

Houry, Equality Florida, and Family Equality have already suffered and will continue to suffer irreparable injury, including violations of their Fourteenth Amendment rights to equal protection of the laws.

222.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, Dan and Brent VanTice, Casares, Feinberg, Morrison, Houry, Equality Florida, and Family Equality have suffered damages to be determined according to proof at trial.

## COUNT III

### First Amendment to the United States Constitution:
### Right to Receive Information
### (Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., Moricz, Doe, and Equality Florida against all Defendants)

223.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

224.   The First Amendment to the United States Constitution provides: "Congress shall make no law … abridging the freedom of speech."  U.S. Const., amend. I.  The First Amendment applies to the State of Florida pursuant to the incorporation doctrine of the Fourteenth Amendment.

225.   The First Amendment protects "the right to receive information and ideas." *Pico*, 457 U.S. at 867.  Laws regarding school curricula and instruction violate students' First Amendment rights to receive information and ideas where they are not "reasonably related to legitimate pedagogical concerns," *Hazelwood*

*Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), or where officials exercise their discretion over curricular decisions "in a narrowly partisan or political manner," *Pico*, 457 U.S. at 870.

226.   H.B. 1557 violates the First Amendment right to receive information and ideas of Plaintiffs M.A., Moricz, Doe, and Equality Florida facially and as applied by Defendants.  More specifically, the law violates their right to receive and debate information and ideas concerning sexual orientation and gender identity, even when such information serves essential pedagogical purposes.

227.   H.B. 1557's restrictions on students' rights to receive information and ideas concerning sexual orientation and gender identity are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purpose.  Instead, H.B. 1557 is rooted in animus against LGBTQ individuals, as demonstrated by the public record.  H.B. 1557 is also the result of partisan or political decision-making.

228.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, and Equality Florida have suffered and will continue to suffer irreparable injury, including violations of their First Amendment rights to receive information and ideas.

229.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, and Equality Florida have suffered damages to be determined according to proof at trial.

## COUNT IV

**First Amendment to the United States Constitution:**
**Right to Freedom of Expression**
**(Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., Moricz, Doe, and**
**Equality Florida against all Defendants)**

230.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

231.   "[S]tudents do not 'shed their constitutional rights of freedom to speech or expression,' even 'at the school house gate.'" *Mahanoy*, 141 S. Ct. at 2044 (quoting *Tinker*, 393 U.S. at 506).  Thus, student speech is presumptively protected unless it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 2045 (quoting *Tinker*, 393 U.S. at 513).

232.   Likewise, laws regulating students' speech violate their First Amendment rights where such laws are not "reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S at 273.

233.   H.B. 1557 violates the First Amendment right to freedom of expression of students, including Plaintiffs M.A., Moricz, Doe, and Equality Florida, facially and as applied by Defendants.  More specifically, the law restricts Plaintiffs' ability to discuss topics related to sexual orientation and gender identity in class and related settings, and even restricts their ability to self-identify.

234.   H.B. 1557's restrictions on students' rights to free expression concerning sexual orientation and gender identity are not justified by preventing

disruption to the school environment, are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purposes.  Instead, the law is rooted in animus against LGBTQ individuals, as demonstrated by the public record.

235.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, and Equality Florida have suffered and will continue to suffer irreparable injury, including violations of their First Amendment right to freedom of expression.

236.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, and Equality Florida have suffered damages to be determined according to proof at trial.

## COUNT V

### First Amendment to the United States Constitution:
### Overbreadth
### (Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., Moricz, Doe, and Equality Florida against all Defendants)

237.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

238.   A "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

239.   H.B. 1557 is overbroad in violation of the First Amendment rights of Plaintiffs M.A., Moricz, Doe, and Equality Florida, facially and as applied by Defendants, because even to the extent that the law could be interpreted as having any legitimate pedagogical purpose, "a substantial number of its applications are unconstitutional." *Id.* More specifically, even if H.B. 1557 has some legitimate pedagogical purpose, it is not narrowly tailored to that purpose but rather will be applied in a manner that broadly infringes Plaintiff M.A., Moricz, Doe, and Equality Florida's First Amendment rights to receive information and ideas, and their right to freedom of expression.

