## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

EQUALITY FLORIDA; FAMILY
EQUALITY; M.A., by and through
his parent AMBER ARMSTRONG;
S.S., by and through her parents,
IVONNE SCHULMAN and CARL
SCHULMAN; ZANDER MORICZ;
LINDSAY MCCLELLAND, in her
personal capacity and as next friend
and parent of JANE DOE; RABBI
AMY MORRISON and CECILE
HOURY; DAN and BRENT
VANTICE; LOURDES CASARES
and KIMBERLY FEINBERG;
LINDSEY BINGHAM SHOOK;
ANH VOLMER; SCOTT BERG;
and MYNDEE WASHINGTON,

                  Plaintiffs,

     v.

RONALD D. DESANTIS, in his
official capacity as Governor of
Florida; FLORIDA STATE BOARD
OF EDUCATION; THOMAS R.
GRADY, BEN GIBSON,
MONESIA BROWN, ESTHER
BYRD, GRAZIE P. CHRISTIE,
RYAN PETTY, and JOE YORK, in
their official capacities as members
of the Board of Education; JACOB
OLIVA, in his official capacity as
Commissioner of Education of
Florida; FLORIDA DEPARTMENT
OF EDUCATION; BROWARD
SCHOOL BOARD; SCHOOL
BOARD OF MANATEE COUNTY;

Civil Action No. 4:22-cv-00134
(AW) (MJF)


**FIRST AMENDED COMPLAINT**

**JURY DEMAND**

SCHOOL BOARD OF SARASOTA
COUNTY; SCHOOL BOARD OF
MIAMI-DADE COUNTY;
ORANGE COUNTY SCHOOL
BOARD; ST. JOHNS COUNTY
SCHOOL BOARD; and PASCO
COUNTY SCHOOL BOARD,

                              Defendants.

## INTRODUCTION

1.     Florida House Bill 1557 (2022) (widely known as the "Don't Say Gay"
law) is an unlawful attempt to stigmatize, silence, and erase LGBTQ people in
Florida's public schools.  It seeks to do so by imposing a sweeping, vague ban
covering any instruction on "sexual orientation and gender identity," and by
constructing a diffuse enforcement scheme designed to maximize the chilling effect
of this prohibition.

2.     Through H.B. 1557, Florida would deny to an entire generation that
LGBTQ people exist and have equal dignity.  This effort to control young minds
through state censorship—and to demean LGBTQ lives by denying their reality—is
a grave abuse of power.  The United States Supreme Court has repeatedly affirmed
that LGBTQ people and families are at home in our constitutional order.  The State
of Florida has no right to declare them outcasts, or to treat their allies as outlaws, by
punishing schools where someone dares to affirm their identity and dignity.

3.     H.B. 1557 piles one violation on top of another.  It offends principles of free speech and equal protection by seeking to censor discussions of sexual orientation or gender identity that recognize and respect LGBTQ people and their families.  It offends due process by using broad and vague terms to define its prohibitions—thus inviting discriminatory enforcement and magnifying its chilling effect on speech.  And it arises from discriminatory purposes and outdated sex-based stereotypes that offend deeply rooted constitutional and statutory requirements.

4.     To start, the law is clearly the product of animus towards Florida's LGBTQ community.  The law's sponsor in the Senate has stated that the law is meant to prohibit discussion of LGBTQ sexual orientations and gender identities that do not comport with Florida's supposed "core belief systems and values."  He has also stated that the law is intended to prevent students "coming out in school" to their peers from being treated as "celebrities."  The premise of these statements is fear that LGBTQ students might live their true identities in school and be met with acceptance rather than state-sanctioned hostility targeting their protected characteristics.

5.     This legislative purpose is reflected in H.B. 1557's statutory structure. H.B. 1557 subjects school districts to the threat of costly litigation if "school personnel" or "third parties" provide "classroom instruction" on "sexual orientation" or "gender identity" for students in K-3, or where such instruction is not "age-

appropriate or developmentally appropriate according to state standards."   The meaning of "classroom instruction" on "sexual orientation" and "gender identity" is subject to intractable uncertainty and disagreement, yet the statute's drafters made a considered choice not to include definitions for any of these terms.  The State need not even adopt "standards" until one year after the law goes into effect.  But from the very outset, any parent can file suit if they believe that a school has violated these expansive, nebulous prohibitions.  In this respect, H.B. 1557 recruits every parent as a roving censor, armed with a legal warrant to sue schools for damages whenever they believe a teacher, any other "school personnel," or any "third party" has provided any "classroom instruction" that may be perceived as relating to "sexual orientation" or "gender identity."   The potential for arbitrary and discriminatory enforcement here is self-evident—and it reflects a choice designed to maximize the law's *in terrorem* effects.   H.B. 1557 thus operates in a manner antithetical to reasonable requirements of an age or developmentally appropriate education, instead creating a scheme in which parents can use the threat of litigation over vague statutory terms to menace school boards and intimidate teachers into offering a skewed, discriminatory curriculum.

6.    While the law's statutory text is broad and vague, and its enforcement mechanism is deliberately diffuse, its objective is clear: H.B. 1557 seeks to discourage, deter, and ban any discussion of LGBTQ identities in public schools,

while permitting discussion of heterosexuality and non-LGBTQ identities.  In so doing, the State promotes a discriminatory dogma in which the only "appropriate" families, students, and teachers are straight and cisgender ones.

7.     Indeed, the law's vagueness and enforcement mechanisms are key to helping it achieve this discriminatory goal: nobody knows exactly what the statutory language covers, but everybody knows that the law's purpose is to prohibit any discussion of LGBTQ people and that any aggrieved parent can file a burdensome lawsuit against the local school district, so the safest thing to do in order to avoid liability is for schools to prohibit any acknowledgment that LGBTQ people exist.

8.     To appreciate how this dynamic is already unfolding in practice, just consider how students, teachers, parents, guests, and school personnel must navigate these common questions:  Can a student of two gay parents talk about their family during a class debate about civics?  Can that student paint a family portrait in art class?  Can a lesbian student refer to their own coming out experience while responding to a work of literature? Can a transgender student talk about their gender identity while studying civil rights in history class?  What if that occurs in homeroom, or during an extracurricular activity with a faculty supervisor, or in an op-ed in the faculty-supervised school newspaper?  Are teachers allowed to respond if students discuss these aspects of their identities or family life in class?  If so, what can they say?  Do those same limits apply if a teacher intervenes where a student is

being bullied or beaten (or mistreated at home) based on their sexual orientation or gender identity?  What if students address aspects of LGBTQ identity in essays for which teachers must provide grades and feedback?  Speaking of which, can a history teacher educate their students about the history of LGBTQ rights?  Can a government teacher discuss *Obergefell v. Hodges*, 576 U.S. 644 (2015)?  Can an English teacher make note of LGBTQ themes or plots—and can they assign books in which one of the characters (or their families or a side character) is LGBTQ?  Does the librarian have to remove every book with LGBTQ characters or references?  Can a gay or transgender teacher put a family photo on their desk?  Can they refer to themselves and their spouse (and their own children) by the proper pronouns?  What do they do if a student's same-sex parents visit the class together on career day, or ask to join a field trip?  Are those parents forbidden from speaking to the class, on the theory that their very presence somehow instructs students on "sexual orientation"?

9.     These questions only scratch the surface of the censorial regime (and the legal quagmire) that H.B. 1557 inflicts on teachers, students, parents, and so many others.  By design, H.B. 1557 raises many questions and offers no answers, even as it works an extraordinary government intrusion on the rights of students, teachers, and parents in public schools.

10.     One might even ask: would it violate H.B. 1557 for a teacher to discuss with their students *this very lawsuit* and the public controversy surrounding H.B.

1557?  Unfortunately, we already know the answer to this question.  As set forth below, Plaintiff Zander Moricz was specifically instructed not to mention H.B. 1557 or his participation in this lawsuit at his high school commencement speech.

11.    The law's vagueness—and its corresponding potential for unequal and discriminatory enforcement—is made clear by applications that its drafters clearly did *not* see as violations.  A teacher who refers to a student's "mom" and "dad," or who presumes the normalcy of opposite-sex attraction while teaching literature, is "instructing" students on "sexual orientation" if H.B. 1557's language is taken at face value.  But the State of Florida has no problem with such run-of-the-mill references to the sexual orientation of non-LGBTQ people.  Similarly, a coach who tells the football team to play like "men" has most certainly undertaken to "instruct" their students on "gender identity."  But here, too, H.B. 1557's drafters surely see no problem.  Or consider a still more commonplace example: if a teacher referred to his *opposite-sex* spouse by name, the sponsors of H.B. 1557 would see no issue, but if a teacher referred to his *same-sex* spouse by name, the sponsors of H.B. 1557 (and parents, free to sue) might think he broke the law.

12.    By design, H.B. 1557 uses vague terms to create a statutory structure in which anyone who discusses or acknowledges any aspect of LGBTQ identity must fear running afoul of the law, while it is simply taken for granted that discussing heterosexuality or cisgender identity in school settings is perfectly fine.

13.    The effect of H.B. 1557 is thus to chill the rights of teachers, students, and officials, who, like any rational person, will avoid the danger zone created by a state-mandated censorship code.   And H.B. 1557 amplifies its chilling effect by empowering parents to sue school boards, the members of which will similarly be motivated to avoid lawsuits by quelling or punishing any potentially risky speech.

14.    All of this is intentional.  The purpose of H.B. 1557 is not to ensure that instruction on human sexuality is age-appropriate: Florida law *already* does that by requiring that teachers who address "human sexuality" must "[p]rovide instruction and material that is appropriate for the grade and age of the student."  Fla. Stat. § 1003.46(2)(d) (2021).   Moreover, efforts to narrow H.B. 1557 to apply to instruction about sexuality or sex acts were repeatedly shot down in the Legislature. So too were efforts to clarify that the law prohibits discussion of *any* sexual orientation and gender identity, not just discussion of LGBTQ identities and issues.

15.    The law as adopted is discriminatory: it aims at sexual orientations and gender identities that *differ from* heterosexual and cisgender identities.  Florida's lawmakers apparently believe such identities do not have any place in the public school environment—even though gay and transgender students, families, teachers, and officials are part of our public schools (and their communities).

16.    The harmful effects of H.B. 1557 are already manifest in public schools across Florida.  Faced with the law's vague prohibitions and threat of litigation,

teachers and school administrators have said that they will remove LGBTQ references from the curriculum and no longer foster or participate in discussions that touch upon LGBTQ issues.  LGBTQ students and parents are unsure about whether they can express or discuss their identities, which leads them to self-censor or face detention or other possible discipline or exclusion that may result if they do.  The subordination and erasure of LGBTQ life that H.B. 1557 seeks to achieve has already begun—and it has already imposed concrete harms on children and families in Florida.

17.    H.B. 1557 places Plaintiffs and countless others in danger.  LGBTQ students already face disproportionality high risks to their mental and physical health.   The law not only stigmatizes and silences those vulnerable students, exacerbating risks to their welfare, but also threatens school officials who foster a safe and inclusive environment for them—as they are required to do for all students under the Board of Education's Code of Ethics.  Moreover, H.B. 1557 erases other LGBTQ members of the school community and parents, to the detriment of all.

18.    H.B. 1557 serves no legitimate pedagogical purpose.  It is motivated by animus against LGBTQ students, families, and teachers of Florida, and those who would accept and support them in schools.  By design and in effect, H.B. 1557 will "humiliate[] . . . children now being raised by same-sex [and other LGBTQ] couples," and will make it "even more difficult for [them] to understand the integrity

and closeness of their own family and its concord with other families in their community and in their daily lives." *United States v. Windsor*, 570 U.S. 744, 772 (2013).

19.     H.B. 1557 thus reflects an effort by the State to use its power over public schools to demean and deny the existence of people whom the Supreme Court has repeatedly held to be protected.  It has no place in a free democratic society.

20.     For the reasons set forth herein, the Court should declare that H.B. 1557 violates the First and Fourteenth Amendments to the United States Constitution, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), and enjoin its implementation and enforcement.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the United States Constitution, 42 U.S.C. § 1983, and Title IX.

22.     This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendants are public officials in the State of Florida, they are sued in their official capacities, and certain Defendants maintain their principal headquarters in this District.  Defendants reside within this District and/or perform official duties within Florida.

23.    There is an actual and justiciable controversy between Plaintiffs and Defendants because H.B. 1557 constitutes an immediate infringement on the constitutional and statutory rights of Plaintiffs.

## PARTIES

### I.    Plaintiffs

24.    Plaintiffs are organizations, students, parents, and teachers who are already being harmed and will continue to be harmed by H.B. 1557.

Organizations

25.    Equality Florida.    Plaintiff Equality Florida is a non-profit, public interest organization based in St. Petersburg, Florida.  Its goal is to secure equal rights and protections for the LGBTQ community in Florida through education, grassroots organizing, coalition building, and lobbying.  Equality Florida is the largest civil rights organization dedicated to securing full equality for Florida's LGBTQ community, with more than 140,000 members.

26.    Equality Florida brings this action in its own capacity and in an associational capacity on behalf of its members. Its members include LGBTQ students and parents who attend or whose children attend Florida public schools, non-LGBTQ students and parents who support LGBTQ equality and who attend or whose children attend Florida public schools, LGBTQ teachers who teach in Florida public schools, non-LGBTQ teachers who support equality and teach in Florida

public schools, and other school personnel such as counselors who support equality and work in Florida public schools.  Equality Florida's members represent a wide range of ages, races, and ethnic backgrounds and reside throughout the State of Florida.

27.    In furtherance of its mission—which includes fighting discrimination against LGBTQ Floridians—Equality Florida has actively opposed the passage of H.B. 1557.  Equality Florida's mission also includes education, and through programs like the Safe and Healthy Schools Project, Equality Florida works to create a culture of inclusion while countering the bullying, harassment, social isolation, and bigotry that increase risk factors for LGBTQ students.

28.    <u>Family Equality.</u>  Plaintiff Family Equality is a nationwide non-profit, public interest organization headquartered in New York, New York, with slightly fewer than 900 individuals on its email list in Florida.  It brings this action in its own capacity.

29.    Family Equality's mission is to ensure that everyone has the freedom to find, form, and sustain their families by advancing equality for the LGBTQ community.  In furtherance of its mission, Family Equality works to advance legal and lived equality for LGBTQ families and those who wish to form them, including by ensuring that families have the support they need in school.  Family Equality recently adopted a new strategic plan that included as a priority protecting LGBTQ

families and children from discrimination in schools as well as increasing Family Equality's presence in the southern states, with an emphasis on the State of Florida.

Students

30.   M.A.   Plaintiff M.A. is a 17-year-old sophomore at Manatee School for the Arts, a public charter school in Palmetto, Florida.   He lives with his mother, grandparents, and cousin.[1]

31.   M.A. has known that he is gay since a very early age.   However, he did not come out to his family and friends until middle school.   At the time, his mother could tell that he was struggling.   She found out M.A. was gay by reading chats he was having with others online on his video game console.

32.   M.A.'s mother was very supportive and told him that she loved him no matter what, and all he needed to do was be truthful and open with her.   His grandparents were also supportive, even though they are conservative.

---

[1] Looking to its plain text and legislative history, H.B. 1557's applicability to charter schools is unclear—a circumstance that itself will have a chilling effect on those schools' LGBTQ communities. While charter schools are generally exempt from the Florida Early Learning-20 Education Code, they must comply with "statutes pertaining to student health, safety, and welfare." Fla. Stat. § 1002.33(16)(a)(5) (2021). H.B. 1557 purports to relate to students' "mental, emotional, or physical health or well-being." It also amends Fla. Stat. § 1001.42(8), a section titled "Student welfare" containing provisions relating to "health, safety, and other matters relating to the welfare of students." Fla. Stat. Ann. § 1001.42(8)(a). In addition, Governor DeSantis conducted the bill signing ceremony at a charter school, and his Press Secretary has stated that the law will apply in charter schools. *See* Danielle J. Brown, *Does the so-called 'Don't Say Gay' law apply to Florida charter public schools?*, FLORIDA POLITICS (Mar. 30, 2022), https://floridapolitics.com/archives/512625-does-the-so-called-dont-say-gay-law-apply-to-florida-charter-public-schools/.   Thus, while there are reasonable arguments that H.B. 1557 does not apply in charter schools, the State is likely to take the position that it does—a threat that is causing the very injuries identified in this Amended Complaint.

33.     Sadly, M.A.'s father was a different story.  When M.A. was younger, his father told his mother that if their son was gay, he "was never going to love him." After M.A.'s mother told his father about M.A.'s sexual orientation, his father initially expressed acceptance, but eventually terminated contact with him and is no longer a part of his life.

34.     While M.A. had a (mostly) supportive family, coming out was difficult. He worried that people around him didn't understand what being gay actually meant. He had anxiety attacks at school, and his grades began to suffer.  But after his mother found him a private counselor, he became empowered to identify his needs in school and at home, and to advocate for himself and other LGBTQ students.

35.     In eighth grade, M.A. decided to start a Gay-Straight Alliance ("GSA") because he knew how important his family's support had been for him and he couldn't imagine what it was like for others who lacked that support.  However, when M.A. and his teacher-advisor submitted their application, the school's administration rejected it, claiming that the school's bylaws barred the GSA and the creation of "non-academic organizations," even though there was no such written policy in place and other non-curricular student organizations existed.  It took two years and the threat of legal action with the help of a local advocacy group to get the school to finally permit M.A. and his advisor to start the club.

36.     Today, M.A. is the president of his school's GSA, which typically has between 15 and 30 members and creates a welcoming space for other LGBTQ students and their allies.  As his mother put it, M.A. "found his voice" through the GSA.

37.     Since starting the GSA, M.A.'s grades have improved significantly, and he is taking college-level classes.  M.A. also participates in Mock Trial and in Manatee Teen Court as a student attorney.

