**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**EQUALITY FLORIDA**, et al.,

    *Plaintiffs*,

    v.                        No. 4:22-cv-134-AW-MJF

**RON DESANTIS**, in his official capacity
as Governor of Florida, et al.,

    *Defendants*.

_____/

## STATE DEFENDANTS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

H.B. 1557—Florida's Parental Rights in Education bill—was enacted in response to reports that some public-school officials were concealing from parents information about the sexual orientation and gender identity of their children. Once it takes effect, the bill will safeguard parents' right to direct the upbringing of their children by requiring, among other things, that public-school officials notify parents of changes in the mental health and well-being of their children and encourage children to discuss sensitive matters with their parents.

Plaintiffs challenge a provision of H.B. 1557 that removes the subjects of "sexual orientation" and "gender identity" from Florida's public-school curricula for kindergarten through the third grade and, after that, leaves teachers free to instruct on those subjects in a manner that is "age-appropriate [and] developmentally

appropriate for students in accordance with state standards." An Act Relating to Parental Rights in Education, Ch. 2022-22 (H.B. 1557), § 1, Laws of Fla. (2022). Falsely dubbed by its opponents the "Don't Say Gay" bill, *see* ECF 47 ¶ 1, H.B. 1557 is nothing of the sort. Far from banning discussion of sexual orientation and gender identity, the legislation expressly allows age and developmentally appropriate education on those subjects. Consistent with that modest limitation, the law prohibits classroom instruction on sexual orientation and gender identity for the youngest children, neutrally allowing *all* parents, no matter their views, to introduce those sensitive topics to their children as they see fit.

Plaintiffs' effort to convince the public that H.B. 1557 "would deny to an entire generation that LGBTQ people exist and have equal dignity," ECF 47 ¶ 2, is fearmongering at best. Nothing in the bill suggests that "the only 'appropriate' families, students, and teachers are straight and cisgender ones." *Id.* ¶ 6. The point of the challenged provision is to leave instruction on such matters to parents rather than state officials at least until the fourth grade, at which point the concepts of sexual orientation and gender identity may be introduced in a manner consistent with "state standards" that have not yet been adopted and need not be adopted until June 30, 2023. When the bill takes effect on July 1, 2022, students, parents, and even teachers will remain free to express themselves as long as they do not "instruc[t]" the youngest children "on" those concepts in public-school classroom settings. H.B.

2

1557 § 1. The bill does not prohibit, for example, mere classroom references to a person's family—whether gay or straight, transgender or cisgender.

This pre-enforcement, facial challenge alleges principally that H.B. 1557's provision regulating the curriculum of Florida's public schools violates the First Amendment and the Equal Protection Clause. For the reasons discussed below, Plaintiffs lack standing and much of the relief they seek is barred by sovereign immunity.

There is also nothing unlawful about H.B. 1557. Because a public-school teacher is a government employee whose "job is to speak in the classroom on the subjects she is expected to teach," her lessons are "not the speech of a 'citizen' for First Amendment purposes." *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Beyond that, states have broad authority to determine the content of public-school curricula in a manner that is "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Here, the State has removed sensitive content from its curricula because it is "inappropriate for the age group." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 880 (Blackmun, J., concurring). That is perfectly constitutional because "a school must be able to take into account the emotional maturity of the intended audience." *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1521 (11th Cir. 1989) (cleaned up).

Plaintiffs' equal-protection claim fares no better. The bill subjects no one "to discriminatory treatment." *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019) (cleaned up). Rather, it establishes an educational standard that, for each grade level, affects classroom instruction equally. And the bill does so neutrally, limiting all classroom instruction on "gender identity" and "sexual orientation," not only instruction on transgender identity and homosexuality.

Interpretative questions about the bill will of course present themselves, as is true of any law. But the meaning of H.B. 1557 is readily apparent, so it is not even close to "standardless," *United States v. Estrada*, 969 F.3d 1245, 1265 (11th Cir. 2020) (cleaned up), which dooms Plaintiffs' vagueness challenge.

The complaint should be dismissed.

## STATEMENT OF THE CASE

**1.** Leading up to the 2022 Regular Session of the Florida Legislature, the Leon County school board was sued for "withholding information from . . . parent[s] regarding their student's gender transition at school." Fla. H.R., CS/CS/HB 1557 (2022) Final Staff Analysis at 4–5 (Mar. 28, 2022), https://www.flsenate.gov/Session/Bill/2022/1557/Analyses/h1557z.EEC.PDF (citing Ana Goni-Lessan, *Lawsuit against Leon Schools says district excluded parents from gender discussions*, TALLAHASSEE DEMOCRAT (Nov. 16, 2021), https://www.tallahassee.com/story/news/2021/11/16/leon-county-schools-sued-

over-lgbtq-guide-transgender-lgbtqguide/6342695001/). That was no isolated incident. For example, the "Clay County School Board [wa]s being sued by parents" alleging that "school officials hid their 12-year-old daughter's mental health and gender identity issues for months – only informing them after the child attempted suicide in the school bathroom on two separate occasions." *Another Florida School Board Sued over Concealing Gender Identity Counseling from Parents*, TALLAHASSEE REPORTS (Jan. 30, 2022), https://tallahasseereports.com/2022/01/30/another-florida-school-board-sued-over-concealing-gender-identity-counseling-from-parents/.

As legislative staff noted, those incidents were symptomatic of a broader issue: "multiple school districts in Florida maintain[ed] policies that exclude[d] parents from discussions and decisions on sensitive topics relating to students." CS/CS/HB 1557 Final Staff Analysis at 4 & nn.25–26, https://www.flsenate.gov/Session/Bill/2022/1557/Analyses/h1557z.EEC.PDF (identifying Leon, Broward, Palm Beach, Miami-Dade, Sarasota, Volusia, and Hillsborough County policies). Miami-Dade County was instructing teachers that, "[w]hen contacting the parent/guardian of a transgender or gender expansive student, school staff should use the student's legal name and the pronoun corresponding to the student's assigned sex at birth, unless the student or parent/guardian has specified otherwise." *2020-2021 Guidelines for Promoting Safe*

*and Inclusive Schools*, MIAMI-DADE COUNTY PUBLIC SCHOOLS at 7 (July 2020),

https://api.dadeschools.net/WMSFiles/94/pdfs/GUIDELINES-FOR-

PROMOTING-SAFE-07-2020.pdf (cited at ECF 47 ¶ 107 & n.9). Broward County

went even further, instructing teachers that (1) they would be in violation of federal

law if they divulged students' LGBTQ status to their parents, (2) they must lie in

response to parents' questions about such issues, and (3) they could not even

"encourage . . . a student to be 'out' at home." *LGBTQ+ Critical Support Guide*,

BROWARD COUNTY PUBLIC SCHOOLS at 26–29 (2012), https://defendinged.org/wp-

content/uploads/2022/05/BCPS-LGBTQ-Critical-Support-Guide-III-Edition-

2020.pdf (cited at ECF 47 ¶ 108 & n.11).[1] Duval, Hillsborough, Pinellas, and

Volusia counties were giving the same direction to their teachers.[2]

---

[1] In support of this directive, Broward relied on a case about a police officer who threatened to "out" an arrestee, leading to the arrestee's suicide. *LGBTQ+ Critical Support Guide*, BROWARD COUNTY PUBLIC SCHOOLS at 27–29 (citing *Sterling v. Borough of Minersville*, 232 F.3d. 190, 196 n.4 (3d Cir. 2000)).

[2] *LGBTQ+ Support Guide*, DUVAL COUNTY PUBLIC SCHOOLS at 12 (2020), https://s3.documentcloud.org/documents/21988102/dcps_lgbtq_support_guide_20 20.pdf (cited at ECF 47 ¶ 109 & n.15); *LBGTQ+ Critical Resource and Support Guide for Staff*, HILLSBOROUGH COUNTY PUBLIC SCHOOLS at 16 (2021), https://www.wfla.com/wp-content/uploads/sites/71/2022/02/Hillsborough-Schools-LGBTQ-Critical-Resource-Guide-2021-08.31.21.pdf (cited at ECF 47 ¶ 109 & n.15); *Inclusive Schools Support Guide: Promoting Safe and Inclusive Schools*, PINELLAS COUNTY SCHOOLS at 22–23 (2020), http://www.pccpta2020.com/wp-content/uploads/2021/09/Inclusive-Schools-Support-Guide_FINAL_5.28.20.pdf (cited at ECF 47 ¶ 109 & n.15); *LGBTQ Support Guide*, VOLUSIA COUNTY SCHOOLS

At the same time, some Florida school boards had published "Guidelines for Curriculum" that encouraged teachers to "include affirmative topics about LGBTQ+ persons in curriculum and classroom discussions" and admonishing that "[n]o parental notification is needed for these classroom discussions." *School District of Palm Beach County LGBTQ+ Critical Support Guide*, PALM BEACH COUNTY SCHOOL                    DISTRICT             at                 80                (2021), https://www2.palmbeachschools.org/caringfirst/resources/lgbtq_critical_support_g uide.pdf. The Guidelines referred to, for example, "the Genderbread Person," a widely publicized infographic of an anthropomorphic gingerbread cookie designed to teach young children the concepts of sexual orientation and gender identity:

---

at 11 (2020), https://beacononlinenews.com/wp-content/uploads/2022/03/VCS-LGBTQ-Support-Guide-2020.pdf (cited at ECF 47 ¶ 109 & n.15).



