## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

EQUALITY FLORIDA; FAMILY
EQUALITY; M.A., by and through
his parent AMBER ARMSTRONG;
S.S., by and through her parents;
IVONNE SCHULMAN and CARL
SCHULMAN; ZANDER MORICZ;
LINDSAY MCCLELLAND, in her
personal capacity and as next friend
and parent of JANE DOE; RABBI
AMY MORRISON and CECILE
HOURY; DAN and BRENT
VANTICE; LOURDES CASARES
and KIMBERLY FEINBERG;
LINDSEY BINGHAM SHOOK;
ANH VOLMER; SCOTT BERG;
and MYNDEE WASHINGTON,

      Plaintiffs,

  v.

RONALD D. DESANTIS, in his
official capacity as Governor of
Florida; FLORIDA STATE BOARD
OF EDUCATION; THOMAS R.
GRADY, BEN GIBSON,
MONESIA BROWN, ESTHER
BYRD, GRAZIE P. CHRISTIE,
RYAN PETTY, and JOE YORK, in
their official capacities as members
of the Board of Education; JACOB
OLIVA, in his official capacity as
Commissioner of Education of
Florida; FLORIDA DEPARTMENT
OF EDUCATION; BROWARD
SCHOOL BOARD; SCHOOL
BOARD OF MANATEE COUNTY;

Case No. 4:22-cv-00134 (AW) (MJF)

SCHOOL BOARD OF SARASOTA
COUNTY; SCHOOL BOARD OF
MIAMI-DADE COUNTY;
ORANGE COUNTY SCHOOL
BOARD; ST. JOHNS COUNTY
SCHOOL BOARD; and PASCO
COUNTY SCHOOL BOARD,

                              Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# **TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT ............................................................1

RELEVANT BACKGROUND ...........................................................5

      A.     Florida's commitment to a safe, equal, and
nondiscriminatory education.............................................5

      B.     The legislative debate over H.B. 1557........................7

      C.     Passage of H.B. 1557 ...................................................10

      D.     Effects of H.B. 1557 ...................................................11

APPLICABLE STANDARD...............................................................16

ARGUMENT .....................................................................................16

    I.     PLAINTIFFS HAVE STANDING .....................................17

      A.     The Individual Plaintiffs ............................................17

            1.     Injury-in-fact.....................................................17

            2.     Traceability and redressability.........................25

      B.     The Organizational Plaintiffs....................................27

    II.     DEFENDANTS ARE NOT IMMUNE...............................30

      A.     State Education Officials ............................................30

      B.     State Education Entities ..............................................32

      C.     School Boards ..............................................................32

    III.    H.B. 1557 VIOLATES THE DUE PROCESS CLAUSE.................33

      A.     H.B. 1557 fails to provide people of ordinary
intelligence fair notice of what conduct it prohibits.................34

      B.     H.B. 1557 authorizes and encourages arbitrary and
discriminatory enforcement ......................................39

    IV.    H.B. 1557 VIOLATES PLAINTIFFS' FIRST AMENDMENT
RIGHTS.......................................................................41

A.     The statute violates Plaintiffs' right to receive
       information and ideas...............................................................41

B.     H.B. 1557 violates Plaintiffs' right to speak and share ideas ...47

V.     H.B. 1557 VIOLATES THE EQUAL PROTECTION CLAUSE......49

A.     H.B. 1557 was motivated by discrimination............................49

B.     The State fails to show that H.B. 1557 would have
       been enacted in the absence of an improper motivation...........55

VI.    H.B. 1557 VIOLATES TITLE IX .....................................................56

VII.   DEFENDANTS' REMAINING ARGUMENTS LACK MERIT......57

CONCLUSION ............................................................................................60

<u>**TABLE OF AUTHORITIES**</u>

**<u>Page(s)</u>**

<u>**Cases**</u>

*281 Care Comm. v. Arneson*,
  766 F.3d 774 (8th Cir. 2014) .................................................................39

*Abrams-Jackson v. Avossa*,
  No. 16-cv-81624, 2017 WL 1153895 (S.D. Fla. Mar. 28, 2017) ........................57

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
  557 F.3d 1177 (11th Cir. 2009) ...................................................................42, 46

*ACLU v. Fla. Bar*,
  999 F.2d 1486 (11th Cir. 1993) ............................................................30

*Acosta v. Huppenthal*,
  No. 10-cv-623, 2012 WL 12829991 (D. Ariz. Jan. 10, 2012) ......................19, 43

*Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*,
  833 F. App'x 235 (11th Cir. 2020) .........................................................29

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) .................................................21, 42, 43

*Arnett v. Kennedy*,
  416 U.S. 134 (1974) .........................................................................38

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ............................................................46

*Babbitt v. United Farm Workers Nat. Union*,
  442 U.S. 289 (1979) .........................................................................20

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ...........................................................................21

*Barmapov v. Amuial*,
  986 F.3d 1321 (11th Cir. 2021) .........................................................58, 59

*Bd. of Educ. v. Pico*,
   457 U.S. 853 (1982) ...............................................................42, 43, 46

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................................16

*Brown v. Board of Education*,
   347 U.S. 483 (1954) .......................................................................44

*Bush v. Holmes*,
   919 So.2d 392 (Fla. 2006) ...............................................................5

*California Teachers Ass'n v. State Bd. of Educ.*,
   271 F.3d 1141 (9th Cir. 2001)..........................................................38

*Campbell v. Tammany Parish School Board*,
   64 F.3d 184 (5th Cir. 1995)..............................................................42

*Chiras v. Miller*,
   432 F.3d 606 (5th Cir. 1995). ..........................................................43

*City of S. Miami v. DeSantis*,
   424 F. Supp. 3d 1309 (S.D. Fla. 2019)...............................51, 53, 55

*Claire v. Fla. Dep't of Mgmt. Servs.*,
   504 F. Supp. 3d 1328 (N.D. Fla. 2020)..............................................30

*Clapper Amnesty Int'l USA, Inc.*,
   568 U.S. 398 (2013) ...............................................................25, 26

*Const. Party of Pennsylvania v. Aichele*,
   757 F.3d 347 (3d Cir. 2014)............................................................23

*Cramp v. Bd. of Pub. Instruction*,
   368 U.S. 278 (1961) .......................................................................38

*Curling v. Sec'y of Ga.*,
   761 F. App'x 927 (11th Cir. 2019)......................................29, 30, 31

*Dream Defenders v. DeSantis*,
   559 F. Supp. 3d 1238 (N.D. Fla. 2021)..............................................40

*Dream Defs. v. DeSantis*,
   553 F. Supp. 3d 1052 (N.D. Fla. 2021) ...........................................................passim

*Edison v. Doublery*,
   604 F.3d 1307 (11th Cir. 2010) .................................................................................56

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
   624 F.3d 332 (6th Cir. 2010) ....................................................................................43

*Ex Parte Young*,
   209 U.S. 123 (1908) ...............................................................................29, 30, 31

*Falls et al. v. DeSantis et al.*
   No. 22-cv-166 (N.D. Fla. July 7, 2022) ..........................................................passim

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008)............................................................................27, 29

*Florida ex rel. McCollum v. U.S. Dep't of Health and Hum. Servs.*,
   716 F. Supp. 2d 1120 (N.D. Fla. 2010) .................................................................24

*Fowler v. Bd. of Educ. of Lincoln Cnty., Ky.*,
   819 F.2d 657 (6th Cir. 1987) ...................................................................................38

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ................................................................................................43

*Georgia Latino All. for Human Rts. v. Governor of Georgia*,
   691 F.3d 1250 (11th Cir. 2012)...............................................................................28

*Gonzalez v. Douglas*,
   269 F. Supp. 3d 948 (D. Ariz. 2017)..................................................................42, 46

*Granite State Outdoor Advert., Inc. v. City of Clearwater*,
   351 F.3d 1112 (11th Cir. 2003)...............................................................................17

*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*,
   992 F.3d 1299 (11th Cir. 2021)...........................................................48, 49, 52, 55

*Grimes by and Through Grimes v. Sobol*,
   832 F. Supp. 704 (S.D.N.Y 1993). ..........................................................................56

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020) ...............................55

*Grizzle v. Kemp*,
  634 F.3d 1314 (11th Cir. 2011) ....................................................................30

*Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*,
  446 F. Supp. 3d 1111 (N.D. Ga. 2020) ................................................28

*Hallandale Pro. Fire Fighters Loc.*
  *2238 v. City of Hallandale*, 922 F.2d 756 (11th Cir. 1991) ................................22

*Harrell v. Fla. Bar*,
  608 F.3d 1241 (11th Cir. 2010) ....................................................................20

*Hazelwood School District v. Kuhlmeier*,
  484 U.S. 260 (1988) ...........................................................42, 43, 46, 47

*Heckler v. Mathews*,
  465 U.S. 728 (1984) ....................................................................................23

*Hunt v. Cromartie*,
  526 U.S. 541 (1999) ....................................................................................49

*Hynes v. Mayor & Council of Borough of Oradell*,
  425 U.S. 610 (1976) ....................................................................................21

*In re Managed Care Litig.*,
  298 F. Supp. 2d 1259 (S.D. Fla. 2003).......................................................28

*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020)..............................................................27, 31

*Jean v. Nelson*,
  711 F.2d 1455 (11th Cir. 1983).................................................................49

*Kennedy v. Bremerton Sch. Dist.*,
  No. 21-418, slip op. (U.S. June 27, 2022).................................................43

*King v. Governor of State of New Jersey*,
  767 F.3d 216 (3d Cir. 2014)......................................................................36

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ........................................................................41

*League of Women Voters of Florida, Inc. v. Florida Sec'y of State,*
    32 F.4th 1363 (11th Cir. 2022).........................................................52

*Levine v. World Financial Network Nat'l Bank,*
    437 F.3d 1118 (11th Cir. 2006).........................................................16

*Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis,*
    894 F.3d 959 (8th Cir. 2018).............................................................22

*Mahanoy Area Sch. Dist. v. B.L. ex. rel. Levy,*
    141 S. Ct. 2038 (2021) .....................................................................44

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .........................................................................26

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n,*
    138 S. Ct. 1719 (2018) .....................................................................45

*Mayer v. Monroe Cnty. Comm. Sch. Corp.,*
    474 F.3d 477 (7th Cir. 2007).............................................................43

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978) ...................................................................32, 33

*Namphy v. DeSantis,*
    493 F. Supp. 3d 1130 (N.D. Fla. 2020).......................................26, 28

*Nat'l Fed. of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .........................................................................24

*Nat'l Taxpayers Union, Inc. v. United States,*
    68 F.3d 1428 (D.C. Cir. 1995) .........................................................28

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656 (1993) .........................................................................24

*Okwedy v. Molinari,*
    333 F.3d 339 (2d Cir. 2003).............................................................21

*Pinkston v. Univ. of S. Fla. Bd. of Trustees*,
   No. 8:15-cv-1724, 2016 WL 3196474 (M.D. Fla. June 9, 2016)........................56

*Pittman v. Cole*,
   267 F.3d 1269 (11th Cir. 2001)....................................................................21, 26

*Pratt v. Ind. Sch. Dist. N. 831*,
   670 F.2d 771 (8th Cir. 1982)..................................................................16, 42, 46

*Searcey v. Harris*,
   888 F.2d 1314 (11th Cir. 1989).............................................................42, 44, 46

*Shorter v. St. Cloud State Univ.*,
   No. 00-cv-1314, 2001 WL 91236710 (D. Minn. Aug. 14, 2001) ......................56

*SisterSong Women of Color Reprod. Just. Collective v. Kemp*,
   472 F. Supp. 3d 1297 (N.D. Ga. 2020) .............................................................38

*Sixth Dist. of African Methodist Episcopal Church v. Kemp*,
   No. 21-cv-1284, 2021 WL 6495360 (N.D. Ga. Dec. 9, 2021)...........................23

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022)....................................................................18, 21

*Speech First, Inc. v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) .............................................................................20

*Sprint Comm'cns Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) .........................................................................................24

*Steinberg v. Carhart*,
   530 U.S. 914 (2000) .........................................................................................40

*Support Working Animals, Inc. v. Governor of Florida*,
   8 F.4th 1198 (11th Cir. 2021).............................................................................31

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ......................................................................19, 20, 21, 39

*Sweezy v. State of N.H. by Wyman*,
   354 U.S. 234 (1957) ...........................................................................................6

*Thomas More L. Ctr. v. Obama*,
   651 F.3d 529 (6th Cir. 2011) ...............................................................24

