# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

EQUALITY FLORIDA, et al.,

    Plaintiffs,

v.

FLORIDA STATE BOARD OF
EDUCATION, et al.,

    Defendants.

Case No. 4:22-cv-134-AW-MJF

**BRIEF OF THE DISTRICT OF COLUMBIA AND THE STATES OF
NEW JERSEY, CALIFORNIA, COLORADO, CONNECTICUT,
DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND,
MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW YORK,
AND OREGON AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION AND INTEREST OF AMICI .................................... 1

SUMMARY OF ARGUMENT ............................................................ 3

ARGUMENT ................................................................................... 4

    I.    Amici States' Experiences Undermine Florida's Contention That Its Extreme Act Has A Legitimate Pedagogical Purpose .................... 4

        A.    Unlike Florida's Act, Amici States' education policies serve the legitimate pedagogical purpose of including and protecting LGBTQ people ......................................... 6

        B.    Instead of censoring or restricting speech like Florida, Amici States equip educators to address LGBTQ topics.......... 10

        C.    Florida stands apart from states by subjecting school communities to costly litigation for their legitimate instructional choices................................................. 15

    II.    Florida's Act Stigmatizes LGBTQ Youth In Florida, And Its Stigmatic Harms Extend To Amici States ......................................... 19

        A.    The Act stigmatizes LGBTQ youth in Florida and Amici States ........................................................................... 19

            1.    Educational decisions that stigmatize LGBTQ youth directly harm mental health and educational outcomes ...................................................... 20

            2.    The Act will increase anti-LGBTQ bias........................ 23

        B.    The Act's harms extend beyond Florida and will require Amici States to expend additional funds ................................. 25

CONCLUSION.............................................................................. 28

# TABLE OF AUTHORITIES

*Cases*

*Ambach v. Norwick*, 441 U.S. 68 (1979) .................................................. 15

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) ........................................ 5

*Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208 (11th Cir. 2004) ........... 5

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ............................................. 1

*Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991) ..................................... 5

*Blau v. Ft. Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005) .................... 17

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ........................................ 1, 17

*Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996) .......... 5

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) .............................. 6

*Gay-Straight All. of Yulee High Sch. v. Sch. Bd. of Nassau Cnty.*,
    602 F. Supp. 2d 1233 (M.D. Fla. 2009) ............................................ 14

*Gillman ex rel. Gillman v. Sch. Bd. for Holmes Cnty.*,
    567 F. Supp. 2d 1359 (N.D. Fla. 2008) ............................................ 14

*Gonzalez through Gonzalez v. Sch. Bd. of Okeechobee Cnty.*,
    571 F. Supp. 2d 1257 (S.D. Fla. 2008) ............................................ 14

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ............................... 4

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ............................. 14

*Lee v. Weisman*, 505 U.S. 577 (1992) ................................................ 14

*Leebaert ex rel. Leebaert v. Harrington*,
    193 F. Supp. 2d 491 (D. Conn. 2002) ............................................... 9

*Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32 (1928) ........................... 2

*Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038 (2021)... 1, 13

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018) .......... 6

*Milliken v. Bradley*, 418 U.S. 717 (1974) ................................................................ 15

*Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir. 1996) ...... 14

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ............................................................. 8

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) ......................................................... 9

*Reno v. ACLU*, 521 U.S. 844 (1997) ...................................................................... 10

*Romer v. Evans*, 517 U.S. 620 (1996) ............................................................ 2, 3, 18

*Searcey v. Harris*, 888 F.2d 1314 (11th Cir. 1989) ........................................... 5, 10

*United States v. Alvarez*, 567 U.S. 709 (2012) ................................................. 2, 11

*Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989) ................. 10

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .................................... 1

### Statutes and Regulations

Act of Mar. 28, 2022, 2022 Fla. Sess. Law Serv. Ch. 2022-22 (West).................... 2

Cal. Educ. Code § 200 ............................................................................................... 7

Cal. Educ. Code § 220 ............................................................................................... 7

Cal. Educ. Code § 234.1(a)-(c) ................................................................................. 7

Cal. Educ. Code § 51101(a)(8) ............................................................................... 17

Cal. Educ. Code § 51204.5 ........................................................................................ 8

Cal. Educ. Code § 60000(b)..................................................................................... 15

Colo. Rev. Stat. § 22-1-104(1)(a) ............................................................................. 8

Colo. Rev. Stat. § 22-1-104(3)(a) ............................................................. 16

Conn. Gen. Stat. § 10-15c(a) ...................................................................... 7

Conn. Gen. Stat. § 10-25b(b) ...................................................................... 8

Conn. Gen. Stat. § 10-25b(d) ..................................................................... 16

Conn. Gen. Stat. § 10-222d(a)(1)................................................................ 7

Conn. Gen. Stat. § 10-222d(b) .................................................................... 7

D.C. Code § 2-1402.41(1)........................................................................... 7

D.C. Code § 2-1535.01(2)(A)(i) .................................................................. 7

D.C. Code § 2-1535.03 ............................................................................... 7

Fla. Stat. § 1001.42(8)(c)(3) ....................................................................... 2

Fla. Stat. § 1001.42(8)(c)(7)(b)(II) ...................................................... 15, 17

Fla. Stat. § 1014.04 ................................................................................... 18

105 Ill. Comp. Stat. § 5/27-21.................................................................... 8

105 Ill. Comp. Stat. § 5/27-23.7(a) ............................................................ 7

775 Ill. Comp. Stat. § 5/1-103(O-1) ........................................................... 7

775 Ill. Comp. Stat. § 5/5-101(A)(11) ........................................................ 7

775 Ill. Comp. Stat. § 5/5-102(A) ............................................................... 7

Mass. Gen. Law ch. 71, § 37O(d)(1) .......................................................... 7

Mass. Gen. Law ch. 71, § 37O(d)(3) .......................................................... 7

Mass. Gen. Law ch. 76, § 5.......................................................................... 7

Md. Code Ann., Educ. § 4-111 .................................................................. 16

Md. Code Ann., Educ. § 4-112(a) ............................................................... 16

Md. Code Ann., Educ. § 7-424.1 ................................................................. 7

Md. Code Ann., Educ. § 7-424(a)(2)(i)(1) .................................................. 7

Md. Code Ann., Educ. § 7-424(b)(1) .......................................................... 7

Mich. Comp. Laws Ann. § 380.1137(1)(a) ................................................. 17

Minn. Stat. § 120B.021(2)(b)(2) ................................................................ 15

Minn. Stat. § 120B.20 ............................................................................... 17

Minn. Stat. § 121A.031(2)(g) .................................................................... 7

Minn. Stat. § 121A.031(3) ........................................................................ 7

Minn. Stat. § 363A.03(44) ........................................................................ 7

Minn. Stat. § 363A.13(1) .......................................................................... 7

N.J. Stat. Ann. § 18A:35-4.35 ................................................................... 8

N.J. Stat. Ann. § 18A:35-4.36 ................................................................... 16

N.J. Stat. Ann. § 18A:37-14 ...................................................................... 7

N.J. Stat. Ann. § 18A:37-15 ...................................................................... 7

N.J. Stat. Ann. § 10:5-4 ............................................................................ 7

