IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**EQUALITY FLORIDA, et al.,**

     **Plaintiffs,**

**v.**                                     **Case No. 4:22-cv-134-AW-MJF**

**FLORIDA STATE BOARD OF
EDUCATION, et al.,**

     **Defendants.**
_____/

## ORDER ON MOTIONS TO DISMISS

The Florida Legislature recently enacted a law "relating to parental rights in education." Ch. 22-22, 2022 Laws of Fla. (H.B. 1557) (codified as amended at Fla. Stat. § 1001.42). One provision of that law is at issue in this case:

> Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards.

*Id.* § 1 (codified at § 1001.42(8)(c)3.)

Plaintiffs—students, parents, teachers, and organizations—contend this provision violates the United States Constitution and Title IX of the Education Amendments Act of 1972. They sued the Governor, the Commissioner of Education, the Florida Department of Education, the Florida State Board of Education, Board of Education members, and several individual school districts. ECF No. 1. Two months later, they filed an amended complaint. ECF No. 47 ("Am. Compl."). All

defendants but one moved to dismiss. ECF Nos. 60, 62, 63, 65, 66, 67, 68. (The Miami-Dade County School Board filed an answer. ECF No. 64.)

Although the motions do not all present identical arguments, there is substantial overlap. Generally, Defendants contend that the court lacks jurisdiction, that Defendants enjoy Eleventh Amendment immunity, that this is the improper venue, and that the Amended Complaint is an improper shotgun pleading. They also challenge the claims on the merits. I will begin with the threshold issue of the court's jurisdiction.

## I.

"Article III of the United States Constitution limits the 'judicial Power'—and thus the jurisdiction of the federal courts—to 'Cases' and 'Controversies.'" *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quoting U.S. Const. art. III, § 2). This court does not have jurisdiction unless at least one plaintiff has standing—"an essential and unchanging part of the case-or-controversy requirement" for Article III jurisdiction. *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). And if the court lacks jurisdiction, it may not consider the merits of Plaintiffs' claims, "no matter how weighty or interesting." *Id.*

Standing requires three elements: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th

2

Cir. 2020) (citing *Lujan*, 504 U.S. at 560-61)). Ultimately, a plaintiff must prove these elements, but at this stage, he need only allege facts that would support them. *See Lujan*, 504 U.S. at 561; *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) (noting need to "sufficiently allege[] a basis" for each element). And at this stage, I accept as true the complaint's factual allegations. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003).

The standing inquiry is separate "for each claim that [Plaintiffs] press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Here, given the varied plaintiffs and claims, the standing issue is multifaceted.

## A.   The Individual Plaintiffs Have Not Shown Traceability or Redressability as to Most of Their Asserted Harms.

Traceability and redressability are intertwined issues that "often travel together." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). To show traceability, a plaintiff must allege a "plausible causal chain" between a defendant's action and the resulting harm. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272 (11th Cir. 2019). The plaintiff must point to some causal chain linking his injury to "*the challenged action* of the defendant," *id.* at 1272 (citing *Lujan*, 504 U.S. at 560). Plaintiffs have not done that here.

The principal problem is that most of Plaintiffs' alleged harm is not plausibly tied to the law's *enforcement* so much as the law's very *existence*. Plaintiffs contend

3

the law's passage, the sentiment behind it, the Legislators' motivation, and the message the law conveys all cause them harm. But no injunction can unwind any of that. "[F]ederal courts have no authority to erase a duly enacted law from the statute books." *Jacobson*, 974 F.3d at 1255 (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)). "Our power is more limited: we may 'enjoin executive officials from taking steps to enforce a statute.'" *Id.* (quoting Mitchell, *supra*, at 936). So Plaintiffs' allegations must tie their alleged harm to Defendants' enforcement of the law.