240.   This overbreadth has a chilling effect on the behavior and speech of students, including Plaintiffs M.A., Moricz, Doe, and Equality Florida, resulting in the self-censoring and intentional avoidance of a broad, sweeping category of protected speech.  For example, due to the overbreadth of H.B. 1557, students like Plaintiffs M.A., Moricz, Doe, and Equality Florida are discouraged from identifying themselves as LGBTQ in school or from coming out as LGBTQ; from sharing experiences or views about LGBTQ issues, sexual orientation, or gender identity in school, as Plaintiffs M.A., Moricz, Doe, and Equality Florida currently do; and from asking questions about LGBTQ issues, sexual orientation, or gender identity in school, as Plaintiffs M.A., Moricz, Doe, and Equality Florida currently do, all of which infringes on their First Amendment rights.

241.   This overbreadth also has a chilling effect on the behavior and speech of teachers, including Plaintiffs Hatcher Powderly and Equality Florida, resulting in the self-censoring and intentional avoidance of a broad, sweeping category of protected speech.  For example, teachers are discouraged from providing students with accurate information about sexual orientation and gender identity for fear of violating the law, which infringes on the First Amendment right to receive information of Plaintiffs M.A., Moricz, Doe, and Equality Florida.

242.   H.B. 1557's overbroad restrictions are not justified by preventing disruption to the school environment, are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purposes.  Instead, the law is rooted in animus against LGBTQ individuals, as demonstrated by the public record, as well as by partisan or political reasons.

243.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, and Equality Florida have suffered and will continue to suffer irreparable injury, including violations of their First Amendment rights.

244.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, Doe, and Equality Florida have suffered damages to be determined according to proof at trial.

## COUNT VI

**Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688:**
**Discrimination Based on Sex**
**(Brought by Plaintiffs M.A., Moricz, Doe, and Equality Florida against**
**Defendants State Board of Education and Florida Department of Education)**
**Discrimination Based on Sex**

245.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

246.   Defendants State Board of Education and Florida Department of Education are recipients of federal financial assistance.

247.   The acts and omissions of Defendants have violated Plaintiffs' M.A., Moricz, Doe, and Equality Florida's rights under Title IX by discriminating against them on the basis of sex, which includes sexual orientation and gender identity.

248.   More specifically, H.B. 1557 results in the disparate treatment of students in Florida's public education system on the basis of sex, because they are excluded from the participation in, denied the benefits of, and/or discriminated in education.  By implementing and enforcing H.B. 1557, Defendants State Board of Education and Florida Department of Education are intentionally and/or with deliberate indifference engaging in such discrimination.

249.   As a direct and proximate result of Defendants State Board of Education and Florida Department of Education's unlawful conduct, Plaintiffs M.A.,

Moricz, Doe, and Equality Florida have suffered and will continue to suffer irreparable injury, including violations of their First Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and request an award of the following relief:

250.   A declaratory judgment that H.B. 1557 and the actions described herein deprive Plaintiffs of their rights under the United States Constitution, including the First and Fourteenth Amendments thereto, and applicable federal statutory law, including 42 U.S.C. § 1983;

251.   Preliminary and permanent injunctive relief enjoining Defendants from implementing and enforcing H.B. 1557 in violation of the rights guaranteed to Plaintiffs by the United States Constitution and applicable federal statutory law;

252.   Nominal, compensatory, statutory, and punitive damages in an amount to be determined at trial, as well as prejudgment interest, where appropriate;

253.   An award of Plaintiffs' costs of suit and reasonable attorneys' fees, expenses, and costs under 42 U.S.C. § 1988 and other applicable laws; and

254.   Such other relief as the Court deems necessary, just, and proper.

Dated: New York, New York      Respectfully submitted,
        March 31, 2022

Roberta A. Kaplan*
Joshua Matz*
John C. Quinn*
Valerie L. Hletko*
D. Brandon Trice*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel.: (212) 763-0883
rkaplan@kaplanhecker.com

Christopher Stoll
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Tel.: (415) 392-6257
CStoll@nclrights.org

Elizabeth F. Schwartz
ELIZABETH F. SCHWARTZ, P.A.
3050 Biscayne Blvd., Suite 600
Miami, Florida 33137
liz@elizabethschwartz.com

*Attorneys for Plaintiffs*

*pro hac vice* forthcoming