38.     <u>S.S.</u>  Plaintiff S.S. is a 17-year-old junior at Miami Beach Senior High School.  She lives with her Cuban-American mother and her father in Miami.  S.S. is very successful at school—she consistently receives all A's and participates in her school's International Baccalaureate ("IB") program.

39.     In middle school, S.S. identified as bisexual.  She shared this with her friends starting in eighth grade, but did not tell her parents at that time.

40.     During her freshman year of high school, after she had dated a boy, S.S. realized that she was only attracted to women.  She then began to identify exclusively as a lesbian, rather than as bisexual.

41.     S.S. first came out as a lesbian to her uncles who are gay in August 2020; she came out to her parents the following January.  S.S.'s parents were very supportive of her sexuality.  Since coming out to her parents, S.S. has also come out

to her father's side of the family.  She has not come out to her mother's side of the family because she is worried they will not be accepting of her identity.

42.    S.S. has gradually come out to people at school, including her friends and some teachers.  In particular, S.S. found support from her ninth-grade biology teacher, who was her teacher at the time S.S. realized she was a lesbian.

43.    S.S. believes that most of her peers and friends know that she is a lesbian, although she has never formally or publicly come out to peers who are not in her social circle.  S.S. finds her school environment to be generally accepting, which has been enormously beneficial to S.S. and has allowed her to succeed both socially and academically.  At least prior to the passage of H.B. 1557, S.S. has felt that she was "able to be herself" at school.

44.    <u>Zander Moricz.</u>  Plaintiff Zander Moricz is an 18-year-old who recently graduated from Pine View School, a public magnet school in Osprey, Florida for academically gifted students.  His parents are divorced, and he mainly lives with his mother and younger brother.

45.    Moricz has known he is gay since middle school.  At the time, he felt as though he had to constantly hide who he truly was.  He would modify his speech and physical gestures and modulate his interests to try to avoid being perceived as gay.  He dreaded going to gym class because the boys would tease him in the locker room and call him names like "pussy" and "faggot."  Living in this closeted

adolescence was deeply debilitating for Moricz at an important time in his life.  He never felt like he fit in or belonged at his school.

46.     Moricz transferred to Pine View School in sixth grade; he came out as gay during his freshman year.  At the time, Moricz wanted to run for president of the freshman class and be a leader for his peers, but he wanted to run only if he could do so without being in the closet.  Moricz ultimately decided to run, with support from a friend, and came out to his school and the broader community in the process.  To his surprise, Moricz won.  He remained class president for all four years.

47.     At home, Moricz's family was not at first accepting of his sexuality.  It took many difficult conversations for him to feel safe and accepted.  But school was different and better.  Moricz has had warm and accepting teachers and friends who embraced him for who he is, and he had many opportunities at school to express who he is and take pride in his identity.

48.     Moricz's ability to be himself at school allowed him to succeed academically.   He had a 5.06 GPA and took nearly every Advanced Placement course his high school offered.  He also served as the president of the local Model UN chapter and the head debate captain of the Pine View Speech and Debate Club.  He will attend college at Harvard University in the fall.

49.     <u>Jane Doe.</u>  Plaintiff Jane Doe is a fifth grader at a Florida public school.  Doe lives half of the time with her mother (Plaintiff Lindsay McClelland) and her

siblings and stepfather in Brandon, Florida.  She lives the other half of the time with her father.

50.    From around age two, it was clear that although Doe was assigned male at birth, she identified as a girl.  Doe would regularly tell her parents, "I am a girl." When she started to choose her own clothes and toys, she immediately gravitated towards feminine clothing, nail polish, and dolls.  She was also drawn to wearing her mother and grandmother's shirts and sought to style them as dresses in order to express her female gender identity.  On a family trip to Busch Gardens, when Doe was a young child, she was enamored with the female characters, like Abby Cadabby of *Sesame Street*.  And when Doe discovered the Disney movie *Frozen*, she was obsessed with the lead princesses, Elsa and Anna.

51.    For McClelland, this was all a huge shock.  McClelland is a former Command Security Analyst for the United States Marine Corps, who grew up in a small town outside of Washington D.C. and was entirely unfamiliar with matters of transgender gender identity.

52.    At first, McClelland tried to satisfy Doe by allowing her to wear dress-up costumes in the house as part of a game.  But it quickly became apparent that "dress-up" would not be enough for Doe to feel like herself.

53.    When Doe was two, her parents bought boys' clothes—and traditionally masculine toys like trucks and airplanes—for Christmas.  As Doe

opened her presents on Christmas morning, she looked deflated and sad because she didn't relate to any of the toys "Santa" had brought.  McClelland saw that Doe did not have the same light and joy her sons had that Christmas morning.

54.    From that point forward, McClelland realized that she had to embrace who her daughter was.  And that is what she did.  For Doe's fourth birthday, the family threw Doe a Rapunzel-themed party and gifted her a Dorothy dress from *The Wizard of Oz*.  Doe was ecstatic.  At another party, she wore a princess head garland and twirled with joy.

55.    As soon as Doe's family started to allow Doe to be herself, they immediately experienced backlash from their community.  Doe's family belonged to a large Baptist church in their neighborhood.  McClelland and her husband were Bible school teachers and involved in community activities at the church.  At a young age, Doe attended Easter morning church services in a dress.  Soon after, the ministry reached out and encouraged the family to participate in a form of conversion therapy for Doe.  They shared pamphlets on how to "fix" and "change" people like Doe.  But McClelland knew that there was nothing about Doe that needed "fixing," and she told their church that she would not be participating in their efforts to change or convert Doe.  As a result, the family was ostracized from their church community.

56.    At the time, McClelland did not know anyone else in her community grappling with these issues, so she turned to support networks online.  She found a

private Facebook group for parents of transgender children, and other parents shared resources with her. McClelland also found an organization in Tampa that provided health and wellness support to LGBTQ individuals, where she learned about the consequences of not supporting a transgender child, which include a high risk of mental health issues, drug abuse, and even suicide.

57.     After speaking with her husband and Doe's father, McClelland decided it was best for Doe's development and safety to allow her to socially transition to a girl in preschool. Since then, Doe has used female pronouns and presented as female at school. Each year, before the start of school, McClelland speaks with both Doe's new classroom teacher and the school principal about how to ensure the classroom will be a safe environment for Doe. She informs the teacher of the use of proper pronouns for Doe (she/her) and discusses how best to mitigate any bullying, name calling, or teasing throughout the school year.

58.     Despite these efforts, Doe is constantly afraid of being "outed" or bullied at school. Indeed, even with some support from the school, issues have still arisen. For example, in Doe's after-school program when she was younger, which took place at her school, the teacher required Doe to be the last or first to use the bathroom to ensure that no other girls were in the bathroom with her. This experience obviously ostracized Doe. And recently, Doe was "outed" by one of her

peers.  As a result, Doe has increased anxiety and has been fearful about going back to school in the fall.

59.     As she gets older, Doe struggles with how to safely and comfortably navigate her identity at school.  Last year, as a fourth grader, Doe came out to a couple of her peers at school as transgender.  And in January 2022, Doe legally changed her name to conform to her gender identity.  Doe wants to live and be her authentic self, a self she has understood and expressed since she was a toddler.  But in doing so, she has already faced bullying, name calling, and ostracization.  Students have told Doe that she "looks like a boy," and have used her name given at birth to taunt and tease her.  As a result, Doe does not have a single close friend at school anymore.

Parents

60.     Amy Morrison and Cecile Houry.  Plaintiffs Rabbi Amy Morrison and Dr. Cecile Houry are a committed lesbian couple in a domestic partnership. They have been together for over a year.  Houry is a member of Equality Florida.

61.     Morrison is a Rabbi at a local temple and Houry works for the City of Miami Beach, managing the Police Department's grants and victim services unit. They live together with their two children.

62.     Morrison gave birth to her son in 2014.  He is currently in the second grade at Miami Children's Museum Charter School, a public school in Miami-Dade

County.  Houry's daughter was placed with her as a foster child when she was six days old and legally adopted by Houry a year later.  Houry's daughter is currently in preschool and will be starting kindergarten at Miami Children's Museum Charter School in August 2022.

63.     Morrison and Houry have raised their children to embrace Morrison's "as you are" mindset that she espouses in her role as a Rabbi.

64.     The children see nothing unique or particularly important about telling someone "My other mom played basketball with me," because they have always been open about their families.

65.     Based on her religious beliefs, Morrison teaches that all individuals should be celebrated—not just accepted—for who they are.  In other words, Morrison and Houry's children have no qualms about talking about their two moms because that is the life that they have always known; they haven't been taught to expect or idealize any other family structure.

66.     These beliefs carry into life at school, where Morrison and Houry's children talk openly about their family.  Morrison's son has a picture of the four of them hanging up in his classroom—and on multiple occasions, he has been asked to make drawings of his family, which have included a portrait of his two moms and his sister.

67.    <u>Dan and Brent VanTice.</u>  Plaintiffs Dan and Brent VanTice are a gay couple who have been together for twenty years and have been married for fifteen. They live in Saint Johns, Florida, and are the parents of two first-grade boys who go to public school in the area.  Dan is an IT consultant and Brent is a financial services executive.

68.    The VanTices are active members of Equality Florida. They are invested in their community, having fought to overturn Florida's previous bans on gay marriage and gay adoption.  They always knew that they wanted to have a family.

69.    When the VanTices first decided to adopt, adoption by gay couples was illegal in Florida.  As a result, they went to great lengths and expense to work with an adoption agency based in California.  Later, after the adoption ban in Florida was overturned, they also began to work with an agency in Florida.  In the summer of 2014, they were informed that they would be able to adopt not one, but two, children. The VanTices were present at both births and have been raising their two sons, who were born just eight weeks apart, ever since.

70.    The VanTices have always worked hard to communicate to their children that families come in many shapes and sizes, and that their family is no different than any other.  They have spoken openly, freely, and lovingly about their family.

71.   <u>Lourdes Casares and Kimberly Feinberg.</u>   Plaintiffs Dr. Lourdes Casares and Dr. Kimberly Feinberg are a lesbian couple who have been together for over seventeen years.  They married in 2016, when marriage became legal in Florida. Casares is a clinical psychologist and psychoanalyst, and Feinberg is an anesthesiologist.  They live together in Miami-Dade County.

72.   Casares and Feinberg have a child who is in K-3 at a public school in Miami-Dade County.   Both parents are very active in and value the school community, and Feinberg serves on the school's PTA.

73.   <u>Lindsey Bingham Shook.</u>   Plaintiff Lindsey Bingham Shook is a heterosexual woman who lives with her partner and their daughter, a first grader at a public elementary school in Miami, Florida.  Shook is an editorial director for a magazine.  She is active in the community and involved in numerous non-profit organizations in the Florida area.

74.   Shook's daughter has expressed no specific sexual orientation or gender identity.  Shook wants her daughter to learn about the diversity of families in her community and to have empathy for all forms of families and identities.

75.   <u>Anh Volmer.</u> Plaintiff Anh Volmer is a heterosexual woman who lives with her husband, her daughter, a kindergartener, and her son, a second grader. Her children attend public elementary school in the Orlando area.  Her family attends events run by her local church, and she is active in her community.

76.     Like Shook's children, Volmer's children have expressed no specific sexual orientation or gender identity.  Volmer wants her children to learn that all families should be welcomed and included in their community.

77.     Volmer's children recently attended a wedding of two women, and she is worried that once H.B. 1557 takes effect, her children will not be able to talk about experiences like attending that wedding or share information about their family's LGBTQ friends with their peers.

Teachers

78.     Scott Berg.  Plaintiff Scott Berg is a veteran elementary school teacher at Flamingo Elementary School in Broward County.  Berg and his husband have been married for seven years and together as a couple for 11 years.  Since becoming a teacher 29 years ago, Berg has taught nearly every grade in elementary school.  He currently teaches elementary school art, and his students range from pre-kindergarten to fifth grade.

79.     Myndee Washington.  Plaintiff Myndee Washington is a long-time middle-school civics and drama teacher at Union Park Charter Academy in Pasco County.  She is also a parent of three children.  Washington is an active member of her local church and a proud Christian.

80.     Throughout her teaching career, Washington has served as the teacher-advisor for gay-straight alliances, or GSAs, at her schools,[2] as well as supported other student-driven LGBTQ events and organizations, such as a student-led book club focused on books with LGBTQ characters.  As a result of Washington's open support, LGBTQ students have routinely turned to and depended on her in school for resources and support.

81.     As a teacher, Washington has frequently had organic, student-driven conversations touching on the LGBTQ community in connection with both her civics and drama curricula.  For example, discrimination against the LGBTQ community has come up in the context of discussing key Supreme Court cases including the marriage equality decision *Obergefell v. Hodges*, and the school desegregation case, *Brown v. Board of Education*.

## II.     Defendants

82.     Defendant Ronald D. DeSantis is the Governor of Florida.  Governor DeSantis is responsible for signing H.B. 1557 into law and for taking care that the laws be faithfully executed as the Chief Executive of Florida.  FLA. CONST., art. IV, § 1.  Governor DeSantis is sued in his official capacity.

83.     Defendant Florida State Board of Education is the chief implementing and coordinating body of K-12 public education in Florida.  It supervises the State's

---

[2] Faculty sponsors are generally required for student groups in Florida public schools, which include GSAs.

public education system and the head of the Department of Education.  FLA. CONST., art. IX, § 2; Fla. Stat. § 20.15(1) (2021).  The Board of Education has authority to implement the provisions of law conferring duties upon it for the improvement of the State system of public education, including to adopt comprehensive educational objectives, approve plans for cooperation with other public agencies in the development of rules and enforcement of laws for which it and such agencies are responsible, enforce systemwide education goals and policies, and adopt and periodically review and revise the Next Generation Sunshine State Standards, which are the core content of the curricula to be taught in the state in K-12 public schools. Fla. Stat. §§ 1001.02-.03, 1003.41 (2021).  Under H.B. 1557, the Board of Education is required to review and approve or reject any recommendation of a special magistrate as to whether a school district is in compliance with the law, and to adopt rules necessary to implement the foregoing procedure.  *Id.* § 1001.42(8)(c)(7)(b)(I). The Board of Education is the recipient of federal financial assistance.

84.    Defendant Thomas R. Grady is the Chairman of the Board of Education, and Defendant Ben Gibson is Vice Chairman.  Defendants Monesia Brown, Esther Byrd, Grazie P. Christie, Ryan Petty, and Joe York are members.  All are sued in their official capacities as members of the Board of Education.

85.    Defendant Jacob Oliva is the Commissioner of Education of Florida appointed by the Board of Education to serve as the Interim Commissioner of the

Department of Education until June 1, 2022.[3]  FLA. CONST., art. IX, § 1; Fla. Stat.

§ 20.15(2) (2021).   As such, he is the chief educational officer of the State and

responsible for assisting the Board of Education in enforcing compliance with the

mission and goals of the education system; he also supports the Board of Education

in general administration.  Fla. Stat. § 1001.10.  Along with the Board of Education,

the Commissioner is charged with assigning the divisions of the Department of

Education with such powers, duties, responsibilities, and functions as are necessary

to ensure the greatest possible coordination, efficiency, and effectiveness of

education for students in K-20 education.  *Id.* § 20.15(5).  The Commissioner is

required, as needed, to develop and submit proposed revisions of the Next

Generation Sunshine State Standards to the Board of Education for adoption.  *Id.*

§ 1003.41.   Under H.B. 1557, the Commissioner is responsible for appointing a

special magistrate to make a recommendation as to whether a school district is in

compliance with the law.  Oliva is sued in his official capacity as Commissioner of

Education.

---

[3] Manny Diaz, Jr. was appointed by the State Board of Education to serve as Florida's next Commissioner of Education on April 29, 2022.  His appointment is effective June 1, 2022, five days after the filing of this Amended Complaint.  *See* Fla. Dep't of Educ. Press Off., *Senator Manny Diaz, Jr. Unanimously Appointed as Florida's Commissioner of Education by State Board of Education* (Apr. 29, 2022), https://www.fldoe.org/newsroom/latest-news/senator-manny-diaz-jr-unanimously-appointed-as-floridas-commissioner-of-education-by-state-board-of-education.stml.  Plaintiffs anticipate that Mr. Diaz will replace Mr. Oliva as a defendant on June 1, 2022.

86.    Defendant Florida Department of Education is the administrative agency that is responsible for implementing Florida's education policies and programs, under the implementation direction of the Board of Education.  Fla. Stat. §§ 20.15, 1001.20 (2021).   Under H.B. 1557, the Department of Education is responsible for reviewing and updating, as necessary, school counseling frameworks and standards, educator practices and professional conduct principles, and any other student services, personnel guidelines, standards, or frameworks in accordance with the requirements of the act.  The Department of Education is the recipient of federal financial assistance.

87.    Defendant Broward County School Board is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The Broward County School Board operates Flamingo Elementary School, where Plaintiff Berg is employed as a teacher.  Its powers and duties include implementing H.B. 1557. *See id.* § 1001.42(8).

88.    Defendant School Board of Manatee County is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The School Board of Manatee County operates Manatee School for the Arts, which Plaintiff M.A. attends.   Its powers and duties include implementing H.B. 1557.   *See id.* § 1001.42(8).

89.     Defendant School Board of Sarasota County is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The School Board of Sarasota County operates Pine View School, which Plaintiff Moricz attended.  Its powers and duties include implementing H.B. 1557.  *See id.* § 1001.42(8).

90.     Defendant School Board of Miami-Dade County is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The School Board of Miami-Dade County operates Miami Beach Senior High School, which S.S. attends; Miami Children's Museum Charter School, which the children of Plaintiffs Morrison and Houry attend or will attend next year; the school attended by the child of Plaintiffs Casares and Feinberg; and the school attended by the child of Plaintiff Shook.  Its powers and duties include implementing H.B. 1557.  *See id.* § 1001.42(8).

91.     Defendant Orange County School Board is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The Orange County School Board operates the school attended by the children of Plaintiff Volmer.  Its powers and duties include implementing H.B. 1557.  *See id.* § 1001.42(8).