*Id.* at 27; *see also The Genderbread Person*, https://www.genderbread.org/ (last visited June 26, 2022); *Parent References 'GenderBread Person' in Public Testimony on Parental Rights in Education Bill*, TALLAHASSEE REPORTS (Mar. 3, 2022), https://tallahasseereports.com/2022/03/03/parent-references-genderbread-person-in-public-testimony-on-parental-rights-in-education-bill/.

Some parents objected to this type of instruction. Parents complained, for example, that their son's second-grade teacher had taught a book entitled *Call Me Max* during story time. *See* Lois K. Solomon, *Florida School District Pulls 2 Books about Transgender Kids, Including 'I Am Jazz'*, SOUTH FLORIDA SUN-SENTINEL (Apr. 6, 2022), https://www.sun-sentinel.com/local/schools/fl-ne-pbc-trans-books-20220406-hkgksij32bcbpod46uclprerlu-story.html. Like the Genderbread Person, *Call Me Max* teaches the concept of gender identity. The book attempts to explain, using child-friendly illustrated terms, the definition of "transgender." Kyle Lukoff, *Call Me Max* 4 (2019). It continues: "When a baby grows up to be transgender, it means that the grown-up who said they were a boy or a girl made a mistake." *Id.* at 5. The protagonist of the book also explains that "[w]hen I looked in the mirror, I saw a girl. Kind of. But because I'm transgender, I wanted to see a boy." *Id.* at 6.




Lukoff at 6–7.

And among many other examples, Broward County was directing teachers to respond to kindergarteners "when answering classroom questions that may arise" that "Gay (for grades Pre-K-2)" means "[a] person who has romantic feelings for someone of the same gender" and "Transgender (Grades K-4)" means that "[w]hen a baby is born, they are given a gender. Transgender people change their gender once they are old enough to explain to others how they feel about their own gender. This person may change their name or pronoun." *LGBTQ+ Critical Support Guide*, BROWARD COUNTY PUBLIC SCHOOLS at 10, 12. Broward further directed that "[n]o parental notification is needed for these classroom discussions." *Id.* at 54.

"National Sex Education Standards" in use by many Florida school districts also provided that, "[b]y the end of the 2nd grade, students should be able to: Define gender, gender identity, and gender-role stereotypes." *National Sex Education Standards*, FUTURE OF SEX EDUCATION INITIATIVE at 19 (2d ed. 2020), https://www.advocatesforyouth.org/wp-content/uploads/2021/11/NSES-2020-web-updated2.pdf. And "[b]y the end of the 5th grade, students should be able to: Distinguish between sex assigned at birth and gender identity and explain how they

may or may not differ," and "[d]efine sexual orientation." *Id.* at 21–22; *see also* Fla. S., recording of proceedings, at 2:07–08 (Mar. 7, 2022) (discussing the standards).[3]

**2.** The Florida Legislature responded by enacting H.B. 1557, which will take effect on July 1, 2022. Entitled "[a]n act relating to parental rights in education," the legislation will "reinforce the fundamental right of parents to make decisions regarding the upbringing and control of their children" in two principal ways. H.B. 1557, Preamble.

*First*, the bill requires transparency with parents regarding the health and well-being of their children. The bill, for instance, requires school districts and their personnel to encourage students to discuss their well-being with their parents. H.B. 1557 § 1. The bill further requires school boards to "notify parents [annually] of each healthcare service offered at their student's school and the option to withhold consent or decline any specific service." *Id.* School boards must also "adopt procedures for notifying a student's parent if there is a change in the student's services or monitoring related to the student's mental, emotional, or physical health or well-being," and "[b]efore administering a student well-being questionnaire or health screening form to a student in kindergarten through grade three, the school district must provide the questionnaire or health screening form to the parent and

---

[3] https://thefloridachannel.org/videos/3-7-22-senate-session-part-3/.

obtain the permission of the parent." *Id.* The bill prohibits school districts from discouraging discussion of their children's health with parents, particularly "critical decisions affecting a student's mental, emotional, or physical health," *id.*, such as a potential gender transition. But school districts may establish procedures for withholding "such information from a parent if a reasonably prudent person would believe that disclosure would result in abuse, abandonment, or neglect." *Id.*

*Second*, the bill regulates public-school curricula. "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." H.B. 1557 § 1. In other words, "[c]lassroom instruction . . . on sexual orientation or gender identity" is permissible so long as it is "age-appropriate [and] developmentally appropriate for students in accordance with state standards," subject to a bright-line rule that classroom instruction on those topics is *not* age-appropriate or developmentally appropriate "in kindergarten through grade 3." *Id.*

State standards for "age-appropriate [and] developmentally appropriate" instruction after grade three must be promulgated by the Department of Education by June 30, 2023. H.B. 1557 § 2. That has not yet happened.

**3.** The Governor signed H.B. 1557 into law on March 28, 2022, and Plaintiffs filed this lawsuit three days later. The operative complaint was served on May 25, 2022.

Plaintiffs are K-12 students, parents of K-12 students, two K-12 teachers, and two organizations. Specifically:

- Plaintiffs M.A., Doe, and S.S. are students currently enrolled in grade five or higher (collectively, "the Student Plaintiffs"). Each is gay or transgender. ECF 47 ¶¶ 30–43, 49–59. They bring a void-for-vagueness claim, as well as claims under the Equal Protection Clause, the First Amendment, and Title IX. M.A. and Doe are minors and therefore bring their claims through their parents (respectively, Plaintiffs Armstrong, McClelland, and Schulman).

- Plaintiff Moricz is a recent high school graduate. He is gay. ECF 47 ¶¶ 44–48. He brings a void-for-vagueness claim, as well as claims under the Equal Protection Clause, the First Amendment, and Title IX.

- Plaintiffs Morrison, Houry, Dan and Brent VanTice, Casares, and Feinberg are parents of K-3 students (collectively, "the Parent Plaintiffs"). Each is gay or lesbian. None alleges that his or her child is gay, lesbian, or transgender. ECF 47 ¶¶ 60–72. They bring void-for-vagueness and equal-protection claims.

- Plaintiff Shook is the parent of a K-3 student. She alleges that she is heterosexual and does not allege that her child is gay or transgender. ECF 47 ¶¶ 73–74. Plaintiff Volmer likewise is the parent of K-3 students. She alleges that she is heterosexual and does not allege that her children are gay, lesbian, or transgender. *Id.* ¶¶ 75–77. Plaintiffs Shook and Volmer bring only a void-for-vagueness claim.

- Plaintiff Berg is an elementary school art teacher. He is gay and alleges that his students range from pre-K through fifth grade. ECF 47 ¶ 78. He brings void-for-vagueness and equal-protection claims.

- Plaintiff Washington is a middle-school civics and drama teacher. She does not allege that she is a lesbian or transgender. ECF 47 ¶¶ 79–81. She brings only a void-for-vagueness claim.

- Equality Florida is a non-profit organization. The only members of Equality Florida specifically identified in the complaint are the VanTice parents, Ms. Houry, and Ms. Washington, who are also plaintiffs. ECF 47 ¶¶ 25–27. Family Equality is a non-profit organization that does not identify any specific members in its allegations. *Id.* ¶¶ 28–29. Equality Florida and Family Equality bring a void-for-vagueness claim, as well as claims under the Equal Protection Clause, the First Amendment, and Title IX.

To summarize the claims another way: The void-for-vagueness claim is brought by all plaintiffs. The equal-protection claim is brought by all plaintiffs except Shook, Volmer, and Washington. And the First Amendment and Title IX claims are brought by the Student Plaintiffs, Moricz, Equality Florida, and Family Equality.

Defendants are Florida Governor Ron DeSantis, Florida Commissioner of Education Manny Diaz, the Florida Department of Education, the Florida Board of Education, each of the members of the Board (collectively, "the State Defendants"), and several district school boards (the "School Board Defendants").

## LEGAL STANDARD

At the pleadings stage, the Court must "assume the veracity of well-pleaded factual allegations" but must not credit mere "labels and conclusions." *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (cleaned up). The well-pleaded allegations, "accepted as true," must be sufficient "to state a claim to relief that is

14

plausible on its face." *Id.* (cleaned up). The alleged facts must be "more than merely *possible*, and a plaintiff's factual allegations that are merely consistent with a defendant's liability will not be considered facially plausible." *Id.* (cleaned up; emphasis in original). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The analysis is "not formulaic; instead, determining whether a complaint states a plausible claim for relief is . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense in reviewing the plaintiff's allegations." *Id.* (cleaned up).