*Tinker v. Des Moines Indep. Sch. Dist.*,
   393 U.S. 503 (1969) .................................................................44, 47

*United States v. American Library Association, Inc.*,
   539 U.S. 194 (2003) ...........................................................................43

*United States v. Davis*,
   139 S. Ct. 2319 (2019) .......................................................................33

*United States v. O'Brien*,
   391 U.S. 367 (1968) ...........................................................................46

*United States v. Sailor*,
   No. 16-cv-319, 2018 WL 278740 (N.D. Fla. Jan. 2, 2018) .................43

*United States v. Thompson*,
   928 F.2d 1060 (11th Cir. 1991) ..........................................................23

*Vazzo v. City of Tampa*,
   No. 8:17-cv-2896, 2019 WL 1048294 (M.D. Fla. Jan. 30, 2019).......36

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 25 (1977) .............................................................................54

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ...........................................................................34

*Vill. of Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) ...........................................................................23

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*,
   862 F.2d 1517 (11th Cir. 1989)..........................................42, 43, 45, 46

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ...........................................................................18

*Watts v. Fla. Int'l Univ.*,
   495 F.3d 1289 (11th Cir. 2007)..........................................................16

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
792 F.3d 1313 (11th Cir. 2015)................................................................58

*Whole Woman's Health v. Jackson*,
142 S. Ct. 522 (2021) .............................................................................30

*Wilding v. DNC Servs. Corp.*,
941 F.3d 1116 (11th Cir. 2019)...............................................................24

*Williams v. Bd. of Regent of Univ. Sys. of Ga.*,
477 F.3d 1282 (11th Cir. 2007)...............................................................32

*Wilson v. State Bar of Ga.*,
132 F.3d 1422 (11th Cir. 1998)...............................................................18

*Windmere Corp. v. Remington Prod., Inc.*,
617 F. Supp. 8 (S.D. Fla. 1985)...............................................................58

*Wollschlaeger v. Governor, Fla.*,
848 F.3d 1293 (11th Cir. 2017)..........................................................passim

*Woodhull Freedom Foundation v. United States*,
948 F.3d 363 (D.C. Cir. 2020) ................................................................39

*Yelapi v. DeSantis*,
525 F. Supp. 3d 1371 (N.D. Fla. 2021).....................................................17

*Young v. Corizon LLC*,
No. 4:18-cv-444, 2019 WL 2587813 (N.D. Fla. May 21, 2019) .......................57

*Zykan v. Warsaw Cmty. Sch. Corp.*,
631 F.2d 1300 (7th Cir. 1980)................................................................45

## **Statutes**

20 U.S.C. § 1681 ...........................................................................6, 55

28 U.S.C. § 1391 .........................................................................57, 58

34 C.F.R. § 106.42 ...........................................................................56

42 U.S.C. § 2000d............................................................................32

Fla. Stat. § 1001.30 ........................................................................32

Fla. Stat. § 1001.41 ........................................................................32

Fla. Stat. § 1001.42 ........................................................................54

Fla. Stat. § 1002.20 ..........................................................................6

Fla. Stat. § 1003.41 ............................................................30, 31, 35

Fla. Stat. § 1003.46 ....................................................................8, 35

Fla. Stat. § 1003.4995 ....................................................................35

Fla. Stat. § 1003.49966 ..................................................................35

## Rules

Fla. Admin. Ann. r. 6A-10.081 ........................................................6

Fla. Admin. Ann. r. 6A-19.008 ........................................................6

## Other Authorities

"12 minute video to prevent LGBTQ+ bullying taken down in Florida schools," LA BLADE (July 11, 2022) ...........................................................15

*Foronda v. DeSantis*, Complaint (May 3, 2022), 2022 WL 1404863 ....................21

H.B. 1557 .................................................................................passim

Kara Voght, "Florida's 'Don't Say Gay' Law Took Effect. Chaos Ensued," ROLLING STONE (July 1, 2022) ...........................................................15

Monica Hesse, "Fans of Florida's 'Don't Say Gay' bill have a new favorite word: 'grooming,' " WASH. POST (Mar 12, 2022) ...........................................51

Nick Papantonis, "Teachers voice concerns after Orange County previews 'Don't Say Gay' impact to classrooms," WFTV.COM (June 27, 2022) .............................15

Shira Moolten, "Broward school district donated LGBTQ books ahead of new Florida law," SOUTH FLORIDA SUN SENTINEL (July 8, 2022)................................19

## PRELIMINARY STATEMENT

Earlier this year, Florida lawmakers enacted a law to ban any discussion or recognition of LGBT people in public schools because they did not like the fact that some students were "coming out" as gay and "hear[ing] about different kinds of identities."  H.B. 1557—widely known as the "Don't Say Gay" law because of its discriminatory intent and inevitable effect—is an exercise of raw governmental power the likes of which one might expect in Russia, not the United States.  The result has been widespread fear, suffering, and discrimination throughout the State.

H.B. 1557 is an exceedingly unusual law.  As relevant, it forbids *any* "school personnel or third party" from engaging in "classroom instruction … on sexual orientation or gender identity."  This is a categorical prohibition through third grade; after that, such instruction must be age or developmentally appropriate for students in accordance with state standards.  Remarkably, none of the key terms in the statute are defined, and legislators rejected every effort to remedy that obvious defect.

Despite its superficially neutral language, H.B. 1557 is aimed squarely at LGBT people.  This is clear from statements by legislators and other public officials, who repeatedly expressed fear and alarm that students might learn about LGBT people or families, but who never once expressed concern that students might learn about straight families or "traditional" gender identities.  Taking the cue, schools across Florida have targeted LGBT student groups, removed rainbow flags and safe

space stickers, carted books out of libraries, forced teachers to hide family photos, and revised anti-bullying policies. Plaintiffs, as well as other LGBT students, teachers, and parents, have faced censorship, threats, and warnings that schools cannot protect them from harm. They have experienced concrete, material harm. They reasonably fear that more will follow. And they are living lives of sustained self-censorship. For these reasons, H.B. 1557 is offensive to the First and Fourteenth Amendments and Title IX.

The injuries inflicted by H.B. 1557 are magnified by its vague prohibitions. H.B. 1557 covers every single person on school property or at a school event who may engage in "classroom instruction" of any kind. A "classroom" appears to be anywhere children experience "instruction" at school. And "instruction" (according to leading dictionaries) encompasses not only formal teaching, but also "the imparting of knowledge, skill, or information," which often occurs at schools through informal lessons, impromptu teachable moments, modeling of appropriate behavior, the sharing of stories, or visits from parents and guests. Given the many ways in which "classroom instruction" might occur in a school—and given the absence of any definitions or examples in H.B. 1557—it is all but impossible for a reasonable person to know what is allowed and what is not. And that dilemma is only exacerbated by the statute's reference to instruction "on sexual orientation or gender identity." These terms are global in scope: all manner of behaviors, practices,

identities, attractions, and beliefs might reasonably be thought to relate to "sexual orientation or gender identity."   The result is that students, teachers, parents, and others who seek to comply with the law are left in the dark about how to handle a wide range of commonplace situations that might reasonably be seen as "classroom instruction … on sexual orientation or gender identity."   *See* ECF 47, Amended Complaint ("AC") ¶ 8.   Even Defendants appear to disagree on the scope of H.B. 1557's terms.   *Compare* ECF 68 ("Br.") at 20 (H.B. 1557 applies to parents and students), *with* ECF 63 at 10 (it does not).   A law that is so vague is clearly at odds with the Due Process Clause.

So too is a law that invites arbitrary and discriminatory enforcement.   To fully unleash the law's discriminatory effect, H.B. 1557 gives any parent with a mere "concern" over a potential violation based on something that allegedly happened at their public school the right to sue school districts for money damages (including attorney's fees).   As a result, every school administrator who attends a contentious PTA or School Board meeting knows that any parent in the room could subject the district to an investigation and litigation if they articulate a "concern" that someone crossed the statute's murky boundaries.   The consequence is that while no one can say for sure what H.B. 1557 forbids, everyone knows that it was meant to censor speech about LGBT people and issues, and so the best way to avoid lawsuits is to limit as much of that speech as possible.   In this respect, while H.B. 1557 does not

explicitly forbid anyone from saying "gay" in school, it creates a censorship regime with that very real effect.  Of course, nobody thinks it has a reciprocal implication for discussion of straight people or families.  Indeed, Defendants cannot point to any example of straight teachers being directed to remove pictures of their loved one, or books featuring heterosexual couples being censored or banned.

In their motions to dismiss, Defendants respond to this by asserting that Plaintiffs have it all wrong and are injuring themselves based on an irrational view of the law.  To hear Defendants tell it, H.B. 1557 is a workaday law imposing modest, neutral limits on formal curricular activities, and Plaintiffs' experiences reflect only their own hysteria.

Every premise and every conclusion of that argument is wrong.  For starters, while Defendants lean heavily on an artifice of neutrality for purposes of this federal litigation, senior Florida officials have repeatedly and publicly affirmed that H.B. 1557 targets LGBT people, which is why both the law's supporters and its opponents share that view of its effects.  Moreover, while Defendants insist that the law has a clear and narrow scope, the interpretation they offer is at odds with ordinary meaning, statutory structure, and legislative history, which explains why so many people (including Plaintiffs) have ordered their conduct based on a drastically different understanding.  Finally, while Defendants treat Plaintiffs' injuries as self-

inflicted and speculative, the Amended Complaint contains detailed allegations of concrete injury-in-fact that more than satisfy the requirements of Article III.

The State has unquestionable authority to regulate public school curriculum within constitutional limits.  It also has the power to and does regulate teaching about human sexuality.  But in form and effect, that is not what H.B. 1557 does.  In fact, several proposed amendments that would have directed H.B. 1557 toward those permissible ends were all rejected in favor of something broader and more sinister: a law that aims not at curriculum, but at speech; not at sexuality, but at identity; and not at particular lesson plans, but at a particular group of people perceived to be different and wrong.  The State's message has been heard loud and clear: schools are transforming themselves into institutions where inequality, bullying, and censorship are not only permitted, but encouraged, and in some cases mandated. Plaintiffs' constitutional challenges to H.B. 1557 should be heard on the merits, and the motions to dismiss should be denied.

## **RELEVANT BACKGROUND**

### **A.    Florida's commitment to a safe, equal, and nondiscriminatory education**

The State of Florida has long recognized its "paramount duty" to educate the next generation in a manner that will prepare them to live in a pluralistic democratic society.  *See, e.g.*, *Bush v. Holmes*, 919 So.2d 392, 402 (Fla. 2006) (quoting Florida Const., art. IX, §1 (1868)).  Education, after all, "is absolutely essential to a free

society under our governmental structure" and is "the very foundation of good citizenship." *Id.* at 405 (citations and quotation marks omitted). The State is thus required to provide education "without discrimination on the basis of … gender." Fla. Stat. § 1002.20(1), (7). And under existing administrative rules, the State must ensure "Educational Equity" by valuing the "worth and dignity of every person" and "freedom to learn" by protecting students against "conditions harmful to learning" (including harassment "on the basis of … sex … [or] sexual orientation"), and by providing students with "access to diverse points of view." Fla. Admin. Ann. r. 6A-10.081(1)(a), 6A-10.081(2), 6A-19.008.

The United States Supreme Court has likewise recognized that education plays a "vital role in a democracy" and that "[t]eachers and students must always remain free to inquire, to study and to evaluate." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957). Florida's stated commitments to a free, equal, non-discriminatory, and safe education are faithful to the federal Constitution's mandate of equal protection and freedom of speech, U.S. Const., amends. I, XIV, as well as Title IX's recognition that no one should be denied educational benefits and opportunities "on the basis of sex," 20 U.S.C. § 1681(a).

At the local level, at least until recently, many Florida school districts—including ones that are Defendants here—sought to make these promises a reality. *See* AC ¶¶ 103-10. To that end, with assistance from Plaintiff Equality Florida, they

adopted educational standards that call for accepting the LGBT community, prohibiting discrimination, and incorporating LGBT persons and issues. *Id.* ¶¶ 104-09. These measures have helped to create a safer environment for at-risk LGBT students (and their families). *Id.* ¶¶ 110 & n.16, 166-69.