N.J. Stat. Ann. § 10:5-5(*l*) ....................................................................... 7

N.Y. Educ. Law § 12(1) ............................................................................ 7

N.Y. Exec. Law § 296(4) ........................................................................... 7

Nev. Rev. Stat. § 388.122(1)(c) ................................................................. 7

Nev. Rev. Stat. § 388.133 .......................................................................... 7

Nev. Rev. Stat. § 388.132(6)(a) ................................................................ 7

Nev. Rev. Stat. § 389.061(1) ................................................................... 16

Nev. Rev. Stat. § 389.061(1)(b) ............................................................... 8

Nev. Rev. Stat. § 651.070 ....................................................................... 7

Or. Rev. Stat. § 329.045(1)(b)(B)(vi) ....................................................... 8

Or. Rev. Stat. § 329.045(1)(b)(C) ........................................................... 16

Or. Rev. Stat. § 339.351(3) ..................................................................... 7

Or. Rev. Stat. § 339.356 ......................................................................... 7

Or. Rev. Stat. § 659.850 ......................................................................... 7

5-E DCMR § 2401.2 ............................................................................. 11

8 N.Y.C.R.R. § 100.2(jj)(2) ...................................................................... 7

8 N.Y.C.R.R. § 100.2(jj)(3)(i) ................................................................... 7

Conn. Agencies Regs. § 10-145d-400a(b)(1)(B) ..................................... 11

Conn. Agencies Regs. § 10-145d-400a(b)(1)(C) ..................................... 11

Md. Code Regs. § 13A.01.06.03(B)(5)(d) ................................................. 7

Md. Code Regs. § 13A.01.06.03(B)(5)(j) .................................................. 7

Md. Code Regs. § 13A.01.06.04 ............................................................... 7

Nev. Admin. Code § 388.880(2)(a) ......................................................... 13

*Administrative Guidance*

Cal. Dep't of Educ., *Frequently Asked Questions: Senate Bill 48* (Oct. 8, 2021) .......................................................................................... 16

Cal. Dep't of Educ., *Frequently Asked Questions - School Success and Opportunity Act (AB 1266)* (Sept. 16, 2021) ...................................................... 12

Cal. Dep't of Educ., *Legal Advisory Regarding Application of California's Antidiscrimination Statutes to Transgender Youth in Schools* (Sept. 16, 2021) .............................................................................................................. 12

Conn. State Dep't of Educ., *Guidance on Civil Rights Protections and Supports for Transgender Students: Frequently Asked Questions* (Sept. 2017) .............................................................................................................. 12

D.C. Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance* (June 2015) .......................................................................................... 12, 16

D.C. State Bd. of Educ., Soc. Studies Standards Advisory Comm., *Social Studies Standards Guiding Principles* 8 (Dec. 16, 2020) ................................... 8

Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* (July 25, 2016) .......................................................................................................... 13

Ill. Inclusive Curriculum Advisory Council, *Inclusive Curriculum Implementation Guidance: Condensed Edition* ............................................ 8, 16

Ill. State Bd. of Educ., *Non-Regulatory Guidance: Supporting Transgender, Nonbinary, and Gender Nonconforming Students* (Mar. 1, 2020) .................... 12

Me. Dep't of Educ., *LGBTQ+ Studies* ..................................................................... 8

Md. State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-conforming Youth: Guidelines for Gender Identity Non-discrimination* (Oct. 2015) .................................................................................. 12

Mass. Dep't of Elementary & Secondary Educ., *Defending Democracy at Home: Advancing Constitutional Rights, Obergefell v. Hodges (2015) Same-Sex Marriage* (Oct. 2018) ......................................................................... 8

Mass. Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (Oct. 28, 2018) .......................................................................................................... 12

Mich. C.R. Comm'n, *Interpretive Statement 2018-1* (May 21, 2018) .................... 7

Mich. Dep't of Educ., *Creating Safe Schools for Sexual Minority Youth* .............. 13

Mich. Dep't of Educ., *Michigan Department of Education's Lesbian, Gay, Bisexual, Transgender and Questioning (LGBTQ+) Students Project at a Glance* ......................................................... 20

Mich. State Bd. of Educ., *Model Anti-Bullying Policy* (Dec. 8, 2020) ................... 7

Mich. State Bd. of Educ., *Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students* (Sept. 14, 2016) ............................................. 12

Minn. Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* (Sept. 25, 2017) ......... 12, 16

Nev. Dep't of Educ., *Supporting Sex/Gender Diverse Students* ............................ 12

N.J. Dep't of Educ., *Transgender Student Guidance for School Districts* ............. 12

N.Y. State Educ. Dep't, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* (July 2015) ................................................................. 13

Or. Dep't of Educ., *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* (May 5, 2016) ...... 12

Vt. Agency of Educ., *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* (Feb. 23, 2017) ................ 12

*Other Authorities*

Am. Pub. Health Servs. Ass'n, *ICPC FAQ's* ......................................................... 25

April J. Ancheta, Jean-Marie Bruzzese, & Tonya L. Hughes, *The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review* (Apr. 2021) ................................................. 21

Kellan Baker, et al., Ctr. for Am. Progress, *The Medicaid Program and LGBT Communities: Overview and Policy Recommendations* (Aug. 9, 2016) ........... 26

Commonwealth of Mass., *The Safe Spaces for LGBTQIA+ Youth Program Engage Youth Who Are LGBTQIA+* ................................................................ 27

Todd A. DeMitchell & Joseph J. Onosko, *A Parent's Child and the State's Future Citizen: Judicial and Legislative Responses to the Tension Over the Right to Direct an Education*, 22 S. Cal. Interdisc. L.J. 591 (2013) ................. 18

GLSEN, *GLSEN Research Brief: Laws Prohibiting "Promotion of Homosexuality" in Schools: Impacts and Implications* (2018) .................. 22, 23

Guttmacher Inst., *Sex and HIV Education* (Jul. 1, 2022) ....................................... 17

*Hearing on H.B. 6619 Before the Joint Comm. on Educ.*, 2021 Sess. 1 (Conn. 2021) (statement of Rep. Geoff Luxenberg) ....................................... 9

HiTops, *About Us* .................................................................................................... 27

Laura Kann, et al., Ctrs. for Disease Control & Prevention, *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors among Students in Grades 9–12 — United States and Selected Sites, 2015* (2016) ...................... 20

Joseph G. Kosciw, et al., GLSEN, *The 2019 National School Climate Survey: The Experience of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2020) ....................................................................... 21

Marlene Matarese, et al., *The Cuyahoga Youth Count: A Report on LGBTQ+ Youth Experience in Foster Care* (2021) ........................................................... 25

Brooke Migdon, *Florida's 'Don't Say Gay' Law Takes Effect Today. Its Impact Is Already Being Felt*, Changing Am. (July 1, 2022) ........................... 11

Movement Advancement Project, *Equality Maps: Safe Schools Laws* ................... 7

Madeleine Roberts, *New CDC Data Shows LGBTQ Youth Are More Likely to Be Bullied Than Straight Cisgender Youth*, Hum. Rts. Campaign (Aug. 26, 2020) ................................................................................................................ 20

Clifford Rosky, *Anti-Gay Curriculum Laws*, 117 Colum. L. Rev. 1461 (2017) ..................................................................... 11