Yet Plaintiffs' complaint is replete with allegations showing their asserted injuries flowed from something other than the law's enforcement. Indeed, they allege that the law's "harmful effects" were "already manifest" even before the law became effective—before, that is, it even *could be* enforced. Am. Compl. ¶ 16; *see also id.* ¶ 173 (alleging that the law "which has not even gone into effect as a technical matter [] is already having effects far and wide throughout the Florida public school system"). It should be obvious that harms predating a statute's enforcement were not caused by the statute's enforcement. And it should be equally obvious that an injunction precluding a statute's enforcement would not stop harms the statute's enforcement never caused in the first place.

Plaintiffs point to a student plaintiff who "was called into his principal's office and informed that his upcoming commencement speech as senior class president

could not include material related to his activism, including his activism against H.B. 1557 or his participation in this lawsuit." Am. Compl. ¶ 174. The principal told him if he did, officials would turn off his microphone. *Id.* This was before the law was effective, and Plaintiffs make no serious effort to argue that the law would limit any student's graduation speech. The complaint here, as best I can tell, is that the school officials were acting in line with whatever sentiment they thought was underlying H.B. 1557's passage. But even if that were true, an injunction precluding the law's enforcement would not remedy the harm.

As another example, Plaintiffs allege that a student plaintiff "fears that H.B. 1557 will empower those who have demonstrated their disapproval of LGBTQ individuals to treat LGBTQ students differently." Am. Compl. ¶ 188; *accord id.* ¶ 196. Again, nothing in the law—much less in its conceivable enforcement—could "empower" other students to do anything they could not otherwise do with respect to treating LGBTQ students differently. Plaintiffs thus have not alleged facts to show that precluding the law's enforcement would address this issue. The same is true for other asserted harms. *See, e.g.*, *id.* ¶ 194 (alleging that "a little over a month after H.B. 1557 was passed, [a transgender plaintiff] was outed at school for the first time"); *id.* ¶ 234 (alleging that a Tallahassee principal and a teacher "faced harassment from parents . . . in response to statements made on their private Facebook posts where they were critical of H.B. 1557").

Another Plaintiff—an elementary school teacher—alleges concern over "the environment created by H.B. 1557," which makes him fear that "if he even acknowledges his own identity as a gay male with a husband, he will be called a 'pedophile' or a 'groomer.'" *Id.* ¶ 219; *see also id.* ¶ 235 (alleging that gay kindergarten teacher who publicly opposed H.B. 1557 "was harassed relentlessly on social media, called a 'groomer,' and [had] calls and emails [] made to his superintendent demanding his termination."). Yet again, nothing about the law's enforcement would make it more or less likely that this Plaintiff—or anyone else— would face such insults. Here too, Plaintiffs attack only the sentiment they contend is behind the law. These are just examples of a problem that permeates Plaintiffs' complaint.

There is a related problem with traceability and redressability. The law is enforced against school districts—not individual teachers. Fla. Stat. § 1001.42(8)(c)7.b.(I)-(II). With or without the law, school districts direct teachers as to what they may and may not teach. Plaintiffs do not allege otherwise; they do not assert, for example, that Florida's public-school teachers may teach whatever lessons they wish. So to the extent Plaintiffs allege that some teachers or others wish to provide "[c]lassroom instruction . . . on sexual orientation or gender identity" to students "in kindergarten through grade 3," they would have to show (at a minimum) that without the law their individual school district would allow it. Yet Plaintiffs

offer no specific allegation that any teacher would be providing such classroom instruction absent H.B. 1577. Thus, to the extent their asserted injury is their being precluded from teaching those lessons, they have not shown that H.B. 1577 caused the injury—or that an injunction precluding its enforcement could cure it. The same is true to the extent Plaintiffs allege that some students are denied those lessons. They have not shown that but for H.B. 1577 any of the student plaintiffs would be receiving "[c]lassroom instruction by school personnel or third parties on sexual orientation or gender identity."