92.     Defendant Pasco County School Board is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The Pasco County School Board operates Union Park Charter Academy, where Plaintiff Washington is

employed as a teacher.  Its powers and duties include implementing H.B. 1557.  *See id.* § 1001.42(8).

93.    Defendant St. Johns County School Board is a district school board organized and governed pursuant to Fla. Stat. § 1001.34 *et seq.*  The St. Johns County School Board operates the school attended by the children of Plaintiffs Dan and Brent VanTice.  Its powers and duties include implementing H.B. 1557.  *See id.* § 1001.42(8).

## STATEMENT OF FACTS

I.    **Florida's commitment and obligation to provide a meaningful education for all students, and school districts' efforts to meet it**

94.    Florida has long affirmed the importance of providing all students with an education that will prepare them to live in a free democratic society—a principle that stands in stark, unmistakable tension with the goals underlying H.B. 1557.

95.    Article IX of the Florida Constitution proclaims that "[t]he education of children is a fundamental value of the people of the State of Florida," and it is therefore "a paramount duty of the state to make adequate provision for the education of all children residing within its borders."  FLA. CONST. art. IX, § 1.  As the Florida Supreme Court has recognized, "this education provision was placed in our constitution in recognition of the fact that education is absolutely essential to a free society under our governmental structure."  *Bush v. Holmes*, 919 So.2d 392, 405

(Fla. 2006) (quoting *Coal. for Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So.2d 400, 409 (Fla. 1996) (Overton, J., concurring)).

96.     The Supreme Court has affirmed the central role of public schools as "the nurseries of democracy." *Mahanoy Area Sch. Dist. v. B. L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021).  Education "is the very foundation of good citizenship" and "a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

97.     The "classroom is peculiarly the marketplace of ideas," a place where our children are "trained through . . . that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (quotation marks and citation omitted).  Schools thus have an obligation to protect even "unpopular ideas," *Mahanoy*, 141 S. Ct. at 2046, and to ensure that students have access to a diversity of information that will prepare them "for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members," *Bd. of Educ. v. Pico*, 457 U.S. 853, 868 (1982) (plurality op.).

98.     In keeping with this longstanding commitment to "academic freedom," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967), the First Amendment protects

students' "right to receive information and ideas," *Pico*, 457 U.S. at 867 (quoting *Stanley v. Georgia*, 394 U.S. 557, 564 (1969)).  Moreover, "students do not 'shed their constitutional rights to freedom of speech or expression,' even 'at the school house gate.'"  *Mahanoy*, 141 S. Ct. at 2044 (quoting *Tinker*, 393 U.S. at 506).

99.    Florida guarantees that "all K-12 public school students are entitled to a uniform, safe, secure, efficient, and high quality system of education, one that allows students the opportunity to obtain a high quality education" that is "made available without discrimination on the basis of race, ethnicity, national origin, gender, disability, religion, or marital status."  Fla. Stat. § 1002.20(1), (7) (2021).

100.    The Board of Education, through the Department of Education, has also adopted rules to ensure "Educational Equity."  Under Section 6B-1.0001 of the Code of Ethics, "The educator values the worth and dignity of every person, the pursuit of truth, devotion to excellence, acquisition of knowledge, and the nurture of democratic citizenship.  Essential to the achievement of these standards are the freedom to learn and to teach and the guarantee of equal opportunity for all."  Fla. Admin. Code r. 6A-10.081(1)(a).

101.    Educators are required to "make reasonable effort to protect the student from conditions harmful to learning and/or to the student's mental and/or physical health and/or safety"; to "not unreasonably deny a student access to diverse points of view"; to "not harass or discriminate against any student on the basis of . . . sex,

. . . [or] sexual orientation"; and to "make reasonable effort to assure that each student is protected from harassment or discrimination." *Id.* r. 6A-10.081(2). In addition, "institutions have an affirmative duty" "to create an educational and work environment free of harassment on the basis of . . . sex." *Id.* r. 6A-19.008.

102.   Florida's representatives and education officials thus have recognized for many years that public schools and educators have a commitment and duty to promote the meaningful education of all students, without discrimination, and to ensure that Florida's students are prepared to live and flourish in a free democracy.

## II.   Florida schools' inclusivity efforts for the LGBTQ community

103.   In recent years, local school districts have aspired to make Florida's promise of a meaningful education real for a historically excluded and disadvantaged group: LGBTQ students.

104.   For instance, Plaintiff M.A.'s school district in Manatee County has an "Equity, Diversion, and Inclusion Policy" that requires "equal opportunity and access in relation to all stakeholders: students, families, and staff . . . by valuing, acknowledging, recognizing, and celebrating everyone in our school system" regardless of "gender, sex, gender identity, gender expression, [or] sexual orientation." That policy instructs the School Board to, among other things, "[s]elect and develop instructional materials that are historically accurate and represent the experiences of the diverse school community," and "interrupt and dismantle harmful

or inequitable practices and policies and eliminate implicit and explicit biases."[4] Manatee County also has a policy of Non-discrimination and Access to Equal Educational Opportunity that prohibits discrimination and harassment on the basis of sexual orientation, transgender status, and gender identity, and requires educational programs "be designed to meet the varying needs of all students." Specifically, curriculum content must be considered in light of its potential "bias based upon the protected classes" and supplemented to fairly depict the contribution of different groups "toward the development of human society."[5] And finally, Manatee County previously adopted "LGBTQ+ District Guidelines" "intended to assist faculty, staff, and students in fostering positive self-image, establishing safe and inclusive schools, and promoting academic success for students who are, or are perceived to be, Lesbian, Gay, Bisexual, Transgender, or Questioning (LGBTQ)," which included eight "Actions" the district should take to support LGBTQ students in accordance with the laws in place at the time.[6]

105.  St. Johns County School District, where Plaintiffs Dan and Brent VanTice's sons attend school, adopted guidelines that include permitting the

---

[4] School District of Manatee County Policy Manual, *po9142* (Oct. 27, 2020), https://go.boarddocs.com/fl/mancofl/Board.nsf/goto?open&id=APMMA75599D6#.

[5] School District of Manatee County Policy Manual, *po2260* (Apr. 12, 2022), https://go.boarddocs.com/fl/mancofl/Board.nsf/goto?open&id=APMMA75599D6#.

[6] School District of Manatee County, *LGBTQ+ District Guidelines*, https://web.archive.org/web/20211228214657/https://www.manateeschools.net/cms/lib/FL02202357/Centricity/Domain/4941/District_LGBTQ_Guidelines.pdf (last visited May 24, 2022).

formation of GSAs and prohibiting "try[ing] to silence students who are open about their sexual orientation or transgender identity, or who question their orientation or gender identity."[7]

106.   Plaintiff Moricz's school district of Sarasota County adopted "Gender Diverse Student Guidelines" to "enhance ongoing efforts to make each Sarasota K-12 public school a safer place for all students – with particular emphasis on LGBTQIA community of students."  These guidelines specifically recognize that "[s]tudents who feel accepted at school are more highly motivated, engaged in learning and committed to achieving the best possible education."[8]

107.   The Miami-Dade County Public Schools, where Plaintiff S.S. and the children of Casares and Feinberg, Morrison, and Shook attend school, has "comprehensive anti-discrimination and anti-bullying policies that require all students be treated with respect regardless of their unique characteristics, including sexual orientation or gender identity."  The "Guidelines for Promoting Safe and Inclusive Schools" have the stated goal of "promot[ing] a positive, proactive approach that upholds and protects the rights of transgender and gender

---

[7] St Johns County School District, *Guidelines for LGBTQ students-Follow Best Practices*, at 1 (last revised December 2021),  https://www.news4jax.com/news/local/2022/02/11/advocates-share-concerns-over-sjc-school-districts-guidelines-for-lgbtq-students/.

[8] Sarasota County Schools, *Creating Safe Schools for All Students: Gender Diverse Student Outlines*, at 3 (last reviewed March 25, 2022),  https://www.sarasotacountyschools.net/cms/lib/FL50000189/Centricity/Domain/1174/revised%20Gender%20Diverse%20Guidelines%20FINAL_10232018.pdf.

nonconforming students; and best practices to ensure that transgender students and gender nonconforming students have equitable access to all aspects of school life (academic, extracurricular and social) in ways that preserve and protect their dignity."[9]  These guidelines highlight existing district policies that support LGBTQ youth, including prohibitions against anti-discrimination, bullying, and harassment, and include best practices to support and ensure the safety of all students.[10]

108.   Similarly, Broward County School District, where Plaintiff Berg teaches, has sought to "promote safer schools and create more welcoming and affirming learning environments" for LGBTQ students, those perceived to be LGBTQ, and their allies.[11]  As an example, Broward County requires an "inclusive curriculum" that must at least include literature written by LGBTQ authors, history including LGBTQ public figures, discussions of families including same-sex parents and relevant topics encompassing the diversity of LGBTQ young people, and recognition of national LGBTQ events.[12]  Broward County has also adopted an anti-

---

[9] Miami-Dade County Public Schools, *Guidelines for Promoting Safe and Inclusive Schools*, at 2 (last revised July 2020), https://api.dadeschools.net/WMSFiles/94/pdfs/GUIDELINES-FOR-PROMOTING-SAFE-07-2020.pdf.

[10] *Id.* at 2, 9-11.

[11] Broward County Public Schools, *Lesbian, Gay, Bisexual, Transgender, Questioning + Critical Support Guide*, at iv (2012), https://www.browardschools.com/cms/lib/FL01803656/Centricity/Domain/13475/BCPS%20LGBTQ%20Critical%20Support%20Guide%20Edition%20III%202020FinalRev2421.pdf.

[12] *Id.* at 4-5.

bullying policy that prohibits bullying and harassment based on sexual orientation, gender identity, and gender expression. [13]

109.   The Palm Beach County School District has supported LGBTQ youth by requiring an inclusive curriculum that covers, among other things, the history and social movements of LGBTQ people, discussions of families that include same-sex parents/caregivers, and relevant topics encompassing the diversity of LGBTQ young people.  It also has adopted an Anti-Bullying Roundtable and Strategic Plan, which includes safe environments for all students and staff. [14][15]

110.   These measures have helped to create an inclusive environment for LGBTQ students that is critical to meeting their educational needs. [16]  They have

---

[13] *Id.* at 5-6.

[14] School District of Palm County, *The School District of Palm Beach County LGBTQ+ Critical Support Guide*, at 5-6 (2d ed. 2021), https://p14cdn4static.sharpschool.com/UserFiles/Servers/Server_270532/File/Curriculum/Middle%20&%20HS/LGBTQ_Critical_Support_Guide_SDPBC_v02_2021.pdf.

[15] Other counties have adopted similar guidelines. *See* Alachua County Public Schools, *LGBTQ+ Critical Support Guide* (Dec. 8, 2021), https://web.archive.org/web/20211222213631/https://go.boarddocs.com/fl/alaco/Board.nsf/files/C9HSYJ7300DD/$file/LGBTQ+%20Critical%20support%20Guide.pdf; Duval County Public Schools, *LGBTQ+ Support Guide* (2020), https://s3.documentcloud.org/documents/21988102/dcps_lgbtq_support_guide_2020.pdf; Hillsborough County Public Schools, *Lesbian, Gay, Bi-Sexual, Transgender, and Questioning/Queer (LBGTQ+) Critical Resource and Support Guide for Staff* (Aug. 31, 2021), https://www.wfla.com/wp-content/uploads/sites/71/2022/02/Hillsborough-Schools-LGBTQ-Critical-Resource-Guide-2021-08.31.21.pdf; Pinellas County Schools, *Inclusive Schools Support Guide: Promoting Safe and Inclusive Schools* (May 28, 2020), http://www.pccpta2020.com/wp-content/uploads/2021/09/Inclusive-Schools-Support-Guide_FINAL_5.28.20.pdf; Volusia County Schools, *Lesbian, Gay, Bi-sexual, Transgender and Questioning (LGBTQ) Support Guide* (2020), https://beacononlinenews.com/wp-content/uploads/2022/03/VCS-LGBTQ-Support-Guide-2020.pdf.

[16] *See, e.g.*, *2018-2019 NEA Resolutions,* at 219-220, NATIONAL EDUCATION ASSOCIATION OF THE UNITED STATES OF AMERICA (2019), https://my.lwv.org/sites/default/files/resolutions_nea_hb_2019.pdf (recommending that schools adopt "inclusive educational programs that address the unique needs and concerns" of LGBTQ students).

also promoted the safety and acceptance of LGBTQ students, who are uniquely at

risk of harassment, depression, and other negative educational experiences because

of their sexual orientation or gender identity.  *See infra* Part IV.

### III.  H.B. 1557 was enacted to undercut these developments, harm LGBTQ students, and stifle speech

111.   H.B. 1557 seeks to undo all of this.  Although it is formally entitled the

"Parental Rights in Education Act," it is popularly and more accurately known as

Florida's "Don't Say Gay" law.  H.B. 1557 is avowedly aimed at eliminating, and

already has begun to eliminate, any recognition or discussion of LGBTQ persons in

public schools.

Vague Statutory Text

112.   In relevant part, H.B. 1557 amends Florida Statutes Section 1001.42 to

add new subsection 8(c)(3), which provides:

> Classroom instruction by school personnel or third parties
> on sexual orientation or gender identity may not occur in
> kindergarten through grade 3 or in a manner that is not
> age-appropriate  or  developmentally  appropriate  for
> students in accordance with state standards.

113.   The law does not define the subject matter of the speech it seeks to

prohibit.  Nowhere does it even attempt to define its operative terms.  "Classroom

instruction" is left undefined, as are "sexual orientation" and "gender identity."[17]

---

[17] Adding to its intended vagueness, the Preamble to H.B. 1557 states that it is a law "prohibiting classroom *discussion* about sexual orientation or gender identity."  (Emphasis added.)

Nor does the law define the actors whose speech is restricted: "school personnel" could span from teachers to principals to guidance counselors, while "third parties" ostensibly reaches anyone outside of the school personnel context, including parents, other family members, and even students.

114.   The law's prohibitions expressly apply in grades K-3.  But despite the statements of many of the law's supporters, they do not stop there.  H.B. 1557 applies to any grade where "classroom instruction" is "not age-appropriate or developmentally appropriate in accordance with state standards."  As with its other core provisions, the law does not define what those "state standards" are.  The law does require the Department of Education to "review and update" "school counseling frameworks and standards; educator practices and professional conduct principles; and any other student services personnel guidelines, standards, or frameworks," but even that need not occur until June 30, 2023—a year *after* the law goes into effect.

115.   In the meantime, any parent with a "concern" about a violation of H.B. 1557 may sue their school district for court costs and attorneys' fees, subject only to the requirement to give 30 days' notice.  Notably, H.B. 1557 places no limit on when parents can sue school districts, and legislators rejected an amendment that would allow districts to recover costs and fees if they prevail.  This means that parents will be able to file suit long before the Department of Education may provide any

guidance as to the meaning of certain aspects of the law, with little repercussion. Going forward, it will be "open season" on Florida school boards, who will find themselves under the constant threat of paying legal fees and costs if they do not accede to any parent's demand to remove content, quell discussion, or ban curricula that the parent views as implicating H.B. 1557.

116.   H.B. 1557's vagueness gives rise to a host of intractable interpretive questions that further invite discriminatory enforcement and broad censorship.

117.   Indeed, the list of unanswerable questions is virtually endless.

118.   For example, does H.B. 1557 require the removal of all library books with LGBTQ characters or families, or those with discussion of LGBTQ history? What about book fairs (attended by third parties) that have books with same-sex families or reference LGBTQ issues?   Some parents have already requested catalogues of their school's library materials, no doubt intending to challenge any materials that hint at LGBTQ issues or people as prohibited under the new law.[18]

119.   Another question that is likely to present itself in short order is whether H.B. 1557 bans teachers from participating in Gay-Straight Alliances.  The statutory text is decidedly unclear.  But, anticipating the passage of H.B. 1557, some parents have already sought information about teachers who are affiliated with GSAs.

---

[18] H.B. 1557 is hardly the first instance of an effort to ban books that touch on LGBTQ persons and issues. *See, e.g.*, Matt Lavietes, *From book bans to 'Don't Say Gay' bill, LGBTQ kids feel 'erased' in the classroom*, NBC NEWS (Feb. 20, 2022), https://www.nbcnews.com/nbc-out/out-news/book-bans-dont-say-gay-bill-lgbtq-kids-feel-erased-classroom-rcna15819.

120.   Equally intractable questions will arise on a daily basis.  To pose just a few of them:  Does the law prohibit students from asking—or teachers from answering—questions about their families, or other families?  Can students ask—and teachers answer—questions about historical events involving LGBTQ people?  Would H.B. 1557 ban a teacher from discussing gay-rights decisions, like *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), where the Supreme Court held that LGBTQ persons cannot be discriminated against in employment?  If a student writes a paper in which they discuss their gender identity or sexual orientation—and relate it to their argument—could a teacher not grade it?  If the teacher did grade it, would they be prohibited from commenting on any aspect of the paper or discussing it with the student, thus leaving LGBTQ students at a systematic educational disadvantage?

121.   Another deeply troubling context is school bullying.  Does H.B. 1557 prohibit teachers from addressing LGBTQ issues that regularly arise in student-on-student bullying, for instance where the victim is gay or transgender and the bullying is partly the result of anti-LGBTQ prejudice?

122.   Parents are also affected.  What does the law require when parents come to talk to students about their jobs and one mentions their same-sex or transgender partner?  Can a student's LGBTQ parents come into the classroom at all?  Can a kindergarten student draw a picture of their LGBTQ parents?  If they do, can the

teacher grade it?  Can the teacher post it on the board with other students' drawings, or are students with same-sex parents excluded from such classroom projects?

123.    Because H.B. 1557 was deliberately written to be vague and terrifying, all in service of discriminatory purposes, none of these questions are answerable by reference to either the text of the statute or any standard interpretive principle.  The law uses sweeping language that fails to provide notice to a reasonable person of what is prohibited, while inviting arbitrary and abusive enforcement.