## ARGUMENT

The amended complaint must be dismissed because plaintiffs lack standing. *See* Fed. R. Civ. P. 12(b)(1). The complaint also fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

### I.   STATUTORY CONSTRUCTION

Because the proper interpretation of H.B. 1557's regulation of classroom instruction cuts across every issue in the case, it makes sense to start there.

Plaintiffs paint the bill as "discriminatory" because, they say, "it aims at sexual orientations and gender identities that differ from heterosexual and cisgender identities," "us[es] broad and vague terms to define its prohibitions," and "recruits

every parent as a roving censor, armed with a legal warrant to sue schools for damages whenever they believe a teacher, any other 'school personnel,' or any 'third party' has provided any 'classroom instruction' that may be perceived as relating to 'sexual orientation' or 'gender identity.'" ECF 47 ¶¶ 15, 3, 5 (emphasis omitted).

None of that is correct. To the contrary, H.B. 1557 is clear in its prohibition, neutral as to sexual orientation and gender identity, and narrow in its remedial scheme.

The bill provides in pertinent part: "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards," which shall be adopted by the Department of Education by "June 30, 2023." H.B. 1557 §§ 1–2.

As a threshold matter, only the instructional restriction applicable to kindergarten through third grade takes effect on July 1, 2022. For older children, the bill ties the prohibition of instruction that is not "age-appropriate" or "developmentally appropriate" to "state standards" that have not yet been adopted and need not be adopted for another year. As the Florida Department of Education has made clear, that restriction "takes effect only after the Florida Department of Education (Department) develops rules or guidance on age-appropriate and

developmentally appropriate instruction." Memo from J. Oliva to School District Superintendents, *House Bill 1557, Parental Rights in Education, School District Responsibilities*, FLORIDA DEPARTMENT OF EDUCATION at 1 (June 6, 2022), https://info.fldoe.org/docushare/dsweb/Get/Document-9559/dps-2022-68.pdf.

Contrary to Plaintiffs' assertions, the curricular restriction for Florida's youngest public-school children, which does take effect July 1, is not discriminatory. The statute limits classroom instruction on "sexual orientation or gender identity." Nothing in that language "aims at sexual orientations and gender identities that differ from heterosexual and cisgender identities." ECF 47 ¶ 15 (emphasis omitted). To the contrary, instruction on "the normalcy of opposite-sex attraction" would equally be "instruction on sexual orientation." *Id.* ¶ 11. The statute is neutral on the proscribed subjects.

Plaintiffs denounce the curricular restriction as giving rise to "a host of" purportedly "intractable interpretive questions." ECF 47 ¶ 116. But the many "questions" Plaintiffs posit flow from their misreading of the statute. There is no merit, for example, to the suggestion that the statute restricts gay and transgender teachers from "put[ting] a family photo on their desk" or "refer[ring] to themselves and their spouse (and their own children)." *Id.* ¶ 8. Those actions are not "instruction," which is "the action, practice, or profession of teaching," *Instruction*, *Merriam-Webster's Dictionary* (last visited June 26, 2022), https://www.merriam-

webster.com/dictionary/instruction; *Instruction*, *American Heritage Dictionary* 666 (2d ed. 1985) (defining "instruction" as "[t]he act, practice, or profession of instructing"); *id.* (defining "instruct" as "[t]o furnish with knowledge; teach"); *Instruction*, *Webster's New International Dictionary* 1288 (2d ed. 1957) (defining "instruct" as "[]to impart knowledge to, esp. methodically; to teach"), much less "classroom" instruction. For the same reason, the statute does not prohibit intervention against LGBTQ bullying, participation in extracurricular activities (such as "Gay-Straight Alliances" or books fairs), and even after-hours tutoring, ECF 47 ¶¶ 8, 118–19, 121, 184, among many other examples. That is not "classroom instruction" covered by the statute.

Even "classroom instruction" is limited only if it is "*on* sexual orientation or gender identity." H.B. 1557 § 1 (emphasis added). In that familiar grammatical structure, the preposition "on" "indicate[s] the subject of study, discussion, or consideration." *Merriam-Webster's Dictionary* (last visited June 26, 2022), https://www.merriam-webster.com/dictionary/on; *American Heritage Dictionary* 868 (defining "on" as "[c]oncerning; about," as in, "a book on astronomy") (emphasis omitted); *Webster's New International Dictionary* 1701 (defining "on" as "[i]ndicating the subject"). The bill thus restricts *instruction* on particular *subjects* (sexual orientation and gender identity), not mere discussion of them. Consistent with that view, the Legislature rejected a restriction on "encourag[ing]

classroom discussion about" the prescribed subjects in favor of a limited restriction on "classroom instruction." *Compare* An Act Relating to Parental Rights, CS/HB1557 (Jan 21, 2022), *with* H.B. 1557 § 1.

The statute thus leaves teachers free to "respond if students discuss . . . their identities or family life," "provide grades and feedback" if a student chooses "LGBTQ identity" as an essay topic, and answer "questions about their families." ECF 47 ¶¶ 8, 120. For kindergarten through grade three, they simply must not handle these situations by teaching the subjects of sexual orientation or gender identity. And like other subject-matter education, that is most naturally understood in terms of the underlying concepts. For example, teaching quadratic functions is quintessential "instruction on mathematics." So too here, "instruction on sexual orientation or gender identity" would include teaching an overview of modern gender theory or a particular view of marriage equality. But just as no one would suggest that references to numbers in a history book constitute "instruction on mathematics," no one should think that H.B. 1557 prohibits incidental references in literature to a gay or transgender person or to a same-sex couple. *Id.* ¶ 8. Such references, without more, are not "instruction on" those topics. Nor are "refer[ences] to a student's 'mom' and 'dad'" "instruction on" cisgender identity or heterosexual orientation. *Id.* ¶ 11. Such references could be to a person of any sexual orientation or gender identity.

Plaintiffs make much of the fact that the instructional restriction applies to "third parties" in addition to "school personnel," suggesting that the bill thereby broadly restricts not only teachers, but also students and parents. *See* ECF 47 ¶¶ 113, 208. But all that means is that schools cannot evade the bill's limits by delegating "classroom instruction" on the prescribed topics to an individual other than a teacher, be it a parent, student, guest lecturer, or anyone else. But typical class participation and schoolwork are not "instruction," even if a student chooses to address sexual orientation or gender identity.

Plaintiffs also cast aspersions on the bill's remedial scheme, characterizing the parents whose rights it protects as "roving censors." ECF 47 ¶ 5. But there is nothing unusual about "private attorneys general acts" or "statutes allowing for private rights of action." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021). And if anything, the remedial scheme is narrower than that of other civil rights legislation, including 42 U.S.C. § 1983, which Plaintiffs invoke here.

Plaintiffs are likewise incorrect to suggest that, under H.B. 1557, parents may "sue schools for damages whenever they believe a teacher, any other 'school personnel,' or any 'third party' has provided any 'classroom instruction' that may be perceived as relating to 'sexual orientation' or 'gender identity.'" ECF 47 ¶ 5. Even putting aside Plaintiffs' gross overreading of the scope of the prohibition, *see supra* pp. 16–20, parents cannot just sue whenever they believe prohibited classroom

instruction has occurred. They may sue only to challenge an unlawful "school district practice or procedure." H.B. 1557 § 1. Even then, before suing, parents must first exhaust two other avenues of relief by "notify[ing] the principal . . . regarding concerns under this paragraph," and then, if "the concern remains unresolved" after 30 days, notifying the school district, which "must either resolve the concern or provide a statement of the reasons for not resolving the concern." *Id.* Only then, with the school district's "statement of the reasons" in hand, may the parent choose between administrative proceedings with the State Board of Education (the cost of which shall be borne by the school district) or litigation against the school district in state court.

## II.   SOVEREIGN IMMUNITY BARS MUCH OF THE RELIEF PLAINTIFFS SEEK.

The Eleventh Amendment bars federal-court litigation against the states unless the immunity is waived or validly abrogated by Congress. *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Under *Ex parte Young*, 209 U.S. 123 (1908), there is an exception for suits seeking prospective injunctive relief against individual state officials.

The Florida Department of Education and State Board of Education must be dismissed because they are "state agencies" and therefore do not fall within that exception. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139,

146 (1993) ("[The exception] has no application in suits against the States and their agencies, which are barred regardless of the relief sought.").

The Governor, too, must be dismissed because Plaintiffs allege only that he "is responsible for signing H.B. 1557 into law and for taking care that the laws be faithfully executed as the Chief Executive of Florida." ECF 47 ¶ 82. As the Eleventh Circuit has explained, a "state official is subject to suit in his official capacity" only "when his office imbues him with the responsibility to enforce the law . . . at issue in the suit." *Grizzle*, 634 F.3d at 1319. That authority must be specific, as opposed to the "governor's 'general executive power,'" which is "not a basis for jurisdiction in most circumstances." *Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003); *see also Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) (holding that the Florida Governor's "general authority to enforce Florida's laws" did not make him a proper party). The Governor has no specific authority under H.B. 1557, which is enforced by the State Board of Education and private citizens. *See supra* pp. 20–21.