**B.    The legislative debate over H.B. 1557**

By passing H.B. 1557, Florida lawmakers sharply turned course and relegated LGBT people to second-class citizenship. In the Senate, the sponsor of the law explained that it was necessary because "parents are very concerned about the departure from the core belief systems and values" and about "kids trying on different things they hear about and different kinds of identities and experimenting." AC ¶ 126; *see also id.* ¶¶ 127-28. These statements did not reflect generalized concern about discussions of sexual orientation and gender identity. Rather, as the Senate sponsor made clear, the "core belief systems and values" that gave rise to H.B. 1557 were beliefs about the presumptive rightness of heterosexual and cisgender identity, and beliefs about the presumptive wrongness or strangeness of LGBT identity.

Other legislators and supporters justified H.B. 1557 in the same terms, with one prominent group backing the law referring to it as the "Don't turn my son into a daughter bill." *See id.* ¶¶ 130-31, 137. Governor Ron DeSantis, in turn, expressly justified H.B. 1557 as necessary to shut down discussion of LGBT issues and to

erase LGBT identities in public schools.  *Id.* ¶¶ 134-36, 138.  For example, shortly before he signed H.B. 1557, the Governor publicly stated that "We don't want transgenderism."  *Id.* ¶ 138.  His press secretary added that anyone opposed to the law is "probably a groomer"—thus invoking an ugly, notoriously anti-LGBT trope to imply that teaching children about the dignity of LGBT people is exactly the same as grooming them for future sexual abuse.  *Id.* ¶ 136.

Even as lawmakers and other supporters of the bill repeatedly vilified LGBT people, none of them—literally not a single legislator who supported the enactment of H.B. 1557—expressed any concern with students identifying as heterosexual or cisgender, or with teachers or students discussing such identities in public schools. Their concern was only with a perceived "departure" from those "core belief systems and values."  *See id.* ¶ 139.  Nothing about this suggested any concern for neutrality or evenhandedness.  H.B. 1557 was aimed at LGBT people and nobody else.

The drafting history of the bill confirms this.  When amendments to replace "sexual orientation or gender identity" with "human sexuality" were voted down, the Senate sponsor said they would "significantly gut" the law's purpose.  *See id.* ¶ 144.  Of course, that purpose was *not* to regulate instruction on human sexuality— which is already directly addressed by Fla. Stat. § 1003.46(2)(d)—but rather to prohibit any discussion or instruction about "departures" from the State's own preferences.

Another proposed amendment would have clarified that the prohibition on "classroom instruction" still allows "instruction or discussion" relating to "family structures," "objective historical events," "bullying prevention," "discussions between students," or "questions asked by students and any answer." *Id.* ¶ 145. But consistent with the discriminatory purpose of the law, this amendment was quickly voted down. Lawmakers also rejected an amendment to clarify that H.B. 1557 "does not apply to any discussion between a student who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBT and their peers." *Id.* ¶¶ 145-46. These amendments were rejected not because they were irrelevant to H.B. 1557, or because they addressed issues that would not arise in implementing H.B. 1577. They were rejected because they were at odds with H.B. 1557's goal of creating a culture of fear, discrimination, and second-class citizenship for LGBT people in schools.

Not only did lawmakers reject amendments to clarify or narrow H.B. 1557, but they took advantage of every opportunity to make the law as broad and confusing as possible. They proclaimed in the Preamble that the law prohibited "classroom *discussion* about sexual orientation or gender identity." H.B. 1557, Preamble (emphasis added).[1] They made the prohibition on "classroom instruction" applicable to anyone—both "school personnel" and "third parties." And they made the law's application to grades 4-12 patently unclear, prohibiting classroom

---

[1] *Available at* https://www.flsenate.gov/Session/Bill/2022/1557/BillText/er/PDF, amending Fla. Stat. § 1001.42.

instruction that is not "age-appropriate or developmentally appropriate" according to unspecified "state standards."  H.B. 1557 § 1.

### C.   Passage of H.B. 1557

As enacted, H.B. 1557 specifically prohibits (i) "classroom instruction" (ii) "by school personnel or third parties" (iii) "on sexual orientation or gender identity" (iv) in "kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards."  H.B. 1557 § 1.  None of these terms or phrases is defined anywhere in the statute.

Instead, in order to maximize the law's chilling effect, H.B. 1557 contains a diffuse—indeed chaotic—enforcement mechanism.  Any parent of a student who has a "*concern*" about a violation of H.B. 1557 is empowered to file a lawsuit against their school district and may recover money damages, as well as attorneys' fees.  *Id.* (emphasis added).  Lawmakers rejected a proposed amendment that would have mitigated the law's chilling effects by allowing school districts to recover their costs and fees if they prevail against such a lawsuit.  AC ¶ 149.

The consequences of this unusual scheme can hardly be overstated: any school administrator who has to deal with a divided local PTA will know that any parent in the PTA can inflict immense burdens—an investigation, a lawsuit, and potentially damages—based on a concern that someone somewhere in a school has said or done something inconsistent with H.B. 1557.  The intent and inevitable effect of this

scheme, which is already on full display throughout Florida, is that schools will face immense pressure to censor anything that even remotely touches on LGBT people or issues. While the State's lawyers assert that everybody else has it totally wrong— and that there is absolutely no difference in how H.B. 1557 applies to (or affects) straight and gay people—that is not how anybody else has interpreted the law, that is not how Florida officials described the law's purpose, and that is not how the law is being applied (which is unsurprising, given the law's vague terms and discriminatory purpose).

### D.   Effects of H.B. 1557

Even before H.B. 1557 went into effect on July 1, 2022, its significant and harmful impact on students, families, and school personnel in Florida public schools was clear. Anybody with access to an internet connection in Florida knows that schools have begun stripping away protections, safe spaces, and resources for LGBT students and that many have also actively censored speech.

For example, Plaintiffs Dan and Brent VanTice, a gay couple, have two first-grade boys, one of whom has already come home and said that he doesn't think he can talk about his family anymore in school. The VanTices are likewise unsure whether they will cause trouble if they both attend school events together. AC ¶¶ 203-05, 207-08; *see also id.* ¶¶ 197, 211, 213-15 (noting similar concerns by Plaintiffs Casares, Feinberg, Morrison, and Houry, whose children are or will soon

11

be K-3, and by Plaintiffs Shook and Volmer, concerning quality of education their K-3 children will receive).  Students like Plaintiff M.A (a gay high-school junior) articulate specific fears that gay groups they participate in will be shut down, and teachers who have been friendly and supportive will be silenced. *Id.* ¶¶ 182-83, 189; *see also id.* ¶¶ 185-87 (similar for Plaintiff S.S., a lesbian high-school junior).  And teachers expect they will have a hard time teaching students empathy or how to interact with others in a respectful manner, that their lesson plans will be altered, and that school will no longer be a welcome place for LGBT people.  *Id.* ¶¶ 218, 221, 229-30, 239.

These concerns are not speculative or hysterical, and it is frankly insulting for the State to suggest as much.  As alleged in the Amended Complaint (and such allegations must be taken as true), numerous Plaintiffs have *already* been told by school personnel that what they fear is exactly what will come to pass under the regime created by H.B. 1557.  Plaintiff S.S., for example, was recently told by a teacher that LGBT "behavior" should be kept "behind closed doors."  *Id.* ¶ 188; *see also* ¶ 183 (cancellation of statewide gay-straight alliance summit due to chilling effect); *id.* ¶ 206 (VanTices' concern their children can no longer bring in LGBT-friendly books, which have recently been added to ban lists elsewhere).  Plaintiff Doe and her mother Plaintiff McClelland have a reasonable fear that Doe (a transgender student) will not be "okay" in school, since Doe was recently outed by

another student, and teachers have told McClelland that due to H.B. 1557, they are not sure they will be able to investigate such incidents (or impose discipline). *Id.* ¶¶ 193-95.

Similarly, following the passage of H.B. 1557—and as schools prepared to implement it—many LGBT people have suffered outright and explicit censorship. Plaintiff Moricz, for example, was prohibited from mentioning his participation in this lawsuit at his high-school graduation speech and threatened with his mic being cut off; he ultimately resorted to delivering a speech that referred to his "curly hair" as a euphemism for being gay. *Id.* ¶¶ 174-76; *see also id.* ¶¶ 198-201 (similar experiences by Shook's daughter, Morrison's son, and Equality Florida student members). Other students have been disciplined for referencing LGBT issues, including a gay 17-year-old who was suspended and then prohibited from running for class president for organizing a protest against H.B. 1557 and handing out Pride flags. *Id.* ¶ 179.

The list goes on, even in these early days of H.B. 1557. LGBT-friendly books have been carted away from elementary school libraries and classrooms to ensure "students do not have access." *Id.* ¶ 191. Teachers have been explicitly told not to mention LGBT issues and have been disciplined or threatened for allowing any reference to LGBT issues in their classes. *See id.* ¶¶ 226, 233-37, 239 (Equality Florida member threatened by parents online after informing the class that bullying

LGBT peers is unacceptable).  To offer just two examples of the new regime, a first-grade teacher was fired after her students drew LGBT flags during free time, while a sixth-grade science teacher quit and stopped teaching altogether after parents called for disciplinary action because he acknowledged his marriage to a man at school.  *Id.* ¶¶ 226, 233.

In response to the enactment of H.B. 1557, whose broad terms and anti-LGBT purpose have sown confusion and fear, Plaintiffs (like many others) have been forced into self-censorship.  As alleged in the Amended Complaint, students have widely reported fear of expressing themselves and an inclination to "return to the closet."  *Id.* ¶ 178.  LGBT teachers, including Plaintiff Berg, have likewise avoided any recognition or discussion of their identities or family for fear of violating H.B. 1557.  *Id.* ¶¶ 219, 231, 235, 240.  More broadly, many students and teachers (again including Plaintiffs) have sought to avoid breaking the law by dodging anything that remotely touches on LGBT issues, taking down flags, removing stickers and other signs of support, avoiding discussions of LGBT issues, and curtailing established inclusivity efforts.  *Id.* ¶¶ 180-82, 184, 186, 204, 217, 222-25, 232, 236, 251-54, 256.  Tragically, some teachers and counselors, including Plaintiffs Berg and Washington (and members of Equality Florida), have been unable to protect LGBT students from harassment and bullying due to reasonable fear of discipline in light of H.B. 1557.  *Id.* ¶¶ 220, 227, 230, 239-41.  Take Berg for example: he stood at the front of his

class when a student called another's artwork "gay" as an insult, and feared he could say nothing to try to explain why that was inappropriate. *Id.* ¶ 220.

The harmful effects of H.B. 1557 are widespread. In Orange County, where Plaintiff Volmer's children are students, teachers were reportedly prohibited from wearing rainbow articles of clothing, displaying safe-space stickers, or putting pictures of their same-sex spouse on their desk.[2] In Duval County, a video aimed at teaching middle- and high-school students how to prevent bullying of LGBT kids was reportedly removed to "ensure the content complies with" H.B. 1557.[3]

Simply put, H.B. 1557 was meant to create—and has succeeded in creating—a stigmatizing environment in which LGBT people (and anyone who supports them) are silenced and fearful. Plaintiffs have already seen an increase in the number of LGBT students experiencing derogatory insults and physical attacks from others, *id.* ¶¶ 200, 210, 229; in LGBT parents and families being denigrated by their school community, *id.* ¶¶ 209, 212; and in teachers and other school administrators facing harassment for opposing the new mandate of discrimination, *id.* ¶¶ 234, 238. H.B.

---

[2] Nick Papantonis, "Teachers voice concerns after Orange County previews 'Don't Say Gay' impact to classrooms," WFTV.COM (June 27, 2022), https://www.wftv.com/news/local/teachers-voice-concerns-after-orange-county-previews-dont-say-gay-impact-classrooms/R6VGDIOC2RFURLBUVT6TVWPDGA/; Kara Voght, "Florida's 'Don't Say Gay' Law Took Effect. Chaos Ensued," ROLLING STONE (July 1, 2022), https://www.rollingstone.com/politics/politics-news/florida-dont-say-gay-law-edcuators-1377353/.

[3] "12 minute video to prevent LGBTQ+ bullying taken down in Florida schools," LA BLADE (July 11, 2022), https://www.losangelesblade.com/2022/07/11/12-minute-video-to-prevent-lgbtq-bullying-taken-down-in-florida-schools/.

1557's "message is not lost on students and teachers, and its chilling effect is obvious." *Pratt v. Ind. Sch. Dist. N. 831*, 670 F.2d 771, 779 (8th Cir. 1982).

## APPLICABLE STANDARD

A motion to dismiss may be granted only "when the movant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. World Financial Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006) (citation omitted). The "pleadings are construed broadly," and the factual allegations, "taken as true," must be "viewed in the light most favorable to the plaintiff." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (citations omitted). So long as the allegations are "enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), dismissal is inappropriate.