Lori Rozsa, *Florida Teachers Race to Remake Lessons as DeSantis Laws Take Effect*, Wash. Post (July 30, 2022) ............................................................ 10

Theo G.M. Sandfort, *Experiences and Well-Being of Sexual and Gender Diverse Youth in Foster Care in New York City: Disproportionality and Disparities* (2020) ............................................................ 25

Cady Stanton, *As 'Don't Say Gay' and Similar Bills Take Hold, LGBTQ Youths Feel They're 'Getting Crushed'*, USA Today (May 9, 2022) ............... 21

Heather Steed, et al., *Only 17 States and DC Report LGBTQ-Inclusive Sex Ed Curricula in at Least Half of Schools, Despite Recent Increases*, Child Trends (Oct. 6, 2021) ............................................................ 9

Deborah Temkin, et al., *Most State Policies That Address LGBTQ+ Students in Schools Are Affirming, Despite Recent Trends Toward Exclusion*, Child Trends (Mar. 22, 2022) ............................................................ 10

The Trevor Project, *Issues Impacting LGBTQ Youth: Polling Analysis* (Jan. 2022) ............................................................ 24

What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019) ............................................................ 19

Jo Yurcaba, *California Budget Includes $3 Million to Train Teachers on LGBTQ Issues*, NBC News (July 16, 2021) ............................................................ 13

## INTRODUCTION AND INTEREST OF AMICI

The District of Columbia and the States of New Jersey, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New York, and Oregon (collectively, "Amici States") file this brief as amici curiae in support of Plaintiffs in their opposition to the motions to dismiss.

The responsibility for public education lies with the states, *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968), and encompasses several "important" duties, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).  One is to "prepare[] students for active and effective participation in [our] pluralistic . . . society." *Bd. of Educ. v. Pico*, 457 U.S. 853, 868 (1982) (plurality op.).  Another is to "protect" students from harm.  *Mahanoy Area Sch. Dist. v. B.L. by & through Levy*, 141 S. Ct. 2038, 2046 (2021).  As the Supreme Court has explained, states must perform these educational duties "within the limits of" the Constitution.  *Barnette*, 319 U.S. at 637.

In carrying out those duties, Amici States work to create an educational environment that is inclusive of everyone—including those who identify as LGBTQ. Indeed, Amici States strongly support the right of LGBTQ people to feel welcomed and to be treated equally in the school community.  And we have sought to make curricular decisions that embrace, rather than stifle, the free expression of students

and teachers. Thus, Amici States have an interest in the protection of LGBTQ students, parents, and teachers, and we can offer expertise in education policy.

Amici States' experiences make clear that Florida's recent actions are far outside the bounds of ordinary educational decision-making. The challenged Act, H.B. 1557, flatly bans "[c]lassroom instruction . . . on sexual orientation or gender identity" in kindergarten through third grade. Act of Mar. 28, 2022, § 1, 2022 Fla. Sess. Law Serv. Ch. 2022-22 (West) (codified at Fla. Stat. § 1001.42(8)(c)(3)). For all other students, the Act prohibits such instruction if not "in accordance with state standards." *Id.* These standards, however, may not exist for another year, and there is no limit to how restrictive they might be. *See id.* § 2. The Act also subjects schools to liability for any violation by granting parents a cause of action for damages and attorney fees. *Id.* § 1.

All of those aspects of the law make it a radical outlier. Indeed, no other state educational law sweeps as broadly as Florida's or targets the LGBTQ community in the same way. That undermines any genuine assertion that the Act furthers educational goals. Said another way, the Act's "unusual character" provides an additional indication that the Act is constitutionally suspect. *Romer v. Evans*, 517 U.S. 620, 633 (1996) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928)); *accord United States v. Alvarez*, 567 U.S. 709, 722 (2012) ("[T]he sweeping, quite unprecedented reach of the statute puts it in conflict with the First

2

Amendment."). Moreover, Amici States' own evidence reveals the "immediate, continuing, and real injuries" the Act will inflict, and those harms "outrun and belie any legitimate justifications." *Romer*, 517 U.S. at 635. In light of the serious constitutional issues raised by Florida's extreme approach, Plaintiffs' allegations that Florida's law is unconstitutional are more than sufficient to survive a motion to dismiss.

## SUMMARY OF ARGUMENT

I. Amici States' experiences reveal that the Act lacks a legitimate pedagogical purpose, rendering it constitutionally suspect. Amici States' policies allow educators to address LGBTQ issues, and these policies demonstrate that there is no legitimate reason to ban mentioning them. Amici States also ordinarily leave educational decisions to schools and teachers, rather than allowing schools to be haled into court over even minor instructional choices. Florida has chosen a starkly different path. It stands alone in its censorship of instruction related to LGBTQ issues and in its imposition of legal liability on school districts that do not censor LGBTQ issues. All the while, there are ways to address Florida's alleged concern in ensuring parental input in education without targeting a minority group. The experience of Amici States thus makes clear that Florida's approach is an unreasonable way to advance the state's professed interests. Indeed, the fact that the

Act so departs from other states' approaches provides further indication that it is not motivated by legitimate pedagogical goals.

II. The Act will stigmatize and harm LGBTQ youth in Florida and Amici States. Research shows that a failure to provide LGBTQ-inclusive classroom instruction adversely affects LGBTQ students' mental health and learning outcomes, and that it results in increased anti-LGBTQ bias. Further, the harms stemming from Florida's law will extend beyond Florida's borders. The Act will harm children from Amici States but who will be placed with families in Florida pursuant to the Interstate Compact for the Placement of Children ("ICPC"). And Amici States will need to devote resources to counteract the Act's harmful effects, including by increasing funding for programs that work to ensure the health and well-being of LGBTQ students in Amici States.

## ARGUMENT

## I. Amici States' Experiences Undermine Florida's Contention That Its Extreme Act Has A Legitimate Pedagogical Purpose.

Florida contends that the Legislature had "legitimate pedagogical concerns" when it enacted H.B. 1557. State Defs.' Mot. to Dismiss & Inc. Mem. of L. ("Fla. Br.") 3 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)). But Amici States' experiences undermine Florida's assertions that the Act has a legitimate pedagogical purpose and that it is reasonably related to any such purpose. *See* Fla. Br. 34-38. To pass constitutional muster, Florida must show—at least under

the First Amendment—that the Act is "reasonably related to legitimate pedagogical concerns." *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213-14 (11th Cir. 2004) (per curiam); *see Searcey v. Harris*, 888 F.2d 1314, 1320 (11th Cir. 1989) (applying same test to a restriction by a school on non-student speech).  That inquiry is fact-intensive and thus unsuitable for resolution at the motion-to-dismiss stage. Florida cannot justify its law with bare assertions; rather, factual development is necessary to determine whether the law is constitutional.  *See Bishop v. Aronov*, 926 F.2d 1066, 1070-71 (11th Cir. 1991) ("[A] correct legal analysis must predicate proper explication of the constitutionally pivotal facts."); *Searcey*, 888 F.2d at 1322 ("We cannot *infer* the reasonableness of a regulation [restricting speech in school] from a vacant record.").[1]

---

[1]    Florida ignores much of this on-point Eleventh Circuit precedent directly addressing restrictions on speech in school, instead relying on out-of-circuit case law and claiming that subsequent Supreme Court decisions have abrogated Eleventh Circuit case law.  *See* Fla. Br. 31-38.  But this Court is "not at liberty to disregard binding case law that is so closely on point," unless it has been "directly overruled"—which none of the above cases have.  *Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996).  Further, Florida points to no decision where a district court has dismissed a challenge to a speech regulation without any factual development.  *See Bishop*, 926 F.2d at 1070-71 (stressing the importance of factual support for a defendant's restriction on speech in school); *Searcey*, 888 F.2d at 1321-22 (same); *Arce v. Douglas*, 793 F.3d 968, 976-77 (9th Cir. 2015) (holding that district court erred, in challenge under the Equal Protection Clause to curriculum law, by granting summary judgment on a limited record, thereby preventing plaintiffs from presenting evidence regarding legislative intent).