*      *      *

Plaintiffs will have an opportunity to replead. If they do so, they must allege sufficient facts to plausibly show harms that are "fairly traceable" to the law's enforcement—harms that are "likely" to "be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (marks omitted).

## B.    The Individual Plaintiffs Have Not Shown Sufficient Injury.

To the extent Plaintiffs have alleged harms that are arguably traceable to the school districts' prospective actions, those harms are not constitutionally cognizable—at least not as currently pleaded. For example, Plaintiffs allege that some of them are chilled in their expression. *See, e.g.*, Am. Compl. ¶ 198 ("Shook is already feeling the chilling effect that H.B. 1557 has on her daughter's classroom environment."); *id.* ¶ 268 (alleging that several student plaintiffs "are uncertain

7

about what they are legally able to say and do in class; and they hesitate to speak or participate in class out of fear of violating the law and facing discipline from their school").

"[I]t is well-established that an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance, the injury is self-censorship." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001) (marks omitted)). Nonetheless, one cannot demonstrate standing merely by announcing a chill. A plaintiff must show that the challenged law arguably forbids the chilled speech and that exercising the speech may have real consequences. That is what is missing here. *Cf. Dermer v. Miami-Dade County*, 599 F.3d 1217, 1220-21 (11th Cir. 2010) ("Dermer, however, failed to provide the court with anything more than generalizations. He refrained from submitting any detail, such as when, where, or how he intends to exercise his right to free speech in the future, that illuminates the specifics of his claimed injury. Without such elaboration, his mere assertion of a chill is insufficient to demonstrate an injury in fact.").

Plaintiffs' claims of self-censorship or chill arise in their vagueness and First Amendment claims. The analysis for these separate claims is similar but not identical. *See Harrell*, 608. F.3d at 1259-60. For the vagueness claim, Plaintiffs must

show that they seriously wish to undertake action that "would arguably be affected
by the [law], but the [law is] *at least arguably vague* as [it] appl[ies] to [them]." *Id.*
at 1254. They must also show "there is at least a minimal probability that the rules
will be enforced, if they are violated." *Id.*[1]

Starting with the latter, Plaintiffs have not shown any probability that they
themselves will suffer consequences if there is "[c]lassroom instruction . . . on
sexual orientation or gender identity." As noted above, the law is enforced against
school districts and not individuals. So although there are allegations that a student
will be less likely to "share information about their family's LGBTQ friends with
their peers," Am. Compl. ¶ 77, and that a teacher "will be 'walking on eggshells'
next year," *id.* ¶ 224, there has been no allegation that H.B. 1557 would be *enforced*
against a Plaintiff.[2] This is therefore unlike *Harrell*, in which The Bar had explicitly

---

[1] Courts must be careful not to address a claim's merits when considering
standing; they are different inquiries. *Lewis*, 944 F.3d at 1296. Nonetheless, it is not
improper—indeed it is necessary—to interpret a challenged provision in deciding
whether a plaintiff has standing to bring a vagueness challenge. *See Harrell*, 608
F.3d at 1257 (noting that court "consider[ed] the text of the [challenged ethics] rules"
to assess whether the plaintiff "may credibly claim to have suffered an injury-in-fact
in the form of self-censorship").

[2] To be sure, there are allegations that teachers could face consequences for
their actions, but Plaintiffs do not carefully tie them to the law they challenge. For
example, they point to a newspaper article about a middle-school teacher who lost
her job "after her students drew LGBTQ flags during their free time in her class."
Am. Compl. ¶ 226. But this happened "even though H.B. 1557 [had] not yet gone
into effect." *Id.*

warned the plaintiff that running prohibited advertisements could subject him to discipline. 608 F.3d at 1257.

This is not to say that direct enforcement against students or teachers is necessary to show an objective chill. But this is a relevant inquiry in evaluating whether Plaintiffs have alleged any probability that the laws would be enforced to their detriment. Plaintiffs offer no indication—speculative or otherwise—about what might happen to students or parents who acted contrary to H.B. 1557. And as to teachers, whom Plaintiffs suggest might face discipline, that conclusion requires several levels of speculation.