Discriminatory Purpose

124.    The future of public education in Florida under this regime is apparent. It is one that goes backwards in time to an era of discrimination and abandons Florida's duty—and many school districts' efforts—to provide a meaningful and inclusive education for all students.  Presented with vague prohibitions under the threat of litigation, schools and educators will be chilled from discussing or even referencing LGBTQ people, and LGBTQ students will be stigmatized, ostracized, and denied the educational opportunities that their non-LGBTQ peers receive.

125.    That is precisely what the Florida lawmakers who supported and passed this law intended.  Indeed, in statements reminiscent of what was said in Congress about the so-called Defense of Marriage Act in 1996, legislators and Governor DeSantis have been crystal-clear about their goal of eliminating any discussion about LGBTQ identities and issues from public schools.  Just as legislators' statements

evidenced DOMA's aim to interfere "with the equal dignity of same-sex marriages," *Windsor*, 570 U.S. at 771-72, the statements here reflect a clear hostility towards and disapproval of LGBTQ students, parents, and teachers.

126.   For example, the sponsor of H.B. 1557 in the Senate, Senator Dennis Baxley, openly admitted that the law is intended to prohibit discussions about sexual orientation and gender identity of LGBTQ students.   He warned that "everybody now is all about coming out when you're in school" and there is a "concern" about "kids trying on different kinds of things they hear about and different kinds of identities and experimenting."   Senator Baxley added that "parents are very concerned about the departure from the core belief systems and values."   He also claimed that "75% of people . . . agree with me that there's something wrong with how we're emphasizing this and all of a sudden overnight [students] are a celebrity when they felt like they were nobody."   These statements reveal an overt purpose of discriminating against LGBTQ people and their families—different kinds of identities that depart from Senator Baxley's core belief systems and values—and an express desire to impose censorship in hopes of stamping out any recognition of LGBTQ identity.[19]

---

[19] Fla. S., recording of proceedings, at 08:09:30-08:12:00 (Mar. 7, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202203071000&Redirect=true.

127.   Were there any doubt, when Senator Baxley was asked if the reason for H.B. 1557 is that "there seems to be a big uptick in the number of children who are coming out as gay or experimenting and therefore we need to not discuss it in the younger grades," he responded: "[W]e know there are social inputs into how people act and what they decide to do so, yeah, that's part of our concern for the well-being of our children."[20]   As another senator observed, Senator Baxley's comments are "what the court points to and quotes as a prima facie case, on its face, of invidious discrimination for what we have targeted and we have selected as a protected class."[21]

128.   In other contexts, Senator Baxley has explained that H.B. 1557 is designed to prevent discussion of LGBTQ families.  At a Senate hearing on February 8, 2022, Republican Senator Travis Hutson gave the example of a math problem that includes the details that "Sally has two moms or Johnny has two dads."  Senator Baxley said that is "exactly" what the law aims to prevent.[22]

---

[20] Fla. S., recording of proceedings, at 08:12:00-08:13:00 (Mar. 7, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202203071000&Redirect=true.

[21] Kelly Hayes, *'Gay is not a permanent thing': Legislature passes bill to restrict LGBTQ topics in elementary schools*, FLORIDA POLITICS (Mar. 9, 2022), https://floridapolitics.com/archives/505744-gay-is-not-a-permanent-thing-legislature-sends-controversial-parental-rights-bill-to-governor/.   Consistent with his discriminatory aim behind H.B. 1557, in 2018 Senator Baxley told his constituents: "I know some districts where there's a big infestation of homosexuals that are pushing their agenda . . . ."

[22] Madeline Carlisle, *Florida Just Passed the "Don't Say Gay" Bill. Here's What It Means for Kids*, TIME (Mar. 8, 2022), https://time.com/6155905/florida-dont-say-gay-passed/.

-45-

129.   H.B. 1557's sponsor in the House, Republican Joe Harding, has also been forthcoming about the law's discriminatory focus on LGBTQ students and issues.   Representative Harding justified the law on the basis that talking about sexual orientation and gender identity could result in students "hav[ing] one identity in school and one at home because the school encourages that kind of behavior."[23]

130.   Other supporting legislators have been equally candid that H.B. 1557 is intended to bar discussions of gay, lesbian, and bisexual orientations and transgender identities, *i.e.*, anything besides the heterosexual and cisgender identities that they believe are aligned with "core belief systems and values."[24]

131.   For instance, in voicing support for H.B. 1557, Representative Juan Fernandez-Barquin claimed: "We have children as young as six years old being taught the radical leftist gender theory and that is frightening."[25]   Senator Ileana Garcia also suggested that discussions of sexual orientation should be prohibited because "'gay' is not a permanent thing.  LGBT is not a permanent thing."[26]

---

[23] Kirby Wilson, *Republicans made changes to 'don't say gay' bill.  LGBTQ advocates aren't buying it*, TAMPA BAY TIMES (Feb. 18, 2022), https://www.tampabay.com/news/florida-politics/2022/02/17/republicans-made-changes-to-dont-say-gay-bill-lgbtq-advocates-arent-buying-it/.

[24] Fla. S., recording of proceedings, at 08:11:30-08:12:00 (Mar. 7, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202203071000&Redirect=true.

[25] Kelly Hayes, *'We are in distress': House passes LGBTQ instruction bill despite pleas from Democrats*, FLORIDA POLITICS (Feb. 24, 2022), https://floridapolitics.com/archives/500337-we-are-in-distress-house-passes-lgbtq-instruction-bill-despite-pleas-from-democrats/.

[26] Kelly Hayes, *'Gay is not a permanent thing': Legislature passes bill to restrict LGBTQ topics in elementary schools*, FLORIDA POLITICS (Mar. 9, 2022), https://floridapolitics.com/archives/505744-gay-is-not-a-permanent-thing-legislature-sends-controversial-parental-rights-bill-to-governor/.

132.   The premise of H.B. 1557 is that if schools and educators ignore the realities and concerns of their LGBTQ students, those students will be discouraged or deterred from being who they are, and will instead be heterosexual, cisgender members of society, as the State of Florida would apparently prefer them to be.

133.   This effort to wipe out LGBTQ identity constitutes illegal discrimination, plain and simple.

134.   Governor DeSantis, in turn, has left zero question that this is the reason for H.B. 1557.   As he has explained: "We've seen instances of students being told by different folks in school, 'Oh, don't worry.   Don't pick your gender yet.   Do all this other stuff.'"   He voiced his support for the law because he does not approve of "injecting these concepts about choosing your gender" in schools.[27]

135.   Governor DeSantis also made clear that H.B. 1557's limitation on "sexual instruction" does not apply to instruction on heterosexuality and cisgender identities.   Rather, he asked rhetorically, "How many parents want their kids to have transgenderism or something injected into classroom instruction?"[28]

136.   Governor DeSantis's press secretary, Christine Pushaw, confirmed this understanding.   She called H.B. 1557 an "Anti-Grooming Bill" and said that "[i]f

---

[27] Li Cohen, *Florida advances 'Don't Say Gay' bill that would bar LGBTQ discussions in schools*, CBS NEWS (Feb. 18, 2022), https://www.cbsnews.com/news/florida-dont-say-gay-bill-lgbtq-schools-senate-committee/.

[28] *Florida Governor DeSantis defends controversial 'Don't Say Gay' bill*, CBS NEWS (Mar. 5, 2022), https://www.cbsnews.com/news/florida-governor-desantis-defends-dont-say-gay-bill/.

you're against the Anti-Grooming Bill, you are probably a groomer or at least you don't denounce the grooming of 4-8 year old children."[29]  She has also stated that "[a]ny adult who wants to discuss sexual and gender identity topics with other people's 5- to 8-year-old children—while keeping this a secret from their parents—is either a groomer or is complicit in promoting an environment where grooming becomes normalized."[30]  Charitably read, Pushaw's statements imply that even discussing LGBTQ issues or acknowledging LGBTQ people's existence entices students to "become" LGBTQ; less charitably and perhaps more accurately read, they are a grotesque assertion that school personnel who discuss LGBTQ issues with students are akin to molesters.[31]

137.   Pushaw's statements were echoed by other supporters of H.B. 1557, who grasped the law's discriminatory intent.  For instance, the Florida Family Policy Council, a group that lists as a core issue "LGBT Agenda & Transgenderism," has called H.B. 1557 the "Don't turn my son into a daughter bill."[32]

---

[29] Christina Pushaw (@ChristinaPushaw), TWITTER (Mar. 4, 2022, 6:33 PM), https://twitter.com/ChristinaPushaw/status/1499890719691051008.

[30] Christina Pushaw (@ChristinaPushaw), TWITTER (Apr. 5, 2022, 9:12 AM), https://twitter.com/ChristinaPushaw/status/1511331024541782020.

[31] *See* Monica Hesse, *Fans of Florida's 'Don't Say Gay' bill have a new favorite word: 'grooming*,' WASH. POST (Mar. 12, 2022), https://www.washingtonpost.com/lifestyle/2022/03/12/florida-dont-say-gay-bill/.  In fact, there is a very real risk that the law will *adversely* impact the detection and prevention of child abuse insofar as instances of sexual abuse and related behaviors are often reported to, or by, teachers and other school personnel.  Measures that limit open lines of communication between students and teachers tend to result in students being afraid or ashamed to speak up about potentially problematic conduct or behavior.

[32] Florida Family Policy Council, *About FFPC*, https://www.flfamily.org/about-ffpc (last visited May 23, 2022); Florida Family Policy Council, *Legislative Session Week 7 of 9 – February 25, 2022* (Feb. 25, 2022), https://www.flfamily.org/uncategorized/week-7-of-9-insiders-report-legislative-session.

138.   Were there any lingering doubt as to the punitive and discriminatory intent behind H.B. 1557, on March 10, shortly before he signed it into law, Governor DeSantis again stated that "[i]n the state of Florida, we are not going to allow them to inject transgenderism into kindergarten."   He added, "[w]e don't want transgenderism in kindergarten and first grade classrooms."[33]   And after the bill was passed, Governor DeSantis expressed his intention to "go on offense" against "injecting transgender ideology into kindergarten classrooms."[34]

139.   Governor DeSantis has not expressed concerns about students identifying as cisgender (or heterosexual) at any age.

140.   The mentality behind these statements is clear: discussions about LGBTQ people are wrong and must be prohibited because the mere recognition of LGBTQ existence will make otherwise heterosexual and cisgender children more likely to be gay and transgender.   It is also a direct statement to LGBTQ children that you are not normal and if you can't change, you should hide your identity.   H.B. 1557 is not even a dog whistle; it is an open declaration of discrimination against LGBTQ children and children with LGBTQ parents.   A law whose purpose is to prevent people from being LGBTQ is not only ridiculous, unscientific, and at odds

[33]  *DeSantis slams 'woke' Disney after CEO condemns parents' rights bill*, FOX NEWS (Mar. 11, 2022), https://video.foxnews.com/v/6300358476001#sp=show-clips.

[34]  Christina Pushaw (@ChristinaPushaw), TWITTER (Apr. 22, 2022, 9:11 PM), https://twitter.com/ChristinaPushaw/status/1517672480571330566?s=20&t=pNnN0_XA5DfCsSbanAtxMA.

with reality; it is also offensive and unconstitutional.  *See Obergefell*, 576 U.S. at 661 ("[P]sychiatrists and others [have] recognized that sexual orientation is both a normal expression of human sexuality and immutable.").

141.   Indeed, the legislative record is remarkably sparse with respect to any particular examples of "classroom instruction" that H.B. 1557 was somehow meant to "fix."  Instead, other than overtly discriminatory statements, proponents relied upon vague and generalized assertions about problems the law is intended to address. For instance, when asked for "specific examples" of why H.B. 1557 was needed in response to "lesson plans," Senator Baxley, the bill's sponsor in the Senate, suggested that others "visit some of the websites."[35]

<u>Doubling Down on Chilling Speech and Promoting Discrimination</u>

142.   The intentional vagueness and discriminatory purpose of H.B. 1557 is further shown by the repeated refusal of lawmakers to adopt language that might mitigate the law's widely recognized discriminatory and chilling effects.

143.   Representative Carlos Smith introduced Amendment No. 703365 to replace "sexual orientation or gender identity" with "sexual activity."   That amendment failed.[36]

---

[35] Fla. S. Comm. on Appropriations, recording of proceedings, at 46:00-47:00 (Feb. 28, 2022 at 10:00 AM)
https://www.flsenate.gov/media/VideoPlayer?EventID=1_zc8d1g0v-202202281030&Redirect=true.

[36] Fla. H.R, recording of proceedings, at 03:43:30-03:47:30 (Feb. 2, 2022 at 1:00 PM),
https://www.flsenate.gov/media/VideoPlayer?EventID=1_zp1pj23y-202202221300&Redirect=true.

144.   Senator Jeff Brandes (a Republican) similarly proposed several amendments to replace "sexual orientation or gender identity" with "human sexuality or sexual activity."  He stated: "If the intent of this bill isn't to marginalize anyone, let's make sure we aren't."  But his amendments failed.  Senator Baxley commented that Senator Brandes's amendments would "significantly gut" the law's intent—once again confirming that his goal was to marginalize LGBTQ people.[37]

145.   Senator Lauren Book proposed Amendment No. 755282 to clarify that "'classroom instruction' does not include instruction or discussion relating to" "family structures," "objective historical events," "bullying prevention," "discussions between students," and "questions asked by students and any answer." That amendment failed.[38]

146.   Senator Randolph Bracy and Representative Marie Paule Woodson proposed Amendments Nos. 734244 and 600607, respectively, to clarify that the law "does not apply to any discussion between a student who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBTQ and their peers."  Those amendments failed.[39]

---

[37] Fla. S. Comm. on Appropriations, recording of proceedings, at 01:04:00-01:07:00 (Feb. 28, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_zc8d1g0v-202202281030&Redirect=true.

[38] Fla. S., recording of proceedings, at 05:23:30-05:33:30 (March 7, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202203071000&Redirect=true.

[39] Fla. S., recording of proceedings, at 05:33:30-05:37:00 (Mar. 7, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202203071000&Redirect=true; Fla. H.R, recording of proceedings, at 03:47:30-03:54:00 (Feb. 2, 2022 at 1:00 PM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_zp1pj23y-202202221300&Redirect=true.

147.    Senator Tina Polsky proposed Amendment No. 290096 to clarify that "sexual orientation" "means an individual's heterosexuality, homosexuality, or bisexuality," and "gender identity" means "gender-related identity, appearance or behavior, regardless of whether such . . . is different from that traditionally associated with an individual's physiology or assigned sex at birth." That amendment failed.[40]

148.    Senator Gary Farmer proposed Amendment No. 175814 to amend a different provision of the Florida Education Code that requires health education to "teach[] the benefits of monogamous heterosexual marriage," by striking the word "heterosexual." Fla. Stat. § 1003.46(2)(a) (2021). That amendment failed.[41]

149.    Representative Fentrice Driskell introduced Amendment No. 194533 to require a court to "award reasonable attorney fees and court costs" to prevailing school districts. That amendment failed.[42]

150.    The fact that these amendments failed further demonstrates the law's true purpose. H.B. 1557 is not about prohibiting "classroom instruction" on "sexual orientation" and "gender identity" that is not "age-appropriate or developmentally appropriate." Florida law *already* requires that health education, including

---

[40] Fla. S., recording of proceedings, at 04:50:30-04:55:00 (March 7, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202203071000&Redirect=true.

[41] Fla. S., recording of proceedings, at 04:29:00-04:33:30 (Mar. 7, 2022 at 10:00 AM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_nty0d3lq-202203071000&Redirect=true.

[42] Fla. H.R, recording of proceedings, at 04:23:00-04:28:30 (Feb. 2, 2022 at 1:00 PM), https://www.flsenate.gov/media/VideoPlayer?EventID=1_zp1pj23y-202202221300&Redirect=true.

instruction on "human sexuality," "[p]rovide instruction and material that is appropriate for the grade and age of the student." Fla. Stat. § 1003.46(2)(d) (2021).[43] Moreover, as the failed amendments make clear, the Legislature is perfectly capable of providing greater specificity when it wants to do so.

151. Any doubt on that score is confirmed by another recent enactment (albeit one that suffers from distinct infirmities): the "Stop WOKE Act."[44] There, in seeking to prohibit "instruction" in public schools on critical race theory, the Legislature listed eight specific "concepts," such as that "[a] person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously."[45] Thus, when the Legislature undertakes to declare, with some level of specificity, what it doesn't want taught in schools, it obviously knows how to do so. But here—in sharp contrast—the Legislature refused to provide any specifics about what "classroom instruction on sexual orientation or gender identity" means. Instead, it chose to enact a highly vague provision that invites arbitrary and discriminatory enforcement against LGBTQ people—exactly as the Legislature intended.

---

[43] This same provision, as noted, requires that instruction on human sexuality "[t]each the benefits of monogamous heterosexual marriage," Fla. Stat. § 1003.46(2)(a) (2021), and in passing H.B. 1557 lawmakers refused to strike "heterosexual" from this text.

[44] H.B. 7 (2022).

[45] *Id.* § 2.

152.   The Legislature did not define the prohibited "instruction" here because H.B. 1557 is aimed at (and already is) stifling all discussion about LGBTQ people, families, and issues, in response to lawmakers' stated concerns about LGBTQ persons and issues having any presence in schools.  And it accomplishes that aim through deliberately ambiguous and expansive proscriptions.

153.   The discriminatory purpose of H.B. 1557 is further apparent from a persistent pattern of efforts by the current Legislature and Governor to use the legislative process to ostracize and harm LGBTQ people.

154.   In December 2021, Governor DeSantis's administration took down a Department of Education web page that provided anti-bullying resources to help promote safe school environments and address high rates of suicide after a right-wing online publication, the *Florida Capital Star*, raised questions with the Department about the inclusion of links to resources for LGBTQ young people.[46] That page was restored after the LGBTQ-related references were removed.