The Commissioner of Education must be dismissed for much the same reason. His status as "chief educational officer of the state" and general role "in enforcing compliance with the mission and goals of the education system," ECF 47 ¶ 85, are insufficient, and he has no "responsibility to enforce" H.B. 1557, *Grizzle*, 634 F.3d at 1319. Plaintiffs point to the Commissioner's duty under the bill to "appoint a

special master" to make a recommendation to the State Board of Education if parents invoke their right to have the Board resolve a dispute with their local school board. H.B. 1557 § 1. The neutral role the special master plays in "resolv[ing] disputes between parties" would not make that adjudicator a proper defendant. *See Whole Woman's Health*, 142 S. Ct. at 532 (explaining that *Ex parte Young* "does not normally permit federal courts to issue injunctions against state-court judges or clerks" because "those individuals do not enforce state laws as executive officials might; instead, they work to resolve disputes between parties").[4] The Commissioner, who merely appoints that neutral adjudicator, has an even more attenuated connection to the statute's enforcement. Nor does the Commissioner's rulemaking authority under the bill provide a basis for a suit against him. *See Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1204 (11th Cir. 2021). In any event, claims based on rulemaking authority are barred by legislative immunity. *See Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731–34 (1980).

As for the remaining State Defendants, the Section 1983 claims against them must be dismissed insofar as they seek damages. *See Grizzle*, 634 F.3d at 1319

---

[4] For much the same reason, the State Board of Education and its members are improper defendants. Their role under H.B. 1557 is to approve or disapprove of the decision of the special magistrate, which (like the state court judges in *Whole Woman's Health*) is an adjudicatory role.

(allowing suits against state officials only insofar as they seek "injunctive relief on a prospective basis").

### III. PLAINTIFFS LACK STANDING.

"[A] plaintiff has to make three showings . . . to demonstrate Article III standing." *Support Working Animals*, 8 F.4th at 1201. "First, he must establish that he has suffered an 'injury in fact'—an invasion of a legally protected interest that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Second, he must demonstrate that there is a 'causal connection' between this injury and the conduct of which he complains—*i.e.*, the injury must be 'fairly traceable' to the defendant's challenged actions and not the result of 'the independent action of some third party not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). "Finally, he must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).

The case must be dismissed for lack of jurisdiction because Plaintiffs have satisfied none of those requirements.

### A. Injury-in-Fact

**1.** To plead injury-in-fact in this pre-enforcement challenge, Plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and [demonstrate that] there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). But H.B. 1557 authorizes enforcement against *school districts*—not against students, parents, or even teachers. Plaintiffs therefore cannot show that "there exists a credible threat of prosecution" against them, and thus fail to allege a "concrete and particularized" injury, *Support Working Animals*, 8 F.4th at 1201.

**2.** In addition, the Student Plaintiffs lack standing because they are, respectively, Fourth, Fifth, and Twelfth grade students. As discussed above, the challenged provision takes effect on July 1, 2022 only for kindergarten through grade three. *See supra* p. 17. Plaintiffs' concerns about what "classroom instruction" may be "age-appropriate and developmentally appropriate in accordance with state standards," ECF 47 ¶ 114, are "conjectural or hypothetical" until the State develops those standards, which need not be done until June 30, 2023. *Support Working Animals*, 8 F.4th at 1201; *see I.L. v. Alabama*, 739 F.3d 1273, 1280 (11th Cir. 2014) ("[T]he contingency of legislative action makes the redress of [an] injury speculative." (quotations omitted)); *United States v. Thompson*, 928 F.2d 1060, 1066 (11th Cir. 1991) (no standing to enforce provision that was not "self-executing").

The same is true for Ms. Washington, who is a middle-school teacher. She brings just one claim—that the challenged provision is void-for-vagueness. ECF 47

¶¶ 261–72. She lacks standing because, like the Student Plaintiffs, the provision is not self-executing as to her.

**3.** Plaintiff Moricz lacks standing for an additional reason. He graduated high school well before H.B. 1557 took effect. He therefore asserts only past injuries that are, at most, attributable to the unilateral actions of third parties other than the State Defendants and, in any event, not traceable to H.B. 1557, which does not regulate students and had not yet taken effect. In addition, Moricz lacks standing to seek prospective injunctive relief because he is not likely to face such harm again. *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983).

**4.** Organizations can bring associational claims (on behalf of their members) and organizational claims (in their own right). "To establish associational standing, an organization must prove that its members 'would otherwise have standing to sue in their own right.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). To do that, they must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (cleaned up); *see Jacobson*, 974 F.3d at 1249 (plaintiff lacked standing because it "failed to identify any of its members").

Equality Florida identifies four of its members, each of whom is also a Plaintiff here—the VanTice parents, Houry, and Ms. Washington, a middle-school

teacher. ECF 47 ¶¶ 60, 68, 79, 239. Each fails to allege an injury-in-fact, as explained above, and therefore cannot support Equality Florida's associational standing. Family Equality does not identify any of its members.

An organization can also assert an organizational claim to standing when it must divert "resources away from" its core activities because of a challenged law. *Jacobson*, 974 F.3d at 1250. But that does not mean that an organization can "convert its ordinary program costs into an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). That is, mine-run organizational spending cannot be a legally cognizable injury. And that is all Plaintiffs allege.

Equality Florida and Family Equality allege that they are "suffering injury to their mission and by virtue of the need to divert resources to combat an unjust law." ECF 47 ¶ 243. Equality Florida alleges that it expended resources "to fight against the passage and implementation of H.B. 1557." *Id.* ¶ 246. These allegations are legally insufficient. *See Nat'l Taxpayers Union*, 68 F.3d at 1434 ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (quotation omitted)). And insofar as Family Equality alleges that it has diverted resources "address the impact of H.B. 1557" by "promoting [the] potential impact [of the bill] via op-eds, lobbying, and social media," ECF 47 ¶ 258, "an organization's expenditure of resources to educate its members and others

regarding government action or inaction does not present an injury in fact." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 925 (D.C. Cir. 2015) (Henderson, J., concurring) (cleaned up). If that were sufficient, any organization of means could easily convert a generalized grievance into an injury-in-fact by lobbying against a bill or explaining a law to its members. Article III demands more.

Equality Florida further alleges that H.B. 1557 has affected its educational mission because "there is now a 'paralysis' among school district leadership, which has become hesitant to engage in Equality Florida programming," ECF 47 ¶ 254, and Family Equality alleges that H.B. 1557 "materially changes what, if anything, Family Equality can provide to Florida schools," *id.* ¶ 256. For example, "Family Equality . . . provides a comprehensive list of the best LGBTQ books for children of all ages, including pre-K through third grade" and "fears that many of these books would not be permitted when H.B. 1557 is in effect." *Id.* In other words, the organizational Plaintiffs believe that H.B. 1557 will interfere with their advocacy work by prohibiting state officials from agreeing with them. That is simply "not a cognizable injury" because "[a]n organization's general interest in its preferred" result is an interest "that federal courts are not responsible for vindicating." *Jacobson*, 974 F.3d at 1250 (cleaned up). After all, "every structural feature of government . . . makes some political outcomes less likely than others." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1100 (10th Cir. 2006) (en banc)

(McConnell, J.); *see id.* at 1101 ("The First Amendment ensures that all points of view may be heard[, but] it does not ensure that all points of view are equally likely to prevail."). In short, the alleged injury is a mere "setback to [Plaintiffs'] abstract social interests, which is insufficient to establish a concrete injury in fact." *Jacobson*, 974 F.3d at 1250 (cleaned up).

### B. Traceability and Redressability

"[T]raceability and redressability . . . often travel together, and where, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals*, 8 F.4th at 1201 (internal citation omitted).

To begin with, Plaintiffs' alleged injuries are neither traceable to H.B. 1557 nor redressable by a prospective injunction against its enforcement. As the Supreme Court explained in *Clapper*, "if the hypothetical harm alleged is not 'certainly impending,' or if there is not a substantial risk of the harm, a plaintiff cannot conjure standing by inflicting some direct harm on itself to mitigate a perceived risk." *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1339 (11th Cir. 2021) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S.398, 416, 422 (2013)). As discussed above, Plaintiffs' view of H.B. 1557 is wildly overbroad, and all of Plaintiffs' purported

injuries (including any diversion of resources by the organizational Plaintiffs) trace to their view of the bill. In other words, their alleged injuries are traceable not to the bill, but to their own "fanciful, paranoid, [and] otherwise unreasonable" view. *Clapper*, 568 U.S. at 416.