## ARGUMENT

Defendants' motions conjure an alternative universe where H.B. 1557 is just about regulating curriculum, where LGBT people suffer no special disadvantage under the law, where the State's only goal is related to parental control over certain information, and where Plaintiffs' own experiences are mistaken or speculative. Every single step of that argument is profoundly misguided—particularly at the motion-to-dismiss stage, where Plaintiffs' allegations must be accepted as true and

all inferences must be drawn in Plaintiffs' favor.  Defendants' motions should be denied and the case should be set for expedited discovery and trial.

## I.   PLAINTIFFS HAVE STANDING

Each Plaintiff has plausibly alleged injury-in-fact, a causal connection between their injury and Defendants' conduct, and a likelihood of redress by a favorable decision.  *Granite State Outdoor Advert., Inc. v. City of Clearwater*, 351 F.3d 1112, 1116 (11th Cir. 2003).  In any event, only one Plaintiff need establish standing as to each claim for the claim to proceed.  *Yelapi v. DeSantis*, 525 F. Supp. 3d 1371, 1377 n.4 (N.D. Fla. 2021) (Winsor, J.) (citation omitted).

### A.   The Individual Plaintiffs[4]

#### 1.   Injury-in-fact

Plaintiffs easily satisfy their burden to make "general factual allegations of injury," namely, "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* at 1377 (citation and quotation marks omitted).

To start, some Individual Plaintiffs and others have already faced censorship or been disciplined based on their speech.  *See, e.g.*, AC ¶¶ 176, 179, 191, 226, 233, 237, 239.  That denial of speech is a clear injury-in-fact.  *See Speech First, Inc. v.*

---

[4] The Individual Plaintiffs refer to all Plaintiffs other than the "Organizational Plaintiffs," Equality Florida and Family Equality.

*Cartwright*, 32 F.4th 1110, 1119-20 (11th Cir. 2022); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) ("[I]n the First Amendment context, litigants are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or presumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." (citation omitted)).  The State does not deny it.

Independently, Plaintiffs have plausibly demonstrated standing to bring a pre-enforcement challenge to H.B. 1557 because they have alleged: "[1] an intention to engage in a course of conduct arguably affected with a constitutional interest, [2] but proscribed by statute, and [3] there exists a credible threat of prosecution" or "other enforcement action." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (citation and quotation marks omitted).

First, the Amended Complaint includes detailed allegations that the Individual Plaintiffs intend to engage in a course of conduct that is affected with a constitutional interest, including speech in which they would otherwise engage and the acquisition of information at school.  *See, e.g.*, AC ¶¶ 189, 195, 198-99, 207, 212, 217, 222.  The deprivation of these interests amounts to injury-in-fact.  *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (chilling of protected speech); *Acosta v.*

18

*Huppenthal*, No. 10-cv-623, 2012 WL 12829991, at *7 (D. Ariz. Jan. 10, 2012) (denial of educational information).

Second, Plaintiffs have plausibly alleged that this protected course of conduct is "*arguably* proscribed by the statute." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (citation and quotation marks omitted) (emphasis added). The State concedes that H.B. 1557 restricts the information Plaintiffs seek to receive in a curricular setting. *See* Br. 31-33; *infra* Argument, Part IV.A. And more broadly, the plain terms of H.B. 1557 extend well beyond the formal curriculum, thus arguably proscribing significant additional protected conduct. To be sure, the State asserts that "classroom instruction" by "school personnel or third parties" on "sexual orientation or gender identity" is a self-defining phrase. *See* Br. 15-20, 29-30. But virtually every other interpreter in Florida—including students, parents, teachers, local officials, and legislators—has read the law very differently than the State's lawyers in this litigation. The Governor and his press secretary have also made statements about H.B. 1557 at odds with the State's litigation-driven interpretation. And many others have struggled to clarify the metes and bounds of the undefined terms in H.B. 1557.[5] On its face, this is strong evidence that H.B. 1557 reaches beyond formal curricular instruction and captures much more discussion of LGBT

---

[5] *See, e.g.*, Shira Moolten, "Broward school district donated LGBTQ books ahead of new Florida law," SOUTH FLORIDA SUN SENTINEL (July 8, 2022), https://www.sun-sentinel.com/news/education/fl-ne-broward-schools-lgbtq-books-20220708-mqbfatmyajgufcfix4mhdtlnwe-story.html.

persons and issues in and around schools. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 (5th Cir. 2020).   That conclusion is bolstered by Chief Judge Walker's recent opinion denying a motion to dismiss a vagueness challenge to the Stop WOKE Act, where Florida lawmakers made a significantly greater effort than in H.B. 1557 to spell out the scope of a statutory prohibition.   Decision on Motion to Dismiss, *Falls v. DeSantis*, No. 22-cv-166, ECF 68 (N.D. Fla. July 7, 2022) (hereinafter, "*Falls* MTD"), at 2 (addressing a statute proscribing eight specific concepts, each of which was defined with a full paragraph of statutory text).

Finally, Plaintiffs have plausibly alleged that there is a credible threat of enforcement.   The applicable standard is "quite forgiving," *Wollschlaeger*, 848 F.3d at 1305 (cleaned up), and it is satisfied where a statute "sweeps broadly … and covers the subject matter of petitioners' intended speech," *Driehaus*, 573 U.S. at 162.   The Eleventh Circuit has added that "intent to enforce the rule may be inferred" where, as here, the law was "recently enacted, or if the enforcing authority is defending the challenged law or rule in court." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1257 (11th Cir. 2010); *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979).   And here, the threat of enforcement is also "bolstered by the fact that the authority to file a complaint … is not limited to a prosecutor or an

agency," but may be made by any parent, none of whom is "constrained by explicit guidelines or ethical obligations…." *Driehaus*, 573 U.S. at 164.[6]

In response to all this, the State mainly retorts that Plaintiffs cannot show a "credible threat of prosecution" because the law directly applies to school districts only. *See* Br. 25. But the State cites no authority for the proposition that Plaintiffs are categorically foreclosed from challenging a statute solely because it does not directly regulate them—and existing precedent rejects that position. The relevant question instead is whether the "operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a *direct prohibition* against the exercise of First Amendment rights." *Speech First, Inc.*, 32 F.4th at 1119-20 (citation and quotation marks omitted) (emphasis added); *accord Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620, 621 n.5 (1976); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963); *Arce v. Douglas*, 793 F.3d 968, 987-88 (9th Cir. 2015); *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam); *Pittman v. Cole*, 267 F.3d 1269, 1283 & n.12 (11th Cir. 2001); *Falls* MTD at 10-12, 18. While the State cannot directly punish Plaintiffs, there are sufficient allegations here to conclude it has burdened their rights in a manner supporting standing, including by creating legal restrictions and an

---

[6] The State has retaliated against one of the largest companies in Florida for publicly opposing the law. *See* AC ¶ 138 n.33; Complaint, *Foronda v. DeSantis*, 2022 WL 1404863 (S.D. Fla. May 3, 2022). It is certainly plausible to assume that the law will be enforced against Plaintiffs and others who are encompassed or impacted by its prohibitions.

enforcement scheme (in which the State remains an active participant) that injure them.  *See* AC ¶¶ 83, 85-86, 114-15.  Indeed, it is precisely "because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced" that the "injury requirement is *most loosely applied*—particularly in terms of how directly the injury must result from the challenged governmental actions—where first amendment rights are involved."  *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760-61 (11th Cir. 1991) (emphasis added).

Separately, the State argues that the student Plaintiffs lack standing because they are above third grade.  Br. 25.  As an initial matter, this ignores that Plaintiffs include many parents with younger children in grades K-3.  AC ¶¶ 62, 67, 71, 73, 75.  And it is well-settled that "[p]arents have standing to sue when practices and policies of a school threaten their rights and interests and those of their children."  *Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 965-66 (8th Cir. 2018) (citations omitted); *cf. Vill. of Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980) (plaintiffs "may … challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court").[7]  In all events, H.B. 1557 explicitly reaches grades 4-12, prohibiting speech on the disfavored topics that is not age- or developmentally

---

[7] Surely, the State would not want to put young kids in jeopardy by requiring Plaintiffs' young children, ages 5-12, to sue in their own name.  However, Plaintiffs would consider adding those children as plaintiffs using pseudonyms to protect their identities if that is deemed to be necessary.

appropriate according to unspecified "state standards." While "state standards" have not yet been issued to provide guidance on what exactly is age- or developmentally appropriate, nothing in the statute says that its penalties do not apply until such standards are issued. Accordingly, many Florida schools have already read the statute as applying to those grades, or have taken steps to insulate themselves from its forthcoming reach, and have therefore burdened the rights of students, parents, and teachers in grades 4-12 on account of the statute. *See supra* Background, Part D; AC ¶¶ 174-77, 179, 183-84, 191, 198-99, 200-01, 206, 233.

The State fares no better in citing cases that turn on the "contingency of legislative action." Br. 25 (citation omitted). The injuries (and requested relief) in this case do not depend on future legislative action; Plaintiffs are *already* suffering harm and that harm would be remedied if H.B. 1557 were enjoined (since it has arisen in direct consequence of the enactment of the law). *United States v. Thompson* is even farther afield: it analyzed whether a treaty created privately enforceable rights. 928 F.2d 1060, 1066 (11th Cir. 1991).

The same pre-enforcement analysis applies to Plaintiffs' equal protection claims, and for the reasons given above, Plaintiffs have standing to proceed. *See, e.g.*, *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 349-50 (3d Cir. 2014); *Sixth Dist. of African Methodist Episcopal Church v. Kemp*, No. 21-cv-1284, 2021 WL 6495360, at *4 (N.D. Ga. Dec. 9, 2021). Although the State asserts that

Plaintiffs fail to allege "how the bill denies equal treatment," as opposed to sending a "discriminatory message," Br. 38-40, Plaintiffs allege much more than stigmatic harm. *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (holding that "discrimination itself … can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group" (cleaned up)). The Amended Complaint alleges in concrete, real-world terms that H.B. 1557 has erected an unconstitutional "barrier" that "makes it more difficult" for LGBT people to obtain an education on the same terms as their non-LGBT peers. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). *See supra* Background, Part D. That, too, is more than sufficient. Further, as the Amended Complaint alleges—an allegation that the State is not entitled to dispute at this stage—the burdens of the law have fallen overwhelmingly and disproportionately on LGBT people in Florida. These allegations of discriminatory purpose, coupled with detailed allegations of disparate impact and injury, clearly satisfy Article III.[8]

---

[8] The State concedes that Plaintiff Moricz has alleged "past injuries," since his speech rights were restricted at his high school graduation speech. Br. 24, 26; AC ¶¶ 174-77. To the extent that the State argues that Moricz (and others) cannot suffer an injury-in-fact based on H.B. 1557 prior to its effective date, that is incorrect. *See, e.g.*, *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 535-36 (6th Cir. 2011), *abrogated on other grounds*, *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012); *Florida ex rel. McCollum v. U.S. Dep't of Health and Hum. Servs.*, 716 F. Supp. 2d 1120, 1145 (N.D. Fla. 2010) (Vinson, J.).

2.      **Traceability and redressability**

The Individual Plaintiffs have also plausibly alleged that their "injuries are connected with" Defendants' conduct, *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up), and that these injuries are "likely to be redressed through the litigation," *Sprint Comm'cns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008).  The State resists this conclusion by claiming that Plaintiffs' actual injuries alleged in detail and with specificity in the Amended Complaint are "hypothetical" and reflect a "wildly overbroad" reading of H.B. 1557.  Br. 29 (citation and quotation marks omitted).  That response fails for two reasons.

First, the State admits that H.B. 1557 applies to curricular speech—and thus it has no basis for disputing Plaintiffs' standing to the extent they challenge respects in which H.B. 1557 unconstitutionally censors such speech.  *See infra* Argument, Part III.A.

Second, there is simply no merit to the State's contention that broader readings of H.B. 1557 by students, teachers, parents, and officials throughout Florida are "fanciful, paranoid, and otherwise unreasonable."  Br. 30 (quoting *Clapper Amnesty Int'l USA, Inc.*, 568 U.S. 398, 416 (2013)).  As shown above, H.B. 1557 is certainly no model of clarity: its operative terms are undefined, legislators rejected repeated efforts to clarify it, the language in the legislative preamble is at odds with the State's proposed interpretation here, and actors throughout Florida have reasonably read the

law as encompassing precisely the conduct at issue.  As demonstrated below, *see infra* Argument, Part III.A, dictionary definitions and ordinary tools of statutory interpretation confirm the reasonableness of that view of the law.  Therefore, Plaintiffs do not allege mere "possible future injury," but rather injury that has *already* occurred, not to mention a "substantial risk" of continued or future injury to their protected rights.  *Clapper*, 568 U.S. at 409.