Moreover, Florida's attempt to justify the Act with bald assertions unsupported by facts is especially unpersuasive because the Act's plain terms are highly unusual and stand in stark contrast to other states' educational policies. As explained below, Amici States' educational policies include and protect LGBTQ people, equip teachers to address LGBTQ topics (while accommodating parental choices), and leave educational decisions to school communities, not courts. Amici States' experiences thus show that states have an interest in including—rather than excluding—LGBTQ people. Further, when it comes to LGBTQ issues in schools, Amici States' policies show that Florida's resort to restricting speech and subjecting schools to litigation is extreme and unreasonable.

### A.    Unlike Florida's Act, Amici States' education policies serve the legitimate pedagogical purpose of including and protecting LGBTQ people.

Recognizing that LGBTQ Americans "cannot be treated as social outcasts or as inferior," *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018)), Amici States' policies foster an educational environment that is inclusive and respectful of LGBTQ people. As a general matter, most states do not single out LGBTQ people or issues for disfavored treatment, and many have inclusive or affirming education policies. Deborah Temkin, et al., *Most State Policies That Address LGBTQ+ Students in Schools Are Affirming, Despite Recent Trends Toward*

6

*Exclusion*, Child Trends (Mar. 22, 2022), https://tinyurl.com/3atccep3.  Amici States have advanced LGBTQ inclusivity and protections in schools in a few key ways.

Most fundamentally, Amici States protect LGBTQ students by statute, regulation, and agency action.  Amici States prohibit discrimination in schools on the basis of sexual orientation or gender identity.[2]  We also prohibit bullying on the basis of sexual orientation or gender identity, or require or urge schools to adopt policies to that effect.[3]

Amici States also recognize the indisputable fact that LGBTQ people are part of American life and therefore include LGBTQ experiences and contributions in history and social studies education.  By statute, seven Amici States have

---

[2]   *See, e.g.*, Cal. Educ. Code §§ 200, 220; Conn. Gen. Stat. § 10-15c(a); D.C. Code § 2-1402.41(1); 775 Ill. Comp. Stat. §§ 5/1-103(O-1), 5/5-101(A)(11), 5/5-102(A); Mass. Gen. Law ch. 76, § 5; Md. Code Regs. §§ 13A.01.06.03(B)(5)(d), (j), 13A.01.06.04; Mich. C.R. Comm'n, *Interpretive Statement 2018-1* (May 21, 2018), https://tinyurl.com/yckmrn3z; Minn. Stat. §§ 363A.03(44), 363A.13(1); Nev. Rev. Stat. §§ 388.132(6)(a), 651.070; N.J. Stat. Ann. §§ 10:5-4, 10:5-5(*l*); N.Y. Exec. Law § 296(4); Or. Rev. Stat. § 659.850; Movement Advancement Project, *Equality Maps: Safe Schools Laws*, https://tinyurl.com/3hn9hh8r ("nondiscrimination" tab) (compiling laws of all states) (last visited Aug. 3, 2022).

[3]   *See, e.g.*, Cal. Educ. Code § 234.1(a)-(c); Conn. Gen. Stat. § 10-222d(a)(1), (b); D.C. Code §§ 2-1535.01(2)(A)(i), 2-1535.03; 105 Ill. Comp. Stat. § 5/27-23.7(a); Mass. Gen. Law ch. 71, § 37O(d)(1), (3); Md. Code Ann., Educ. §§ 7-424.1, 7-424(a)(2)(i)(1), (b)(1); Mich. State Bd. of Educ., *Model Anti-Bullying Policy* (Dec. 8, 2020), https://tinyurl.com/mttsrte3; Minn. Stat. § 121A.031(2)(g), (3); Nev. Rev. Stat. §§ 388.122(1)(c), 388.133; N.J. Stat. Ann. §§ 18A:37-14, 18A:37-15; N.Y. Educ. Law § 12(1); 8 N.Y.C.R.R. § 100.2(jj)(2), (3)(i); Or. Rev. Stat. §§ 339.351(3), 339.356; Movement Advancement Project, *supra* ("anti-bullying" tab) (compiling laws for all states).

promulgated history or social studies curricular requirements relating to LGBTQ
Americans.  Cal. Educ. Code § 51204.5; Colo. Rev. Stat. § 22-1-104(1)(a); Conn.
Gen. Stat. § 10-25b(b); 105 Ill. Comp. Stat. § 5/27-21; Nev. Rev. Stat.
§ 389.061(1)(b); N.J. Stat. Ann. § 18A:35-4.35; Or. Rev. Stat.
§ 329.045(1)(b)(B)(vi) (effective 2026).   Other Amici States have undertaken
similar efforts to update curricular standards to include LGBTQ people.  *E.g.*, D.C.
State Bd. of Educ., Soc. Studies Standards Advisory Comm., *Social Studies*
*Standards Guiding Principles* 8 (Dec. 16, 2020), https://tinyurl.com/3a6s68yh.  Still
others encourage and allow teachers to provide lessons that comprehensively cover
the American experience, including that of LGBTQ people.  *See, e.g.*, Me. Dep't of
Educ., *LGBTQ+ Studies*, https://tinyurl.com/2p9793vf (last visited Aug. 3, 2022)
(listing resources for teachers); Mass. Dep't of Elementary & Secondary Educ.,
*Defending Democracy at Home: Advancing Constitutional Rights, Obergefell v.*
*Hodges (2015) Same-Sex Marriage* (Oct. 2018), https://tinyurl.com/2zh9p3ej
(providing a model lesson plan on the history of *Obergefell v. Hodges*, 576 U.S. 644
(2015), to teach students about constitutional rights and the judiciary).  At bottom,
these efforts aim to "offer[] public school students a more accurate, complete, and
equitable picture of American society," Ill. Inclusive Curriculum Advisory Council,
*Inclusive Curriculum Implementation Guidance: Condensed Edition* 1,
https://tinyurl.com/4pn8yt94 (last visited Aug. 3, 2022), and prepare them to live in

the contemporary United States, *Hearing on H.B. 6619 Before the Joint Comm. on Educ.*, 2021 Sess. 1 (Conn. 2021) (statement of Rep. Geoff Luxenberg), https://tinyurl.com/2rsxc7fs.