In addition, Plaintiffs have not alleged any specific actions they wish to take that would make the law arguably vague to them. A vague statute is one that uses terms such that "persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (cleaned up) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984)). Again, this is unlike *Harrell*, in which one of the challenged rules prohibited "manipulative" advertisements, whatever that meant. *Id.* at 1255. Here, the challenged law applies to "[c]lassroom instruction . . . on sexual orientation or gender identity." Plaintiffs have not alleged any future actions that would lead someone of ordinary intelligence to guess as to whether the law applies.

Plaintiffs allege that some parents worry they "may no longer be included in school events, including career day or other classroom activities, because of a fear that *their presence* will lead to violations of H.B. 1557 or make school community members uncomfortable." Am. Compl. ¶ 215 (emphasis added). Other parents worry they may not be able to "authentically present themselves" because "speaking about their relationship and family, or even being present as a couple" when they are "visiting or presenting to their children's class" might be prohibited by H.B. 1557. *Id.* ¶ 208. They also allege that some teachers "are petrified" to directly address bullying based on a student's gender identity. *Id.* ¶ 227. And they allege that others believe rainbow flags must be removed from classrooms, that LGBTQ teachers cannot mention their partners, or that students cannot mention having LGBTQ parents. *Id.* ¶¶ 184, 204, 231. But there is no arguable vagueness as to any of these actions.[3] These actions are not classroom instruction on sexual orientation or gender identity, even if they involved parties who mention a sexual orientation or gender identity. In short, none of the asserted future actions involve classroom instruction on sexual orientation or gender identity, so the act is not vague is it applies to them.[4]

---

[3] This point is similar to the redressability point made above; Plaintiffs are pointing to harms not addressed by the statute. But in the self-censorship area, this issue relates to whether there is an injury, not redressability.

[4] It is not entirely clear that Plaintiffs rely on any of the examples in their complaint specifically as to their vagueness challenge. As noted below, one problem

A similar analysis resolves the First Amendment claims. To assert a self-censorship First Amendment claim, the plaintiffs must show that "the challenged policy 'objectively chills' protected expression." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). The required inquiry asks "whether the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights." *Id.* (cleaned up).

The fact that the law is not enforced directly against Plaintiffs is a relevant (but not dispositive) factor. *Id.* at 1120 ("[T]he threat of formal discipline or punishment is relevant to the inquiry, but it is not decisive."). Here, as with the vagueness-related alleged chill, Plaintiffs have not alleged nonspeculative facts that would show a reasonable would-be speaker would self-censor. Regardless, Plaintiffs do not point to specific future actions that the law arguably forbids. Again, they allege generalities and point to actions clearly not covered—like teachers' having photos of same-sex spouses on their desks. Am. Compl. ¶ 231. These are insufficient to plead that H.B. 1557 objectively chills speech of a reasonable plaintiff, because they are not covered by the law. *Cf. Speech First*, 32 F.4th at 1124 (holding student

---

with Plaintiffs' complaint is that it incorporates every allegation into every claim, making it difficult to parse. If Plaintiffs replead, they must incorporate into each count only the allegations pertinent to that count.

plaintiffs had standing to challenge UCF's speech code because no "average college student [would] want to run the risk that [UCF] will track her, monitor her, or mount a comprehensive response against her" (cleaned up)). Put another way, none of Plaintiffs' asserted activities are "arguably proscribed" by H.B. 1557, so their complaint fails as drafted. *Id.* at 1120 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014)).