155.   Last year, Governor DeSantis line-item vetoed all LGBTQ-related funding from the budget, including money earmarked for mental health

---

[46] Brody Levesque, *Florida's DeSantis attacks LGBTQ youth by removing website resource*, LOS ANGELES BLADE (Dec. 6, 2021), https://www.losangelesblade.com/2021/12/06/floridas-desantis-attacks-lgbtq-youth-by-removing-website-resource/.

programming to support survivors of the Pulse night club massacre, to house homeless LGBTQ children, and for Orlando's LGBTQ community center.[47]

156.   H.B. 1557 is merely the latest in a sequence of discriminatory laws and policies.

157.   And H.B. 1557 itself reflects a longer history in which opponents of LGBTQ rights have used narratives of "depravity" and "grooming" to try to justify altering the school environment in ways meant to discriminate against LGBTQ people.[48]

158.   During a press conference on March 28, 2022, Governor DeSantis seized these narratives, stating falsely that critics of H.B. 1557 "support sexualizing kids in kindergarten" and "enabling schools to, quote, transition students to a, quote, different gender without the knowledge of the parent."[49]

## IV.   H.B. 1557 will inevitably harm the LGBTQ community and, in fact, is already doing so

159.   H.B. 1557's discrimination against the LGBTQ members of Florida's public schools is plain.  In purpose and effect, it denies their existence, demeans their families, and demands their silence.  It thus "generates a feeling of inferiority as to

---

[47] Office of Governor Ron DeSantis, *2021 Veto List (2021)*, https://www.flgov.com/wp-content/uploads/2021/06/2021-Veto-List-Final.pdf.

[48] *See, e.g.,* Clifford Rosky, *Anti-Gay Curriculum Laws*, 117 COLUM. L. REV. 1461 (2017).

[49] Ryan Dailey, *DeSantis signs bill on how schools handle sexual orientation, gender identity*, PALM COAST OBSERVER (Mar. 28, 2022), https://www.palmcoastobserver.com/article/desantis-signs-bill-on-how-schools-handle-sexual-orientation-gender-identity.

[their] status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown*, 347 U.S. at 494.  By denying to LGBTQ students, teachers, and families "full citizenship stature—equal opportunity to aspire, achieve, participate in and contribute to society," Florida violates equal protection principles.  *United States v. Virginia*, 518 U.S. 515, 532 (1996).  *Cf. Obergefell*, 576 U.S. at 670 ("It demeans gays and lesbians for the State to lock them out of a central institution of the Nation's society.").

160.   H.B. 1557 is especially pernicious because it will invariably harm, and already is harming, a group that has faced heightened mental and physical risks.  As President Biden recognized in condemning the law, H.B. 1557 is "designed to target and attack the kids who need support the most—LGBTQI+ students, who are already vulnerable to bullying and violence just for being themselves."[50]

161.   The Trevor Project's 2021 National Survey on LGBTQ Youth Mental Health found that 42% of LGBTQ youth seriously considered attempting suicide in the last year.  72% of respondents reported symptoms of generalized anxiety disorder in the last two years.  62% reported symptoms of major depressive disorder in the

---

[50] Anthony Izaguirre, *White House denounces Florida GOP over 'Don't Say Gay' bill*, ASSOCIATED PRESS (Feb. 8, 2022), https://apnews.com/article/education-florida-73ffe14f403d95e0cc09f2804d0d9ffe.  The American Academy of Child and Adolescent Psychiatry has likewise asserted that H.B. 1557 "blocks teachers and educators from talking about LGBTQ+ issues and undermines existing protections for LGBTQ+ youth and families in schools."  American Academy of Child & Adolescent Psychiatry, *Florida's 'Don't Say Gay or Trans' Law Stigmatizes LGBTQ+ Youth and Families* (Mar. 18, 2022), https://www.aacap.org/AACAP/zLatest_News/Floridas_Dont_Say_Gay_or_Trans_Law_Stigmatizes_LGBTQ_Youth_Families.aspx.

last two weeks.  And nearly half wanted counseling from mental health professionals but did not receive it.[51]

162.   With respect to Florida schools specifically, the Gay, Lesbian and Straight Education Network's ("GLSEN") 2019 National School Climate Survey found that the school climate in Florida is "not safe" for most LGBTQ secondary school students, even before enactment of H.B. 1557.[52]  94% of respondents heard students use "gay" in a negative way, 80% heard other homophobic remarks (*e.g.*, "fag") or negative remarks about gender expression, and 72% heard negative remarks about transgender people.  Roughly 10% of respondents were victims of physical assault based on their sexual orientation or gender expression, and only 28% of LGBTQ students who reported incidents of verbal or physical harassment or assault said it resulted in effective staff intervention.

163.   Students also described an environment of disparate treatment, where 31% were disciplined for public displays of affection that did not result in similar action for non-LGBTQ students, and 57% of transgender students were unable to use the bathroom aligned with their gender.  Just 9% of students reported attending a school with a comprehensive anti-bullying and harassment policy that included

---

[51] *National Survey on LGBTQ Youth Mental Health 2021*, THE TREVOR PROJECT, https://www.thetrevorproject.org/survey-2021/?section=Introduction (last visited May 24, 20022).

[52] *2019 State Snapshot: School Climate for LGBTQ Students in Florida*, GLSEN (2021), https://www.glsen.org/sites/default/files/2021-01/Florida-Snapshot-2019.pdf.

specific protections based on sexual orientation and gender identity and expression, 15% were taught positive representations of LGBTQ people, history, or events, and only a mere 3% reported receiving LGBTQ-inclusive sex education at school.

164.    Similarly, the Youth Risk Behavior Survey—which is conducted by the CDC and managed by the Florida Department of Education to monitor priority health-risk behaviors that contribute substantially to the leading causes of death, disability, and social problems among youth[53]—found that for the first time since sexual orientation was added in 2013, there has been an increase in LGBTQ youth seriously considering suicide.  There was no corresponding shift among heterosexual and cisgender peers.[54]

165.    Lurking beneath these statistics is a sobering fact: LGBTQ students will suffer—and some of them will likely die—if this policy is allowed go into effect.

166.    Indeed, ample research in neuroscience, social science, and education has demonstrated that threats based on social identity affect the health and education of students.  Put simply, making children feel unsafe causes lasting damage to their

---

[53] On April 20, 2022, the Florida Department of Education ended its decades-long participation in the Youth Risk Behavior Survey, which means that Florida will no longer be collecting data necessary to understand and support adolescent health in Florida, including data that will determine the impact H.B. 1557 and other anti-LGBTQ laws and policies will have on Florida's youth. *See* Evie Blad, *Some States Back Away Form a Major Student Well-Being Survey. Why, and What it Could Mean*, EDUCATION WEEK (May 5, 2022), https://www.edweek.org/leadership/some-states-back-away-from-a-major-student-well-being-survey-why-and-what-it-could-mean/2022/05.

[54] *Youth Risk Behavior Survey: Data Summary & Trends Report 2009-2019*, at 98 CENTERS FOR DISEASE CONTROL AND PREVENTION (2019) https://www.cdc.gov/healthyyouth/data/yrbs/pdf/YRBSDataSummaryTrendsReport2019-508.pdf.

physical health, brain development, and learning.  And that is precisely why school districts have responded with the kinds of affirming and accepting measures that H.B. 1557 is designed to stamp out.

167.   LGBTQ students who are taught an inclusive curriculum are less likely to hear homophobic remarks or remarks about gender expressions.  They perform better academically and are more likely to pursue post-secondary education.  They are also significantly more likely to have classmates who are somewhat or very accepting of LGBTQ people.[55]

168.   Having a supportive school environment is also tied to better mental health.  LGBTQ youth who have the benefit of a trusted adult at their school have higher levels of self-esteem.[56]   And anti-bullying policies that are specifically protective of LGBTQ students are tied to reduced bullying of LGBTQ students, as well as decreases in depressive symptoms and less psychological distress; this is also true for the presence of GSAs.[57]   Moreover, affirming transgender and non-binary

---

[55] Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN (2020), https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf.

[56] Adrienne B. Dessel et al., *The importance of teacher support: Differential impacts by gender and sexuality*, 56 J. OF ADOLESCENCE 136 (2019).

[57] Jack Day et al., *Gay-Straight Alliances, Inclusive Policy, and School Climate: LGBTQ Youths' Experiences of Social Support and Bullying*, 30 J. OF RSCH. ON ADOLESCENCE 418 (2019).

youth by respecting their pronouns is also associated with lower rates of attempted suicide.[58]

169.   In short, LGBTQ students with inclusive educational environments receive a more equal and fair education; they are less likely to suffer discrimination, stigma, and harm; and they are more likely to report positive health outcomes.

170.   H.B. 1557 thus will not just stigmatize and mark as "lesser" LGBTQ students—a serious injury in itself.  It also will create and exacerbate environments where LGBTQ students are more likely to do poorly in school, experience bullying and harassment, and suffer higher risks to their mental and physical health.  Indeed, a GLSEN survey found that in states with laws widely known as "No Promo Homo" laws, like H.B. 1557, students were more likely to hear homophobic remarks from school personnel, staff were far less effective in handling reported incidents of harassment or assault, and schools were less likely to have LGBTQ-related resources (such as comprehensive harassment policies, supportive school personnel, and Gay-Straight Alliances).[59]

171.   By banning discussions about LGBTQ students and issues and erasing LGBTQ students from their schools, H.B. 1557 will cause serious, irreparable, and

---

[58] *National Survey on LGBTQ Youth Mental Health 2021*, THE TREVOR PROJECT, https://www.thetrevorproject.org/survey-2021/?section=Introduction (last visited May 24, 20022).

[59] Joseph G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN (2020), https://www.glsen.org/sites/default/files/2021-04/NSCS19-FullReport-032421-Web_0.pdf.

immediate harm to students.  Beyond that, H.B. 1557 discriminates against LGBTQ parents, teachers, and other school personnel by denying their existence and ability to speak and participate freely in schools.  And it injures non-LGBTQ persons who desire (for themselves or their children) an environment that is free of discrimination and provides for an open education.

172.   The experiences of the student, parent, teacher, and organizational Plaintiffs in this case, and many others in Florida, reflect that these harms are already occurring and will continue to occur absent judicial relief.  And, as discussed below, their experiences are emblematic of others across the state.

**A.    Harm to Students**

173.   The student Plaintiffs have already felt and witnessed first-hand the impact of H.B. 1557.  Passage of this law has led to an environment where recognition of and discussion about LGBTQ persons and issues is chilled or silenced completely; LGBTQ students are relegated to second-class status; and LGBTQ students are unable to obtain as good an education as other students.  Indeed, the evidence to date makes clear that the law's proscription on "classroom instruction on sexual orientation and gender identity"—which has not even yet gone into effect as a technical matter—is already having effects far and wide throughout the Florida public school system.

174.   On April 27, 2022, Moricz was called into his principal's office and informed that his upcoming commencement speech as senior class president could not include material related to his activism, including his activism against H.B. 1557 or his participation in this lawsuit.   He was told that should he reference any forbidden topics during his speech, the administration would shut off his microphone and halt the ceremony.

175.   Moricz delivered his class president speech at the Pine View graduation ceremony on May 22, 2022.   Because of his principal's warning, and the administration's threat to cut off his microphone and disrupt the ceremony, Moricz did not directly address H.B. 1557 or this lawsuit, nor did he say the word "gay."   In short, he was not permitted to give the speech he had planned to give, and he was not able to speak his own identity or values.

176.   Instead, he developed a euphemism, in which he spoke about having curly hair, about the difficulties he faced growing up in Florida with curly hair—"due to the humidity," as he put it—and about his own failed and futile efforts to "straighten his curls."   He said that ultimately he embraced his curly hair, and he thanked his class and his teachers and principal for accepting and embracing him as curly-haired (prior to the passage of H.B. 1557).   "It's because of the love I've drawn from this community that I came out to my family," he said. "Now I'm happy—and that is what is at stake."   Moricz went on: "There are going to be so many kids with

curly hair who need a community like Pine View, and they will not have one. Instead, they'll try to fix themselves so that they can exist in Florida's humid climate. . . . [My speech] needs to be about this for the thousands of curly-haired kids who are going to be forced to speak like this for their entire lives as students." He noted that his principal had always "loved my curls and loved me." But, Moricz said, "those we have given our power to"—a non-explicit reference to the passage of H.B. 1557, which he was forbidden from addressing directly—"are the reason that I have to stand here and talk about my hair during my graduation speech." Moricz's speech was met with cheers and a standing ovation, and his principal was the first to hug him.

177. Moricz's clever coded language enabled him to navigate the day. As Moricz always has, he found a way to soldier on, to care for others, and to call for justice. But he found it dehumanizing to have to speak cagily about his own identity—to be told, in effect, by the State, that there was something shameful and wrong about him that he should not say out loud. He had been thinking about and planning the speech he would give for years, and he was unable to give that speech. As he rewrote the speech in the weeks following his meeting in the principal's office, Moricz was frustrated, hurt, sad, and at times angry that he was being censored and silenced in his efforts to speak about his own identity and values. He wanted to speak openly and candidly, as he had learned to do, but he believed that if he defied

the principal's instructions, and the microphones were cut and the ceremony halted, an event that was meant as a celebration for all the students of his class would be ruined.  He might put at risk the very love and support that had enabled him to flourish and find happiness at Pine View.  Again, Moricz was put to the painful choice of having to hide or suppress a part of himself—to "straighten his curls"—in order to find acceptance.  He had expected that on the day of his graduation, he would be accepted and celebrated as his authentic self, without stigma or censorship. The exercise of State power to stigmatize and censor Moricz thus caused him considerable emotional harm.

178.   Current LGBTQ students in Florida who are not graduating this year are also understandably expressing acute fears about the upcoming school year. Students have reported wanting to "return to the closet" and are scared to express themselves.[60]

179.   Another 17-year-old gay student at Flagler Palm Coast Beach High School was suspended in March for organizing a school protest opposing H.B. 1557 and defying school officials' orders not to distribute rainbow pride flags.  He has now been prohibited from running for senior class president.[61]

---

[60] *See* Michael Sainato, *'Hurtful and insulting': Florida teachers react to the 'don't say gay' bill*, THE GUARDIAN (Apr. 29, 2022), https://www.theguardian.com/world/2022/apr/29/dont-say-gay-bill-florida-teachers-react.

[61] *Gay student says Flagler County school stopping run for student leadership*, NEWS4JAX (May 19, 2022), https://www.news4jax.com/news/florida/2022/05/19/gay-student-says-flagler-county-school-stopping-run-for-student-leadership/.

180.   M.A. has been actively trying to increase teacher education and support at his school for those teachers who either are not inclined or do not know how to be supportive of LGBTQ students.  A couple of months ago, he drafted and submitted a proposal to establish a "Committee on Classroom Practices" related to LGBTQ students.  The committee would consist of students and teachers and be charged with creating guidelines for teachers on how to respond to common problems for LGBTQ students.

181.   M.A. recognizes that there is little chance that this proposal will be considered, let alone implemented, as a result of the new law.  He has therefore decided not to pursue conversations with the school on his proposal, as he justifiably fears that the school will simply ignore him.

182.   M.A. knows that as his teachers face consequences, they will be afraid to do anything that could potentially violate the law, including acknowledging and helping LGBTQ students.  M.A.'s GSA teacher-advisor has already warned him that she could potentially lose her job for adjusting pronouns to respect a student's gender identity.

183.   M.A. now fears that the very existence of the GSA that he fought for two long years to establish is at risk.  And these fears have already been validated—the ALSO Youth Board of Directors (which supports GSAs across Florida) recently cancelled its GSA summit that had been scheduled for April 2022 because of "low

attendance" due to a "chilling effect" from H.B. 1557. And a smaller GSA summit that was supposed to take place in a school facility was moved outside of the school for fear of running afoul of H.B. 1557.

184.   Similarly, Moricz's teachers have said that they will need to remove their images of support, including pride flags and rainbows in the classroom. These insignia have always indicated to Moricz that he was in a safe and welcoming environment. But apparently out of fear that this support constitutes "classroom instruction on sexual orientation or gender identity," teachers intend to self-censor.

185.   S.S. similarly fears the impact that H.B. 1557 will have on her classroom experience. For instance, in her AP U.S. history class, the students recently learned about the Stonewall Riots, a lesson that S.S. found empowering and validating, not to mention meaningful to her development and education. S.S. worries that she will no longer be exposed to these kinds of lessons and the resulting discussions, and that her education will suffer.

186.   Indeed, this has already been borne out. After H.B. 1557 was passed, one of the teachers in the IB program at S.S's school was discussing the importance of women in STEM. Another student asked how the teacher was defining "women," and the teacher expressed that she did not want to answer and address the question because she might get fired. S.S. knows that situations like this will continue to

come up, as they always have, and that discussion is likely to be limited because of H.B. 1557.

187.   While she was comfortable at school prior to the law, she believes that when the law goes into effect, she will no longer feel that way.   She cannot imagine having to go to school each day knowing that her school environment does not welcome her.   S.S. has begun to experience increased anxiety as she begins to observe and anticipate changes to her school as a result of H.B. 1557.

188.   S.S. further fears that H.B. 1557 will empower those who have demonstrated their disapproval of LGBTQ individuals to treat LGBTQ students differently.   One teacher with whom S.S. is close, and who S.S. assists on a regular basis, has made it clear to her students that she is not supportive of the LGBTQ community.   The teacher has said that any LGBTQ "behavior" should be kept "behind closed doors."   S.S. finds this ironic because this teacher is incredibly fond of her.   Since the passage of H.B. 1557, S.S. fears that if this teacher finds out that S.S. is a lesbian, she might feel empowered by the law to justify treating S.S. differently.