Plaintiffs' alleged injuries are also not traceable to the State Defendants. Because H.B. 1557 allows lawsuits only by parents and only against the policies and practices of district school boards, *see* H.B. 1557 § 1, students, parents, and teachers face no risk of enforcement from the State Defendants. And to the extent Plaintiffs nevertheless fear that district school boards will act against them, that subjective fear is not "fairly traceable to" the State Defendants' "challenged actions," but is instead attributable to "the independent action of" the school boards. *Support Working Animals*, 8 F.4th at 1201 (cleaned up).

For the same reason, an injunction against the State Defendants would not redress Plaintiffs' alleged harms. Under no circumstance could Plaintiffs recover the resources they have allegedly diverted through a prospective injunction. And any ongoing harms, as noted, stem from potential actions by the school boards, which an injunction against the State Defendants would not address. *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (remedies operate on "specific part[ies]," they "do not simply operate on legal rules in the abstract") (cleaned up); *Jacobson*, 974 F.3d at 1254 (holding that plaintiffs lacked standing because an injunction against the

defendant would not bind the third parties who enforced the challenged law). In addition, enjoining the State Defendants would do nothing to stop parents from bringing state-court suits against school boards. *Jacobson*, 974 F.3d at 1254. "Any persuasive effect a judicial order might have upon the [parents], as absent nonparties who are not under the [State Defendants'] control, cannot suffice to establish redressability." *Id.*

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Even if Plaintiffs had standing, the complaint must be dismissed because it fails to state a claim upon which relief can be granted.

### A. Count III – First Amendment (Right to Receive Information)

Plaintiffs claim that H.B. 1557 "violates their right to receive and debate information and ideas concerning sexual orientation and gender identity." ECF 47 ¶ 289. As a threshold matter, the legislation does not restrict "debate," only "classroom instruction." *See supra* pp. 18–20. And insofar as the bill limits classroom instruction, it easily survives First Amendment scrutiny.

**1.** "Central among the [states'] discretionary powers is the authority to establish public school curricula which accomplishes the states' educational objectives." *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005). And "[i]n matters pertaining to the curriculum, educators have been accorded greater control over

31

expression than they may enjoy in other spheres of activity." *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1520 (11th Cir. 1989).

Consistent with that broad discretion, the Fifth Circuit held in *Chiras v. Miller* that curricular decisions like the "selection of textbooks [are] government speech" and therefore not subject to traditional judicial review under the free speech clause of the First Amendment. 432 F.3d at 620. Put differently, "where the [State] is selecting textbooks for use in the classroom, students have no constitutional right to compel the [State] to select materials of their choosing." *Id.* Because such decisions concern only "the government's own message," the State's "decision is not subject to forum analysis or the viewpoint neutrality requirements." *Id.* at 613.

In a similar case sixteen years earlier, the Eleventh Circuit concluded in *Virgil* that "[t]he most direct guidance from the Supreme Court" as to "the degree of discretion to be accorded [states] to restrict access to curricular materials" was "the" then "recent case of *Hazelwood School District v. Kuhlmeier*." *Virgil*, 862 F.2d at 1520–21. "In *Hazelwood*, a high school principal removed several pages of a school newspaper containing an article describing a student's experience with pregnancy and an article on the impact of divorce on students." *Chiras*, 432 F.3d at 615 (citing *Hazelwood*, 484 U.S. at 263). "The Court found that the school newspaper was a nonpublic forum, established to allow students to express themselves within the context of the school's curriculum and under the supervision of school officials." *Id.*

(citing *Hazelwood*, 484 U.S. at 270). Under those circumstances, the Court held, restrictions on student speech during "activities [that] may fairly be characterized as part of the school curriculum" pass muster so long as they "are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 271, 273.

But since the Supreme Court decided *Hazelwood* (and since the Eleventh Circuit applied *Hazelwood* in *Virgil*), the Supreme Court has further developed the government-speech doctrine, and under that doctrine classroom instruction is government speech not subject to traditional First Amendment scrutiny. *See Chiras*, 432 F.3d at 617–18; *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341–44 (6th Cir. 2010) (Sutton, J.); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479–80 (7th Cir. 2007) (Easterbrook, J.); *Nampa Classical Acad. v. Goesling*, 447 F. App'x 776, 778 (9th Cir. 2011); *cf. United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality op.) (explaining that "forum analysis and heightened judicial scrutiny are incompatible with the . . . discretion that public libraries must have to fulfill their traditional missions"). Indeed, the Supreme Court just explained that a high school coach "instructing players" is government speech because it is the "speech the [school d]istrict paid him to produce." *Kennedy v. Bremerton Sch. Dist.*, No. 21-418, slip op. at 17 (U.S. June 27, 2022). *Hazelwood* concerned a restriction on *student* speech during school-sponsored activities. Curricular rules like H.B. 1557, by contrast, concern the

*government*'s message in a classroom setting. *Chiras*, 432 F.3d at 618. And "[w]hen the government exercises the right to speak for itself, it can freely select the views that it wants to express." *Dean v. Warren*, 12 F.4th 1248, 1264 (11th Cir. 2021) (W. Pryor, C.J.) (cleaned up).

**2.** Even under the *Hazelwood* test, H.B. 1557 easily passes muster. That test is "extremely lenient." *Panama City Med. Diagnostic Ltd. v. Williams*, 13 F.3d 1541, 1545 (11th Cir. 1994). The challenged regulation need only "be 'reasonably related' to a legitimate state interest," *Silverstein v. Gwinnett Hosp. Auth.*, 861 F.2d 1560, 1568 (11th Cir. 1988)—in the education context, a "legitimate pedagogical" interest. *Virgil*, 862 F.2d at 1521 (quoting *Hazelwood*, 484 U.S. at 273). The question is not what the State concluded, but what it "could reasonably have concluded." *Hazelwood*, 484 U.S. at 275.

Under *Hazelwood*, "educators are entitled to exercise greater control over [expressive activities that might bear the imprimatur of the school] to assure that participants learn whatever lessons the activity is designed to teach [and] that readers or listeners are not exposed to material that may be inappropriate for their level of maturity." 484 U.S. at 271. Curricular rules advance a "legitimate pedagogical concern" when they shield students from topics that are "inadequately researched" or "unsuitable for immature audiences," including "potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting

to the particulars of teenage sexual activity in a high school setting," or "matters of political controversy." *Id.* at 271–72. H.B. 1557 advances all of those interests.

As discussed above, the bill neutrally limits public education on "gender identity" and "sexual orientation" conducted from any point of view. The Legislature reasonably could have concluded that the bill would thereby advance the State's interest in educational "neutrality on matters of political controversy," *Hazelwood*, 484 U.S. at 272, which sexual orientation and gender identity plainly are, regardless of one's preferred orthodoxy. Indeed, the Supreme Court has acknowledged that "sexual orientation and gender identity" are "controversial subjects" and "sensitive political topics." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 & n.20 (2018) (citing Watanabe, *How To Teach Gay Issues in 1st Grade? A New Law Requiring California Schools to Have Lessons About LGBT Americans Raises Tough Questions*, L.A. Times, Oct. 16, 2011, p. A1).

For much the same reason, H.B. 1557 advances the State's interest in shielding students from topics that are "potentially sensitive" and "unsuitable for immature audiences." *Hazelwood*, 484 U.S. at 271–72. If "the existence of Santa Claus" is too "sensitive" for students "in an elementary school setting," *id.* at 272, then the State certainly could have reasonably concluded that sexual orientation and gender identity are too sensitive for the youngest children in the same setting.

**3.** Plaintiffs suggest that H.B. 1557 does not advance a "legitimate" interest because it is "rooted in animus against LGBTQ individuals, as demonstrated by the public record." ECF 47 ¶ 290. As discussed more fully below, Plaintiffs have not come close to showing that the Legislature acted out of animus against LGBTQ individuals. *See infra* pp. 43–52. But the argument fails for a more basic reason: The First Amendment does not authorize the courts to "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also In re Hubbard*, 803 F.3d 1298, 1313–14 (11th Cir. 2015) (holding that retaliation claims premised on "inquiry into the subjective motives of the legislators who supported enactment of a facially constitutional law" are not cognizable under the First Amendment); *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1224 (11th Cir. 2022) ("We have held—'many times'— that 'when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose.'" (quoting *Hubbard*, 803 F.3d at 1312)).

And even if such claims were cognizable, *Hazelwood* asks not what the State's actual motivation was, but what legitimate motives the State could have had. *Hazelwood*, 484 U.S. at 271–73. The bill reflects no governmental preference about what students should learn about sexual orientation and gender identity. Those subjects must be taught appropriately and, for the youngest children, they may be

taught by parents, not in public-school classroom settings. That is a legitimate interest.