The State separately argues that Plaintiffs' injuries are not traceable to its actions because "H.B. 1557 allows lawsuits only by parents and only against the policies and practices of district school boards."  Br. 30.  However, that ignores the State's intricate involvement in the implementation and ongoing interpretation and enforcement of H.B. 1557.  *See infra* Argument, Part II.A-B.  It also conflicts with the School Board Defendants' contentions that the buck stops with the State, not them.  *See, e.g.*, ECF 63 at 5-8; ECF 70.  At bottom, Defendants are all on the hook: they all play a role in implementing, administrating, and enforcing H.B. 1557; every single one of them is therefore a partial contributor to Plaintiffs' injuries; and an injunction against any one of them would mitigate at least some of Plaintiffs' injuries.  *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *Pittman*, 267 F.3d at

1284-85.[9]   Accordingly, the Individual Plaintiffs each have Article III standing to press their claims.[10]

### B.      The Organizational Plaintiffs

In addition to the Individual Plaintiffs, Equality Florida and Family Equality also have standing. An organization has standing to sue on its own behalf when a law "impedes its ability to attract members, to raise revenues, or to fulfill its purposes," *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1138 (N.D. Fla. 2020) (Walker, C.J.) (citation and quotation marks omitted), or forces it to "divert resources to counteract" a law and its illegal effects, *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020).

As alleged in the Amended Complaint, H.B. 1557 has seriously impeded Equality Florida's mission to combat discrimination against LGBT Floridians.  AC ¶ 27.  In light of H.B. 1557, many schools are fearful of participating in (or have sought modifications to) Equality Florida's educational programming, which aims to create an inclusive, non-discriminatory environment in schools.  *Id.* ¶¶ 254-55. Equality Florida has had to expend significant resources as a result of this change.

---

[9] Although three School Boards suggest otherwise, ECF 63 at 8-11; ECF 67 at 21-22; ECF 70, Plaintiffs' claims are ripe for the same reasons: the unconstitutionality of H.B. 1557 is apparent here and now on the face of the statute, so there is no basis to justify inaction or indecision.  *See Wollschlaeger*, 848 F.3d at 1304.

[10] Along the same lines, Manatee County argues Plaintiffs cannot satisfy Article III because M.A attends a charter school.  ECF 67 at 13-17.  That argument fails because H.B. 1557 arguably applies to charter schools, AC ¶ 30 n.1; indeed, the law imposes duties on school districts, H.B. 1557 § 1, and Manatee County does not cite any provision that would preclude it from exercising authority over charter schools to ensure compliance with H.B. 1557.

H.B. 1557 has likewise impeded Family Equality's efforts to fight discrimination against LGBT members of the public school system, which include providing schools with LGBT-related guidance and resources like the "Book Nook," a comprehensive list of the best LGBT books for children of all ages. *Id.* ¶ 256.

The Amended Complaint also details how Equality Florida has diverted financial and staff resources from preexisting projects and allocations to fight H.B. 1557 and its effects, *id.* ¶¶ 244-50, and how Family Equality has done the same, *id.* ¶¶ 257-60; *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008) (similar diversion sufficed).

The State disputes the Organizational Plaintiffs' standing by claiming that their activities are mere "litigation and legal counseling" and "advocacy" efforts. Br. 27-28.  That is wrong for two reasons.  First, it ignores Plaintiffs' allegations, which must be accepted as true, that their programmatic efforts to fight LGBT discrimination in schools have been directly impacted—injuries that courts commonly recognize suffice to confer standing.  *See Namphy*, 493 F. Supp. 3d at 1138-39; *Dream Defs. v. DeSantis*, 553 F. Supp. 3d 1052, 1075 (N.D. Fla. 2021) (Walker, C.J.).  Second, while the State relies on *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995), unlike the organizations at issue there, Equality Florida and Family Equality "provide more services than just general advocacy and policy work." *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1306

(S.D. Fla. 2003) (distinguishing *Nat'l Taxpayers Union, Inc.*).  And the Eleventh Circuit has recognized that counseling and educating members and the public are cognizable injuries.  *See, e.g.*, *Georgia Latino All. for Human Rts. v. Governor of Georgia*, 691 F.3d 1250, 1260 (11th Cir. 2012).

Equality Florida separately has associational standing because its members "would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1119 (N.D. Ga. 2020) (citation and quotation marks omitted).  The State has no response on this front, other than to claim that the four Plaintiff members lack standing themselves.  Br. 26-27.  Yet even setting the Individual Plaintiffs aside, Equality Florida has more than 140,000 members, many of whom are part of the public school system, including students, parents, and school personnel.  AC ¶¶ 25-26.  It is thus plausible that "at least one member faces a realistic danger" of having their rights denied, and "highly unlikely … that not a single [other] member" will be harmed.  *Browning*, 522 F.3d at 1163; *see also Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*, 833 F. App'x 235, 240-41 (11th Cir. 2020).

## II.    DEFENDANTS ARE NOT IMMUNE

Beyond their attempts to dispute Plaintiffs' standing, Defendants also raise immunity arguments.  These defenses lack merit.  Because "[t]he state has no power to impart to [officials] any immunity from responsibility to the supreme authority of the United States," *Ex Parte Young*, 209 U.S. 123, 159-60 (1908), a federal court may enjoin state officials from enforcing an unconstitutional act.  The enforcement at issue need not rest solely in any one official's hands:  Defendants need only have "some connection with the enforcement of" H.B. 1557 to be enjoined, *id.* at 157, including "in the sense of administering it," *Curling v. Sec'y of Ga.*, 761 F. App'x 927, 932 n.3 (11th Cir. 2019) (per curiam).  That standard is clearly met here.[11]

### A.    State Education Officials

The State contends that the Commissioner of Education must be dismissed because he has only a "general role" with respect to the education system and "no 'responsibility to enforce'" H.B. 1557.  Br. 22 (quoting *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011)).  But authority to "enforce" is not necessary.  As courts in this District have recognized, so long as a defendant enforces *or administers* the challenged statute, the *Ex Parte Young* cause of action applies.  *See Claire v. Fla. Dep't of Mgmt. Servs.*, 504 F. Supp. 3d 1328, 1334 (N.D. Fla. 2020) (Walker, C.J.)

---

[11] In light of the recent decision in *Falls*, where the court held the Governor lacked a sufficient connection with respect to the Stop WOKE Act, *Falls* MTD at 2-3, Plaintiffs have withdrawn their claims against the Governor.

(citing *Curling*, 761 F. App'x at 932 n.3); *Falls* MTD at 22 (permitting claims challenging Stop WOKE Act to proceed against Board of Education members).

As relevant here, the Commissioner is specifically responsible for developing and submitting to the Board of Education proposed revisions to the Next Generation Sunshine State Standards, Fla. Stat. § 1003.41, which the Department of Education is required to update pursuant to H.B. 1557, H.B. 1557 § 2. The Commissioner is also responsible for appointing the special magistrate in any administrative proceeding under H.B. 1557. *Id.*[12] This involvement suffices. *See, e.g.*, *Grizzle*, 634 F.3d at 1319; *ACLU v. Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993). So, too, does the role of Board members in reviewing the proposed revisions to curricular standards, *see* Fla. Stat. § 1003.41, ensuring that the Board adopts procedures for implementing H.B. 1557's requirements, and reviewing and approving or rejecting any recommendation of a special magistrate in an enforcement proceeding.

The State also asserts that "rulemaking authority" cannot provide a basis for suit, citing a case about redressability. Br. 23 (citing *Support Working Animals, Inc. v. Governor of Florida*, 8 F.4th 1198 (11th Cir. 2021)). But the State Education Officials are not being sued solely because of their role in adopting procedures; they

---

[12] Although the State argues that the Commissioner's duty to appoint a special magistrate, and the Board members' duty to "approve or disapprove" the special magistrate's decision, "would not make *that adjudicator* a proper defendant," Br. 23 (quoting *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (emphasis added)), that sleight of hand doesn't work. The Commissioner and Board's members are not "judges or clerks," nor are they members of the state judiciary; they are "executive officials," 142 S. Ct. at 532, playing a role with respect to implementation and administration.

are required by H.B. 1557 to "both make and execute [the] challenged regulation." *Jacobson*, 974 F.3d at 1257. Even Governor DeSantis implicitly recognizes this, conceding that H.B. 1557 is "enforced by the State Board of Education," Br. 22, which is overseen by the State Education Officials. Relatedly, the State's attempt to invoke legislative immunity fails because Plaintiffs do "not challenge legislative acts," but rather the State Education Officials' "implementation and execution of a state law and policy." *Curling*, 761 F. App'x at 934 (citations omitted).

### B.    State Education Entities

Plaintiffs agree that Counts I-V must be dismissed insofar as they are asserted against the Board of Education and Department of Education because *Young* does not waive sovereign immunity for state agencies. *See* Br. 21-22. But Congress has waived sovereign immunity with respect to Plaintiffs' Title IX claims, so these Defendants should remain in the case under Title IX. 42 U.S.C. §§ 2000d-7; *Williams v. Bd. of Regent of Univ. Sys. of Ga.*, 477 F.3d 1282, 1301 (11th Cir. 2007).

### C.    School Boards

Two School Boards (Orange and Sarasota Counties) argue that they are not properly in this case because the relief sought "may adequately be entered against" the State Defendants. Dkt. No. 63 at 5-8; Dkt. No. 70. But the possibility of relief against other Defendants is irrelevant. And H.B. 1557's statutory structure contemplates that school boards will be deeply involved in the administration and

enforcement of the law.  Moreover, the School Boards are generally responsible "for the actual operation and administration of all schools … in conformity with rules and minimum standards prescribed by the state," which include ensuring "all laws and rules of the State Board of Education … are properly enforced."  Fla. Stat. §§ 1001.30, 1001.41(15).  Thus, the School Boards are proper defendants.

Three School Boards (Broward, St. Johns, and Sarasota Counties) separately argue that they cannot be sued under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because Plaintiffs have not alleged a policy over which the School Boards have responsibility.  ECF 62 at 8-9; ECF 66 at 15-17; ECF 70.  This fails for two reasons.  First, Plaintiffs have indeed identified a relevant policy—namely, the policy and practice of implementing and enforcing H.B. 1557, and the School Boards have made clear that they will "follow" H.B. 1557's mandate.  ECF 66 at 2-3; *see also* ECF 62 at 8-9.  Second, Plaintiffs need not proceed under *Monell* in any event because, as Broward County concedes, their conduct in implementing and enforcing H.B. 1557 "will be as a[n] 'arm of the state.'"  ECF 62 at 9.

Accordingly, Defendants' various immunity arguments should be rejected, and the Court should proceed to consideration of the merits of Plaintiffs' claims.

## III.   H.B. 1557 VIOLATES THE DUE PROCESS CLAUSE

"Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of

them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (citations omitted).  By vesting officials with too much discretionary authority, "vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect."  *Id.*  H.B. 1557 implicates both of these concerns.  It is therefore unconstitutionally vague and must be enjoined under the Fourteenth Amendment.

## A.    H.B. 1557 fails to provide people of ordinary intelligence fair notice of what conduct it prohibits

A law is unconstitutionally vague when it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Wollschlaeger*, 848 F.3d at 1319 (citations omitted).  H.B. 1557 flunks that test. Although courts generally afford "greater tolerance of enactments with civil rather than criminal penalties," when it comes to vagueness challenges, the test that applies to laws that "threaten[] to inhibit … the right to free speech" is "more stringent." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982); *see also Wollschlaeger*, 848 F.3d at 1320 ("narrow specificity" required).

As explained above, H.B. 1557 forbids "school personnel" or "third parties" from (ii) "[c]lassroom instruction" (iii) "on sexual orientation or gender identity." That proscription applies in K-3, "or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards."  H.B. 1557 § 1.  The statute does not define any of these terms.  They must therefore be given their "ordinary, commonly understood meaning."  *Wollschlaeger*, 848 F.3d at

1320.  Read in that light—and notwithstanding the State's best efforts to invent and insist upon a stable, comprehensible interpretation—H.B. 1557 is impermissibly vague.