In addition to teaching academic subjects, states have an "interest in preparing children to lead responsible, healthy lives." *Leebaert ex rel. Leebaert v. Harrington*, 193 F. Supp. 2d 491, 497 (D. Conn. 2002), *aff'd*, 332 F.3d 134 (2d Cir. 2003).  To that end, an increasing number of schools have established health instruction to ensure that all students, including LGBTQ students, have the information necessary about their health.  *See* Heather Steed, et al., *Only 17 States and DC Report LGBTQ-Inclusive Sex Ed Curricula in at Least Half of Schools, Despite Recent Increases*, Child Trends (Oct. 6, 2021), https://tinyurl.com/58zpj9kw ("From 2016 to 2018, 27 states and the District of Columbia reported increases . . . in the percentage of schools offering sex-ed materials that are inclusive of LGBTQ youth.").

Instead of including LGBTQ people in the school community, however, Florida's Act excludes them, thereby running counter to constitutional principles. States have a "legitimate . . . interest in seeking to eradicate bias against same-gender couples," and other LGBTQ people, "and to ensure the safety of all public school students."  *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008).  As Amici States' efforts reflect, LGBTQ people are part of American history and society, and "in the preparation of students for citizenship," it is "entirely rational" for schools to

9

include their experiences in an age-appropriate manner.  *Id.* at 95.  It is not a legitimate pedagogical interest, however, to exclude the entire class of LGBTQ people and their experiences from the education provided by public schools by censoring discussion about their identities.

### B.  Instead of censoring or restricting speech like Florida, Amici States equip educators to address LGBTQ topics.

While Florida's law sweeps broadly in its censorship or restriction of LGBTQ topics, Amici States approach these issues in more tailored and effective ways.  The experience of other states reflects that Florida's severe approach to LGBTQ issues is unjustifiable and thus violative of the First Amendment.  *See Searcey*, 888 F.2d at 1322 ("It is the total banning of a group . . . that we find to be unreasonable."); *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1525 (11th Cir. 1989) (considering, when upholding the removal of texts from a required reading list, that they "have not been banned from the school" and "[n]o student or teacher is prohibited from assigning or reading these works or discussing the themes contained therein in class or on school property").[4]

---

[4]    Although Florida tries to narrow the Act's reach to cover only, essentially, lessons given by teachers, *see* Fla. Br. 15-21, the Act uses broad terms lacking precise definitions.  "[T]he many ambiguities concerning the scope of [the Act's] coverage render it problematic for purposes of the First Amendment."  *Reno v. ACLU*, 521 U.S. 844, 870 (1997).  Indeed, despite what Florida now claims, the Act's broad, vague prohibitions have already chilled expression.  *E.g.*, Lori Rozsa, *Florida Teachers Race to Remake Lessons as DeSantis Laws Take Effect*, Wash.

At the outset, Amici States—and, in fact, all states aside from Florida—do not generally ban entire topics from discussion in schools.  Until recently, "there [was] no state that actually [had] a 'don't say gay' law—one that explicitly prohibits teachers from discussing homosexuality at all."  Clifford Rosky, *Anti-Gay Curriculum Laws*, 117 Colum. L. Rev. 1461, 1469 (2017).  Put simply, Florida's effort to censor LGBTQ topics is "sweeping, [and] quite unprecedented." *Alvarez*, 567 U.S. at 722.

Amici States, by contrast, have codified protections for the free exchange of ideas in schools.  The District of Columbia, for instance, protects a student's "right to voice his or her opinions."  5-E DCMR § 2401.2.  Likewise, Connecticut's Code of Professional Responsibility for Teachers states that teachers shall "[e]ngage students in the pursuit of truth, knowledge and wisdom and provide access to all points of view" and "[n]urture in students lifelong respect and compassion for themselves and other human beings regardless of . . . sexual orientation."  Conn. Agencies Regs. § 10-145d-400a(b)(1)(B), (C).

Moreover, Amici States understand that the way to address LGBTQ-related topics that inevitably arise in schools is to equip teachers and schools to handle them directly and compassionately.  For example, it is understandable that "questions arise

---

Post (July 30, 2022); https://tinyurl.com/yu4ue5z5; Brooke Migdon, *Florida's 'Don't Say Gay' Law Takes Effect Today. Its Impact Is Already Being Felt*, Changing Am. (July 1, 2022), https://tinyurl.com/bs92arsc.

for . . . school staff when considering the best supports for transgender and gender nonconforming students."  Vt. Agency of Educ., *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* 1 (Feb. 23, 2017), https://tinyurl.com/243yhrax.  Thus, states have issued guidance to schools to address these questions rather than restrict what teachers can say.[5]  Such guidance can helpfully identify example scenarios a teacher or administrator may encounter,

---

[5]    *E.g.*, Cal. Dep't of Educ., *Legal Advisory Regarding Application of California's Antidiscrimination Statutes to Transgender Youth in Schools* (Sept. 16, 2021), https://tinyurl.com/mr282sf9; Cal. Dep't of Educ., *Frequently Asked Questions - School Success and Opportunity Act (AB 1266)* (Sept. 16, 2021), https://tinyurl.com/2t4ncmsd; Conn. State Dep't of Educ., *Guidance on Civil Rights Protections and Supports for Transgender Students: Frequently Asked Questions* (Sept. 2017), https://tinyurl.com/24vuawfy; D.C. Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance* (June 2015), https://tinyurl.com/tatd3ncu; Ill. State Bd. of Educ., *Non-Regulatory Guidance: Supporting Transgender, Nonbinary, and Gender Nonconforming Students* (Mar. 1, 2020), https://tinyurl.com/2p8ehwz6; Md. State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-conforming Youth: Guidelines for Gender Identity Non-discrimination* (Oct. 2015), https://tinyurl.com/48by45jn; Mass. Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (Oct. 28, 2018), https://tinyurl.com/2p836nrh; Mich. State Bd. of Educ., *Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students* (Sept. 14, 2016), https://tinyurl.com/yetpukkh; Minn. Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* (Sept. 25, 2017), https://tinyurl.com/zr6r3j89; Nev. Dep't of Educ., *Supporting Sex/Gender Diverse Students*, https://tinyurl.com/3sv5tyrp (last visited Aug. 3, 2022); N.J. Dep't of Educ., *Transgender Student Guidance for School Districts*, https://tinyurl.com/2evmmuj6 (last visited Aug. 3, 2022); Or. Dep't of Educ., *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* (May 5, 2016), https://tinyurl.com/36ecxvuf.

such as when a student begins to dress in a gender-nonconforming way, and explain best practices. *See, e.g.,* Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* 6-11 (July 25, 2016), https://tinyurl.com/3bra5kjn; N.Y. State Educ. Dep't, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* 5-10 (July 2015), https://tinyurl.com/2p8mk97k.

Amici States also invest in training for educators so they can meet the needs of LGBTQ students, parents, and teachers. California's recent budget allocated "$3 million for LGBTQ cultural competency training for public school teachers." Jo Yurcaba, *California Budget Includes $3 Million to Train Teachers on LGBTQ Issues*, NBC News (July 16, 2021), https://tinyurl.com/mrx84bnb. Nevada requires that teachers "receive annual training concerning the requirements and needs of persons with diverse gender identities or expressions." Nev. Admin. Code § 388.880(2)(a). And Michigan developed a workshop for educators on LGBTQ issues. Mich. Dep't of Educ., *Creating Safe Schools for Sexual Minority Youth*, https://tinyurl.com/4yesvp2e (last visited Aug. 3, 2022).