Plaintiffs also allege that a general "imprimatur of discrimination" causes "injury and ostracization from the passage of the law" and that it is "substantially likely" H.B. 1557 will impact their school and personal lives. Am. Compl. ¶ 279. But although they allege a "culture of fear created by H.B. 1557," *id.* ¶ 215, Plaintiffs point to no actual stigmatic injury. As noted above, they allege that some students fear that teachers who are "not supportive of the LGBTQ community" may "feel empowered by the law to justify treating [Plaintiffs] differently." *Id.* ¶ 188. And they allege that some parents "fear that H.B. 1557 will empower and embolden anyone— students, other parents, and even school officials—who might want to bully or ostracize their children." *Id.* ¶ 196. But these fears are insufficient to allege stigmatic injury. *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1113 (11th Cir. 2021) ("[T]o sufficiently allege stigmatic injury, a plaintiff still must meet the

constitutional standing requirements" including that they "personally experienced the discrimination." (citing *Allen v. Wright*, 468 U.S. 737, 757 n.22 (1984))).[5]

Finally, Plaintiffs allege infringement of their First Amendment right to receive information. They allege that they will be "denied the educational opportunities that their non-LGBTQ peers receive," Am. Compl.¶ 124, but they never clarify what instruction would be denied. Likewise, they allege that they will "no longer receive education on the normalcy and value of differences" and that they cannot "receive and debate information and ideas concerning sexual orientation and gender identity," *id.* ¶¶ 214, 289, but they do not include sufficient details to evaluate their asserted constitutional injury. And in other areas, they offer only speculation about what they might miss. *See, e.g., id.* ¶ 185 ("S.S. worries that she will no longer be exposed to [lessons about the Stonewall Riots] and that her education will suffer.").

## C. The Organizational Plaintiffs Have Not Shown Standing.

Two Plaintiffs are organizations. Organizations can have standing on behalf of their members. They can also have standing on their own. *Jacobson*, 974 F.3d at

---

[5] Plaintiffs allege that some parents have felt stigma from other parents since the law was enacted, and that some children have experienced an increase in other children using the term "gay" as an insult. *Id.* ¶¶ 209-210. But, similar to before, these are not traceable to H.B. 1557's enforcement.

1249. Plaintiffs contend they have satisfied both kinds of standing, but they have not alleged facts to support this.[6]

For associational standing, an organization must have a member who would have standing to sue in his own right. *Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). For the reasons discussed above, Plaintiffs have not sufficiently alleged this. They point to several specific Equality Florida members, but they have not shown that any has standing. Nor have they alleged that any other non-named member has standing.

Plaintiffs also come up short on their diversion-of-resources theory. Diversion of resources can supply the constitutional injury for an organization's standing, but Plaintiffs here have not shown enough. They allege, at length, that they diverted funds from certain initiatives so they could oppose H.B. 1557's enactment. Am. Compl. ¶ 245. They "spent on social media and television ads, staff travel to the legislature, and expenses relating to constituent lobbying days, among other things." *Id.* ¶ 246; *see also id.* ¶ 248 (expenses "to lobby against the bill"); *id.* ¶ 249 (resources "to coordinate the campaign against H.B. 1557").

But these injuries do not relate to the law's enforcement. Political advocacy to defeat legislation is not cognizable harm in this circumstance. If it were, any

---

[6] Family Equality alleges only that it sues "in its own capacity." Am. Compl. ¶ 28.

political opponent of any law would have standing to sue. *Cf. Jacobson*, 974 F.3d at 1252 ("This expansive theory of standing would allow any organization that favors the election of certain candidates to claim an injury based on harm to those candidates' electoral prospects."). That has never been the law.

Plaintiffs also allege other past diversions. *Cf., e.g.*, Am. Compl. ¶ 244 (Equality Florida "already diverted significant financial and staff resources."); *id.* ¶ 258 ("Family Equality has diverted resources away from other campaigns and projects nationwide to focus on fighting the law's impact."). It is unclear whether all these past diversions were related to political advocacy against the law, but either way, past diversions are not sufficient to support standing for prospective relief. *Jacobson*, 974 F.3d at 1251 (noting that organization lacks standing to seek prospective relief without "certainly impending" injury (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013))).