189.   M.A. too shares these worries.   In his creative writing class, he often writes about issues related to his sexual identity and sexual orientation more generally.   For instance, he wrote about H.B. 1557 and how it would impact his life. Now it is unclear whether he would be able to write such an essay.   M.A. also worked

on a project in which he was instructed to write a "rant" about an issue that he cares about.  He wrote a response to those who say that gay marriage should be illegal, including by doing significant legal research into the history of gay marriage.  Here, too, he worries that his education will be stymied by H.B. 1557.  Similarly, in his biology class, M.A.'s peers recently asked what it meant to be transgender.  His teacher explained in an accepting way that she was happy and comfortable in her body but that some people are not and everyone should be.  M.A. believes that this conversation would no longer be possible.

190.   For these reasons, on March 4, 2022, M.A. sent a letter to his state senator explaining why the senator should not vote for the bill.  He explained:

> History is consistent with common sense: it demonstrates that students must feel safe and affirmed, while laws and statutes must not unreasonably abridge their individual rights at school.  Lawmakers are tasked with making sure legal statutes are in place to protect student rights.  But when lawmakers remove those rights, like forcing developing children to not communicate their own experiences with their peers, they neglect to fulfill their duties.  It's a further disservice when teachers, including school counselors who have a confidentiality obligation, have to tell the students' parents what they don't want out in public.

191.   The impact on curriculum and educational experiences is not limited to older students.  In Palm Beach County, in early April and prior to the law going into effect, the Superintendent of Schools wrote a memo to principals mandating them to remove two children's books—*I am Jazz* and *Call Me Max*, both of which are about

transgender youth—from the shelves and put them in a "location where students do not have access" so that the district could attempt to comply with the law.[62]

192.   Many parents of young children fear the long-term consequences H.B. 1557 could have on their children. These fears are not unfounded. Numerous psychologists, as well as the American Psychological Association itself, have commented on how H.B. 1557 is developmentally unhealthy for children in their early elementary years, particularly since the whole goal of early childhood education is to socialize young children so that they learn to be part of a broader community, which obviously necessarily includes safety and acceptance in the classroom.[63]   As the APA has stated, "Prohibiting classroom discussion on these topics sends the message that identifying as LGBTQ is inherently wrong, stigmatizing and marginalizing children who may realize their difference at a young age," and the resulting "increased social isolation and stigma can lead to depression, anxiety, self-harm and even suicide."[64]

193.   Doe is just 11 years old, yet she too has already felt the impact of the new law.  When Doe's mother, McClelland, explained the new law to Doe at a high

---

[62] See Jeffrey Rodack, *Florida School District Removes 2 Books About Transgender Kids*, NEWSMAX (Apr. 7, 2022), https://www.newsmax.com/newsfront/florida-schools-law-lgbtq/2022/04/07/id/1064685/.

[63] See Jacqueline Quynh, *Psychologists Explain Why HB 1557, Dubbed 'Don't Say Gay,' Is Unhealthy For Children*, 4 CBS MIAMI (Mar. 29, 2022), https://miami.cbslocal.com/2022/03/29/psychologists-dont-say-gay-unhealthy-for-children/.

[64] Press Release, American Psychological Association, APA President condemns Florida's 'Don't Say Gay' bill (Mar. 9, 2022), https://www.apa.org/news/press/releases/2022/03/florida-dont-say-gay.

level, Doe asked McClelland if she is going to be okay.  McClelland did not know how to respond.

194.   McClelland already has heightened anxiety related to her daughter's safety at school. McClelland and her family are deeply concerned that H.B. 1557 will operate to stigmatize Doe in school, leading to bullying and ostracization.  These fears have recently been validated: a little over a month after H.B. 1557 was passed, Doe was outed at school for the first time.  Doe has only told two of her peers that she is transgender. These peers have known for years. Yet, after one of these peers got mad at Doe, she told a group of other students that she knew "secrets" about Doe, including that Doe is transgender and that she knows Doe's "real" name. The other students then came up to her and started to ask her if she was a boy. McClelland spoke with Doe's teacher and administrators about what happened and the school investigated the incident and disciplined the student, but McClelland believes that Doe's new school will not be able to handle such incidents meaningfully and effectively once H.B. 1557 has gone into effect.  School officials feel similarly: they have told McClelland explicitly that they are not sure what will happen when issues such as these come up next year.

195.   McClelland's ability to have open conversations with Doe's teachers and school officials is necessary for her to monitor and ensure her daughter's safety, as well as make sure her child can learn like every other student.  Without having

staff and administration who are willing to engage in frank conversations with her, McClelland reasonably fears that her child's physical and mental safety are at risk. Indeed, Doe has already expressed anxiety and fear about substitute teachers to McClelland, explaining that she is not sure how new substitute teachers feel about the law and how they may treat her in the classroom as a result.

196.   The VanTices also worry about their sons' safety and well-being, both physically and emotionally.  They fear that H.B. 1557 will empower and embolden anyone—students, other parents, and even school officials—who might want to bully or ostracize their children because of their parents' sexual orientation.

197.   As heterosexual parents, both Shook and Volmer fear the impact H.B. 1557 will have on their children's education.  They want their children to be taught that all families are valid and that they can grow up to be themselves and be accepted in school, no matter their sexual orientation or gender identity.  H.B. 1557 will prevent that from occurring.

198.   Indeed, Shook is already feeling the chilling effect that H.B. 1557 has on her daughter's classroom environment.  Just a few weeks ago, Shook's daughter hoped to bring to school a picture of herself marching in the Miami Pride parade. She thought this would be a good contribution to a lesson about women's history month.  But Shook's daughter's teacher suggested that would not be a good idea in light of H.B. 1557, so Shook's daughter brought in another picture instead.  Thus,

Shook has already experienced firsthand that she now has to limit what she and her daughter do and talk about at home—and certainly what her daughter talks about at school—so as not to put her daughter or her daughter's teachers in precarious positions.

199.   Similarly, while talking to his teacher, Morrison's son, who is only eight years old, asked her if he could talk about his two moms.  His teacher told him that he could always say something to her privately about them, but that she wasn't sure that they would be able to have more public discussions.  She also advised him that this was not something he should talk to administrators about.  As a result, Morrison's son has now internalized that being gay is a "controversial" and "taboo" topic.

200.   Since the passage of H.B. 1557 and its vague ban on "classroom instruction on sexual orientation and gender identity," Equality Florida's members have reported an increase in the number of LGBTQ students experiencing harmful language or physical attacks from other members of the school community.  In most incidents, students report that the school does little, if anything, to respond.  Moreover, Equality Florida has learned that a transgender student at one school has been told by their principal that they are not allowed to talk about being transgender with other students because of the new law.

201.   Equality Florida's members have also faced increased discrimination and censorship from their school administration because of H.B. 1557.  For example, students at Lyman High School in Seminole County (including students who are members of Equality Florida), were told that they had to cover pictures of images of pride flags printed in the 2021-2022 yearbook with white stickers prior to distribution of the yearbook.  While that decision was ultimately reversed after students raised the issue for their school board, the students were still required to include stickers alongside the pictures that said that the pictures were not part of a school-sponsored event.[65]

**B.    Harm to Parents and Families**

202.   H.B. 1557 is also harming LGBTQ parents, who are being excluded from their children's education and stigmatized in front of their children.  Many of these parents are already experiencing the reality that the lessons they have taught their children about acceptance and inclusion are being undermined by the new law and its fostering of an environment of discrimination.

203.   For instance, when Dan VanTice was preparing to testify in front of the Florida State Senate regarding the impact of H.B. 1557 on his family, his son came up to him and asked if he was going to be able to talk about his family with his

---

[65] Senait Gebregiorgis, *Lyman High School students receive yearbooks with added disclaimer after photo controversy delay*, WESH2 (May 13, 2022),  https://www.wesh.com/article/lyman-high-school-students-receive-yearbooks/39997205#.

friends at school.  Dan had to honestly answer that he wasn't sure, but that was why he was testifying against the bill.

204.   Days later, on Valentine's Day 2022, while Brent VanTice was driving their sons to school, the boys were discussing their excitement to pass out homemade Valentines to their friends.  Brent jokingly asked one of his sons if he was going to say that his favorite Valentine was his Daddy.  His son responded that he couldn't talk about his Daddy at school anymore because of H.B. 1557.

205.   The VanTices know that H.B. 1557 will impact their sons' abilities to fully participate in their school curriculum.  For example, every year, the boys are asked to bring in a picture of their family and to talk about their family with their teacher and peers.  This is part of the way that their children, like many young children, build community at school—by talking and sharing stories about their family.  The VanTices anticipate that when their children have a similar assignment next year, their children's participation in such an assignment will be limited, since as a result of H.B. 1557, their teacher will not be able to engage in classroom discussion that expressly include LGBTQ families.

206.   Similarly, their sons have more than once been asked to bring their favorite book into school, and, on multiple occasions, they have brought in *Daddy, Papa, and Me*, a story about a toddler who happens to have gay parents.  But this, along with other of their favorite books such as *Everywhere Babies*, have already

been added to "banned books" lists as the result of H.B. 1557. The VanTices know that if their children choose to bring these books to school in the future, they likely will not be able to share them with their classmates.

207. As a result of H.B. 1557, the VanTices sons' participation in assignments like these will be limited since their teacher will not be able to engage with their family experience in the same way the teacher engages with the family experiences of students with heterosexual-parent families. Children with heterosexual parents will continue to express themselves, bond with their peers, and build community through their families, but the VanTices' sons will be left out.

208. The VanTices also fear that H.B. 1557 will prevent them from being able to authentically present themselves when engaging in school activities, such as visiting or presenting to their children's class or attending school-wide events or PTO meetings. Would speaking about their relationship and family, or even being present as a couple, constitute "classroom instruction" by "third parties"? Like everyone who reads the text of the statute, they do not know the answer to this question.

209. The VanTices have already experienced the way the law empowers and emboldens others to discriminate against them. Since H.B. 1557 was enacted, the VanTices have been stigmatized within their community, particularly from families

with straight parents, which has caused them to experience insomnia, anxiety, and increased stress.

210.  Casares and Feinberg also have experienced adverse impacts on themselves and their child as a result of the new law.  Since the law was enacted, their child has experienced an increase in the number of students at the child's school who are using the term "gay" as an insult.

211.  Casares and Feinberg are also already experiencing a great deal of anxiety and concern for their child based on how H.B. 1557 will change the way teachers treat their child and will be required to limit their child's participation in instructional activities.  For example, at the beginning of each school year since starting public school, their child has been asked to introduce their family to the class, whether through a picture or a family tree.  This year, their child was instructed to do a project in which they were to write down two things they wanted their teacher to know about them and two things they wanted their peers to know about them.  Their child shared with the teacher that they have two moms.  Casares and Feinberg believe that, as a result of H.B. 1557, their child will not be able to participate in this and many other classroom activities with students who have heterosexual parents, and that their child's teacher will not be able to engage with (let alone comment on) their child's home and personal life.  This will impede their child's ability to form meaningful and important relationships at school, let alone feel safe in their school

environment, as Casares and Feinberg recognize that in elementary school, in order for their child to have personal, warm connections with a teacher, it is important for teachers to be able to discuss and demonstrate empathy for a child's home life and family. The necessity of planning about how to navigate this new legal reality for their child is already causing them to experience severe anxiety and distress.

212.   Since H.B. 1557 was signed into law, Casares and Feinberg have already begun to feel increased ostracization from their child's school personnel and community. As a result, they have already experienced the way that the law is impeding their ability to fully interact with their child's teacher and school community, as teachers, staff, and administrators are already altering their behavior and refraining from communicating with them on the same terms as opposite-sex parents. This will not only impact their involvement as classroom parents, but also Feinberg's role in the PTA. This will limit the effectiveness of their relationships with school staff and administrators, as well as the parent community, and will broadly undermine their ability to be included in regular class and school-wide activism, as well as their ability to rely on the school and its community to care for their child.

213.   Morrison and Houry also are already experiencing anxiety and distress over the impact H.B. 1557 will have on their children. In the past, their children have felt comfortable and accepted at school, but Morrison and Houry are aware that

H.B. 1557 has changed and will continue to change their children's school environment in a negative way.  They are aware that teachers will no longer be able to openly recognize and embrace their children's family structure, and that their children will be stigmatized at school and otherwise.  For example, this year, when Houry's daughter made a Mother's Day Card, she drew a picture of her two moms. Houry is aware that her daughter's teacher will have a reason not to respond as positively or openly to her daughter sharing that she has two mothers as the teacher does to students with different-sex parents lest the teacher be accused of providing instruction about sexual orientation.

214.   They are also experiencing anxiety and distress because their children will be made to feel that the differences in families are negative rather than positive, and that their children will no longer feel as safe or supported in being open about their family.  They are concerned that because of the law, the curriculum for their children will have to be changed, and children will no longer receive education on the normalcy and value of differences, whether it be about families or any other aspects of life.  They know that these changes, which required the marginalization of same-sex parent families, will harm their children by sending them a message that their family is inferior.

215.   Moreover, Morrison and Houry fear that their role in the school community could be curtailed by H.B. 1557.  Morrison and Houry are open that they

are a lesbian couple.  They worry that, as a result of the culture of fear created by H.B. 1557, school personnel and other members of the school community will view their openness and lived value of acceptance as divisive.   Morrison and Houry believe that they may no longer be included in school events, including career day or other classroom activities, because of a fear that their presence will lead to violations H.B. 1557 or make school community members uncomfortable.  Further, they believe that even if they are included in these events, they will be ostracized or stigmatized for these same reasons.  They worry about the impact this will have on their children.

### C.      Harm to Teachers and Other School Personnel

216.   Many Plaintiffs have recognized the harm that H.B. 1557 is already inflicting on teachers and on teachers' ability to provide a welcoming and inclusive environment that is safe for LGBTQ students.

217.   Berg has taught in elementary classrooms in California, Nevada, and Florida for over 29 years.  Currently, Berg is an elementary school art teacher, and he will have to alter his curriculum as a result of H.B. 1557.  For instance, in order to complement the social studies units currently being taught in the early-elementary school homerooms, Berg has his early elementary students draw their own families, but he will not do this next year.  Berg is worried that such a lesson will invite scrutiny if students ask about Berg's own family (which consists of two men) or

other students' families, which may include LGBTQ individuals. Berg is also concerned that students in his classroom who have LGBTQ parents will not feel safe or comfortable drawing their own families as a result of H.B. 1557.

218. Berg also recognizes that a fundamental goal of early elementary education is to teach children empathy and how to socialize and interact with others in a respectful and safe manner. Berg feels that if he cannot address certain topics—such as a student noting that they have two moms in class or that families may look different—he will be unable to foster the inclusive environment necessary to best instruct young children. As a result, he will be less effective as a teacher.

219. To be clear, Berg is worried about far more than censorship. He is concerned that, in the environment created by H.B. 1557, if he even acknowledges his own identity as a gay male with a husband, he will be called a "pedophile" or a "groomer." This is not only scary and offensive, but particularly heartbreaking for Berg because at an early age, he was taught to hate himself for being gay. He has spent decades of his life (through the support of professionals) dealing with his own internalized homophobia, and that wisdom about self-acceptance is something he attempts to pass on to his students, whether straight or gay. Berg feels that H.B. 1557 has stifled his ability to teach other children to accept themselves and others, and to prevent the damage that was done to Berg at a young age.

220.   In fact, just recently in Berg's classroom, a student told another student that their artwork was "so gay."  Berg was deeply offended, and afraid other students might be offended, but felt that he could not address the student or say anything at all because he was worried H.B. 1557 limited his ability to explain either the problematic usage of that phrase or how such a homophobic slur impacted him personally.

221.   Notably, Berg teaches in a bilingual school, and he is a unique asset to the school as a native English speaker who also speaks Spanish fluently.  Recently, a little girl in Berg's classroom who has difficulty speaking English, but also refused to speak Spanish, heard Berg speaking in Spanish.  Immediately the little girl's face lit up.  She suddenly had pride and self-acceptance, and even noted that "it was cool to speak two languages."  Berg wishes that he could make students who identify as LGBTQ or who have LGBTQ parents feel that same level of acceptance, but Berg feels that he will not be able to do that since he will not be able to discuss that aspect of his or his students' identities because of H.B. 1557.

222.   Washington, a middle school civics and drama teacher, has already changed aspects of her instruction to align with H.B. 1557.  For example, every year, Washington's drama students compete in the Florida State Thespians competition.  Until now, Washington has permitted transgender students to choose a song to

perform based on the student's gender identity.   As a result of H.B. 1557, Washington will no longer do so.

223.   Washington also plans to remove certain books from her classroom that touch on issues related to the LGBTQ community.   For example, she currently has books such as *George*, *Fun Home*, *All Boys Aren't Blue*, and *Drama* in her classroom library, which she uses as part of her civics curriculum to teach about "banned books" in connection with the Supreme Court's *Board of Education v. Pico* decision. Washington will change how she discusses this case in her classroom to avoid violating H.B. 1557.

224.   Other teachers are making similar changes to avoid discussion that includes LGBTQ families, people, or issues.   A third-grade teacher in Volusia County recently explained that because of the possibility of lawsuits she will be "walking on eggshells" next year, and worries that she will have to take steps to "police kids' expression" during share time if they share a detail about their lives such as "my two uncles got married over the weekend." [66]

225.   Ultimately, given the vagueness of H.B. 1557's proscriptions on "classroom instruction on sexual orientation or gender identity," which can be enforced through a suit by any parent, Washington is aware that any mention of

---

[66] Kelly Field, *Under New Laws, Some Teachers Worry Supporting LGBTQ Students Will Get Them Sued or Fired*, USA TODAY (May 23, 2022), https://www.usatoday.com/story/news/nation/2022/05/23/lgbtq-civil-rights-laws-worry-some-teachers-who-fear-punishment/9859737002/?gnt-cfr=1.

LGBTQ identity or people could be turned against her.  She has been forced by the law to change how she teaches and is already experiencing a constant fear of losing her job if she slips up and says something about LGBTQ people or issues, which would be emotionally devastating, in addition to a financial hardship.