In a slight variation of their animus argument, Plaintiffs point to *Board of Education vs. Pico* for the plurality's statement that the State's discretion to select school library books may not be exercised "in a narrowly partisan or political manner." ECF 47 ¶ 288 (citing *Pico*, 457 U.S. at 870 (plurality op.)). As the Eleventh Circuit has explained, however, *Pico* was "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues." *ACLU of Fla., Inc.*, 557 F.3d at 1199–1200 (quotations omitted). Plaintiffs also overread *Pico* on its own terms. The plurality was clear that classroom instruction is different, expressing "full agreement" that States "must be permitted to establish and apply their curriculum in such a way as to transmit community values, and that there is a legitimate and substantial community interest in promoting respect for . . . traditional values be they social, moral, or political." 457 U.S. at 864 (cleaned up). The plurality observed that States may well have "absolute discretion in matters of *curriculum*" given "their duty to inculcate community values." *Id.* at 869 (emphasis in original).

Plaintiffs' view that classroom instruction may not be regulated "in a narrowly partisan or political manner," ECF 47 ¶ 288 (cleaned up), is thus not rooted in *Pico* at all. The view is, moreover, irreconcilable with *Hazelwood*, where all nine Justices

repeatedly emphasized that public education "demands particularized and supremely subjective choices among diverse curricula, moral values, and political stances to teach or inculcate in students[.]" 484 U.S. at 278 (Brennan, J., dissenting); *see id.* at 272 (majority explaining that because of their role as "a principal instrument in awakening the child to cultural values," schools must determine and teach the "values of a civilized social order"). Plaintiffs' view would also lead to intractable problems, including under the political-question doctrine because there is "'no clear' and 'manageable' way of distinguishing permissible from impermissible partisan motivation." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2505 (2019).

## B. Count II – Fourteenth Amendment (Equal Protection)

Count II of the Complaint alleges that H.B. 1557 violates the Equal Protection Clause because it "was enacted with an inviodiously discriminatory purpose and results in discriminatory and disparate effects" on the basis of "sex, sexual orientation, gender, gender identity, and transgender status." ECF 47 ¶¶ 276, 275. That count must be dismissed for lack of standing because Plaintiffs fail to allege a sufficiently personalized injury under the Equal Protection Clause. *See* Fed. R. Civ. P. 12(b)(1). In any event, the allegations are insufficient to state a claim on the merits. *See* Fed. R. Civ. P. 12(b)(6).

**1.** Besides the reasons discussed above, *see supra* pp. 24–31, Plaintiffs lack standing to bring their equal-protection claim for another reason. Standing "often

turns on the nature and source of the claim asserted," *Warth v. Seldin*, 422 U.S. 490, 500 (1975), and "the gravamen of an equal protection claim is differential governmental treatment, not differential governmental messaging," *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017).

But H.B. 1557 does not subject Plaintiffs (or anyone else) to differential treatment. Like other curricular standards, it subjects all teachers at a given grade level to the same restriction on "classroom instruction" and thus operates equally on the education of all students at that grade level.

Plaintiffs make conclusory allegations that H.B. 1557 denies LGBTQ "students equal educational opportunities based on their LGBTQ orientation or identity" and "disparately harms" LGBTQ teachers and parents. ECF 47 ¶¶ 281–82; *see also id.* ¶ 275 ("Defendants . . . have treated Plaintiffs differently from other similarly situated persons based on their sex, sexual orientation, gender, gender identity, and transgender status."); *id.* ¶ 276 ("H.B. 1557 . . . results in discriminatory and disparate effects."); *id.* ¶ 283 ("LGBTQ married couples will be treated differently and worse than non-LGBTQ married couples," and "the children of LGBTQ married couples will similarly suffer discrimination and disadvantage in Florida's public schools as compared to all other children."). But Plaintiffs do not explain *how* the bill denies equal treatment, and this Court must not credit "labels

and conclusions" pleaded in the guise of factual allegations. *Newbauer*, 26 F.4th at 934 (cleaned up).

Plaintiffs also allege stigmatic injury from the bill's "imprimatur of discrimination." ECF 47 ¶ 279. They believe the bill was intended to "target, demean, belittle, and harass LGBTQ individuals and families" and "reflects an effort to impose state-selected (but demonstrably outmoded and offensive) gender stereotypes as the dominant ideology." *Id.* ¶ 277. "There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action." *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). But as the Supreme Court has explained, "such injury accords a basis for standing only to those persons who are personally denied equal treatment." *Id.* (cleaned up); *see Aaron*, 912 F.3d at 1338 (same).

For example, in *Moore v. Bryant*, an African-American plaintiff sued various Mississippi officials alleging that the state flag, the upper left corner of which depicted the confederate battle flag, "violate[d] his rights under the Equal Protection Clause." 853 F.3d at 248. Despite his allegations that the flag's "message is 'painful, threatening, and offensive' to him, makes him 'feel like a second-class citizen,' and causes him both physical and emotional injuries,'" the Fifth Circuit held that he lacked standing because "exposure to a discriminatory message, without a

40

corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case." *Id.* at 249–50. Likewise, in *Penkoski v. Bowser*, white plaintiffs challenged a government-sanctioned Black Lives Matter mural on equal-protection grounds, and the court held that they lacked standing because "[t]hey may, indeed, be subject to a discriminatory message" but had "made no showing [of] . . . discriminatory *treatment* because of their race." 486 F. Supp. 3d 219, 228–29 (D.D.C. 2020) (emphasis in original).

Plaintiffs' claim is indistinguishable. They too allege only stigma from a "discriminatory message"—the bill's "imprimatur of discrimination." ECF 47 ¶ 279. And their speculation that H.B. 1557 will lead "to bullying and ostracization" of LGBTQ students, *id.* ¶ 194, is more of the same—an alleged downstream effect of the same stigma, and a conjectural one at that. *See Moore*, 853 F.3d at 252 (rejecting "hostile workplace" theory of equal protection standing). The stigmatic character of their asserted injury is only confirmed by Plaintiffs' further allegation that H.B. 1557 has already led to a reported "increase in the number of LGBTQ students experiencing harmful language or physical attacks from other members of the school community." ECF 47 ¶ 200. Because the bill has not even taken effect, Plaintiffs' claimed injury must be attributable to the message they believe the bill sends, not its regulatory effect.

**2.** Even if Plaintiffs had standing, as discussed above, the challenged provision restricts only "classroom instruction," which is government speech. *See supra* pp. 32–34. Equal-protection claims challenging government speech are barred because "it is the very business of government to favor and disfavor points of view," and "a government entity is entitled to say what it wishes and to select the views it wants to express," with a notable exception for the establishment of religion. *Am. Atheists, Inc. v. Port Auth. of N.Y. & N.J.*, 760 F.3d 227, 246 (2d Cir. 2014) (cleaned up) (rejecting equal-protection claim alleging animus in the adoption of the September 11 Memorial at Ground Zero). And because the Government can express whatever views it wants, it follows that "the Equal Protection Clause does not apply to government speech." *Fields v. Speaker of Penn. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019); *accord Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 (6th Cir. 2013). That is so even where, as here, plaintiffs allege that a facially neutral provision was motivated by "discriminatory animus." *Am. Atheists, Inc.*, 760 F.3d at 246.

Plaintiff Berg alleges that H.B. 1557 discriminates against him by restricting his "ability to be open about his gay identity in the classroom to the same extent and in the same ordinary ways that heterosexual teachers are open about their heterosexual identity," such as putting "a picture of his husband on his desk." ECF

47 ¶ 231. But the bill simply does not do that. As discussed above, it restricts only *classroom instruction* on the prescribed concepts. *See supra* pp. 16–20.

**3.** Plaintiffs have not, in any event, plausibly "plead[ed] animus." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). To do that, they "must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Id.* Here, that means ascertaining the underlying motivation for the decision of "the legislature as a whole," *Brnovich v. DNC*, 141 S. Ct. 2321, 2350 (2021), a task that is demanding because "determining the intent of the legislature is a problematic and near-impossible challenge," *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1324 (11th Cir. 2021). Plaintiffs must also overcome "the presumption of legislative good faith" to which the Legislature is entitled when charged with invidious discrimination. *Id.* at 1325 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)).

Plaintiffs' allegations do not even approach that high bar.

As the Supreme Court has explained, "discrimination is not a plausible conclusion" from the allegations in a complaint where there are "'obvious alternative explanation[s].'" *Iqbal*, 556 U.S. at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). Here, the challenged provision is "neutral on its face and rationally may be said to serve a purpose the Government is constitutionally

empowered to pursue." *Washington v. Davis*, 426 U.S. 229, 246 (1976). The Legislature plainly adopted H.B. 1557 to safeguard parents' right to educate their children about two sensitive topics, irrespective of the parents' viewpoints. *See Greater Birmingham Ministries*, 992 F.3d at 1323 (crediting the state's account of intent). The statute does exactly that, prohibiting classroom instruction on those topics for the youngest children (those in kindergarten through third grade) and, thereafter, permitting such instruction if it is "age-appropriate [and] developmentally appropriate for students." H.B. 1557 § 1. Plaintiffs' charge of animus is also irreconcilable with the fact that the statute (1) expressly *allows* classroom instruction regarding sexual orientation and gender identity after the third grade, provided it is age-appropriate, and (2) evenhandedly restricts instruction that (for example) opposes same-sex marriage as much as instruction that embraces it.