First consider "school personnel or third parties."  Given its ordinary meaning, "school personnel" encompasses any employee of the school—from teachers to principals to nurses to guidance counselors.  Many such individuals do not typically participate in curricular instruction, contrary to the State's position.  And "third parties" (as the State admits, Br. 20) seemingly captures anyone who does not work for the school, such as students and parents.  H.B. 1557 may thus cover essentially anyone who finds themself at or near a school—or related in any way to a school activity, wherever it may occur.  Vagueness in H.B. 1557's other prohibitions therefore burdens virtually *every* person connected in any way to Florida's schools.

The wide range of persons to whom the law may apply only magnifies the interpretive morass that arises upon consideration of the second undefined term: "classroom instruction."  The word "instruction" encompasses not only "the action, practice, or profession of teaching," but also "the imparting of knowledge, skill, or information."  Oxford English Dictionary, "Instruction" (online ed. June 2022).  Applying these definitions, "classroom instruction" is most certainly not limited solely to the "curriculum," a term the legislature knows how to use, but did not use here.  *See, e.g.*, Fla. Stat. §§ 1003.41, 1003.46, 1003.4995, 1003.49966.  Given its

ordinary sense, "classroom instruction" could reasonably be interpreted to include informal lessons in any classroom or fieldtrip setting.  It could equally reasonably be interpreted to cover any conduct in an educational setting meant to model proper behavior, to impart knowledge, or to instruct on how not to behave (especially in younger years, when knowledge is often imparted through role models and ad hoc, impromptu teachable moments).  *See, e.g.*, AC ¶¶ 220, 227, 229, 230.  This is where the law's vagueness is most obvious: any definition beyond "curriculum" fails to provide fair notice of what is prohibited and what is not, since all manner of routine activity in classrooms or schools might reasonably qualify—indeed, this is exactly why schools throughout Florida have understood H.B. 1557 to potentially impact their policies, practices, and activities in virtually every aspect of the school setting.

This leads to the third undefined term: "on sexual orientation or gender identity."  In relevant part, the *American Heritage Dictionary* defines "on" to mean "concerning" or "about," which connotes an extremely broad relation.  *See also* Br. 18 (offering an equally broad definition of "on" that addresses the "subject of study, *discussion*, or *consideration*" (emphasis added)).  So what does it mean to engage in "classroom instruction" on such contested concepts as "sexual orientation" and "gender identity"?  As another court recently held in allowing a vagueness challenge to a law banning conversion therapy, "sexual orientation and gender identity are difficult to define and encompass a number of factors, including behavior, practices,

identity, attractions, sexual fantasy, romantic attractions, and erotic desires." *Vazzo v. City of Tampa*, No. 8:17-cv-2896, 2019 WL 1048294, at \*9 (M.D. Fla. Jan. 30, 2019), *rep. and rec. adopted sub nom. Vazzo v. City of Tampa, Fla.*, 2019 WL 1040855 (Mar. 5, 2019).  And here, that ambiguity is exacerbated by the fact that H.B. 1557 does not provide any examples whatsoever of what is intended to be covered.  *See King v. Governor of State of New Jersey*, 767 F.3d 216, 240-41 (3d Cir. 2014), *abrogated on other grounds*, *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018); *Falls* MTD at 19-20.

The result is irresolvable uncertainty: Is it "classroom instruction" on "sexual orientation" for a teacher to tell a story in which a child has a mom and a dad?  What about a story where the child has two moms?  What about a story where a princess and a prince fall in love?  Or a story, at homeroom or recess, set during the teacher's summer vacation with his wife (or his husband)?  Or a story whose explicit moral is to not bully people because they have one mom or two?  Or the many other entirely commonplace examples enumerated in the Amended Complaint. *See, e.g.*, AC ¶¶ 11, 52, 69, 92, 102, 112.

The State's entire response to these arguments is to insist that the law refers only to formal curricular instruction, and to claim that it applies only when school personnel or third parties provide such instruction.  *See, e.g.*, Br. 1, 12, 31-34, 44-45.   Even looking to the dictionary it cites, however, H.B. 1557 prohibits

"discussion" or "consideration" of the covered topics.  Br. 18.  That is *much* broader than the State's proposed limited view, which (for the reasons given above) is hardly the most obvious reading of the statutory language.  The State's position also faces a difficulty in the legislative history: legislators not only rejected proposals to clarify that classroom "discussion" was permitted, but also wrote the word "discussion" into the Preamble in describing what is banned.  *See supra* Background, Part B.  And legislators made clear that they wanted to block students from even "hear[ing] about" "different kinds of identities" in schools, AC ¶ 12, a goal that extends far beyond the official curriculum.

Yet even if the Court were to credit the State's "mid-litigation assurances," *contra SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 472 F. Supp. 3d 1297, 1317-18 & n.18 (N.D. Ga. 2020), those assertions collapse upon inspection. For instance, the State contends that a teacher could respond to student-led discussions on LGBT families and identities so long as they do "not handle these situations by teaching about the subjects of sexual orientation or gender identity." Br. 19.  But what does that mean, really?  In truth, it isn't an answer at all, but just a different statement of the same problem.  Indeed, if a child were to come home and tell their parents that there was a discussion about LGBT families and identities, there would be no threading the needle over whether it was "teaching" or not; parents will raise their "concerns" at the slightest hint that their children are hearing about

things they do not like.  The State also overlooks the fact that legislators actually *voted down* an amendment that would have permitted teachers to respond to student questions.  AC ¶ 145.  At bottom, the State has no statutorily grounded answer to how teachers and others may lawfully address run-of-the-mill situations—and "the very absurdity of these possibilities brings into focus the extraordinary ambiguity of the statutory language."  *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286 (1961).[13]  For this reason, H.B. 1557 fails to provide fair notice to a person of ordinary intelligence about what is forbidden and what is permitted—and thereby violates the Constitution.[14]

## B.    H.B. 1557 authorizes and encourages arbitrary and discriminatory enforcement

An independent basis for finding that H.B. 1557 offends due process is that it invites arbitrary and discriminatory enforcement.  Indeed, it does so much more than the law struck down in *Wollschlaeger*, which exposed doctors to "punishment according to the arbitrary whims of annoyed patients."  848 F.3d at 1320.  Not only are parents throughout Florida authorized to commence litigation against schools

---

[13] None of the cases cited by the State, Br. 56, dealt with an expansive law that imposes a nebulous prohibition on certain topics in schools, with no interpretive principles or other way to understand what the law allows and proscribes.  *See Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) (prohibition on employee speech); *California Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) (requiring "teaching personnel" to instruct "curriculum" in English); *Fowler v. Bd. of Educ. of Lincoln Cnty., Ky.*, 819 F.2d 657, 665-66 (6th Cir. 1987) (teacher allowed student to show "controversial, highly suggestive and somewhat sexually explicit movie").

[14] As a fallback, the State maintains that H.B. 1557 is not unconstitutional for grades 4-12 because it has no effect until after the Department of Education adopts standards in 2023.  Br. 16-17.  But, as noted, nothing in H.B. 1557 says that.  To the contrary, H.B. 1557 expressly permits parents to sue immediately, without any enumerated waiting period for grades 4-12, and thus the law apparently contemplates judicial lawmaking while the standards are prepared.

whenever they believe someone said or did something unlawful, even when it wasn't when their own child was there or in their own child's classroom; they are authorized to do so based on a mere "concern."  Thus, they are not at all "constrained by explicit guidelines or ethical obligations," and "there is a real risk of complaints from, for example, political opponents." *Driehaus*, 573 U.S. at 164.  Similarly, the law all but invites one-sided and arbitrary enforcement by parents whose goal is to silence, erase, and discriminate against LGBT people and their families.  *See Woodhull Freedom Foundation v. United States*, 948 F.3d 363, 373-74 (D.C. Cir. 2020); *281 Care Comm. v. Arneson*, 766 F.3d 774, 790 (8th Cir. 2014).

The Amended Complaint makes clear that Plaintiffs' concerns about arbitrary and discriminatory enforcement are not unfounded.  Even before the law went into effect, parents repeatedly lodged complaints about any expressions of support or welcomeness for LGBT people.  *See, e.g.*, AC ¶¶ 118-19, 223, 226.  In contrast, there has not been a similar wave of complaints targeting discussions or representations of heterosexual or cisgender people.  H.B. 1557's private cause of action provisions also render toothless the State's representations in this litigation that *it* does not believe the law should apply beyond curricular speech.  *See, e.g.*, *Steinberg v. Carhart*, 530 U.S. 914, 940 (2000).  Under the irregular regime Florida has created, "individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than

regulation by law." *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1281-82 (N.D. Fla. 2021) (Walker, C.J.) (quotation marks and citation omitted).  While state court judges may not uphold parental claims, that has never been enough to rescue a vague law: the law's invitation to arbitrary enforcement extends to courts as well as parents, and has already made a mockery of the State's litigation-driven claim that H.B. 1557 does not impose disparate impacts or burdens on LGBT people.

## IV.   H.B. 1557 VIOLATES PLAINTIFFS' FIRST AMENDMENT RIGHTS

In addition to violating the Due Process Clause, H.B. 1557 burdens Plaintiffs' First Amendment rights because it improperly denies them the right to receive information and ideas, as well as the right to speak and share ideas.

### A.   The statute violates Plaintiffs' right to receive information and ideas

On its face, H.B. 1557 forbids certain speech in schools.  The State's principal defense to this is a restatement of its claim (described and refuted above) that H.B. 1557 applies only to curricular content—which, in its view, is not subject to the First Amendment.  Br. 31-33.  The first flaw with this theory is that it rests on a faulty premise: H.B. 1557 does not apply only to school curricula, and so it reaches non-government speech that enjoys constitutional protection.  *See infra* Argument, Part III.A.

The second and more fundamental problem with the State's position is that it is foreclosed by binding precedent.  The Supreme Court has recognized that the

41

"right to receive information and ideas" is "nowhere more vital than in our schools and universities." *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (cleaned up). Because that right is "a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom," it may not be restricted "in a narrowly partisan or political manner" or "simply because [officials] dislike the ideas … and seek by their removal to 'prescribe what shall be orthodox….'" *Bd. of Educ. v. Pico*, 457 U.S. 853, 867, 870-72 (1982) (plurality op.) (citations omitted). Similarly, in *Hazelwood School District v. Kuhlmeier*, the Supreme Court held that the government's exercise of its discretion over curriculum must be "reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273 (1988).[15]

Consistent with this precedent, the Eleventh Circuit has held that curricular decisions must comport with the guarantees of the First Amendment. Br. 32-33 (citing *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1521-25 (11th Cir. 1989) (applying *Hazelwood* to removal of textbooks from curriculum)); *see also Searcey v. Harris*, 888 F.2d 1314, 1319-22 (11th Cir. 1989) (applying *Hazelwood* to invalidate curricular restrictions on access to Career Day forum). *Cf. ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1201-02, 1219-20 (11th Cir. 2009) (citing *Virgil* and *Searcey* approvingly and applying *Pico*, *arguendo*, to

---

[15] While the State casts doubt on *Pico*'s precedential value, the Fifth Circuit has recognized that *Pico* offers "useful guidance." *Campbell v. Tammany Parish School Board*, 64 F.3d 184, 189 (5th Cir. 1995).

removal of books from library).  Many other courts have embraced the same view.  *See, e.g.*, *Arce v. Douglas*, 793 F.3d 968, 983-84 (9th Cir. 2015); *Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 972-74 (D. Ariz. 2017); *Pratt*, 670 F.2d at 777-78.

Ignoring these cases, the State contends that curricular content is "government speech" beyond constitutional review.  Br. 32.  But this Court must apply precedent until a decision is issued that actually changes the law."  *United States v. Sailor*, No. 16-cv-319 2018 WL 278740, at *1 (N.D. Fla. Jan. 2, 2018) (Rodgers, C.J.) (citation and quotation marks omitted).  The governing precedent here consists of *Hazelwood*, *Pico*, *Virgil*, and the other authorities cited above.

The few authorities cited by the State do not support the State's position.  Most do not consider students' right to receive information, nor do they mention *Hazelwood* or *Pico*.[16]   *See Kennedy v. Bremerton Sch. Dist.*, No. 21-418, slip op. at 17 (U.S. June 27, 2022) (coach's right to pray on football field after a game); *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340-41 (6th Cir. 2010) (teacher claim for retaliation based on curricular choices); *Mayer v. Monroe Cnty. Comm. Sch. Corp.*, 474 F.3d 477, 479-80 (7th Cir. 2007) (similar).