All these efforts comport with the constitutional principle of a "free exchange" of ideas. *Mahanoy*, 141 S. Ct. at 2046. Yet Florida's Act seeks to remove LGBTQ-related topics from schools entirely or otherwise restrict them because—purportedly—these are sensitive issues for some. Fla. Br. 35. As federal courts in

Florida have acknowledged, however, the way to approach such issues is not to censor them but to equip educators to address them. *See Gillman ex rel. Gillman v. Sch. Bd. for Holmes Cnty.*, 567 F. Supp. 2d 1359, 1370 (N.D. Fla. 2008) ("If the schools are to perform their traditional function of inculcating the habits and manners of civility, . . . they must be allowed the space and discretion to deal with the nuances." (internal quotation marks omitted) (quoting *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1543 (7th Cir. 1996))). Although Florida's justifications may "sound in a desire to avoid the discomfort and unpleasantness of tolerating a minority of students whose sexual identity is distinct from the majority," "[e]nsuring that this minority of students are afforded meaningful expression secures the precept of freedom . . . exalted by the founders." *Gonzalez through Gonzalez v. Sch. Bd. of Okeechobee Cnty.*, 571 F. Supp. 2d 1257, 1269 (S.D. Fla. 2008); *see also Gay-Straight All. of Yulee High Sch. v. Sch. Bd. of Nassau Cnty.*, 602 F. Supp. 2d 1233, 1237 (M.D. Fla. 2009). Indeed, Florida's approach stands outside "a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2431 (2022) (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992)).

### C.    Florida stands apart from states by subjecting school communities to costly litigation for their legitimate instructional choices.

States typically set education policy at a general level and leave particular instructional decisions to districts, schools, and teachers, in collaboration with parents. *See, e.g.*, *Milliken v. Bradley*, 418 U.S. 717, 741 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools . . . ."); *Ambach v. Norwick*, 441 U.S. 68, 78 (1979) ("[T]eachers by necessity have wide discretion over the way the course material is communicated to students."); Cal. Educ. Code § 60000(b) (recognizing that "specific choices about instructional materials need to be made at the local level"); Minn. Stat. § 120B.021(2)(b)(2) (providing that statewide academic standards must "not require a specific teaching methodology or curriculum").   Indeed, "local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to [the] quality of the educational process." *Milliken*, 418 U.S. at 741-42.   But Florida bucks this "tradition," *id*. at 741, by making such instructional decisions the subject of lawsuits—all purportedly in the name of parental rights, Fla. Stat. § 1001.42(8)(c)(7)(b)(II) (granting parents a cause of action). As Amici States' experience shows, however, parent perspectives and prerogatives can be reasonably accommodated by teachers and schools without courts being involved at every turn to enforce blanket statewide censorship requirements and speech restrictions.

To begin, Amici States largely place curricular and instructional choices with school boards and other bodies that seek public input, including that of parents. *See, e.g.*, Md. Code Ann., Educ. §§ 4-111 (vesting county school boards with the power to "[e]stablish curriculum guides and courses of study"), 4-112(a) (establishing "citizen advisory committee[s] to advise the [school] board[s]"). For example, Colorado instructs school boards to "convene a community forum on a periodic basis . . . to discuss adopted content standards." Colo. Rev. Stat. § 22-1-104(3)(a). Similarly, Oregon provides that the state board, in revising content standards, shall "[i]nvolve . . . parents." Or. Rev. Stat. § 329.045(1)(b)(C) (effective 2026). California, Connecticut, Illinois, Nevada, and New Jersey likewise leave most of the implementation of their inclusive curriculum requirements to local boards. *See* Cal. Dep't of Educ., *Frequently Asked Questions: Senate Bill 48* (Oct. 8, 2021), https://tinyurl.com/yc8yhnkh; Conn. Gen. Stat. § 10-25b(d); Ill. Inclusive Curriculum Advisory Council, *supra*; Nev. Rev. Stat. § 389.061(1); N.J. Stat. Ann. § 18A:35-4.36.

If parental concerns arise over instructional choices, Amici States have developed targeted, cooperative ways to accommodate them. Some Amici States have provided guidance to teachers on how to handle parental perspectives on LGBTQ topics, including sample letters. *See, e.g.*, D.C. Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance*, *supra*, at 31-36; Minn. Dep't of

Educ., *Toolkit*, *supra*, at 6-7.  Other Amici States allow parents to review curriculum and instructional material.  Cal. Educ. Code § 51101(a)(8); Mich. Comp. Laws Ann. § 380.1137(1)(a).  Minnesota allows parents who object to certain instruction to "make reasonable arrangements with school personnel for alternative instruction." Minn. Stat. § 120B.20.  Finally, when it comes to the most sensitive topics like health or sex education, 36 states and the District provide some type of parental opt-out option.   Guttmacher Inst., *Sex and HIV Education* (Jul. 1, 2022), https://tinyurl.com/r259h2d2.  Through these mechanisms, teachers and schools can accommodate parental choices.

Instead of these common, conciliatory approaches to parental choices, Florida's Act subjects schools to costly litigation by permitting parental lawsuits regarding curricular decisions.   That approach breaks so significantly from reasonable alternatives that it undermines any claim that it is motivated by a legitimate effort to accommodate parents and their concerns about limiting inappropriate sexual content in schools.  The Act subjects school districts to litigation, injunctions, damages, and attorney fees for any violation of its vague provisions banning certain speech.  *See* Fla. Stat. § 1001.42(8)(c)(7)(b)(II).  Such "[j]udicial interposition in the operation of the public school system," absent a compelling constitutional reason, is unprecedented.  *Epperson*, 393 U.S. at 104; *see Blau v. Ft. Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395-96 (6th Cir. 2005) (Sutton,

J.) (collecting cases rejecting a parental right to direct classroom instruction); Todd A. DeMitchell & Joseph J. Onosko, *A Parent's Child and the State's Future Citizen: Judicial and Legislative Responses to the Tension Over the Right to Direct an Education*, 22 S. Cal. Interdisc. L.J. 591, 622 (2013) (explaining that states have near universally rejected legislative attempts to shift power over curricular decisions away from educators). It is also unneeded: as explained above, several options are available to involve parents in their child's education. Indeed, Florida already provides many of these procedures to parents. Fla. Stat. § 1014.04. Incentivizing litigation against schools is a punitive approach that chills the free exchange of ideas. The Act's drastic approach is thus unreasonable.

\* \* \*

In short, Florida's extreme approach implies the absence of a legitimate pedagogical purpose, rendering its restrictions on speech and targeting of a minority highly suspect. And Amici States' experiences show that reasonable policies are available that include LGBTQ people, foster free speech, and accommodate parents. Florida's turn, instead, to restricting speech and targeting a minority supplies additional evidence of the Act's unconstitutionality. *See Romer*, 517 U.S. at 633. At a minimum, it plainly demonstrates that Florida cannot succeed on its motion to dismiss.