To the extent Plaintiffs allege future injury, their allegations are too vague or speculative to sustain their burden at this stage. It is not enough, for example, to allege vaguely that "[t]he organizations themselves are also suffering injury to their mission and by virtue of the need to divert resources to combat an unjust law." Am. Compl. ¶ 243; *see also id.* ¶ 248 (unspecified "efforts related to H.B. 1557"); *id.* ¶ 257 ("Florida Equality is also going to now focus more time and effort on supporting families in Florida, particularly with respect to how to navigate the

16

impact of H.B. 1557."); *id.* ¶ 258 ("Family Equality will have to allocate resources to develop specific resources for Florida families as to how the law might impact them and what they can do to try to ensure that their families are as safe and supported as possible."); *id.* ¶ 259 (Family Equality will add a staff position "partly in response to making sure there are adequate staff resources to [do unspecified] work on the impact of H.B. 1557."); *id.* ¶ 260 (alleging need for "policy team to figure out what resources need to be developed to assist LGBTQ parents in Florida who are impacted by this new law").

It is true that Plaintiffs need not offer all specific details, *see Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1115 (11th Cir. 2022) (noting that "broad allegation of diversion of resources is enough at the pleading stage"), but they must allege enough specificity to "'plausibly' state that the elements of standing are met." *Hunstein v. Preferred Collection & Mgmt. Servs., Inc*., --- F.4th ---, 2022 WL 4102824, at *3 (11th Cir. Sept. 8, 2022) (en banc) (quoting *Thole v. U.S. Bank N.A*., 140 S. Ct. 1615, 1621 (2020)); *see also Ga. Ass'n of Latino Elected Offs.*, 36 F.4th at 1115 (noting that plaintiff offered "more specific allegations identifying the steps it is taking in response to Defendants' alleged illegal activities and the personnel it has assigned to help limited-English proficient, Spanish-speaking voters who received English-only materials").

Finally, where Plaintiffs offer the most specifics, they have the biggest redressability problems. They allege, for example, that Family Equality has an anti-discrimination program that includes "a 'Book Nook,' which provides a comprehensive list of the best LGBTQ books for children of all ages, including pre-K through third grade." *Id.* ¶ 256. They fear the books will no longer be allowed in schools, thanks to H.B. 1557. But they do not allege facts suggesting the law's enforcement would affect those books or otherwise undermine the "Book Nook" program.

Plaintiffs point to *Florida State Conference of N.A.A.C.P. v. Browning*, in which the court found standing based on an organization's diverted resources. ECF No. 91 at 41 (citing 522 F.3d 1153, 1156-57 (11th Cir. 2008)). But that case was different. The law at issue imposed additional steps in the voter-registration process—additional steps that plaintiffs contended impeded voter access. *Browning*, 522 F.3d at 1156-57. The court concluded that the organizations showed a concrete injury because "[t]he organizations reasonably anticipate[d] that they w[ould] have to divert personnel and time to educating volunteers and voters on compliance with [the law] and to resolving the problem of voters left off the registration rolls on election day." *Id.* at 1165-66. Here, Plaintiffs plead no comparable facts suggesting that they "reasonably anticipate" H.B. 1557 will require the Book Nook's removal.

It may be that the organizations ultimately have standing. But they have not met their burden at this stage to allege sufficient facts supporting it. They will have another opportunity to do so.

**D.    The Plaintiffs Have Not Shown Standing for Their Damages Claims.**

Several Plaintiffs seek monetary relief, but in doing so they point to events that occurred before H.B. 1557 became effective. So even if these events were injuries, Plaintiffs have not tied them to any action from any defendant. *Cf. Support Working Animals*, 8 F.4th at 1204 (noting that the Eleventh Circuit has "rejected the idea that an official's role in crafting duly enacted legislation can satisfy the traceability requirement"). So they have not alleged traceability.[7]

In short, Plaintiffs have not sufficiently alleged facts to support standing.