226.   Other teachers have already been penalized for doing so, even though H.B. 1557 has not yet gone into effect.  For example, in Cape Coral, after the bill was signed into law, a first-year middle school art teacher was fired after her students drew LGBTQ flags during their free time in her class.[67]   Another teacher was reported by a parent for wearing a "Protect Trans Kids" T-shirt on National Transgender Day of Visibility, and Defendant Byrd praised the parent in a Facebook post for reporting "[u]nacceptable teacher attire."[68]

227.   Berg is very nervous about his ability to protect LGBTQ students in his classroom after the passage of H.B. 1557.  Berg currently has one student who is being bullied and taunted because of their gender identity.  Although Berg has discussed this bullying with the student's homeroom teacher, both teachers are petrified to address it directly because of H.B. 1557.

---

[67] Dave Elias, *Cape Coral art teacher fired for discussing lgbtq topics*, NBC-2 (May 6, 2022), https://nbc-2.com/news/local/2022/05/03/cape-coral-art-teacher-fired-for-discussing-lgbtq-topics/.

[68] Emily Bloch (@emdrums), TWITTER (Apr. 1, 2022, 9:09 A.M.), https://twitter.com/emdrums/status/1509880610143322112 (tweeting image of Def. Byrd's Facebook post).

228.   Washington is deeply concerned about the negative impact H.B. 1557 will have on her LGBTQ students and students with LGBTQ families, who will no longer be recognized or supported in the same way as other students.

229.   As a middle-school teacher, Washington is deeply aware of the impact that these developments will have on students' mental health, as well as the ability of the other students to learn about tolerance and how to become effective members of a diverse society.   Washington is concerned that H.B. 1557 will limit her effectiveness in the classroom to the detriment of her students' education by preventing her from including discussions of LTBTQ identity and issues on equal footing or from interacting on equal terms with LGBTQ students.   Already, she has had students who have come to her because they have been harmed by the new law because it has emboldened those who do not support LGBTQ students.   Since H.B. 1557 was passed, in scenes reminiscent of *The Scarlet Letter* by Nathaniel Hawthorne, two of Washington's students were "outed" by their peers and their peers' parents, who created a "phone chain" to further "out" the students to the wider parent community.   The students both came to Washington in tears because they had been outed and feared the consequences they might face at home.   One of the girls was afraid she would be kicked out of her home because her mother had previously said that if she ever found out that her daughter was gay, she would be kicked out of her house.   In another example of the far-reaching (and absurd) effect of H.B. 1557,

a teacher at Washington's school recently pointed at each student as they entered his classroom and identified them as either "girl" or "boy" based on their sex assigned at birth.

230.   Washington's students rely on her to provide them with support, in her role as both a teacher and GSA advisor.  Washington is afraid that H.B. 1557 will prevent her from being able to fill the critical role as a supportive adult in these students' lives.  Recently, Washington was asked by the parents of a transgender student in upper elementary school whether the student could join Washington's middle-school GSA because she lacked the support she needed in her elementary school.  Washington initially agreed to the request but, given H.B. 1557, must reconsider whether agreeing to these parents' request could actually endanger her job.

231.   H.B. 1557 also restricts Berg's ability to be open about his gay identity in the classroom to the same extent and in the same ordinary ways that heterosexual teachers are open about their heterosexual identity.  As noted above, Berg does not put a picture of his husband on his desk, despite the fact that numerous other teachers have pictures of their spouses on their desks.  Berg is concerned that even a simple photograph could be perceived as "grooming" his students or result in criticism or complaints from parents.  Indeed, when Berg recently went on a vacation with his

husband, Berg told his students upon his return that he had gone on a trip with his "friend" because he was afraid of inviting unwanted scrutiny and adverse treatment.

232.   Washington has many signs and posters in her classroom, including those supporting LGBTQ students.  She is aware that if she keeps these signs up next year, she will be putting her job at risk and face ostracization from her colleagues, which could further limit her effectiveness as a teacher and leader in the school community.  In fact, Washington already faced questioning by her colleagues for using a district-provided lanyard that had an LGBTQ-ally flag on it.

233.   Another middle-school teacher and GSA teacher-advisor was recently given a formal directive by his school that he not use references to sexual orientation or gender identity with his students.  This occurred after the school received a complaint from a parent that the teacher had wished students "Happy Lesbian Awareness Day" when students arrived at school, as well as a complaint from another teacher after he shared, at the student's request, a student's desire to be called by a name associated with a different sex.  Worried for his job security, the teacher rushed to find a position at another school in the district for the upcoming school year even though he will now be teaching a different subject and will have to undergo recertification.

234.   Other teachers have been harassed for speaking out against H.B. 1557. For example, a principal and teacher in Tallahassee faced harassment from parents,

including at a local school board meeting, in response to statements made on their private Facebook posts where they were critical of H.B. 1557.[69]  Another teacher has been called numerous names, including "a groomer, a pedophile, [and] an indoctrinator."[70]

235.   One gay kindergarten teacher, who has been teaching in Florida's schools for six years, is concerned that he could lose his job just by answering his student's questions about who he is married to.  When he spoke publicly against H.B. 1557, he was harassed relentlessly on social media, called a "groomer," and calls and emails were made to his superintendent demanding his termination.[71]

236.   Since H.B. 1557 was introduced and enacted, LGBTQ teachers have also reported being targeted.  Another teacher, who has been teaching history to middle- and high-school students in Live Oak, Florida for 17 years, reported that everyone in her school knows she is gay but she does not talk about it at school and it has not been an issue.  She no longer feels that way.  Instead, she feels "targeted" and that any interaction she has with students might put her job at risk.  As just one

---

[69] Lynn Hatter, *A Tallahassee principal and teacher face calls to resign over Facebook posts, but the First Amendment likely protects them*, WFSU (May 17, 2022), https://news.wfsu.org/wfsu-local-news/2022-05-17/a-tallahassee-principal-and-teacher-face-calls-to-resign-over-facebook-posts-but-the-first-amendment-likely-protects-them.

[70] Andrew Atterbury, *Florida's fight over 'Don't Say Gay' is getting more heated. And it hasn't even gone into effect yet*, POLITICO (May 17, 2022), https://www.politico.com/news/2022/05/17/florida-fight-dont-say-gay-00032512.

[71] Cory Bernaert, *I'm a gay kindergarten teacher in Florida. These are the questions I'm asking myself.*, NBC NEWS (Apr. 29, 2022), https://www.nbcnews.com/think/opinion/teach-kindergarten-florida-now-called-groomerrcna26625?cid=sm_npd_nn_fb_ma&fbclid=IwAR1vL3CpWFa0uwnCd3nr0ppSY2cd2d30qh8WUiRob6-TRRp2JjU2lznc1mM.

example, she fears that if a student comes out to her in front of the class, as has happened before, she could be fired.[72]  And as another teacher explained, the attacks feel personal and "like an intent to erase an entire population of people, as if they don't exist."[73]

237.   Following the enactment of H.B. 1557, some educators in Florida have already decided to quit the profession or leave the state to teach elsewhere.  In March, a group of parents in Orlando called for disciplinary action against a sixth-grade science teacher for allegedly acknowledging his marriage to a man at school (even though the teacher denies such a discussion).  This incident prompted his decision to stop teaching in Florida and pursue a career in real-estate instead.[74]

238.   Another fourth-grade teacher in Miami-Dade County, who had been teaching for more than four years, quit.  The teacher, a lesbian, worried that the law would erase her identity as an LGBTQ teacher and put her "in the closet."[75]

239.   Equality Florida's membership includes teachers in Florida public schools, including Washington.  Many of these teachers have reached out to Equality

---

[72] Jay Michaelson, *The Don't Say Gay Bill Is Worse Than It Sounds*, NEW YORK MAGAZINE (Mar. 24, 2022), https://nymag.com/intelligencer/2022/03/florida-dont-say-gay-bill-is-even-worse-than-it-sounds.html?regwall-newsletter-signup=true.

[73] Kelly Field, *Under New Laws, Some Teachers Worry Supporting LGBTQ Students Will Get Them Sued or Fired*, USA TODAY (May 23, 2022), https://www.usatoday.com/story/news/nation/2022/05/23/lgbtq-civil-rights-laws-worry-some-teachers-who-fear-punishment/9859737002/?gnt-cfr=1.

[74] Matt Lavietes, *'I cannot teach in Florida: LGBTQ educators fear fallout from new school law*, NBC NEWS (Apr. 1, 2022), https://www.nbcnews.com/nbc-out/out-politics-and-policy/-cannot-teach-florida-lgbtq-educators-fear-fallout-new-school-law-rcna22106.

[75] *Id.*

Florida since H.B. 1557 has been signed into law to ask for guidance as to how they should be responding to the law, and how it affects what they can do or say in a school environment or in the classroom.   Some of these teachers have LGBTQ students they would like to support, including through service as teacher-advisors for GSAs or other student clubs—and also by protecting these LGBTQ students from bullying and harassment (which requires discussing LGBTQ identities and issues with students).   But these teachers feel they must refrain from doing so because they are concerned about violating H.B. 1557 and being disciplined or fired.   Some teachers have reported that they avoid engaging LGBTQ students all together because they fear what might happen as a result.   Those that do engage have already faced consequences; for instance, one teacher who affirmed an LGBTQ student by informing the class that bullying about sexual orientation or gender identity is unacceptable is being harassed online by parents.

240.   Equality Florida's membership also includes LGBTQ teachers who are afraid to identify themselves as LGBTQ or discuss LGBTQ issues because they are concerned about violating H.B. 1557.   Some LGBTQ teachers reasonably fear that acknowledging the existence of a same-sex or transgender partner or spouse to students would be considered a violation of H.B. 1557 and could result in discipline.

241.   Finally, Equality Florida's membership includes other school personnel, including school counselors, in Florida public schools.   Counselors have

reported that they are afraid to talk with LGBTQ youth because they are concerned that they will lose their licensure or will be sued in a personal capacity simply for trying to hear from an LGBTQ student what their needs are.  This fear has created an immense barrier in counselors' ability to do their jobs and provide students with access to necessary mental health services.

### D.    Harm to Organizational Plaintiffs

242.   Equality Florida, and Family Equality's members are experiencing harm as a result of H.B. 1557, as set forth above.

243.   The organizations themselves are also suffering injury to their mission and by virtue of the need to divert resources to combat an unjust law.

244.   Equality Florida has been on the frontlines in educating the public about the dangers of and fighting against the passage of H.B. 1557 to protect its LGBTQ members.  In doing so, the organization has already diverted significant financial and staff resources.

245.   Equality Florida diverted funds received in connection with a grant from the Movement Voter Project to H.B. 1557.  This grant was originally provided to Equality Florida without regard to H.B. 1557, and Equality Florida had planned to use these funds for recruitment purposes, but instead was forced to divert these funds to oppose H.B. 1557.

246.   Equality Florida has raised and expended substantial financial resources in its fight against the passage and implementation of H.B. 1557, amounting to over $250,000.  These funds were spent on social media and television ads, staff travel to the legislature, and expenses relating to constituent lobbying days, among other things.

247.   Equality Florida diverted money away from existing education and lobbying efforts by leveraging its relationship with national partners to recruit additional funds directly for H.B. 1557, which are funds that would have been diverted to public education and lobbying for other bills and/or issues.

248.   Equality Florida's Public Policy Department shifted time and energy away from other programs, including time that would have been spent lobbying for other bills and supporting other policy efforts, to focus on fighting H.B. 1557.  For example, Equality Florida's Senior Political Director spent three weeks focused solely on H.B. 1557 at the expense of other projects.  And Equality Florida used funds to provide for him and other staff members to travel to and stay in Tallahassee so they could lobby against the bill.  Equality Florida also increased its staffing to assist with efforts related to H.B. 1557.  As a result of H.B. 1557, the part-time Public Policy Fellow who came on prior to legislative session had their weekly hours increased during the legislative session and subsequently was elevated to a newly

created, full-time salaried position with benefits, the Public Policy Associate, to assist with efforts related to H.B. 1557.

249.   Equality Florida's Field Department also diverted significant time and resources away from their key programs, including Get Out the Vote and Persuasion programs, to coordinate the campaign against H.B. 1557.  This included shifting staff and volunteer resources away from mid-term campaigns in municipalities, including for example Boynton Beach, and putting on hold standard programming, such as candidate and election tracking for mid-term elections.  The Department was unable to hold general intern and volunteer recruitment programs and trainings, and volunteer wellness-support programs; as a result, the volunteer program lost participants and resources.  Instead, the Department focused on organizing Days of Action, phone banking, and regional rallies and facilitating advocates from the Equality Florida network to travel to Tallahassee for the legislative session and lobby against H.B. 1557.  The Department also lost a full-time staff member as a result of the bill and was forced to hire and train someone new to join the team.

250.   Equality Florida also made a strategic decision to shift staff and resources away from Pride events, including those attended in the past, in order to focus on fighting against H.B. 1557.  In doing so, Equality Florida sacrificed membership and volunteer recruitment opportunities, as well as the opportunity to strengthen its membership base.

251.   Equality Florida's educational mission is also directly implicated by H.B. 1557.  Equality Florida administers a Safe and Healthy Schools Project, which aims to create a culture of inclusion while countering the bullying, harassment, social isolation, and bigotry that are risk factors for LGBTQ students.  This project offers free resources to educators, students, parents, and supporters.  It is the only statewide LGBTQ initiative focused on providing support and guidance to school districts.

252.   As part of its Safe and Healthy Schools Project, Equality Florida has compiled materials for educators in Florida outlining policies and steps schools can take to ensure LGBTQ students are adequately supported.  It also hosts the "All Together Now" conference, which one District Superintendent described as "about recognizing that we must move beyond the culture of indifference when it comes to securing LGBTQ safe learning environments. Policies and lip service get you nowhere without action."[76]

253.   Already, Equality Florida has noticed many respects in which its efforts have been impacted by H.B. 1557.  Equality Florida has learned that in anticipation of the law being enacted and going into effect, school districts with LGBTQ support guides have removed and/or begun to revise these guides.  As a result, the guides have been significantly shortened or eliminated altogether, and key protections for

---

[76] Equality Florida, *Florida School District LGBTQ+ All Together Now Conference*, YOUTUBE (July 27, 2018), https://www.youtube.com/watch?v=FTlMuJv2xko&t=84s.

LGBTQ students have been removed.  For example, in Duval County, a comprehensive, stand-alone 37-page LGBTQ Support Guide was eliminated, and replaced with significantly limited guidance and protections for LGBTQ students that are incorporated into a larger student support manual that references all student support services.[77]  The "Equity, Diversion, and Inclusion Policy" in Manatee County, where M.A. is a student, has been taken off of the school district's website and is being revised, and the "Guidelines for LGBTQ Students-Follow Best Practices" in St. Johns County, where the VanTices' sons are in school have already been revised.  Moreover, the Sarasota County Schools' "Creating Safe Schools for All Students: Gender Diverse Student Guidelines" were updated on March 25, 2022, to remove references to elementary students.[78]

254.  Further, there is now a paralysis among school district leadership, which has become hesitant to engage in Equality Florida programming.  Indeed, multiple school employees who had previously agreed to speak on panels for

---

[77] Claire Heddles, *What Duval Schools is cutting from its LGBTQ+ Support Guide*, JAXTDY, (May 17, 2022), https://jaxtoday.org/2022/05/17/what-duval-schools-is-cutting-from-its-lgbtq-support-guide/; Travis Gibson, *Duval County School Board reworks LGBTQ+ support guide, may notify parents of name change*, NEWS4JAX (May 17, 2022),  https://www.news4jax.com/news/local/2022/05/17/duval-county-school-board-holds-workshop-to-rework-lgbtq-support-guide/.

[78] *Compare* Sarasota County Schools, *Creating Safe Schools for All Students: Gender Diverse Student Outlines*, at 2 (March 25, 2022), https://www.sarasotacountyschools.net/cms/lib/FL50000189/Centricity/Domain/1174/revised%20Gender%20Diverse%20Guidelines%20FINAL_10232018.pdf *with* Sarasota County Schools, *Creating Safe Schools for All Students: Gender Diverse Student Outlines*, at 2 (Oct. 2018), https://web.archive.org/web/20220209143944/https://www.sarasotacountyschools.net/cms/lib/FL50000189/Centricity/Domain/1167/SCSBGenderDiverseGuidelinesFINAL_10232018.pdf.

Equality Florida have had to cancel after school leadership made it clear that they could not participate in a conference organized by Equality Florida.   School members have expressed fears as to whether GSAs will be able to remain in existence, and some schools have prevented GSAs from forming in the first place.

255.   Thus, the enactment of H.B. 1557 significantly changes what, if anything, Equality Florida can do in schools across the state.

256.   Family Equality's mission is also directly impacted by H.B. 1557, as the law materially changes what, if anything, Family Equality can provide to Florida schools to fight discrimination against LGBTQ families and youth and to LGBTQ parents and their children to help them successfully navigate being a LGBTQ family in K-12 schools.  For example, Family Equality has a "Book Nook," which provides a comprehensive list of the best LGBTQ books for children of all ages, including pre-K through third grade.[79]  Family Equality fears that many of these books will not be permitted in schools when H.B. 1557 is in effect.  Family Equality also has resources that it has created and provides to LGBTQ parents to help them and their families navigate the K-12 education system, including a toolkit and guidance on how parents can help create LGBTQ-friendly classrooms, advice for parents from other parents about how to foster LGBTQ-friendly schools, and guidelines for how

---

[79] *LGBTQ+ Books for Parents and Children*, FAMILY EQUALITY, https://www.familyequality.org/family-support/lgbtq-books/ (last visited May 23, 2022).

to identify an LGBTQ-friendly school, among other resources.  Given the passage of H.B. 1557, these resources will largely be inapplicable for Florida public schools.

257.   As a result of its recent strategic plans and the passage of H.B. 1557, Family Equality has been and will continue to be shifting resources away from nationwide work toward work focused on Florida and other states that are considering laws similar to H.B. 1557.  Family Equality is also going to now focus more time and effort on supporting families in Florida, particularly with respect to how to navigate the impact of H.B. 1557.