The legitimate motive for the curricular restriction is underscored by the bill's structure. Plaintiffs have no constitutional quarrel with the bulk of the bill, which is designed to advance parental rights by ensuring that parents have transparency into the well-being of their children at school. H.B. 1557 § 1. The remedial scheme, too, is focused on parental rights, which is why it empowers only "parents" to seek relief when school boards establish policies or procedures that are inconsistent with the statute. *See id.* Likewise, the title ("An Act Relating to Parental Rights in Education") and the staff analysis (which extensively discusses a "parent's

fundamental right to make decisions") reinforce the focus on empowering parents, which was repeatedly echoed during debate in the House and Senate. *E.g.*, Fla. H., recording of proceedings, at 2:37, 2:41, 2:47, 2:51, 3:12, 3:13, 4:16 (Feb. 22, 2022);[5] Fla. H., recording of proceedings, at 2:18, 2:20, 2:45, 2:47–49, 2:51–52, 3:04, 3:11, 3:13, 3:17 (Feb. 24, 2022);[6] Fla. S., recording of proceedings, at :36–:37, :44–:45, 1:00–01, 1:02, 1:47, 2:07–09, 2:13–14, 2:19–21, 2:43, 2:46, 3:09, 3:11, 3:32 (Mar. 7, 2022);[7] Fla. S., recording of proceedings, at 1:53; 1:56; 2:26; 2:31 (March 8, 2022).[8] The curricular restriction—like the rest of the bill—was designed to protect parental rights, not to demean or disparage anyone.

Where, as here, "there [a]re legitimate reasons for the . . . Legislature to adopt and maintain" a law, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298–99 (1987). Accordingly, courts should "ordinarily defer to the legislature's stated intent," and "only the clearest proof will suffice to override" that consideration. *Smith v. Doe*, 538 U.S. 84, 92 (2003) (cleaned up). Plaintiffs' allegations come nowhere close to clearing that hurdle, especially in view

---

[5] https://thefloridachannel.org/videos/2-22-22-house-session/.

[6] https://thefloridachannel.org/videos/2-24-22-house-session-part-1/.

[7] https://thefloridachannel.org/videos/3-7-22-senate-session-part-3/.

[8] https://thefloridachannel.org/videos/3-8-22-senate-session/.

of the presumption of good faith to which the Legislature is entitled. *See Greater Birmingham Ministries*, 992 F.3d at 1324.

Plaintiffs respond with cherrypicked statements from the legislative record. But the statements of individual legislators do not "demonstrate discriminatory intent by the state legislature." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022). That is because "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents," *Brnovich*, 141 S. Ct. at 2350, so the allegations would be insufficient to support an inference of discriminatory purpose on the part of the Legislature as a whole. After all, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it," *O'Brien*, 391 U.S. at 384, and even "[t]he vote of a sponsor is only one vote" among many, *Greater Birmingham Ministries*, 992 F.3d at 1324. Thus, "[e]ven when an argument about legislative motive is backed by statements made by legislators who voted for a law," the Supreme Court has "been reluctant to attribute those motives to the legislative body as a whole." *Dobbs v. Jackson Women's Health Org.*, No. 19-1392, 2022 WL 2276808, at *18 (U.S. June 24, 2022).

In any event, Plaintiffs' cherrypicked statements fail to evince animus even on the part of their speakers. *See* ECF 47 ¶¶ 126–131. Instead, Plaintiffs' chosen statements reflect the desire to empower parents and ensure age-appropriate

education. Representative Harding, for example, was concerned about schools "encourag[ing]" students to hide their identity from their parents. *Id.* ¶ 129. Senator Baxley talked about "parents" being "very concerned" about "departure[s] from the[ir] core belief systems" in schools. *Id.* ¶ 126. Governor DeSantis, too, spoke of restricting the "concepts" in schools, *id.* ¶ 134, because "parents" don't want them "injected into classroom instruction," *id.* ¶ 135.

Plaintiffs make much of Senator Baxley's statement about the "big uptick in the number of children who are coming out as gay" or transgender at school, going so far as to characterize his statements as "a prima facie case" of invidious discrimination. ECF 47 ¶ 127. But the presumption of legislative good faith requires that such statements be taken at their best, not their "worst." *League of Women Voters of Fla.*, 32 F.4th at 1373. H.B. 1557 was adopted against a background of Florida schools hiding from parents that their children had "come out" at school, *see supra* pp. 4–11, and that issue, as well as other, related parental-rights issues, are the entire focus of the bill, *see supra* pp. 11–13. There is no reason to think Senator Baxley (or anyone else) had any other concern in mind. Nor in any event are stray statements probative of the Legislature's intent as a whole when viewed against the many statements in the legislative record that are consistent with the bill's design, purpose, and effect of safeguarding parental rights in education. *See supra* pp. 45– 46 & nn.5–8.

Plaintiffs also accuse Senator Baxley of harboring discriminatory intent because, they say, he failed to provide a fellow Senator with "'specific examples' of why H.B. 1557 was needed in response to 'lesson plans,'" instead inviting his colleague to "'visit some of the websites.'" ECF 47 ¶ 141. But those websites, some of which Plaintiffs cite in their complaint, *id.* ¶¶ 104–110 & nn.4–16, reveal (just as Senator Baxley indicated) that school boards in Florida were indeed encouraging teachers to instruct young students on the concepts of sexual orientation and gender identity and even to hide related information from parents. For example, Broward County teachers were given guidance on instructing kindergartners about gender identity and sexual orientation and told that "[n]o parental notification is needed for these classroom discussions." *LGBTQ+ Critical Support Guide* at 10, 12, 54. There were many more examples. *See supra* pp. 4–11 & nn.1–3.[9] Senator Baxley's response thus correctly explained that the bill's stated purpose was to protect parental rights.

Plaintiffs next point to various proposed amendments to H.B. 1557 that were rejected but which Plaintiffs say would have "mitigate[d] the law's" alleged discriminatory effects. ECF 47 ¶¶ 142–149. First of all, the mere fact that the "legislature did not include the alternative option[s] that Plaintiffs would have

---

[9] https://thefloridachannel.org/videos/3-7-22-senate-session-part-3/.

preferred" is not a persuasive allegation of discriminatory intent. *Greater Birmingham Ministries*, 992 F.3d at 1327. Here, many of the rejected amendments are not even logically relevant, as most of them would have altered the substantive reach of the bill. For example, Senator Brandes proposed replacing "'sexual orientation or gender identity' with 'human sexuality or sexual activity.'" ECF 47 ¶ 144. Because such amendments would not have achieved the Legislature's objectives, rejecting them is not evidence of animus. *See Easley v. Cromartie*, 532 U.S. 234, 249 (2001) (demanding that alternatives satisfy the Legislature's "nonracial political goals"). Other proposed amendments were simply redundant because they would have excluded items like student-to-student speech, which the enacted bill does not prohibit. ECF 47 ¶ 146.

Plaintiffs' narrative about the amendment history is, in any event, seriously misleading. The Legislature *did* substantially amend the bill to address its opponents' concerns. The original version restricted anything that would "encourage classroom discussion" about gender identity or sexuality. *See* Kirby Wilson, *Republicans made changes to 'don't say gay' bill. LGBTQ advocates aren't buying it*, TAMPA BAY TIMES (Feb. 18, 2022), https://www.tampabay.com/news/florida-politics/2022/02/17/republicans-made-changes-to-dont-say-gay-bill-lgbtq-advocates-arent-buying-it/ (cited at ECF 47 ¶ 129 n.23). Representative Harding acknowledged that "some might find the word 'encourage' to be vague" and

amended the bill to restrict only "classroom instruction." *Id.* Against that backdrop, the Court "cannot say that the legislature failed to consider . . . alternatives that would lessen any potentially discriminatory impact," *Greater Birmingham Ministries*, 992 F.3d at 1327—indeed, it *adopted* one such alternative.

Plaintiffs' effort to link H.B. 1557 to other allegedly discriminatory laws and actions is no more persuasive. Plaintiffs allege that "Governor DeSantis's administration took down a Department of Education web page" with links to resources for LGBTQ youth. ECF 47 ¶ 154. But Plaintiffs do not allege that the page was redesigned out of animus. If anything, the change was consistent with the stated purpose of H.B. 1557, as the site previously recommended that teachers not "discuss sexual identity issues with parents." *See* Brody Levesque, *Florida's DeSantis attacks LGBTQ youth by removing website resource*, LOS ANGELES BLADE (Dec. 6, 2021), https://www.losangelesblade.com/2021/12/06/floridas-desantis-attacks-lgbtq-youth-by-removing-website-resource/ (cited at ECF 47 ¶ 154 n.46). And it bespeaks the weakness of their animus claim for Plaintiffs to attach constitutional significance to the fact that Governor DeSantis line-item vetoed LGBTQ-related funding from the budget. ECF 47 ¶ 155. Those few line items out of $1.5 billion worth of budget cuts, *see* 2021 Veto List, *available at* https://www.flgov.com/wp-content/uploads/2021/06/2021-Veto-List-Final.pdf, have no constitutional relevance, and nothing whatsoever to do with H.B. 1557.