---

[16] Even as to teacher's speech rights, the Supreme Court has left open the question of whether *Garcetti v. Ceballos*, 547 U.S. 410 (2006), applies to classroom instruction, *id.* at 425.  And *United States v. American Library Association, Inc.*, 539 U.S. 194 (2003), concerns public libraries, not public-school libraries (or public schools more generally).

*Cf. Acosta*, 2012 WL 12829991, at \*5-6 (agreeing with *Evans-Marshall* as to teacher's claim but finding student stated right to receive information claim).[17]

There is good reason why neither the Supreme Court nor the Eleventh Circuit has adopted the State's view: were schools not subject to constitutional limitations in setting curricular content, they could adopt a curriculum that teaches that one race is superior to another, that women belong at home rather than in the workplace, or that any other constitutionally protected group should be despised and discriminated against. That would defy the very concept of equal protection; it would also invite each generation to imbue prejudice in the next through a public institution, so long as local or state officials with sufficient power over curricula wished to do so.

A wall of precedent stands against that threat. The Supreme Court has thus affirmed that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," and "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 507, 512 (1969) (citation omitted). As the "nurseries of democracy," schools must protect even "unpopular ideas." *Mahanoy Area Sch. Dist. v. B.L. ex. rel. Levy*, 141 S. Ct. 2038,

---

[17] The sole exception is *Chiras v. Miller*, which rejected a textbook author's challenge to Texas's refusal to approve his textbook because that decision was government speech (explicitly at odds with *Virgil*) and went on to reject the student's right to receive information claim (at odds with *Hazelwood*). 432 F.3d 606, 614-19 (5th Cir. 1995). That decision is non-binding. *See Arce*, 793 F.3d at 982 (declining to follow *Chiras* because analysis did not involve "a *student's* First Amendment rights" and was "accordingly inapplicable" to case involving restriction of curricular courses).

2046 (2021).  They cannot be used to single out disfavored groups and "generate[] a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."  *Brown v. Board of Education*, 347 U.S. 483, 493-94 (1954).

As a fallback, the State asserts that even if H.B. 1557 is subject to judicial review, such review amounts to a rubber stamp.  Br. 34.  But that grossly "overstates the deference a court may pay to [education-related] decisions."  *Searcey*, 888 F.2d at 1321.  The State must come forward with "evidence" to explain and justify its choice, and a lack of evidence can "support the inference that the [law] … was intended to suppress [a disfavored] viewpoint."  *Id.* (citation omitted).

Here, H.B. 1557 is not based upon a legitimate pedagogical interest.  The State claims that sexual orientation and gender identity are "sensitive" topics of "political controversy," which should be "taught by parents."  Br. 35-36 (citations omitted).  But even if that were true, a blanket ban on any discussion or acknowledgment of LGBT people is not reasonably related to the State's asserted pedagogical interest.  *See, e.g.*, *Virgil*, 862 F.2d at 1525; *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980).  There are many LGBT students, teachers, families, and parents in Florida's public school system, and they will remain in that system regardless of whether their very existence is deemed "sensitive."  The Constitution protects their right to do so.  *See Masterpiece Cakeshop, Ltd. v. Colorado C.R.*

*Comm'n*, 138 S. Ct. 1719, 1727 (2018) ("[G]ay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth.").  As alleged, however, H.B. 1557 is at odds with that promise; it was intended to impose (and has in fact imposed) a near-categorical ban on addressing LGBT people and issues in virtually every aspect of the life of Florida's schools.  Even the State does not defend the idea that Florida has an interest in prohibiting teachers from opposing the bullying of LGBT children, or in preventing references to gay or transgender people in literature, or in censoring students when they speak about their families.  But that is what H.B. 1557 (shorn of the State's litigation-driven interpretation) does.  It is thus massively overinclusive relative to any asserted state interest, and so it is unconstitutional.

Regardless, and as addressed below in relation to Plaintiffs' equal protection claim, the State's asserted interest paints a false picture.  As alleged in the Amended Complaint, H.B. 1557 was motivated by key lawmakers' hostility to LGBT people—and by their intent to suppress speech about LGBT issues in hopes of advancing their own preferred "core belief systems and values."  *See supra* Background, Part B. That is not a legitimate pedagogical interest, nor is it a legitimate use of state power over public schools.  *See, e.g.*, *ACLU of Fla., Inc.*, 557 F.3d at 1227; *Searcey*, 888 F.2d at 1319 n.7; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1300 (10th Cir. 2004); *Pratt*, 670 F.2d at 779; *Gonzalez*, 269 F. Supp. 3d at 973-74.  Any doubt on this score is dispelled by legislators' repeated decision to reject amendments that would

have clarified the law, avoided a chilling effect, and limited its foreseeable and significant damage to LGBT people in Florida.  Federal courts "have not hesitated to look beyond the stated reasons for" education-related decisions.  *Virgil*, 862 F.2d at 1522 n.6.  Here, the Amended Complaint plausibly alleges (and the legislative history shows) that H.B. 1557 was motivated at least in part (and really, in substantial part) by illegitimate interests.[18]

## B.   H.B. 1557 violates Plaintiffs' right to speak and share ideas

Plaintiffs separately allege a violation of their own rights to free speech.  To the extent that Plaintiffs' speech is curricular (*i.e.*, school-sponsored, like Moricz's graduation speech), it is subject to *Hazelwood*, and H.B. 1557 violates the First Amendment for the reasons given above.  Notably, the State admits that H.B. 1557 would indeed prohibit student speech if it occurred in a curricular setting.  Br. 20.

Independently, and also as explained above, H.B. 1557 covers substantial non-curricular student speech.  This is confirmed by the law's reference to "third parties" and "discussion," and by legislators' rejection of amendments that would have carved out student-to-student discussions.  H.B. 1557 thus encompasses "pure speech."  *Tinker*, 393 U.S. at 514.  As a matter of law, such speech must be permitted unless there are "facts which might reasonably have led school authorities to forecast

---

[18] While the State contends that Plaintiffs' right to receive information claims cannot be predicated upon improper motive under *United States v. O'Brien*, 391 U.S. 367 (1968), *O'Brien* dealt with a claim based upon freedom of speech and did not mention the right to receive information or *Pico* or *Hazelwood*, both of which looked to underlying motive.

substantial disruption of or material interference with school activities…." *Id.* The State has not even attempted to show that it meets this standard—and so H.B. 1557 is unconstitutional with respect to this substantial set of applications.[19]

To the extent that the State now resists, the Amended Complaint contains detailed allegations that H.B. 1557 has unconstitutionally burdened both curricular and non-curricular student speech. For example, Plaintiffs Berg and Washington have said they will change their curriculum to remove LGBT issues, thus censoring what students discuss. AC ¶¶ 217, 222. Plaintiff Shook's daughter's teacher told her not to bring in a picture of herself marching in the Miami Pride parade to contribute to a lesson on Women's History Month. *Id.* ¶ 198. Plaintiffs Dan and Brent VanTice's sons understand they cannot bring in a picture of their family and talk about their family for an assignment. *Id.* ¶¶ 205-08. Plaintiff Morrison's son was told by his teacher not to talk about his two moms at school. *Id.* ¶ 199. And Plaintiff Moricz's teachers informed him that they will need to remove their images of support, including Pride flags and rainbows, from their classrooms—the type of conduct that will chill students' expression of solidarity and support as well. *Id.* ¶ 184. In these and many other respects, H.B. 1557 is offensive to the First Amendment.

---

[19] H.B. 1557 is overbroad because it "prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits." *Dream Defs.*, 559 F. Supp. 3d at 1283.

## V.  H.B. 1557 VIOLATES THE EQUAL PROTECTION CLAUSE

As lawmakers admitted while drafting it, H.B. 1557's discriminatory effects are a feature, not a bug.  The law thus violates the Equal Protection Clause.

### A.  H.B. 1557 was motivated by discrimination

The Amended Complaint alleges with particularity that sexual orientation and gender identity were at least "motivating factor[s]" behind H.B. 1557's passage under the eight-factor test in *Greater Birmingham Ministries v. Secretary of State of for State of Alabama*, 992 F.3d 1299, 1321-22 (11th Cir. 2021) ("*GBM*").  That test looks to:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departure; (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.

*GBM*, 992 F.3d at 1321-22.  Determining motivation is a "fact intensive examination of the record," *GBM*, 992 F.3d at 1322 n.33, which "does not lend itself to dismissal in the pleading stages where the record is not fully developed," *Dream Defenders*, 553 F. Supp. 3d at 1094; *see also Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).[20] The presence of even a single *GBM* factor can suffice to defeat a motion to dismiss. *See, e.g.*, *Jean v. Nelson*, 711 F.2d 1455, 1489-90 (11th Cir. 1983).

---

[20] The State's contention that H.B. 1557 is not subject to the Equal Protection Clause because it is "government speech," Br. 42, fails for the same reasons that the law is subject to the First Amendment, *see supra* Argument, Part IV.A.

Here, the *GBM* factors powerfully indicate, and at least plausibly show, that sexual orientation and gender identity were "motivating factors" behind H.B. 1557.

The law's impact, and the foreseeability and knowledge of that impact.  As described *supra*, Background, Part D, the Amended Complaint alleges at length the many ways in which H.B. 1557 has already had (and will continue to have) a disparate impact on LGBT people.  Simply put, LGBT students, parents, and teachers are hearing loud and clear that they are not welcome, that any discussion of their existence (or their needs) is dangerous, and that schools are increasingly unsafe for them if they face bullying, hostility, or discrimination.  Moreover, that message is being directed at LGBT kids or the children of LGBT parents—and *not* at straight or cisgender people—from every single level of government in Florida.  And in reality, it is more than just a message: it is a lived reality, described through many detailed allegations in the Amended Complaint, of being treated worse in very concrete ways.  These disparate impacts are especially unnerving because LGBT students already face heightened mental and physical risks in Florida's schools, many of which have responded to H.B. 1557 by removing safe spaces, student groups, and anti-bullying measures.  *See* AC ¶¶ 162-72.

Against all this, the State offers the conclusory response that H.B. 1557 does not subject "Plaintiffs (or anyone else) to differential treatment."  Br. 39.  That is a factual claim, not a legal one, and Plaintiffs are entitled to test it in discovery and

dispute it at trial.  To the extent the State's position is that H.B. 1557 is incapable of uniquely disadvantaging LGBT people, or subjecting them to a disparate impact, the Amended Complaint (and the lived experience of many thousands of people throughout Florida, including Plaintiffs) stands against that blithe assertion.

The law's historical background, and the specific sequence of events leading up to passage.  The events surrounding H.B. 1557's enactment further support a finding of discriminatory motive.  The Amended Complaint identifies numerous statements from Governor DeSantis, legislators, and other supporters in the lead-up to the law's passage that focused directly on LGBT persons and identities—and not at all on heterosexuality or cisgender identity.  AC ¶¶ 126-37; *see, e.g.*, *Dream Defenders*, 553 F. Supp. 3d at 1094.  Perhaps most notably, Governor DeSantis's spokesperson and other supporters labelled the law the "Anti-Grooming Bill," AC ¶ 136, which is so notoriously anti-LGBT that it cannot even be called a dog whistle.[21]  These statements also include the Senate Sponsor's comments that the law was needed because parents are "very concerned about the departure from the core belief systems and values," and specifically about kids "coming out" or hearing about "different kinds of identities."  *Id.* ¶¶ 127, 136.  As one Florida Senator presciently remarked during the legislative debates, these sorts of comments are

---

[21] *See* Monica Hesse, *Fans of Florida's 'Don't Say Gay' bill have a new favorite word: 'grooming,'* WASH. POST (Mar 12, 2022), https://www.washingtonpost.com/lifestyle/2022/03/12/florida-dont-say-gay-bill/ (cited in AC ¶ 31).

exactly "what the court points to and quotes as a prima facie case, on its face, of invidious discrimination…." *Id.* ¶ 127.

But there is more. H.B. 1557 uses tired tropes of "depravity" (and "grooming") to try to justify discriminating against LGBT people in the academic environment, *id.* ¶ 157, and it follows directly in the footsteps of decades of previously invalidated "No Promo Homo" laws that tried to accomplish expressly what H.B. 1557 seeks to do under cover of "neutrality," *id.* ¶ 278. *See, e.g.*, *City of S. Miami v. DeSantis*, 424 F. Supp. 3d 1309, 1344 (S.D. Fla. 2019). Moreover, the Amended Complaint explains how H.B. 1557 is part of a persistent pattern of efforts by the Florida Legislature and Governor to harm LGBT people. *See* AC ¶¶ 134-35, 138.