II.   **Florida's Act Stigmatizes LGBTQ Youth In Florida, And Its Stigmatic Harms Extend To Amici States.**

The harm caused by the challenged Act extends well beyond Florida.  By targeting the LGBTQ community, the Act harms children in Amici States, including those who will be placed in Florida pursuant to the ICPC, as well as students who attend school in Florida and then move to Amici States.  And Amici States will need to devote resources to mitigate and counteract the harm that the Act is causing to LGBTQ students and others in their States.

A.   **The Act stigmatizes LGBTQ youth in Florida and Amici States.**

The Act stigmatizes LGBTQ youth by prohibiting or limiting the discussion of LGBTQ people in schools.  And in so doing, it threatens grave harm to the health and well-being of LGBTQ individuals, their families, and their communities.  As study after study has shown, discriminatory social conditions have severe negative health impacts on LGBTQ people, resulting in increased rates of mental health disorders and suicide attempts, especially among LGBTQ youth.  *See, e.g.*, What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019), https://tinyurl.com/2p84akjn (summarizing findings of 300 primary research studies, 82% of which "found robust evidence that discrimination on the basis of sexual orientation or gender identity is associated with harms to the health of LGBT

people").   Those harms extend to youth not just in Florida, but throughout the country.

### 1.   Educational decisions that stigmatize LGBTQ youth directly harm mental health and educational outcomes.

As a vulnerable population, LGBTQ youth already face significant hardships. They are particularly likely to experience feelings of sadness and hopelessness, Laura Kann, et al., Ctrs. for Disease Control & Prevention, *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors among Students in Grades 9–12 — United States and Selected Sites, 2015* 18 (2016), https://tinyurl.com/6cyefk2m, and to be victims of bullying, Madeleine Roberts, *New CDC Data Shows LGBTQ Youth Are More Likely to Be Bullied Than Straight Cisgender Youth*, Hum. Rts. Campaign (Aug. 26, 2020), https://tinyurl.com/2wu4ajuj.   Increased victimization of LGBTQ students leads to health and suicide risks.   Roberts, *supra*.   These hardships are evident at the state level, too.   For instance, LGBTQ students in Michigan are 2.9 times more likely to be threatened or injured with a weapon at school, 1.9 times more likely to be bullied at school or online, 2.7 times more likely to skip school because they feel unsafe, 1.5 times more likely to get Ds and Fs, and 3.2 times more likely to engage in self-harm behavior.   Mich. Dep't of Educ., *Michigan Department of Education's Lesbian, Gay, Bisexual, Transgender and Questioning (LGBTQ+) Students Project at a Glance* 1, https://tinyurl.com/4jxns374 (last visited Aug. 3, 2022).   To take just one of the most troubling examples, 23% of Michigan's LGBTQ

high school students (13,500 students) attempted suicide in a recent 12-month period.  *Id.*  That rate is 4.6 times higher than their non-LGBTQ peers.  *Id.*

An inclusive school climate, which permits teachers and students to discuss sexual orientation and gender identity, can help reduce the likelihood of these damaging outcomes.   Inclusive school climates foster positive learning environments for LGBTQ youth, which are "an important factor in decreasing suicidality among LGBTQ adolescents."  April J. Ancheta, Jean-Marie Bruzzese, & Tonya L. Hughes, *The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review* 10 (Apr. 2021), https://tinyurl.com/42hmsmdu.  LGBTQ students in schools with inclusive climates are nearly 40% less likely to attempt suicide compared with LGBTQ students who attend schools with non-inclusive climates.  Cady Stanton, *As 'Don't Say Gay' and Similar Bills Take Hold, LGBTQ Youths Feel They're 'Getting Crushed'*, USA Today (May 9, 2022), https://tinyurl.com/yckncebt.  They are more likely to feel comfortable speaking to their teachers about LGBTQ-related issues, report less severe victimization based on sexual orientation and gender expression, and are less likely to feel unsafe at school because of their sexual orientation and gender expression.  Joseph G. Kosciw, et al., GLSEN, *The 2019 National School Climate Survey: The Experience of Lesbian, Gay, Bisexual, Transgender, and Queer Youth*

*in Our Nation's Schools* 73-74 (2020) ("Climate Survey"), https://tinyurl.com/5fmmzv9x.

LGBTQ-inclusive school climates are also associated with better educational outcomes. When LGBTQ students see themselves reflected in curricula, it creates an affirming learning environment that "may result in increased student engagement and may encourage students to strive academically which, in turn, may yield better educational outcomes." *Id.* at 74-75. Indeed, LGBTQ students in schools with inclusive curricula achieve a higher GPA than those in schools without inclusive curricula. *Id.* at 75. And LGBTQ students in schools with an LGBTQ-inclusive curriculum are more likely to say they plan to pursue post-secondary education. *Id.*

In light of the benefits of LGBTQ-inclusive curricula, it is no surprise that research also shows that non-inclusive schools—for example, ones that do not incorporate, or that expressly prohibit, discussion of LGBTQ issues within the classroom, as the Act requires—have damaging consequences for LGBTQ youth. As explained above, the absence of an LGBTQ-inclusive climate is strongly correlated with more suicidal ideation, worse educational outcomes, and decreased feelings of safety. LGBTQ students at schools with non-inclusive curricula are also less likely to feel supported by educators and less likely to have access to supportive school clubs, such as Gay-Straight Alliances. GLSEN, *GLSEN Research Brief: Laws Prohibiting "Promotion of Homosexuality" in Schools: Impacts and*

*Implications* 6-7 (2018), https://tinyurl.com/47r9yhzc ("GLSEN Research Brief").

And at non-inclusive schools, students are "more likely to face harassment and

assault at school based on their sexual orientation and gender expression," *id.* at 3,

and are less likely to have the benefit of supportive anti-bullying policies, *id.* at 7.

### 2.    The Act will increase anti-LGBTQ bias.

Laws like the challenged Act that stigmatize LGBTQ people also increase the

risk of anti-LGBTQ bias inside and outside the school environment.

For example, LGBTQ students attending schools with non-inclusive curricula

are more likely to hear homophobic remarks at school.  GLSEN Research Brief 3.

By contrast, "attending a school that included positive representations of LGBTQ

topics in the curriculum was related to less frequent use of anti-LGBTQ language."

Climate Survey 73; *see also id.* (documenting less frequent usage of negative

remarks about sexual orientation, gender identity, and gender expression).