## II.

The conclusion regarding standing requires dismissal. But several Defendants also assert Eleventh Amendment immunity, and because this order affords Plaintiffs an opportunity to replead, I will address the issue now—at least in part.

The Eleventh Amendment generally immunizes states from suit in federal court. *Alden v. Maine*, 572 U.S. 706, 713 (1999). But *Ex parte Young* recognizes "a narrow exception grounded in traditional equity practice" that permits suits for

---

[7] This assumes that all claims are challenging H.B. 1557, although this is not entirely clear. If Plaintiffs sought to present any standalone claim—that is, one not dependent on H.B. 1557's validity—they must do so clearly if they replead.

prospective injunctive relief against individual state officials. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)). Where, as here, plaintiffs assert that many different defendants should be enjoined, the analysis turns on the immunity available to each defendant. *See, e.g.*, *id.* at 532-33 (separately analyzing the doctrine's applicability to different officials). So I will address each Defendant in turn.

First, the Florida Department of Education and Florida State Board of Education assert Eleventh Amendment immunity, ECF No. 68 at 21-22, and the Plaintiffs conceded that as to the § 1983 claims. ECF No. 91 at 45. But Plaintiffs correctly note that Eleventh Amendment immunity does not preclude their Title IX claim because Congress abrogated states' immunity for Title IX suits. *Id.* (citing *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1301 (11th Cir. 2007)).

The Commissioner of Education also argues Eleventh Amendment immunity, noting that the *Ex parte Young* exception only authorizes suits against a state official in his official capacity "when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (citing *Ex parte Young*, 209 U.S. at 161)). This argument is well founded. The Commissioner's office does not enforce H.B. 1557. It does serve to appoint a special magistrate if parents seek review of a district's potential H.B. 1557 violation. *See*

H.B. 1557, § 1. (It is unclear how that process would work, but the appointment is tangential at best.) Aside from that, the Commissioner's only function under the statute is to develop state educational standards—including the ones the statute says must be updated by June 30, 2023. *See id.* § 2.

These functions are insufficient for the Plaintiffs to invoke the *Ex parte Young* exception against the Commissioner. Plaintiffs admit that the special magistrate could not be sued because she would be an adjudicator. ECF No. 91 at 44 n.12; *see also Whole Woman's Health*, 142 S. Ct. at 539. Just as *Ex parte Young* does not permit suits against adjudicators, neither does it permit suits against the appointer of an adjudicator based on that appointment.[8] Likewise, the Commissioner's generalized rulemaking authority does not abrogate immunity. *See Support Working Animals*, 8 F.4th at 1204. Because the Commissioner's office does not grant him the "responsibility to enforce" H.B. 1557, the *Ex parte Young* exception does not apply to him, and the Eleventh Amendment precludes suit against the Commissioner.

The members of the Florida State Board of Education also assert Eleventh Amendment immunity. They claim that they serve in an adjudicatory role because they review the special magistrate's decision, so the *Ex parte Young* exception does

---

[8] Notably, the Plaintiffs withdrew their claims against the Governor because of Eleventh Amendment immunity, even though the Governor appoints the Board of Education members who would review the special magistrate's decision. ECF No. 91 at 73; *see* Fla. Const. art. IX, § 2.

not apply. ECF No. 68 at 23 n.4. But as the State Defendants argued separately,
"H.B. 1557 . . . is enforced by the State Board of Education." *Id.* at 22. Enforcement
by executive branch officials—like the Board Members—is precisely what permits
suits under the *Ex parte Young* exception. *See Whole Woman's Health*, 142 S. Ct. at
532.[9]

Finally, the Broward County School Board makes passing reference to its
having Eleventh Amendment immunity. No other County School Board raises this
argument, likely because the Eleventh Circuit has long "denied Eleventh
Amendment immunity to school boards in Florida." *Walker v. Jefferson Cnty. Bd. of
Educ.*, 771 F.3d 748, 752 (11th Cir. 2014) (citing *Stewart v. Baldwin Cnty. Bd. of
Educ.*, 908 F.2d 1499, 1510 (11th Cir. 1999) (collecting cases)). But "[w]hether an
entity is an 'arm of the state' must be assessed in light of the particular function in
which the entity was engaged when taking the actions out of which liability is
asserted to arise." *Id.* at 757 (cleaned up) (quoting *Manders v. Lee*, 338 F.3d 1304,
1308 (11th Cir. 2003) (en banc)). Broward County makes this argument but does not
fully develop it, so I will not address it now.

---

[9] Even though the *Ex parte Young* exception applies to them, the Board of
Education members are correct that the Plaintiffs cannot seek damages against them
under § 1983. *See Grizzle*, 634 F.3d at 1319.

## III.

Several Defendants—the Pasco, Orange, and Sarasota County School Boards—argue that venue is improper. ECF Nos. 60 at 8-9; 63 at 3-5; 65 at 27-29. But the venue statute is clear that when "all defendants are residents of the State," venue is proper in a district where "any defendant resides." 28 U.S.C. § 1391(b)(1). Here, all Defendants are Floridians or Florida entities. Am. Compl. ¶¶ 83-93. Though none of the County School Board Defendants reside in the Northern District, many of the State Defendants do. That makes the Northern District a proper venue. Florida's home venue privilege has no application in this federal challenge.

Even still, some counties have argued that the court should transfer the case to the Middle District or dismiss them. ECF Nos. 63 at 3-5; 65 at 27-29. Under the federal venue statute, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The interests-of-justice inquiry includes factors like access to the source of proof, availability of a compulsory process for ensuring witness availability, and judicial economy. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981). But in any case, "a plaintiff's choice of forum should rarely be disturbed," *id.* at 241, and the ultimate decision "is left to the sound discretion of the district court." *Roofing & Sheet Metal Servs., Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 985 (11th Cir. 1982).

Here, no Defendant has shown that the interests of justice favor transfer. No district is home to all Defendants, and the school boards have not shown that location of witnesses, sources of proof, or judicial economy would favor another district. There is no basis for a transfer.

## IV.

Finally, several Defendants argue the First Amended Complaint is a shotgun complaint. Plaintiffs disagree, insisting that their pleading gives fair notice of the claims. The problem—which has complicated review—is that Plaintiffs allege all facts into all claims, with each claim incorporating all preceding claims. This makes Plaintiffs' complaint a quintessential shotgun pleading. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015) (explaining that one type of shotgun complaint is "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"). This serves as an independent basis for dismissal, albeit with leave to amend. *Id.*

If they replead, Plaintiffs should include only the allegations necessary to support their claim. Their operative complaint includes more than 300 paragraphs spanning 114 pages. Yet under Rule 8(a)(2), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Additional clarity and specificity now may avoid future problems.

24

Among other things, Plaintiffs must specify which factual allegations are against which Defendants; against which Defendants which Plaintiff(s) seek damages, and on what basis; and which factual allegations support which claims for relief.[10]

CONCLUSION

The Motions to Dismiss (ECF Nos. 60, 62, 63, 65, 66, 67, 68) are GRANTED because Plaintiffs have not adequately pleaded facts to support standing. The First Amended Complaint is DISMISSED. Plaintiffs may file a Second Amended Complaint within 14 days. Defendants will then have 14 days to respond.

Plaintiffs' motion to lift the stay of discovery, ECF No. 113, is DENIED. Plaintiffs may reraise the issue after they file a Second Amended Complaint.

SO ORDERED on September 29, 2022.

s/ *Allen Winsor*
United States District Judge

---

[10] Plaintiffs sought punitive damages but have since withdrawn that claim. ECF No. 91 at 73.

25