258.   Family Equality has diverted and will have to divert many financial resources to address the impact of H.B. 1557 in Florida and beyond.  Already, Family Equality has diverted resources away from other campaigns and projects nationwide to focus on fighting the law's impact.  Family Equality has disseminated multiple "Action Alerts" to inform individuals on their mailing list about the impact of the H.B. 1557 and leadership has spent time and resources promoting its potential impact via op-eds, lobbying, and social media.  Once H.B. 1557 is in effect, Family Equality will have to allocate resources to develop specific resources for Florida families as to how the law might impact them and what they can do to try to ensure that their families are as safe and supported as possible.

259.   Family Equality's staff resources also have been and will be diverted. The policy team's resources have been shifted away from its other workstreams,

including its Family Equity and Justice Project, fighting anti-LGBTQ bills in other states, and the development of its "paths to parenthood" resource, to focus on H.B. 1557. And Family Equality's former Chief Policy Officer, who serves as Of Counsel to Family Equality, traveled to Tallahassee specifically to testify against the bill. Since the bill's passage, Family Equality has restructured its Policy Department and will be adding an attorney position focused primarily on schools, partly in response to making sure there are adequate staff resources to work on the impact of H.B. 1557; this individual will spend part of their time responding to H.B. 1557 specifically.

260.   Family Equality's communication team's resources have also been and continue to be diverted away from other projects and campaigns to focus on urgent communications related to H.B. 1557. The communications team diverted time and bandwidth away from development and fundraising work, deliverables for the annual gala, and strategic brainstorming for a virtual fundraising and public awareness campaign, in order to focus on campaigns related to H.B. 1557. The team was also not able to disseminate time-sensitive digital campaigns for LGBTQ Families Day and National Foster Care Month because of time constraints related to the H.B. 1557 efforts. This impacted programming as well because press for events was limited. The Department of Family Engagement, Programs, and Data has also shifted resources. For example, once hired, the Chief Family Engagement and Programs officer will prioritize that department's focus directly on family

engagement and programmatic priorities to support LGBTQ parents and their school-age children with an emphasis on Florida.  Their team will work alongside the policy team to figure out what resources need to be developed to assist LGBTQ parents in Florida who are impacted by this new law.

## CAUSES OF ACTION

### COUNT I

**Due Process Clause of the Fourteenth Amendment
to the United States Constitution: Vagueness
(Brought pursuant to 42 U.S.C. § 1983 by all Plaintiffs against all Defendants)**

261.  Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

262.  A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  These requirements have particular weight when the law threatens to impinge on First Amendment rights.  *See Smith v. Goguen*, 415 U.S. 566, 573 (1974).

263.  H.B. 1557 is void for vagueness and thereby violates Plaintiff's Fourteenth Amendment rights facially and as applied by Defendants.

264.  As to Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what students can and cannot say and do while participating in "classroom instruction" (a term that is itself vague), and because it invites arbitrary and discriminatory enforcement.

265.   Similarly, as to Plaintiffs McClelland, Dan and Brent VanTice, Casares and Feinberg, Morrison and Houry, Shook, Volmer, and Equality Florida, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what parents can and cannot say and do in the course of "classroom instruction" (a term that is itself vague), and because it invites arbitrary and discriminatory enforcement.

266.   As to Plaintiffs Berg, Washington, and Equality Florida, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what teachers can and cannot say and do during "classroom instruction" (a term that is itself vague), and because it invites arbitrary and discriminatory enforcement.

267.   As to Plaintiffs Equality Florida and Family Equality, H.B. 1557 fails to provide a person of ordinary intelligence a reasonable opportunity and fair notice to understand what the law permits and prohibits, and because it invites arbitrary and discriminatory enforcement.

268.   H.B. 1557 prohibits "[c]lassroom instruction" by "third parties" on "sexual orientation" and "gender identity" in K-3, and otherwise in any context where it is not "age-appropriate" and "developmentally appropriate" in accordance with unspecified "state standards" that may go into effect long after the law does. These key terms are all ambiguous and undefined.  The vagueness of these terms has

a chilling effect on the behavior and speech of students, including Plaintiffs M.A., S.S., Doe, and Equality Florida because they are unable to determine what the law does and does not prohibit; they are uncertain about what they are legally able to say and do in class; and they hesitate to speak or participate in class out of fear of violating the law and facing discipline from their school.

269.   The law also has a chilling effect on the behavior and speech of parents, including Plaintiffs McClelland, Dan and Brent VanTice, Casares and Feinberg, Morrison and Houry, Shook, Volmer, and Equality Florida because they are likewise unable to determine what the law does and does not prohibit, and they are uncertain about what they are legally able to say and do in the classroom or school.

270.   The vagueness and ambiguity of the law also have a chilling effect on the behavior and speech of LGBTQ teachers, including Plaintiffs Berg, Washington, and Equality Florida, because they are likewise unable to determine what the law does and does not prohibit, and they are uncertain about what they are legally able to say and do while teaching in school, for fear of violating the law.

271.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable injury, including violations of their rights under the Fourteenth Amendment to due process.

272.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered damages to be determined according to proof at trial.

## COUNT II

**Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution: Discrimination
(Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., Moricz, S.S., Doe,
Dan and Brent VanTice, Casares, Feinberg, Morrison, Houry, Berg, Equality
Florida, and Family Equality against all Defendants)**

273.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

274.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides: "No State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.

275.   Defendants have deprived Plaintiffs of the rights, privileges, or immunities secured by the Equal Protection Clause because Defendants, without sufficient justification, have treated Plaintiffs differently from other similarly situated persons based on their sex, sexual orientation, gender, gender identity, and transgender status.

276.   H.B. 1557 was enacted with an invidiously discriminatory purpose and results in discriminatory and disparate effects, and thus violates the Fourteenth Amendment rights of Plaintiffs facially and as applied by Defendants.

277.   Comments by the legislative sponsors of the Act, other legislators, and Governor DeSantis all confirm that H.B. 1557 was enacted, at least in part, with the unlawful purpose to discriminate against LGBTQ people.  The public record reflects

a purpose to target, demean, belittle, and harass LGBTQ individuals and families, with the intent and effect of depriving them of full advantage of the academic and extracurricular opportunities provided by the school environment. It also reflects an effort to impose state-selected (but demonstrably outmoded and offensive) gender stereotypes as the dominant ideology and controlling rule of public education in Florida—a form of improper sex stereotyping prohibited by the Constitution.

278.   In addition, H.B. 1557 is simply the latest in a long line of anti-LGBTQ laws that the Florida legislature and Governor have passed or attempted to pass in recent memory, further illustrating and confirming its invidiously discriminatory purpose. H.B. 1557 also follows in the footsteps of decades of "No Promo Homo" and "Don't Say Gay" laws and has the same aim, which it achieves by imposing vague and broad proscriptions that invite—and indeed are already causing— discriminatory enforcement only against discussions of LGBTQ persons and issues.

279.   Although the law has not yet taken effect, Plaintiffs have already suffered injury and ostracization from passage of the law, and from the imprimatur of discrimination by Defendants. And the law is substantially likely to encompass further material, educational, and other injuries to Plaintiffs in their school and personal lives.

280.   For example, H.B. 1557 has already stigmatized and singled out LGBTQ students such as Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida as

inferior and unequal in public school settings; encouraged teachers and other students to view LGBTQ students as different and inferior and effectively condoned bullying and harassment by others; interfered with the healthy development and socialization of LGBTQ students; and harmed their health and well-being.

281.   H.B. 1557 disparately harms LGBTQ students such as Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida and denies such students equal educational opportunities based on their LGBTQ orientation or identity.

282.   H.B. 1557 also disparately harms LGBTQ teachers, such as Berg and Equality Florida, and LGBTQ parents including Plaintiffs Dan and Brent VanTice, Casares, Feinberg, Morrison, and Houry based on their LGBTQ orientation or identity.

283.   In addition, as to Plaintiffs Dan and Brent VanTice, Casares and Feinberg, Morrison and Houry, and LGBTQ parent members of Equality Florida, H.B. 1557 violates the equal protection right to marry on the "same terms and conditions as opposite-sex couples." *Obergefell*, 576 U.S. at 676; *see also id.* at 667 ("A third basis for protecting the right to marry is that it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education."); *Pavan v. Smith*, 137 S. Ct. 2075, 2078 (2017).  The purpose and effect of H.B. 1557 is that LGBTQ married couples will be treated differently and worse than non-LGBTQ married couples in important aspects of their interactions with

Florida's public schools, and that the children of LGBTQ married couples will similarly suffer discrimination and disadvantage in Florida's public schools as compared to all other children.

284.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, Dan and Brent VanTice, Casares, Feinberg, Morrison, Houry, Berg, Equality Florida, and Family Equality have already suffered and will continue to suffer irreparable injury, including violations of their Fourteenth Amendment rights to equal protection of the laws.

285.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, Dan and Brent VanTice, Casares, Feinberg, Morrison, Houry, Equality Florida, and Family Equality have suffered damages to be determined according to proof at trial.

## COUNT III

**First Amendment to the United States Constitution:**
**Right to Receive Information**
**(Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality against all Defendants)**

286.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

287.   The First Amendment to the United States Constitution provides: "Congress shall make no law … abridging the freedom of speech."  U.S. CONST.,

amend. I.   The First Amendment applies to the state of Florida pursuant to the incorporation doctrine of the Fourteenth Amendment.

288.   The First Amendment protects "the right to receive information and ideas." *Pico*, 457 U.S. at 867.  Laws regarding school curricula and instruction violate students' First Amendment rights to receive information and ideas where they are not "reasonably related to legitimate pedagogical concerns," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), or where officials exercise their discretion over curricular decisions "in a narrowly partisan or political manner," *Pico*, 457 U.S. at 870.

289.   H.B. 1557 violates the First Amendment right to receive information and ideas of Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida facially and as applied by Defendants.  More specifically, the law violates their right to receive and debate information and ideas concerning sexual orientation and gender identity, even when such information serves essential pedagogical purposes.

290.   H.B. 1557's restrictions on students' rights to receive information and ideas concerning sexual orientation and gender identity are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purpose.  Instead, H.B. 1557 is rooted in animus against LGBTQ individuals, as demonstrated by the public record.  H.B. 1557 is also the result of partisan or political decision-making.

291. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality have suffered and will continue to suffer irreparable injury, including violations of their First Amendment rights to receive information and ideas.

292. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality have suffered damages to be determined according to proof at trial.

## COUNT IV

**First Amendment to the United States Constitution:**
**Right to Freedom of Expression**
**(Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality against all Defendants)**

293. Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

294. "[S]tudents do not 'shed their constitutional rights of freedom to speech or expression,' even 'at the school house gate.'" *Mahanoy*, 141 S. Ct. at 2044 (quoting *Tinker*, 393 U.S. at 506). Thus, student speech is presumptively protected unless it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Id.* at 2045 (quoting *Tinker*, 393 U.S. at 513).

295. Likewise, laws regulating students' speech violate their First Amendment rights where such laws are not "reasonably related to legitimate pedagogical concerns." *Kuhlmeier*, 484 U.S at 273.

296.   H.B. 1557 violates the First Amendment right to freedom of expression of students, including Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida facially and as applied by Defendants.  More specifically, the law restricts Plaintiffs' ability to discuss topics related to sexual orientation and gender identity in class and related settings, and even restricts their ability to self-identify.

297.  H.B. 1557's restrictions on students' rights to free expression concerning sexual orientation and gender identity are not justified by preventing disruption to the school environment, are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purposes.  Instead, the law is rooted in animus against LGBTQ individuals, as demonstrated by the public record.

298.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality have suffered and will continue to suffer irreparable injury, including violations of their First Amendment right to freedom of expression.

299.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality have suffered damages to be determined according to proof at trial.

## COUNT V

### First Amendment to the United States Constitution:
### Overbreadth

**(Brought pursuant to 42 U.S.C. § 1983 by Plaintiffs M.A., S.S., Doe, Equality Florida, and Family Equality against all Defendants)**

300.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

301.   A "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

302.   H.B. 1557 is overbroad in violation of the First Amendment rights of Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality facially and as applied by Defendants, because even to the extent that the law could be interpreted as having any legitimate pedagogical purpose, "a substantial number of its applications are unconstitutional." *Id.*  More specifically, even if H.B. 1557 has some legitimate pedagogical purpose, it is not narrowly tailored to that purpose but rather will be applied in a manner that broadly infringes Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality's First Amendment rights to receive information and ideas, and their right to freedom of expression.

303.   This overbreadth has a chilling effect on the behavior and speech of students, including Plaintiffs M.A., Moricz, S.S., Doe, and members of Equality Florida, resulting in the self-censoring and intentional avoidance of a broad, sweeping category of protected speech.  For example, due to the overbreadth of H.B.

1557, students like Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida are discouraged from identifying themselves as LGBTQ in school or from coming out as LGBTQ; from sharing experiences or views about LGBTQ issues, sexual orientation, or gender identity in school, as Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida currently do; and from asking questions about LGBTQ issues, sexual orientation, or gender identity in school, as Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida currently do, all of which infringes on their First Amendment rights.

304. This overbreadth also has a chilling effect on the behavior and speech of teachers, including Plaintiffs Berg, Washington, and Equality Florida, resulting in the self-censoring and intentional avoidance of a broad, sweeping category of protected speech. For example, teachers are discouraged from providing students with accurate information about sexual orientation and gender identity for fear of violating the law, which infringes on the First Amendment right to receive information of Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida.

305. H.B. 1557's overbroad restrictions are not justified by preventing disruption to the school environment, are unrelated to legitimate pedagogical concerns, and serve no other legitimate state purposes. Instead, the law is rooted in animus against LGBTQ individuals, as demonstrated by the public record, as well as by partisan or political reasons.

306.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida have suffered and will continue to suffer irreparable injury, including violations of their First Amendment rights.

307.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, and Equality Florida have suffered damages to be determined according to proof at trial.

## COUNT VI

**Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688:**
**Discrimination Based on Sex**
**(Brought by Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family**
**Equality against Defendants State Board of Education and Florida**
**Department of Education)**
**Discrimination Based on Sex**

308.   Plaintiffs reallege and incorporate by reference the preceding allegations as though fully set forth herein.

309.   Defendants State Board of Education and Florida Department of Education are recipients of federal financial assistance.

310.   The acts and omissions of Defendants have violated Plaintiffs' M.A., S.S., Doe, Equality Florida, and Family Equality's rights under Title IX by discriminating against them on the basis of sex, which includes sexual orientation and gender identity.

311.   More specifically, H.B. 1557 results in the disparate treatment of students in Florida's public education system on the basis of sex, because they are excluded from the participation in, denied the benefits of, and/or discriminated in education.  By implementing and enforcing H.B. 1557, Defendants State Board of Education and Florida Department of Education are intentionally and/or with deliberate indifference engaging in such discrimination.

312.   As a direct and proximate result of Defendants State Board of Education and Florida Department of Education's unlawful conduct, Plaintiffs M.A., Moricz, S.S., Doe, Equality Florida, and Family Equality have suffered and will continue to suffer irreparable injury, including violations of their First Amendment rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and request an award of the following relief:

313.   A declaratory judgment that H.B. 1557 and the actions described herein deprive Plaintiffs of their rights under the United States Constitution, including the First and Fourteenth Amendments thereto, and applicable federal statutory law, including 42 U.S.C. § 1983;

314.   Permanent injunctive relief enjoining Defendants from implementing and enforcing H.B. 1557 in violation of the rights guaranteed to Plaintiffs by the United States Constitution and applicable federal statutory law;[80]

315.   Nominal, compensatory, statutory, and punitive damages in an amount to be determined at trial, as well as prejudgment interest, where appropriate, including for the pain and suffering experienced by Plaintiff Moricz as a result of the censorship of his high school graduation speech;

316.   An award of Plaintiffs' costs of suit and reasonable attorneys' fees, expenses, and costs under 42 U.S.C. § 1988 and other applicable laws; and

317.   Such other relief as the Court deems necessary, just, and proper.

---

[80] Pursuant to the Court's Scheduling Order dated May 13, 2022 (ECF 44), the Court has set a trial date of February 13, 2023.  Given the fact that trial is now scheduled to take place in relatively short order, Plaintiffs are no longer seeking a preliminary injunction at this time, since it will be more efficient and expeditious for the parties to proceed with discovery and trial.  However, Plaintiffs reserve all rights to seek a preliminary injunction or any other appropriate remedy in the event that any of the Plaintiffs are treated in a way that requires such relief prior to trial or in the event that the February 13, 2023 trial date is postponed.

Dated: New York, New York          Respectfully submitted,
  May 25, 2022

Roberta A. Kaplan (NY #2507093)*
John C. Quinn (NY #4965000)*
Kate L. Doniger (NY #5128251)*
D. Brandon Trice (NY #5140017)*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel.: (212) 763-0883
rkaplan@kaplanhecker.com

Joshua Matz (DC #1045064)*
Valerie L. Hletko (DC #485610)*
KAPLAN HECKER & FINK LLP
1050 K Street, NW, Suite 1040
Washington, D.C. 20001
Tel: (212) 763-0883
jmatz@kaplanhecker.com

Christopher Stoll (CA #179046)*
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Tel.: (415) 392-6257
CStoll@nclrights.org

Michael W. Weaver (IL #6291021)*
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Tel.: (312) 984-5820
mweaver@mwe.com

Joseph M. Wasserkrug (FL #112274)
MCDERMOTT WILL & EMERY LLP
333 SE 2nd Avenue, Suite 4500

Miami, Florida 33131
jwasserkrug@wme.com

Elizabeth F. Schwartz (FL #114855)
ELIZABETH F. SCHWARTZ, P.A.
3050 Biscayne Blvd., Suite 600
Miami, Florida 33137
liz@elizabethschwartz.com

*Attorneys for Plaintiffs*

*\* admitted pro hac vice*