Taken together, Plaintiffs' allegations amount to (1) legislative statements that neither legally nor logically support their animus claim, (2) rejected amendments that are irrelevant because they were either redundant or would have changed the substantive scope of the bill, and (3) other governmental acts relating to LGBTQ individuals that neither evince discriminatory intent nor, in any event, have anything to do with H.B. 1557. Those allegations are plainly insufficient to state an equal-protection claim given (1) the legislative presumption of good faith, (2) a recent history of Florida schools cutting parents out of decision-making regarding their children, (3) the bill's stated purpose of safeguarding parental rights, (4) statutory text that restricts only "classroom instruction" and does so neutrally as to sexual orientation and gender identity, (5) language that expressly *allows* classroom instruction on those topics after the third grade, (6) a remedial scheme that, consistent with the bill's stated objective, is limited to parents, and (7) a legislative history full of statements consistent with that objective.

There is nothing to Plaintiffs' charges of discriminatory purpose, and the claim should be dismissed.

## C. Count VI: Title IX

Plaintiffs also claim that H.B. 1557 violates Title IX of the Education Amendments of 1972 (ECF 47 ¶¶ 308–12), which provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits

of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Title IX has no application here. As explained above, the challenged provision of H.B. 1557 regulates only "classroom instruction"—*i.e.*, curricular materials. Under longstanding regulatory authority, however, Title IX does not "require[] or prohibit[] or abridge[] in any way the use of particular textbooks or curricular materials." 34 C.F.R. § 106.42. To conclude otherwise would lead to absurd results, as "permitting lawsuits against school districts on the basis of the [allegedly discriminatory] content of [curricula] to proceed past the complaint stage could have a significant chilling effect on a school district's willingness to assign books with themes, characters, snippets of dialogue, or words that might offend the sensibilities of any number of persons or groups." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1030 (9th Cir. 1998). Title IX thus does not speak to state laws like H.B. 1557.

That interpretation is consistent with how courts have interpreted Title IX's sister statute—Title VI. For example, in *Grimes ex rel. Grimes v. Sobol*, the plaintiff sued New York school officials alleging that "the curriculum of the New York City public schools injure[d] African Americans because it [wa]s systematically biased against them." 832 F. Supp. 704, 706 (S.D.N.Y. 1993). Given the parallels between Title VI and Title IX, the court requested briefing on Title IX's implementing

regulations. *Id.* at 711. It then dismissed the complaint, concluding that Title VI "do[es] not encompass the regulation of curricular content." *Id.* at 713. Likewise, in *Shorter v. St. Cloud State University*, the plaintiff alleged that "he suffered a hostile educational environment created by" his school's "Euro-centric curriculum." No. 00-cv-1314, 2001 WL 912367, *10 (D. Minn. Aug. 14, 2001). Drawing on analogy to Title IX, the court explained that "a Title IX claim stemming from the school's choice of curriculum materials is not actionable." *Id.* at *10. And then applying that rule to Title VI, the court dismissed the claim. *Id.* at *11; *see also Monteiro*, 158 F.3d at 1032 (dismissing Title VI claim premised on the assignment of *Huckleberry Finn*).

Background principles of statutory interpretation confirm that Title IX does not supersede state curricular decisions. For one thing, states have historically enjoyed an "undoubted right to prescribe the curriculum for [their] public schools," *Epperson v. Arkansas*, 393 U.S. 97, 107 (1968). "Congress normally preserves 'the constitutional balance between the National Government and the States,'" and must speak clearly if it wishes to upset the balance. *Bond v. United States*, 572 U.S. 844, 862 (2014). Moreover, "if Congress intends to impose a condition on the grant of federal moneys," as it did in Title IX, "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). At a minimum, Congress

must speak clearly enough that a funding recipient can "voluntarily and knowingly accept[]" Congress' "term[s]." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002).

Because Title IX does not regulate state curricular decisions, Plaintiffs lack standing to assert this claim, which in any event fails on the merits.

### D. Counts I, IV, and V: First Amendment (Freedom of Expression), First Amendment (Overbreadth), and Due Process (Vagueness)

**1.** In Count IV, the Student Plaintiffs claim that H.B. 1557 "restricts [their] ability to discuss topics related to sexual orientation and gender identity in class and related settings, and even restricts their ability to self-identify." ECF 47 ¶ 296. But as discussed more fully above, the statute does not restrict student speech, only "classroom instruction." *See supra* pp. 16–20. The Student Plaintiffs thus fail to allege an injury-in-fact as to this claim and therefore lack standing and, for the same reason, the claim fails on the merits.

To the extent the concern is that schools will misconstrue the legislation and punish students as a result, that "boils down to an assertion that [the State] could, but need not, apply its law in an unconstitutional way. This assertion is too speculative to support standing." *Moore*, 853 F.3d at 253. Indeed, the Supreme Court has held that restrictions on student speech during "activities [that] may fairly be characterized as part of the school curriculum" pass muster so long as they "are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 271,

273. It is therefore especially rank speculation to assume that schools' response to H.B. 1557 will violate that lenient standard. Even then, the alleged injury would not be caused by or traceable to the State Defendants.

**2.** Counts I and V—Plaintiffs' overbreadth and vagueness claims—add nothing of substance to their free speech claim. They allege that H.B. 1557's purported vagueness unconstitutionally chills their behavior and speech. *See* ECF 47 ¶¶ 268, 293–299. They likewise allege that the bill's "overbreadth has a chilling effect on the behavior and speech of students." *Id.* ¶ 303.

A "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010). But because the legislation does not restrict student speech, it certainly is not unconstitutional in "a substantial number" of applications. In other words, because the provision "does not regulate [student] speech, it does not violate the First Amendment rights of persons not before the court" and "Plaintiffs' 'overbreadth' argument is nothing more than a restatement of the First Amendment argument they make on their own behalf." *Walker*, 450 F.3d at 1105.

As for Plaintiffs' vagueness claim, compared to criminal statutes, "the consequences of imprecision are qualitatively less severe," so "a civil statute is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard

at all.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)); *see Estrada*, 969 F.3d at 1265 (a statute is void-for-vagueness only if it is truly "standardless"). H.B. 1557's meaning is readily apparent. *See supra* pp. 16–21.

Indeed, H.B. 1557 provides substantially more guidance to teachers, students, and parents than other civil statutes upheld against vagueness challenges. For example, in *California Teachers Ass'n v. State Board of Education*, the Ninth Circuit rejected a vagueness challenge to a California law that required "the language of instruction used by the teaching personnel [to be] overwhelmingly the English language." 271 F.3d 1141, 1145, 1152–53 (9th Cir. 2001). Likewise, in *Fowler v. Board of Education of Lincoln County*, the Sixth Circuit held that a school rule that proscribed "conduct unbecoming a teacher" was not unconstitutionally vague because it gives "adequate notice" to teachers. 819 F.2d 657, 664–66 (6th Cir. 1987). And in *Arnett v. Kennedy*, the Supreme Court held that the phrase "for such cause as will promote the efficiency of the service" gave federal employees constitutionally sufficient notice of possible grounds of termination. 416 U.S. 134, 158–64 (1974) (plurality op.). Unlike those laws, H.B. 1557 provides abundant notice of its scope in "terms of common understanding." *California Teachers Ass'n*, 271 F.3d at 1152–53.

Like every statute, the bill will be amenable of various interpretative questions, but that is no constitutional defect. *See Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994) ("If run-of-the-mill statutory ambiguities *were* enough to violate the Constitution, no court could ever clarify statutes through judicial interpretation."). Instead, Plaintiffs must prove that H.B. 1557 is truly standardless. They cannot make that showing.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint on sovereign-immunity grounds and for lack of standing. If the Court reaches the merits, it should dismiss the Complaint for failure to state a claim upon which relief can be granted.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Daniel William Bell*
Daniel William Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Bilal Faruqui (FBN 15212)
ASSISTANT ATTORNEY GENERAL

Anita Patel (FBN 70214)
ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
daniel.bell@myfloridalegal.com

*Counsel for Governor Ron DeSantis, the Florida State Board of Education, Thomas R. Grady, Ben Gibson, Monesia Brown, Esther Byrd, Grazie P. Christie, Ryan Petty, Joe York, Commissioner Manny Diaz, and the Florida Department of Education*

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 7.1(F) and the order of this Court, this motion contains 12,731 words.

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

_/s/ Daniel William Bell_
Chief Deputy Solicitor General