The State does not even try to defend most of these discriminatory statements, and its efforts to sanitize the legislative record fall short. It relies heavily on general references to a "presumption of legislative good faith"—a presumption that belongs mainly to the redistricting context (given the unique deference owed to states in that field).[22] The State also complains that Plaintiffs rely on "cherrypicked statements."

Both arguments miss the mark. In contrast to *League of Women Voters of Florida, Inc. v. Florida Secretary of State*, this is not an instance of a "statement by

---

[22] The State does not cite any authority applying the presumption outside of that context, and authorities cited by the State in other contexts do not mention any such presumption. *See* Br. 43.

a single legislator." 32 F.4th 1463, 1373 (11th Cir. 2022). Nor is this case like *GBM*, where the plaintiffs relied on statements by the sponsor about a separate bill. 992 F.3d at 1324-25. To the contrary, Plaintiffs' claim is supported by a stream of comments from the House Sponsor, the Senate Sponsor, the Governor, and the Governor's spokesperson. And it is powerfully bolstered by many additional considerations—including a legislative pattern of rejecting proposed amendments to H.B. 1557 that makes no sense without reference to discriminatory purpose, the absence of any legislative effort to assess the burden of the law on LGBT people, the stark over-inclusiveness of the law relative to its stated purpose, the consistency of legislative statements with the law's discriminatory effects, and the State's retaliation against entities like Disney that have dared to criticize H.B. 1557. It is also striking that the Governor and other senior officials are apparently content to sit idly by—without making any statements or issuing any guidance—while LGBT people throughout Florida experience discrimination and suffering under an interpretation of H.B. 1557 that the Solicitor General has supposedly deemed so unreasonable that he thinks it cannot support a claim.

Simply put, the "contemporary statements and actions of key legislators"—as well as conduct and statements by others involved in the enactment of H.B. 1557— make clear that this law was passed with discriminatory motives. *City of South Miami*, 424 F. Supp. 3d at 1345. At the pleading stage, where the State is not entitled

to bend inferences in its own favor, Plaintiffs' allegations are more than sufficient, particularly since Plaintiffs need only show that discrimination is "a motivating factor" behind H.B. 1557, not "the dominant or primary one." *Dream Defenders*, 553 F. Supp. 3d at 1093.

Substantive departure.  In addition, Plaintiffs have plausibly alleged that H.B. 1557 amounts to a departure from substantive principles embodied in existing law. *See, e.g.*, *City of South Miami*, 424 F. Supp. at 1343.  The State here opted to pass a total ban on classroom instruction on certain disfavored topics—and to single out a protected class for discriminatory treatment—in defiance of the State's longstanding commitments to providing a meaningful education for all children, not to mention schools' efforts to meet those commitments through guidelines that are being scaled back or rescinded.  AC ¶ 253.  The State also acted in a manner contravening federal cases recognizing that LGBT persons are at home in our constitutional order.  *See supra* Background, Part B.  These departures, especially when viewed along with the legislative record, further indicate an illicit motive.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1977).

The availability of less discriminatory alternatives.  Finally, the Amended Complaint—and H.B. 1557 itself—make clear that there were less-discriminatory alternatives short of a ban on classroom instruction on LGBT issues and identities. Again, the State insists that the primary motive for the law was not discrimination,

but rather ensuring that parents have adequate information about their children's well-being.  Br. 4-11.  But another provision of the law not being challenged here already addresses that concern.  Fla. Stat. § 1001.42(8)(c)(1).  And the State's alternative formulation of its interests is inconsistent with (a) the breadth of H.B. 1557 as understood by everybody except the State Defendants in this case; (b) legislators' repeated rejection of amendments that would have far more effectively, and less painfully, accomplished these supposed purposes; and (c) the experience of many other states, which have managed to protect core interests without such discriminatory attacks on LGBT people.  The State maintains that H.B. 1557 applies *only* to the curriculum and describes its interests by reference to that view, but if H.B. 1557 does apply much more broadly (as it seems to), the State has no credible explanation for why less-discriminatory alternatives (including actually using the word "curriculum" in the statute) were not available.

### B.    The State fails to show that H.B. 1557 would have been enacted in the absence of an improper motivation

Because Plaintiffs have plausibly alleged that discrimination on the basis of sexual orientation and gender identity was a motivation for H.B. 1557's passage, the burden shifts to the State to "demonstrate that the law would have been enacted without this [improper] factor."  *GBM*, 992 F.3d at 1321.  The State has not tried to carry that burden here and has thus waived the point.  Nor could it, given the detailed

allegations in the Amended Complaint. *See Dream Defenders*, 553 F. Supp. 3d at 1095; *cf. City of South Miami*, 424 F. Supp. 3d at 1345.

## VI.    H.B. 1557 VIOLATES TITLE IX

For reasons similar to those just explained, H.B. 1557 violates Title IX of the Education Amendments of 1972:  it discriminates on the basis of sexual orientation and gender identity in the provision of educational benefits.  20 U.S.C. § 1681(a).

Ticking through the elements of the statute, the Amended Complaint plausibly alleges that the student Plaintiffs (and student members of the organizational Plaintiffs) are part of a protected class, *see, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); that they have been (and will substantially likely be) subjected to adverse educational actions; that heterosexual and cisgender students who are similarly situated have been (and will be) treated more favorably; and that Plaintiffs are qualified to receive educational benefits on the same terms as their non-LGBT peers.  *See Pinkston v. Univ. of S. Fla. Bd. of Trustees*, No. 8:15-cv-1724, 2016 WL 3196474, at *1 (M.D. Fla. June 9, 2016).[23]

Once again, the State contends that Title IX has no application because H.B. 1557 applies only to "'classroom instruction'—*i.e.*, curricular materials," and "Title

---

[23] The Department of Education and Board of Education do not dispute that they are recipients of federal funds and "covered institutions" under Title IX. AC ¶¶ 83-86; *see also* Br. 51-54.

IX does not 'require or prohibit or abridge in any use the use of particular textbooks or curricular materials.'"  Br. 52 (quoting 34 C.F.R. § 106.42).  But this argument does not succeed.  While the federal government may not regulate *formal* or *written* curricular materials under Section 106.42,[24] H.B. 1557 applies well beyond such materials and therefore collides with the proscriptions of Title IX.  Under settled precedent interpreting Section 106.42's limited restriction, the State cannot rely on that provision to justify a broad denial of educational benefits on equal terms.

## VII.   DEFENDANTS' REMAINING ARGUMENTS LACK MERIT

Several School Board Defendants argue that this case must be dismissed on grounds that the other Defendants do not raise.[25]  Those contentions are groundless.

Pasco, Orange, and Sarasota Counties argue that the Amended Complaint must be dismissed because the "home venue privilege" permits them to insist on litigation in their home district for any claims against them.  ECF 60 at 4, 8-9; ECF 63 at 3-5; ECF 65 at 27-30.  But the home-venue privilege is a state common-law rule that does not prevail over federal venue rules and therefore "does not bind a federal court.  Rather, federal law controls the question of proper venue."  *Young v. Corizon LLC*, No. 4:18-cv-444, 2019 WL 2587813, at *4 (N.D. Fla. May 21, 2019)

---

[24] *See* 34 C.F.R. § 106.42; *Edison v. Doublery*, 604 F.3d 1307, 1309 (11th Cir. 2010) (recognizing canon *noscitur a sociis*); *Shorter v. St. Cloud State Univ.*, No. 00-cv-1314, 2001 WL 912367, at *1, 10 (D. Minn. Aug. 14, 2001); *Grimes by and Through Grimes v. Sobol*, 832 F. Supp. 704, 707, 712-13 (S.D.N.Y 1993).

[25] As stated in our letter dated July 18, 2022, Plaintiffs agree with the School Boards that their claim for punitive damages must be stricken.  *See, e.g.*, *Abrams-Jackson v. Avossa*, No. 16-cv-81624, 2017 WL 1153895, at *5 (S.D. Fla. Mar. 28, 2017).

(Frank, M.J.), *rep. and rec. adopted*, 2019 WL 2583156 (N.D. Fla. June 24, 2019) (Hinkle, J.) (collecting cases).

The same Defendants also contest venue under 28 U.S.C. § 1391 because they purportedly lack sufficient contacts with this district.  ECF 60 at 5-6; ECF 63 at 5, 11-13; ECF 65 at 27-29.  They ignore that the venue statute provides, without exception, that venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).[26]

Next, Sarasota, St. Johns, and Manatee Counties contend that the Amended Complaint must be dismissed as an improper "shotgun pleading."  ECF No. 65 at 10-13; ECF 66 at 8-10; ECF 67 at 22-24.  But this is not an instance where the pleading fails "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests," *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015), or where Plaintiffs have tried to "confuse the 'enemy,' and the court," *Barmapov v. Amuial*, 986 F.3d 1321, 1324 (11th Cir. 2021).  Plaintiffs included factual detail about their own experiences in order to meet the pleading standards, not to flout them.  The School Board Defendants are clearly able to respond to the Amended Complaint on the merits, as is evident from the many

---

[26] Orange County argues that venue should be transferred to the Middle District of Florida.  ECF 63 at 11-13.  But it does not and cannot contend that Plaintiffs could have brought this action against all Defendants in that district.  Br. 12; *see Windmere Corp. v. Remington Prod., Inc.*, 617 F. Supp. 8, 10 (S.D. Fla. 1985).

pages of briefing devoted to their arguments for dismissal.  *See, e.g.*, *Dream Defenders*, 553 F. Supp. 3d at 1092.

In any event, it is not the case that the Amended Complaint "asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which specific acts." ECF 65 at 4; *see id.* at 12.  Quite the opposite: the Amended Complaint attributes specific actions and connections to each Defendant.  To the extent Defendants are confused (and there is no good reason why they should be), Plaintiffs hereby clarify that they all allege claims against the State Defendants and they each allege claims against their own local school boards.

It is equally incorrect that the Amended Complaint is "replete with conclusory and immaterial facts that bear no relation to any of the causes of action." ECF 65 at 11.  While Sarasota County cites Plaintiff Moricz's conversation with his school principal as an example of supposedly "conclusory and immaterial facts," *id.* at 11-12, the Amended Complaint relates these facts directly to the passage of H.B. 1557 and the resulting harm to Moricz from infringement to his First Amendment rights, *see* AC ¶¶ 174-77.  *Barmapov*, on which Defendants rely nearly exclusively, is readily distinguishable since it involved "immaterial factual allegations, including five pages and 24 paragraphs of irrelevant details about the alleged criminal backgrounds of some of the defendants." 986 F.3d at 1325.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motions to dismiss, with the following caveats: (i) Plaintiffs' claims against Governor DeSantis are dismissed pursuant to Plaintiffs' Notice of Voluntary Dismissal Without Prejudice of Claims Against Defendant Ronald D. DeSantis, being filed concurrently herewith; (ii) Plaintiffs will not pursue Counts I-V against Defendants Florida State Board of Education and Florida Department of Education; and (iii) Plaintiffs hereby withdraw their request for punitive damages.

Dated: July 27, 2022

Roberta A. Kaplan (NY #2507093)*
John C. Quinn (NY #4965000)*
Kate M. Doniger (NY #5128251)*
D. Brandon Trice (NY #5140017)*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, New York 10118
Tel.: (212) 763-0883
rkaplan@kaplanhecker.com

Joshua Matz (DC #1045064)*
Valerie L. Hletko (DC #485610)*
KAPLAN HECKER & FINK LLP
1050 K Street, NW, Suite 1040
Washington, D.C. 20001
Telephone: (212) 763-0883
jmatz@kaplanhecker.com

Christopher Stoll (CA #179046)
NATIONAL CENTER FOR LESBIAN RIGHTS

60

870 Market Street, Suite 370
San Francisco, California 94102
Tel.: (415) 392-6257
CStoll@nclrights.org

Michael W. Weaver (IL #6291021)*
MCDERMOTT WILL & EMERY LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Tel.: (312) 984-5820
mweaver@mwe.com

Joseph M. Wasserkrug (FL #112274)
MCDERMOTT WILL & EMERY LLP
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
jwasserkrug@mwe.com

Elizabeth F. Schwartz (FL #114855)
ELIZABETH F. SCHWARTZ, P.A.
3050 Biscayne Blvd., Suite 600
Miami, Florida 33137
liz@elizabethschwartz.com

*Attorneys for Plaintiffs*

*\*admitted pro hac vice*

## **CERTIFICATE OF WORD COUNT**

Consistent with the Order of this Court (ECF 71), this brief contains 14,997

words.