Whether a school has LGBTQ-inclusive policies also correlates with the rate

of peer acceptance of LGBTQ students.  Non-inclusive schools are less likely to

have students who are accepting of LGBTQ people than schools with inclusive

climates (39.4% vs. 51.1%).  GLSEN Research Brief 3.  By contrast, "[t]he inclusion

of positive portrayals of LGBTQ topics in the classroom may . . . help educate the

general student body about LGBTQ issues and promote respect and understanding

of LGBTQ people in general."  Climate Survey 75.  Indeed, LGBTQ students who

attend schools with LGBTQ-inclusive curricula are significantly more likely to report that their classmates are somewhat or very accepting of LGBTQ people (66.9% vs. 37.9%). *Id.*

Further, this increased understanding and respect "may lead students in general to speak up when they witness anti-LGBTQ behaviors." *Id.* Relative to students in schools with anti-LGBTQ curricula, LGBTQ youth in schools with inclusive curricula report that other students are more than twice as likely to intervene most or all of the time when hearing homophobic remarks and negative remarks about gender expression. *Id.*

Notably, the damaging effects of a law prohibiting instruction on LGBTQ issues in schools do not stop at a state's borders. When a law anywhere sends the message that some members of the community are disfavored, as the Act does, it compounds the stigma associated with being part of that community everywhere. Indeed, evidence suggests that, as with prior laws that victimize particular groups, the Act will adversely affect the mental health of LGBTQ youth in other states. For example, recent debates around laws that target the transgender community adversely affected the mental health of LGBTQ youth nationwide. The Trevor Project, *Issues Impacting LGBTQ Youth: Polling Analysis* 6 (Jan. 2022), https://tinyurl.com/2xnr9r5t. Two-thirds of LGBTQ youth reported that the recent debates about state laws restricting the rights of transgender people have negatively

affected their mental health.  *Id.*  And among transgender and non-binary youth, the effects were even more profound, with 85% reporting harm to their mental health. *Id.*  These findings suggest that the Act stigmatizes and poses risk of harm to LGBTQ youth not just in Florida, but also elsewhere, including in Amici States.

**B.    The Act's harms extend beyond Florida and will require Amici States to expend additional funds.**

In addition to the harms it inflicts on LGBTQ youth in Florida and in Amici States, the Act harms Amici States by requiring them to increase expenditures of state funds to combat bias and protect their most vulnerable residents.

For example, the Act directly implicates Amici States' interest in protecting at-risk youth who will be placed in Florida pursuant to the Interstate Compact for the Placement of Children.  The ICPC—to which Florida and all Amici States are parties—provides for the movement and safe placement of children between states when children are in the state's custody, being placed for adoption, or being placed by a parent or guardian in a residential treatment facility.  Am. Pub. Health Servs. Ass'n, *ICPC FAQ's*, https://tinyurl.com/342eej8h (last visited Aug. 2, 2022).  This population includes children in foster care, and recent surveys of children in foster care have revealed a high percentage who identify as LGBTQ.  *See, e.g.*, Marlene Matarese, et al., *The Cuyahoga Youth Count: A Report on LGBTQ+ Youth Experience in Foster Care* 6 (2021), https://tinyurl.com/mp9bmunb (survey of an Ohio county identifying 32% of foster children to be LGBTQ); Theo G.M. Sandfort,

*Experiences and Well-Being of Sexual and Gender Diverse Youth in Foster Care in New York City: Disproportionality and Disparities* 5 (2020), https://tinyurl.com/5e6e59kj (survey of New York City identifying 34% of foster children to be LGBTQ).  Amici States regularly place children in Florida pursuant to the ICPC,[6] and those children who identify as LGBTQ will be stigmatized by Florida's new law.  LGBTQ youth from Florida may also be placed in Amici States under the ICPC, leaving schools and social services agencies in Amici States to address the negative impacts of Florida's law.

State agencies will also need to expend additional resources to address the Act's negative effects on members of their own LGBTQ communities.  For example, because the Act stigmatizes and harms LGBTQ people in Amici States, those individuals may require additional mental health services.  In light of the "high prevalence of poverty in LGBT communities," state-run programs like Medicaid may bear a substantial share of the burden of addressing the significant mental health consequences stemming from the Act.  Kellan Baker, et al., Ctr. for Am. Progress, *The Medicaid Program and LGBT Communities: Overview and Policy Recommendations* (Aug. 9, 2016), https://tinyurl.com/ytp8apz3.

---

[6]     As of April 2022, Amici States have placed over 130 students in Florida through the ICPC this calendar year.

Furthermore, Amici States may need to ensure that the stigma caused by the Act does not spread to their own school environments.  As explained, Amici States provide training and assistance to school staff to address bullying, understand LGBTQ issues, and improve the educational climate for LGBTQ youth.  The Act's adverse impact on LGBTQ students' mental health will increase the demand for such school-based services.  And Amici States' education agencies will need to expand their efforts to address barriers to the well-being and educational success of LGBTQ students.

Finally, Amici States may need to increase funding for nonprofit organizations that provide social services to LGBTQ youth.  Amici States recognize the vital role these organizations play in promoting LGBTQ individuals' health and well-being.  Massachusetts, for example, funds organizations through its Safe Spaces for LGBTQ Youth program, whose goal is to "promote self-esteem, increase social connectedness and resilience, and decrease risk for suicidal behaviors (and self-harm)."  Commonwealth of Mass., *The Safe Spaces for LGBTQIA+ Youth Program Engage Youth Who Are LGBTQIA+*, https://tinyurl.com/v25hcf86 (last visited Aug. 3, 2022).  And New Jersey's Department of Children and Families provides funding and resources to organizations that serve LGBTQ youth, such as HiTops, which provides health services and group support to LGBTQ youth throughout New Jersey.  HiTops, *About Us*, https://tinyurl.com/3bz9n622 (last

visited Aug. 3, 2022).  The stigmatic harms stemming from the Act will increase the

demand for these organizations' services—and Amici States' funding for them.

## CONCLUSION

The Court should deny the motions to dismiss.

Respectfully submitted,

| | |
|---|---|
| MATTHEW J. PLATKIN<br>Acting Attorney General for the<br>State of New Jersey | KARL A. RACINE<br>Attorney General for the District of<br>Columbia |
| JEREMY M. FEIGENBAUM<br>Solicitor General | CAROLINE S. VAN ZILE<br>Solicitor General |
| SUNDEEP IYER<br>MAYUR P. SAXENA<br>Assistant Attorneys General | ASHWIN P. PHATAK<br>Principal Deputy Solicitor General |

                                    */s/ Adam J. Tuetken*

| | |
|---|---|
| MELISSA MEDOWAY<br>MELISSA FICH<br>JOHN T. PASSANTE<br>Deputy Attorneys General | ADAM J. TUETKEN*<br>Assistant Attorney General |
| The Office of the Attorney General<br>of New Jersey<br>Richard J. Hughes Justice Complex<br>25 Market Street, P.O. Box 112<br>Trenton, NJ 08625<br>(609) 376-2690<br>jeremy.feigenbaum@njoag.gov | Office of the Solicitor General<br>Office of the Attorney General<br>for the District of Columbia<br>400 6th Street, NW, Suite 8100<br>Washington, D.C. 20001<br>(202) 735-7474<br>adam.tuetken@dc.gov |

August 2022
*Admitted in the U.S. District Court for the Northern District of Florida

28

On behalf of:

ROB BONTA
*Attorney General*
State of California

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

HOLLY T. SHIKADA
*Attorney General*
State of Hawaii

KWAME RAOUL
*Attorney General*
State of Illinois

AARON M. FREY
*Attorney General*
State of Maine

BRIAN E. FROSH
*Attorney General*
State of Maryland

MAURA HEALEY
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON D. FORD
*Attorney General*
State of Nevada

LETITIA JAMES
*Attorney General*
State of New York

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

## LOCAL RULE 7.1(F) CERTIFICATION

As required by Local Rule 7.1(F), the undersigned counsel certifies that this

brief contains 6,416 words.

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2022, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN