## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**M.A.**, et al.,

    *Plaintiffs*,

    v.                            No. 4:22-cv-134-AW-MJF

**FLORIDA STATE BOARD OF
EDUCATION**, et al.,

    *Defendants*.

_____/

## STATE DEFENDANTS' SECOND MOTION TO DISMISS
## AND INCORPORATED MEMORANDUM OF LAW

HB 1557—Florida's Parental Rights in Education law—responded to reports that some public-school officials were concealing from parents information about the sexual orientation and gender identity of their children. The legislation safeguards parents' right to direct the upbringing of their children by requiring, among other things, that public-school officials notify parents of changes in the mental health and wellbeing of their children and encourage children to discuss sensitive matters with their parents.

Plaintiffs challenge a provision of HB 1557 that removes the subjects of "sexual orientation" and "gender identity" from Florida's public-school curricula for kindergarten through the third grade and, after that, leaves teachers free to instruct on those subjects in a manner that is "age-appropriate [and] developmentally

1

appropriate for students in accordance with state standards." Fla. Stat. § 1001.42(8)(c)(3). Falsely dubbed by its opponents the "Don't Say Gay" law, *see* ECF 123 ¶ 32, HB 1557 is nothing of the sort. Far from banning discussion of sexual orientation and gender identity, the legislation expressly allows age and developmentally appropriate education on those subjects. Consistent with that modest limit, the law prohibits classroom instruction on sexual orientation and gender identity for the youngest children, neutrally allowing *all* parents, no matter their views, to introduce those sensitive topics to their children as they see fit.

Plaintiffs' effort to convince the public that HB 1557 "is an open declaration of discrimination against LGBTQ children," ECF 123 ¶ 52, is fearmongering at best. The statute is not "aimed at eliminating . . . [all] recognition or discussion of LGBTQ persons or issues." *Id.* ¶ 32. It merely leaves orthodoxy on such matters to parents rather than state officials at least until the fourth grade, at which point the concepts may be introduced in a manner consistent with "state standards" that have not yet been adopted and need not be adopted until June 30, 2023. Until then, Florida's students, parents, and teachers face just one restriction regarding instruction: There may be no "classroom instruction" for the youngest public-school students "on" the concepts of "sexual orientation" and "gender identity." Fla. Stat. § 1001.42(8)(c)(3). The statute does not prohibit, for example, mere classroom references to a person's family—whether gay or straight, transgender, or otherwise.

This pre-enforcement, facial challenge claims principally that HB 1557 violates the First Amendment, the Equal Protection Clause, and the Due Process Clause. For the reasons discussed below, Plaintiffs have failed to cure the standing problems that led the Court to dismiss their First Amended Complaint. There is, in any event, nothing unlawful about HB 1557. Because a public-school teacher is a government employee whose "job is to speak in the classroom on the subjects she is expected to teach," the teacher's lessons are "not the speech of a 'citizen' for First Amendment purposes." *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Beyond that, states have broad authority to determine the content of public-school curricula in a manner that is "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Here, the State has removed sensitive content from its curricula because it is "inappropriate for the age group." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 880 (1982) (Blackmun, J., concurring in part and concurring in the judgment). That is perfectly constitutional because "a school must be able to take into account the emotional maturity of the intended audience." *Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1521 (11th Cir. 1989) (cleaned up).

Plaintiffs' equal-protection claim fares no better. The statute subjects no one "to discriminatory treatment." *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d

1330, 1338 (11th Cir. 2019) (cleaned up). Rather, it establishes an educational standard that, for each grade level, affects classroom instruction equally and neutrally. The law limits all classroom instruction on "gender identity" and "sexual orientation," not just instruction on transgender identity and homosexuality.

Interpretative questions about HB 1557 will of course present themselves, as is true of any law. But the statute's meaning is readily apparent, so it is not even close to "standardless," *United States v. Estrada*, 969 F.3d 1245, 1265 (11th Cir. 2020) (cleaned up), which dooms Plaintiffs' vagueness challenge.

The complaint should be dismissed.

## STATEMENT OF THE CASE

**1.** Leading up to the 2022 Regular Session of the Florida Legislature, the Leon County school board was sued for "withholding information from . . . parent[s] regarding their student's gender transition at school." Fla. H.R., CS/CS/HB 1557 (2022) Final Staff Analysis at 4–5 (Mar. 28, 2022), https://www.flsenate.gov/Session/Bill/2022/1557/Analyses/h1557z.EEC.PDF (citing Ana Goñi-Lessan, *Lawsuit against Leon Schools says district excluded parents from gender discussions*, TALLAHASSEE DEMOCRAT (Nov. 16, 2021), https://www.tallahassee.com/story/news/2021/11/16/leon-county-schools-sued-over-lgbtq-guide-transgender-lgbtqguide/6342695001/). That was no isolated incident. For example, the "Clay County School Board [wa]s being sued by parents"

alleging that "school officials hid their 12-year-old daughter's mental health and gender identity issues for months – only informing them after the child attempted suicide in the school bathroom on two separate occasions." *Another Florida School Board Sued over Concealing Gender Identity Counseling from Parents*, TALLAHASSEE REPORTS (Jan. 30, 2022), https://tallahasseereports.com/2022/01/30/another-florida-school-board-sued-over-concealing-gender-identity-counseling-from-parents/.

As legislative staff noted, those incidents were symptomatic of a broader issue: "multiple school districts in Florida maintain[ed] policies that exclude[d] parents from discussions and decisions on sensitive topics relating to students." CS/CS/HB 1557 Final Staff Analysis at 4 & nn.25–26, https://www.flsenate.gov/Session/Bill/2022/1557/Analyses/h1557z.EEC.PDF (identifying Leon, Broward, Palm Beach, Miami-Dade, Sarasota, Volusia, and Hillsborough County policies). Miami-Dade County, for example, was instructing teachers that, "[w]hen contacting the parent/guardian of a transgender or gender expansive student, school staff should use the student's legal name and the pronoun corresponding to the student's assigned sex at birth, unless the student or parent/guardian has specified otherwise." MIAMI-DADE CNTY. PUBLIC SCHS., 2020-2021 GUIDELINES FOR PROMOTING SAFE AND INCLUSIVE SCHOOLS 7 (2020), https://api.dadeschools.net/WMSFiles/94/pdfs/GUIDELINES-FOR-

PROMOTING-SAFE-07-2020.pdf (cited at ECF No. 123 ¶ 28 & n.86). Broward County went even further, instructing teachers that (1) they would be in violation of federal law if they divulged students' LGBTQ status to their parents, (2) they had to lie in response to parents' questions about such issues, and (3) they could not even "encourage . . . a student to be 'out' at home." BROWARD CNTY. PUBLIC SCHS., LGBTQ+ CRITICAL SUPPORT GUIDE 26–28 (3d ed. 2012), https://defendinged.org/wp-content/uploads/2022/05/BCPS-LGBTQ-Critical-Support-Guide-III-Edition-2020.pdf (cited at ECF No. 123 ¶ 29 & n.8).[1] Duval, Hillsborough, Pinellas, and Volusia counties were giving the same direction to their teachers.[2]

---

[1] In support of this directive, Broward relied on a case about a police officer who threatened to "out" an arrestee, leading to the arrestee's suicide. BROWARD CNTY. PUBLIC SCHS., *supra*, at 24, 26, 38 (citing *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n.4 (3d Cir. 2000)).

[2] DEP'T OF HEALTH EDU. & PHYSICAL EDU. & OFFICE OF EQUITY & INCLUSION, DUVAL CNTY. PUBLIC SCHS., LGBTQ+ SUPPORT GUIDE 12 (2020), https://s3.documentcloud.org/documents/21988102/dcps_lgbtq_support_guide_20 20.pdf (cited at ECF No. 123 ¶ 30 n.12); DIVISION OF DIVERSITY, EQUITY & INCLUSION, HILLSBOROUGH CNTY. PUBLIC SCHS., LBGTQ+ CRITICAL RESOURCE AND SUPPORT GUIDE FOR STAFF 16 (2021), https://www.wfla.com/wp-content/uploads/sites/71/2022/02/Hillsborough-Schools-LGBTQ-Critical-Resource-Guide-2021-08.31.21.pdf (cited at ECF No. 123 ¶ 30 n.12); PREVENTION DEP'T, PINELLAS CNTY. SCHS., INCLUSIVE SCHOOLS SUPPORT GUIDE: PROMOTING SAFE AND INCLUSIVE SCHOOLS 22–23 (2020), http://www.pccpta2020.com/wp-content/uploads/2021/09/Inclusive-Schools-Support-Guide_FINAL_5.28.20.pdf (cited at ECF No. 123 ¶ 30 n.12); VOLUSIA CNTY. SCHS., LGBTQ SUPPORT GUIDE

At the same time, some Florida school boards had published "Guidelines for Curriculum" that encouraged teachers to "include affirmative topics about LGBTQ+ persons in curriculum and classroom discussions" and admonishing that "[n]o parental notification is needed for these classroom discussions." PALM BEACH CNTY. SCH. DIST., SCHOOL DISTRICT OF PALM BEACH COUNTY LGBTQ+ CRITICAL SUPPORT GUIDE 80 (2d ed. 2021), https://www.wlrn.org/education/2022-07-15/palm-beach-school-district-pulls-lgbtq-support-guide-from-its-website (cited at ECF No. 123 ¶ 30 & n.11). The Guidelines referred to, for example, "the Genderbread Person," a widely publicized infographic of an anthropomorphic gingerbread cookie designed to teach young children the concepts of sexual orientation and gender identity:

---

11      (2020),      https://beacononlinenews.com/wp-content/uploads/2022/03/VCS-LGBTQ-Support-Guide-2020.pdf (cited at ECF No. 123 ¶ 30 n.12).

School District of Palm Beach County LGBTQ+ Critical Support Guide

27

*Id.* at 27; *see also The Genderbread Person*, https://www.genderbread.org/ (last visited Nov. 30, 2022); *Parent References 'GenderBread Person' in Public Testimony on Parental Rights in Education Bill*, TALLAHASSEE REPORTS (Mar. 3, 2022), https://tallahasseereports.com/2022/03/03/parent-references-genderbread-person-in-public-testimony-on-parental-rights-in-education-bill/.

Some parents objected to this type of instruction. Parents complained, for example, that their son's second-grade teacher had taught a book entitled *Call Me Max* during story time. *See* Lois K. Solomon & Brooke Baitinger, *Florida School District Pulls 2 Books about Transgender Kids, Including 'I Am Jazz'*, SOUTH FLORIDA SUN-SENTINEL (Apr. 6, 2022), https://www.sun-sentinel.com/local/schools/fl-ne-pbc-trans-books-20220406-hkgksij32bcbpod46uclprerlu-story.html. Like the Genderbread Person, *Call Me Max* teaches the concept of gender identity. The book attempts to explain, using child-friendly illustrated terms, the definition of "transgender." Kyle Lukoff, *Call Me Max* 4 (2019). It continues: "When a baby grows up to be transgender, it means that the grown-up who said they were a boy or a girl made a mistake." *Id.* at 5. The protagonist of the book also explains that "[w]hen I looked in the mirror, I saw a girl. Kind of. But because I'm transgender, I wanted to see a boy." *Id.* at 6.




Lukoff at 6–7.

And among many other examples, Broward County was directing teachers to respond to kindergarteners "when answering classroom questions that may arise" that "Gay (for grades Pre-K-2)" means "[a] person who has romantic feelings for someone of the same gender" and "Transgender (Grades K-4)" means that "[w]hen a baby is born, they are given a gender. Transgender people change their gender once they are old enough to explain to others how they feel about their own gender. This person may change their name or pronoun." BROWARD CNTY. PUBLIC SCHS., *supra*,

at 9–10, 12. Broward further directed that "[n]o parental notification is needed for these classroom discussions." *Id.* at 54.

"National Sex Education Standards" in use by many Florida school districts also provided that, "[b]y the end of the 2nd grade, students should be able to: Define gender, gender identity, and gender-role stereotypes." FUTURE OF SEX EDUC. INITIATIVE, NATIONAL SEX EDUCATION STANDARDS 19 (2d ed. 2020), https://www.advocatesforyouth.org/wp-content/uploads/2021/11/NSES-2020-web-updated2.pdf. And "[b]y the end of the 5th grade, students should be able to: Distinguish between sex assigned at birth and gender identity and explain how they may or may not differ," and "[d]efine sexual orientation." *Id.* at 21–22; *see also* Fla. S., recording of proceedings, at 2:07–08 (Mar. 7, 2022) (discussing the standards).[3]

**2.** The Florida Legislature responded by enacting HB 1557, which took effect on July 1, 2022. Entitled "[a]n act relating to parental rights in education," the legislation "reinforce[s] the fundamental right of parents to make decisions regarding the upbringing and control of their children" in two principal ways. 2022 Fla. Sess. Law Serv. Ch. 2022-22 (C.S.C.S.H.B. 1557) pmbl. (West).

*First*, the law requires transparency with parents regarding the health and wellbeing of their children. For instance, it requires school districts and their

---

[3] https://thefloridachannel.org/videos/3-7-22-senate-session-part-3/.

personnel to encourage students to discuss their wellbeing with their parents. Fla. Stat. § 1001.42(8)(c)(1). The statute further requires school boards to "notify parents [annually] of each health care service offered at their student's school and the option to withhold consent or decline any specific service." *Id.* § 1001.42(8)(c)(3). School boards must also "adopt procedures for notifying a student's parent if there is a change in the student's services or monitoring related to the student's mental, emotional, or physical health or well-being," and "[b]efore administering a student well-being questionnaire or health screening form to a student in kindergarten through grade three, the school district must provide the questionnaire or health screening form to the parent and obtain the permission of the parent." *Id.* §§ 1001.42(8)(c)(1), (6). The statute prohibits school districts from discouraging discussion with parents about their children's health, particularly "critical decisions affecting a student's mental, emotional, or physical health," *id.* § 1001.42(8)(c)(2), such as a potential gender transition. But school districts may establish procedures for withholding "such information from a parent if a reasonably prudent person would believe that disclosure would result in abuse, abandonment, or neglect." *Id.*

*Second*, the statute regulates public-school curricula. "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." Fla.

Stat. § 1001.42(8)(c)(3). In other words, "[c]lassroom instruction . . . on sexual orientation or gender identity" is permissible so long as it is "age-appropriate [and] developmentally appropriate for students in accordance with state standards," subject to a bright-line rule that classroom instruction on those topics is *not* age-appropriate or developmentally appropriate "in kindergarten through grade 3." *Id.*

State standards for "age-appropriate [and] developmentally appropriate" instruction after grade three must be promulgated by the Department of Education by June 30, 2023. HB 1557 § 2. That has not yet happened.

**3.** The Governor signed HB 1557 into law on March 28, 2022, and Plaintiffs filed this lawsuit three days later. This Court dismissed Plaintiffs' First Amended Complaint for lack of standing, and Plaintiffs served their Second Amended Complaint on October 27, 2022.

Plaintiffs are K-12 students, parents of K-12 students, and two K-12 teachers. Specifically:

- Plaintiffs M.A. and S.S. (collectively, "the Student Plaintiffs") are high school students. M.A. is gay. S.S. is a lesbian. ECF 123 ¶¶ 9–10. They bring a void-for-vagueness claim, as well as claims under the Equal Protection Clause, the First Amendment, and Title IX. M.A. and S.S. are minors and therefore bring their claims through their parents (respectively, Plaintiffs Armstrong and Schulman).

- Plaintiff Berg is an elementary school art teacher. He is gay and alleges that his students range from pre-K through fifth grade. ECF 123 ¶ 14. He brings void-for-vagueness and equal-protection claims.

- Plaintiff Washington is a middle-school civics and drama teacher. She alleges that she is the parent of three children, one of whom is a bisexual high school student. ECF 123 ¶ 15. She brings a void-for-vagueness claim, as well as claims under the Equal Protection Clause, the First Amendment, and Title IX.

- Plaintiffs Morrison and Houry are a lesbian couple and the parents of two K-3 students. Plaintiffs Casares and Feinberg are a lesbian couple and the parents of a "K-4" student. ECF 123 ¶¶ 11–12. They bring a void-for-vagueness claim, as well as claims under the Equal Protection Clause, the First Amendment, and Title IX.

- Plaintiff Volmer is a heterosexual woman and the parent of two K-3 students. ECF 123 ¶¶ 13. Plaintiff Volmer brings void-for-vagueness, First Amendment, and Title IX claims.

- Plaintiffs Morrison, Houry, Casares, Feinberg, Volmer, and Washington are referred to collectively as "the Parent Plaintiffs."

To summarize the claims another way: The void-for-vagueness claim is brought by all plaintiffs. The equal-protection claims are brought by all plaintiffs except Volmer. And the First Amendment and Title IX claims are brought by the Student Plaintiffs and Parent Plaintiffs.

Defendants are the Florida Department of Education, the Florida Board of Education, each of the members of the Board (collectively, "the State Defendants"), and several district school boards (the "School Board Defendants").

## ARGUMENT

The amended complaint must be dismissed because plaintiffs lack standing. *See* Fed. R. Civ. P. 12(b)(1). The complaint also fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

## I.    STATUTORY CONSTRUCTION

Because the proper interpretation of HB 1557's regulation of classroom instruction cuts across every issue in the case, it makes sense to start there. The statute provides, in pertinent part: "Classroom instruction by school personnel or third parties on sexual orientation or gender identity may not occur in kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards," which shall be adopted by the Department of Education by "June 30, 2023." Fla. Stat. § 1001.42(8)(c)(3); HB 1557 § 2.

As a threshold matter, only the instructional restriction applicable to kindergarten through third grade took effect on July 1, 2022. For older children, the statute ties the prohibition of instruction that is not "age-appropriate" or "developmentally appropriate" to "state standards" that have not yet been adopted and need not be adopted until next year. In other words, for those older children, HB 1557 currently imposes no restriction whatsoever. *See* Memo from J. Oliva to School District Superintendents, *House Bill 1557, Parental Rights in Education, School District Responsibilities*, FLORIDA DEPARTMENT OF EDUCATION at 1 (June 6, 2022), https://info.fldoe.org/docushare/dsweb/Get/Document-9559/dps-2022-68.pdf (explaining that the restriction "takes effect only after the Florida Department of

Education (Department) develops rules or guidance on age-appropriate and developmentally appropriate instruction").

There remains the prohibition of "classroom instruction . . . on sexual orientation or gender identity" in grades K–3. Fla. Stat. § 1001.42(8)(c)(3). "Instruction" is "the action, practice, or profession of teaching." *Instruction*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/instruction (last visited Nov. 30, 2022); *see* AMERICAN HERITAGE DICTIONARY 666 (2d ed. 1985) (defining "instruction" as "[t]he act, practice, or profession of instructing"); *id.* (defining "instruct" as "[t]o furnish with knowledge; teach"); WEBSTER'S NEW INTERNATIONAL DICTIONARY 1288 (2d ed. 1957) (defining "instruct" as "[]to impart knowledge to, esp. methodically; to teach"). The statute is concerned, moreover, only with "*classroom* instruction," *i.e.*, the formal work of teaching that occurs in a classroom setting.

That reading of "classroom instruction" is reinforced by the prepositional phrase that follows: The statute limits "classroom instruction" only if it is "*on* sexual orientation or gender identity." Fla. Stat. § 1001.42(8)(c)(3) (emphasis added). In that familiar grammatical structure, the preposition "on" "indicate[s] the subject of study, discussion, or consideration." *On*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/on (last visited Nov. 30, 2022); AMERICAN HERITAGE DICTIONARY, *supra*, at 868 (defining "to" as

"[c]oncerning; about," as in, "a book on astronomy") (emphasis omitted); WEBSTER'S NEW INTERNATIONAL DICTIONARY, *supra*, at 1701 (defining "on" as "[i]ndicating the subject"). And classroom instruction "on" particular "subject[s] of study"—"sexual orientation" and "gender identity"—means formal classroom teaching about those subjects, nothing less.

Accordingly, just as a unit on quadratic functions is quintessential "instruction on mathematics," teaching a particular view of marriage equality or modern gender theory would be "instruction on sexual orientation or gender identity." But just as no one would suggest that references to numbers in a history book constitute "instruction on mathematics," HB 1557 does not prohibit literary references to a gay or transgender person or to a same-sex couple. More generally, as this Court has already explained, teachers having photos of same-sex spouses on their desks, intervening in bullying, and engaging with a student's same-sex parents, among many other examples, "are not classroom instruction on sexual orientation or gender identity, even if they involve[] parties who mention a sexual orientation or gender identity." ECF 120 at 11; *accord Cousins v. Sch. Bd. of Orange Cnty.*, No. 6:22-cv-01312, ECF 81 at 22 (M.D. Fla. Oct. 20, 2022).

HB 1557 is also neutral. Far from an "open declaration of discrimination against LGBTQ children," ECF 123 ¶ 52, the law's proscription applies equally, regardless of viewpoint. For example, it would violate the statute to instruct students

that heterosexuality is superior or that gender identity is immutable based on biological traits.

Finally, the limited scope of the law's proscription informs the meaning of the phrase "school personnel or third parties," which Plaintiffs mistakenly suggest broadly expands the statute's reach not only to teachers and other school personnel, but also to students and parents. *See* ECF 123 ¶ 102. The law prohibits only formal classroom teaching about sexual orientation or gender identity. By its nature, such formal teaching can be carried out only by school personnel or those to whom the school has delegated responsibility for such teaching—*i.e.*, agents of the public school system, not parents or students acting in the ordinary course.

## II.   PLAINTIFFS LACK STANDING.

"[A] plaintiff has to make three showings . . . to demonstrate Article III standing." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). "First, he must establish that he has suffered an 'injury in fact'— an invasion of a legally protected interest that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Second, he must demonstrate that there is a 'causal connection' between this injury and the conduct of which he complains—*i.e.*, the injury must be 'fairly traceable' to the defendant's challenged actions and not the result of 'the independent action of some third party

not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). "Finally, he must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).

The case must be dismissed for lack of jurisdiction because Plaintiffs have satisfied none of those requirements.

## A.   Injury-in-Fact

The Court previously found Plaintiffs' allegations about self-censorship insufficient for two reasons: (1) they failed to show any risk of enforcement against them because HB 1557 "is enforced against school districts and not individuals," and (2) they failed to allege "specific future actions" they wished to take "that the law arguably forbids." ECF 120 at 9–10, 12. The Court also found insufficient their allegations of stigmatic and denial-of-information harm. ECF 120 at 13–14. Plaintiffs have cured none of the defects the Court identified.

> *i.   The Student and Parent Plaintiffs have not sufficiently pleaded a chilling effect or self-censorship.*

**1.** To begin with, the Student and Parent Plaintiffs' alleged self-censorship in response to "the threat of discipline" is attributable not to HB 1557 but to concerns that are "fanciful, paranoid, [and] otherwise unreasonable." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (citation omitted). Plaintiffs have not claimed, and cannot claim, that the statute will be enforced against them—by the State Defendants or otherwise. As the Court previously observed, the statute can be

19

enforced only through private claims brought by parents against school districts. *See* ECF 120 at 9–10.

Plaintiffs now allege that "school districts are seeking to structure the behavior of school personnel, students, and everyone else who comes into contact with the school system so as to avoid litigation." ECF 123 ¶ 86. But that is simply more of what this Court has already found insufficient: allegations not of actual or threatened enforcement of the statute, but that "officials were acting in line with whatever sentiment they thought was underlying HB 1557's passage." ECF 120 at 5. Such allegations cannot support a lawsuit seeking to invalidate HB 1557 on its face or indeed in any application. At most, they would support challenges to the administrative acts of the school districts behind the alleged "structur[ing]" scheme, though even then Plaintiffs do not specify what that scheme involves. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (conclusory allegations are insufficient).

**2.** Plaintiffs have likewise failed to plead "specific future actions" they wish to take "that the law arguably forbids." ECF 120 at 12. Plaintiff M.A. says, for example, that he has been unable to find a teacher to sponsor his Gay-Straight Alliance club. ECF 123 ¶ 78. Ms. Washington alleges that Pasco County has required the removal of "safe space stickers" and that "lines referring to LGBTQ issues" were removed from musicals at her son's high school. ECF 123 ¶¶ 81, 82. Plaintiffs also

blame the statute for prohibiting "dancing between persons of the same gender" or "wear[ing] clothing [in]consistent with [students'] gender assigned at birth." ECF 123 ¶ 79. But none of that is "classroom instruction." *See* ECF 120 at 11; *supra* Part I; *see also Cousins*, 6:22-cv-01312, ECF 81 at 16 (the law covers "'[c]lassroom instruction,' not meetings, teacher trainings," etc.); *id.* at 25 (discussion of "issues relevant to the LGBTQ+ community" is not even "arguably" "classroom instruction").

Plaintiffs also allege that schools are adopting rules prohibiting such activities, but allegations of a "chilling effect" are insufficient where they are attributable not to the challenged provision but instead to fear of "some *other* and additional action detrimental to that individual." *Clapper*, 568 U.S. at 418 (emphasis in original) (citation omitted). Plaintiffs' allegations largely concern the actions of third parties—schools and teachers who are not before the Court. *See Support Working Animals*, 8 F.4th at 1201. And anyway, none of those rules have anything to do with the statute for reasons already explained.

**3.** Plaintiffs M.A. and S.S. cannot allege injury-in-fact for the additional reason that they are high school students. As discussed above, the challenged provision took effect on July 1, 2022 only for kindergarten through grade three. *See supra* Part I. Plaintiffs' concerns about what "classroom instruction" may be "age-appropriate and developmentally appropriate in accordance with state standards,"

ECF 123 ¶ 35, are especially "conjectural or hypothetical" until the State develops

those standards, which need not be done until June 30, 2023. HB 1557 § 2; *see I.L.*

*v. Alabama*, 739 F.3d 1273, 1280 (11th Cir. 2014) ("[T]he contingency of legislative

action makes the redress of [an] injury speculative." (quotations omitted)); *United*

*States v. Thompson*, 928 F.2d 1060, 1066 (11th Cir. 1991) (no standing to enforce

provision that was not "self-executing").

Insofar as they bring claims on behalf of their children, Plaintiffs Washington,

Casares, and Feinberg lack standing for the same reason—their children are enrolled

in the fourth grade or higher.[4] Ms. Washington also lacks standing as a teacher. She

teaches middle-school and therefore is not regulated by the statute.

> ii.   *The Teacher Plaintiffs have not sufficiently pleaded a*
>       *chilling effect or self-censorship.*

The Teacher Plaintiffs have likewise failed to sufficiently plead self-

censorship. Berg alleges that he "is being denied the ability to use [certain] books

and foster a more welcoming environment for LGBTQ students." ECF 123 ¶ 83. But

Berg does not allege that, but for the statute, he would use those books to instruct

---

[4] Casares and Feinberg allege that their child is a "K-4" student. ECF 123 ¶ 12. Plaintiffs have carefully denoted K-3 students by the grade in which they are enrolled, *i.e.*, "kindergarten" or "third grade." *See, e.g.*, ECF 123 ¶ 11. Any ambiguity in the phrase "K-4" is insufficient to satisfy Plaintiffs' burden of pleading subject matter jurisdiction. *See Underwriters at Lloyd's v. Osting-Schwinn*, 613 F.3d 1079, 1092 (11th Cir. 2010).

his students on the concepts of sexual orientation or gender identity, and that is all the statute prohibits. Nor would such an allegation be plausible; Berg is an "elementary school art" teacher, ECF 123 ¶ 14, and thus subject to curricular restrictions not challenged here, *see, e.g.*, Fla. Stat. § 1006.28(2)(a) (outlining method of selecting instructional materials and permitting parent objections). And as discussed above, HB 1557 does not prohibit the display of a "safe space" sticker, as Washington wishes to do. *See supra* Part I.

Nor have the Teacher Plaintiffs alleged a non-speculative risk of enforcement. This Court previously explained that it requires "several levels of speculation" to assume that a teacher will face discipline under HB 1557. ECF 120 at 10. That conclusion follows from HB 1557's remedial scheme. Under the law, parents sue only to challenge an unlawful "school district procedure or practice." Fla. Stat. § 1001.42(8)(c)(7)(b)(II). Even then, before suing, parents must first exhaust two other avenues of relief by "notify[ing] the principal . . . regarding concerns under this paragraph," and then, if "the concern remains unresolved" after 30 days, notifying the school district, which "must either resolve the concern or provide a statement of the reasons for not resolving the concern." *Id.* § 1001.42(8)(c)(7)(a). Only then, with the school district's "statement of the reasons" in hand, may the parent choose between administrative proceedings with the State Board of Education

(the cost of which shall be borne by the school district) or litigation against the school district in state court. *Id.* § 1001.42(8)(c)(7)(b).

Under that scheme, a teacher will face discipline under HB 1557 only if (1) a parent becomes concerned about the teacher's conduct, (2) the parent notifies the school's principal, (3) the principal fails to resolve the issue, (4) the parent notifies the school district, (5) the school district fails to resolve the issue, (6) the parent seeks enforcement under HB 1557, and (7) a special magistrate or court finds an actual violation of the statute premised on a "procedure or practice" of the school district, Fla. Stat. § 1001.42(8)(c)(7). That is far too speculative to be an objective threat of enforcement. *See Clapper*, 568 U.S. at 418. And any discipline short of those preliminary steps would be traceable not to HB 1557, but instead to "officials . . . acting in line with whatever sentiment they thought was underlying HB 1557's passage." ECF 120 at 5.

Plaintiffs point to the State Board's recent rule amendment administratively "provid[ing] that teachers can lose their license if they violate HB 1557." ECF 123 ¶ 87. But that piles speculation on speculation: license revocation requires the vote of the Educational Practices Commission, which under Florida law is an independent, quasi-judicial agency. Fla. Stat. § 1012.795. And regardless, the amended rule provides that a teacher "[s]hall not intentionally provide classroom instruction to students in kindergarten through grade 3 on sexual orientation or

gender identity." Fla. Admin. Code Ann. r. 6A-10.081(a)(6) (2022). The Rule does not apply to Washington because she is a middle-school teacher. ECF 123 ¶ 15. And Berg has not identified any conduct he wishes to undertake that would violate HB 1557, so he is in no danger of violating the rule, much less doing so "intentionally." In any event, the threat of discipline under the rule is at most a basis to challenge the rule. It does not also supply a basis to challenge the statute.

> iii.  *The Student Plaintiffs have not pleaded that they will be denied information or educational opportunities.*

Plaintiffs also allege that they have been denied information and educational opportunities. This Court previously found these allegations insufficient because the students did "not include sufficient details to evaluate their asserted constitutional injury." ECF 120 at 14. For three reasons, the Student Plaintiffs have not filled that gap.

First, much of the information Plaintiffs say they are denied is not proscribed by HB 1557. Some of the information is not proscribed because it concerns middle and highschoolers to whom the statute does not yet apply. S.S., for example, alleges that the Miami-Dade school district, in rejecting Item H-11, "denied" her "curricular content that she wants to have available to her, including the opportunity to learn about and discuss the Supreme Court's landmark LGBTQ precedents." ECF 123 ¶ 74. That has nothing to do with HB 1557, which the State has made clear applies

25

only to grades K-3 until standards for later grades are promulgated next year. *See supra* Part I.

Other information is not proscribed because it does not concern instruction on gender identity or sexual orientation. Volmer, for example, alleges that her children "are being denied an equal educational opportunity" because Orange County has apparently told teachers not to talk about their same-sex partners or "wear[] clothing that could bring up similar discussions." ECF 123 ¶ 80. This Court already rejected that injury theory: the law clearly does not cover "LGBTQ teachers" "mention[ing] their partners." ECF 120 at 11. It follows with even greater force that the law also is inapplicable to "wearing clothing that could" prompt a discussion about a spouse. ECF 123 ¶ 80; *see supra* Part I.

Second, Plaintiffs fail to allege that any such lack of information resulted from the enforcement of HB 1557. As noted above, S.S. alleges that this year Miami-Dade County did not include an item on teaching landmark LGBTQ precedents. ECF 123 ¶¶ 71–73. But she does not allege that such precedents were taught before HB 1557 was enacted. Indeed, her allegations strongly suggest that they were not. ECF 123 ¶ 71 (alleging that last year "[a] briefing was then issued to activities directors and club sponsors, but not classroom teachers, providing various LGBTQ resources that could be used, voluntarily, but not in the classroom").

Finally, many of Plaintiffs' allegations concern third parties whose alleged injuries are irrelevant to standing. S.S., for example, alleges that her "friend" wants to create a "website dedicated to LGBTQ resources" as part of her IB program but was told not to. ECF 123 ¶ 76. But S.S.'s friend is not a plaintiff, and thus S.S.'s friend's injury—no matter how sincere—cannot prove an injury-in-fact. *See Bischoff v. Osceola Cnty.*, 222 F.3d 874, 884 (11th Cir. 2000). Plaintiffs also allege that the Broward, Seminole, and Palm Beach school districts removed books from libraries after the passage of HB 1557. *See* ECF 123 ¶¶ 84–85. But library books, without more, are not "classroom instruction" and thus are not covered by the statute. In addition, no Plaintiff is injured by the alleged removal of these books because no Student Plaintiff attends school in Broward, Seminole, or Palm Beach County. ECF 123 ¶¶ 8–13, 15.

> iv.    *Plaintiffs have failed to allege a cognizable Equal Protection injury.*

The Court previously concluded that Plaintiffs' allegations of stigmatic harm were insufficient because Plaintiffs did not allege that they had "personally experienced . . . discrimination." ECF 120 at 13–14. That was correct, and Plaintiffs have failed to cure the defect. Accordingly, their equal-protection claims (Counts II and III) must be dismissed for lack of standing.

In Count II, Plaintiffs allege that "H.B. 1557 stigmatizes and marks as 'lesser' LGBTQ" individuals. ECF 123 ¶ 98. "There can be no doubt that this sort of

noneconomic injury is one of the most serious consequences of discriminatory government action." *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). But as the Supreme Court has explained, "such injury accords a basis for standing only to those persons who are personally denied equal treatment." *Id.* (cleaned up); *see Aaron*, 912 F.3d at 1338 (same).

For example, in *Moore v. Bryant*, a black plaintiff sued various Mississippi officials alleging that the state flag, the upper left corner of which depicted the confederate battle flag, "violate[d] his rights under the Equal Protection Clause." 853 F.3d 245, 248 (5th Cir. 2017). Despite his allegations that the flag's "message is 'painful, threatening, and offensive' to him, makes him 'feel like a second-class citizen,' and causes him both physical and emotional injuries,'" the Fifth Circuit held that he lacked standing because "exposure to a discriminatory message, without a corresponding denial of equal treatment, is insufficient to plead injury in an equal protection case." *Id.* at 249–50. Likewise, in *Penkoski v. Bowser*, white plaintiffs challenged a government-sanctioned Black Lives Matter mural on equal-protection grounds, and the court held that they lacked standing because "[t]hey may, indeed, be subject to a discriminatory message" but had "made no showing [of] . . . discriminatory *treatment* because of their race." 486 F. Supp. 3d 219, 228–29 (D.D.C. 2020) (emphasis in original).

Plaintiffs' case is indistinguishable. HB 1557 does not subject them (or anyone else) to differential treatment. Like other curricular standards, it applies the same standard to all "classroom instruction" at each grade level and thus operates equally on students and teachers at that grade level. Although Plaintiffs allege that the statute "exacerbates environments where LGBTQ students are more likely to . . . experience bullying and harassment," ECF 123 ¶ 98, those are downstream effects of the same stigma, and conjectural ones at that, not denials of equal treatment. *See Moore*, 853 F.3d at 252 (rejecting "hostile workplace" theory of equal protection standing).

Plaintiffs' selective-enforcement claim (Count III) fares no better. Plaintiffs allege that Defendants are applying "HB 1557 solely to restrict discussion of and instruction on LGBTQ sexual orientations, gender identities, and issues . . . while failing to restrict discussion and instruction of non-LGBTQ sexual orientations, gender identities, and issues." ECF 123 ¶ 114. That may not be the education Plaintiffs prefer (and it is not the one required by HB 1557, which is neutral), but all students are receiving the same education and therefore are not subject to "differential government treatment." *Moore*, 853 F.3d at 250. Plaintiffs have thus failed to plead an equal-protection injury. Even if Plaintiffs had pleaded differential treatment, moreover, alleged injuries from generally applicable curricular decisions are too speculative to support standing. *See Hollander v. Inst. for Research on*

*Women & Gender at Columbia Univ.*, 372 F. App'x 140, 141 (2d Cir. 2010) (male plaintiff's alleged injury from university's Women's Studies Program without a Men's Studies Program was too speculative); *see also Ripa v. Stony Brook Univ.*, 17-cv-4941, 2018 WL 3829000, at *6 (E.D.N.Y. June 11, 2018).[5]

### B.   Traceability and Redressability

"[T]raceability and redressability . . . often travel together, and where, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual." *Support Working Animals*, 8 F.4th at 1201 (citation omitted). In short, "Plaintiffs' allegations must tie their alleged harm to Defendants' enforcement of the law." ECF 120 at 4. To do that, Plaintiffs must point to more than "school officials . . . acting in line with whatever sentiment they thought was underlying HB 1557's passage," ECF 120 at 5; they must point to an actual threat of enforcement.

---

[5] Plaintiffs also allege that "students have been unable to participate in LGBTQ-related student clubs; books featuring LGBTQ-related protagonists have been removed from school libraries; students have been discouraged from pursuing LGBTQ-related research projects; and students have been prohibited from dancing with others of the same gender." ECF 123 ¶ 117. But those allegations have nothing to do with HB 1557, which restricts only "classroom instruction . . . on sexual orientation [and] gender identity." Fla. Stat. § 1001.42(8)(c)(3); *see supra* Part I. Nor do Plaintiffs allege that they have anything to do with the State Defendants.

But under HB 1557, it is parents, not governmental entities, who initiate litigation. An injunction against Defendants would leave parents free to enforce the statute, and even if Plaintiffs are correct that HB 1557 is causing school districts to "structure" their behavior "to avoid litigation," ECF 123 ¶ 86, an injunction against Defendants would not diminish the incentive for school districts to do so. Accordingly, the relief Plaintiffs seek would not redress the injuries they allege. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021); *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1304–05 (11th Cir. 2019) (en banc).

Plaintiffs complain of a new State Board of Education rule that may cause teachers to lose their licenses if they intentionally teach "gender identity" or "sexual orientation" in grades K-3. ECF 123 ¶ 87. But the rule is independent of HB 1557, and any injury traceable to one is not traceable to the other. Likewise, an injunction barring enforcement of one would not redress any injury caused by the other.

Plaintiffs also complain that the Commissioner of Education issued a memorandum "reject[ing] the notion that LGBTQ persons are entitled to the same protections against discrimination as their peers." ECF 123 ¶ 88. The memorandum of course does not say that. It instructs school districts not to subvert Florida law in favor of non-binding federal guidance on the scope of Title IX. ECF 95, Ex. A. The memorandum does not even mention HB 1557, which makes sense because Title IX has nothing to do with curriculum. *See infra* Part III.E.1. Regardless, the

31

memorandum offers nothing to change the traceability or redressability analysis. HB 1557 is enforced only by parents against school districts, and districts' obligation to enforce the statute is independent of anything the State Defendants do. Fla. Stat. §§ 1000.03(3), 1001.41(1).

## III.   PLAINTIFFS FAIL TO STATE A CLAIM.

Plaintiffs' claims also fail on the merits. There is no constitutional right to teach or be taught gender theory, especially in kindergarten. Plaintiffs do not dispute that core constitutional claim directly; instead, each of their claims attempts to recreate a right to a specific curriculum indirectly.

### A.   Count I - Vagueness

Plaintiffs allege that HB 1557 is unconstitutionally vague because its "key terms are all ambiguous and undefined." ECF 123 ¶ 102. That is wrong. Compared to criminal statutes, "the consequences of imprecision are qualitatively less severe," so "a civil statute is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard at all.'" *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)).

This Court previously concluded that HB 1557 is not even "arguably vague" as to Plaintiffs, and nothing has changed. ECF 120 at 10. As the Court explained, the phrase "[c]lassroom instruction . . . on sexual orientation or gender identity" is

readily understandable to "someone of ordinary intelligence," ECF 120 at 10–11, and that is dispositive because it supplies the requisite "rule or standard," *Leib*, 558 F.3d at 1310.

If anything, the statute provides far more guidance than other provisions the courts have upheld against vagueness challenges. For example, in *California Teachers Association v. State Board of Education*, the Ninth Circuit rejected a vagueness challenge to a California law that required "the language of instruction used by the teaching personnel [to be] overwhelmingly the English language." 271 F.3d 1141, 1145, 1152–53 (9th Cir. 2001). Likewise, in *Fowler v. Board of Education of Lincoln County*, the Sixth Circuit held that a school rule that proscribed "conduct unbecoming a teacher" was not unconstitutionally vague because it gives "adequate notice" to teachers. 819 F.2d 657, 664–66 (6th Cir. 1987). And in *Arnett v. Kennedy*, the Supreme Court held that the phrase "for such cause as will promote the efficiency of the service" gave federal employees constitutionally sufficient notice of possible grounds of termination. 416 U.S. 134, 158–64 (1974) (plurality op.).

Compared to those laws, HB 1557 provides abundant notice of its scope in "terms of common understanding." *Cal. Teachers Ass'n*, 271 F.3d at 1152–53. Terms such as "unbecoming a teacher" and "promot[ing] the efficiency of the service" deploy malleable, subjective language yet are sufficiently clear in the public

education context because the rules to which they pertain regulate internal government operations, not private behavior. That conclusion is all the more sound here.

Like every statute, HB 1557 will be amenable of various interpretative questions, but that is no constitutional defect. *See Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994) ("If run-of-the-mill statutory ambiguities *were* enough to violate the Constitution, no court could ever clarify statutes through judicial interpretation.") (emphasis in original). Instead, Plaintiffs must plausibly plead that HB 1557 is truly standardless. They cannot make that showing.

### B. Counts V and VI – First Amendment Expression and Overbreadth

**1.** Plaintiffs allege that HB 1557 violates the First Amendment by restricting their "ability to discuss topics related to the sexual orientation and gender identity of LGBTQ people in class and related settings, and also restricts their ability to self-identify as LGBTQ." ECF 123 ¶ 128. That is wrong. The statute restricts only curricular choices in public schools. *See supra* Part I. And as the Eleventh Circuit has explained, in public schools, "expression delivered directly through the government or indirectly through private intermediaries" is government speech in which the "government is free to make subject-matter-based choices." *Bannon v. Sch. Dist. Of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004) (citation omitted).

The State's plenary control of its own message extends even to certain student activities, such as cheerleading and mental-health counseling practica. *See Dean v. Warren*, 12 F.4th 1248, 1265–66 (11th Cir. 2021) (rejecting first Amendment right to protest while cheering); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011) (rejecting First Amendment right to exceed scope of counseling practicum). It even more obviously extends to public-school classroom instruction. *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022) (explaining that the government-speech doctrine applies to coaches "instructing" players). Accordingly, curricular choices like those at issue here—those that "direct teachers as to what they may and may not teach," ECF 120 at 6—are within the State's sole discretion, *see Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007); *Marshall v. Bd. of Educ. Of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 341 (6th Cir. 2010) (Sutton, J.); *Nampa Classical Acad. V. Goesling*, 447 F. App'x 776, 778 (9th Cir. 2011).[6] Put differently, "where the [State] is selecting textbooks for use

---

[6] *Virgil v. School Board of Columbia County*, 862 F.2d 1517 (11th Cir. 1989), is not to the contrary. There, the Eleventh Circuit applied rational-basis scrutiny to a school's decision to remove a textbook from an elective course's curriculum. *Id.* at 1521. But *Virgil* predates the Supreme Court's government speech cases and does not reject their application to curricular choices. *See Chiras v. Miller*, 432 F.3d 606, 617 (5th Cir. 2005) (discussing *Virgil*). The court worked with the best "guidance" it had in 1989. *Virgil*, 862 F.2d at 1520–21. Since then, the Supreme Court has clarified "the government's authority over its own message," *Chiras*, 432 F.3d at 617, and (as explained above) subsequent Eleventh Circuit cases have applied the government speech doctrine to government messaging in public schools.

in the classroom, students have no constitutional right to compel the [State] to select materials of their choosing." *Chiras*, 432 F.3d at 620.

**2.** Apart from the government-speech doctrine, the Supreme Court has said that schools can restrict even *student* speech during "activities [that] may fairly be characterized as part of the school curriculum" if doing so is "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 271, 273. As the Court explained, restrictions advance a "legitimate pedagogical concern" when they shield students from topics that are "inadequately researched" or "unsuitable for immature audiences," including "potentially sensitive topics, which might range from the existence of Santa Claus in an elementary school setting to the particulars of teenage sexual activity in a high school setting," or "matters of political controversy." *Id.* at 271–72.

HB 1557 advances those interests. As discussed above, the statute neutrally limits public education on "gender identity" and "sexual orientation" conducted from any point of view. The Legislature reasonably could have concluded that legislation would thereby advance the State's interest in educational "neutrality on matters of political controversy," *Hazelwood*, 484 U.S. at 272, which sexual orientation and gender identity plainly are, regardless of one's preferred orthodoxy. Indeed, the Supreme Court has acknowledged that "sexual orientation and gender identity" are "controversial subjects" and "sensitive political topics." *Janus v. Am.*

*Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 & n.20 (2018) (citing Watanabe, *How To Teach Gay Issues in 1st Grade? A New Law Requiring California Schools to Have Lessons About LGBT Americans Raises Tough Questions*, L.A. Times, Oct. 16, 2011, p. A1).

For much the same reason, HB 1557 advances the State's interest in shielding students from topics that are "potentially sensitive" and "unsuitable for immature audiences." *Hazelwood*, 484 U.S. at 271–72. If "the existence of Santa Claus" is too "sensitive" for students "in an elementary school setting," *id.* at 272, then the State certainly could have reasonably concluded that sexual orientation and gender identity are too sensitive for the youngest children in the same setting. *See Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 288–89 (4th Cir. 2021) (holding that fourth grader had no First Amendment right to present a "LGBTQ-themed essay").

**3.** Plaintiffs suggest that HB 1557 does not advance a "legitimate" interest because it is "rooted in animus." ECF 123 ¶ 129. As discussed more fully below, Plaintiffs have not come close to showing that the Legislature acted out of animus. *See infra* Part III.D.2. But the argument fails for a more basic reason: The First Amendment does not authorize the courts to "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also In re Hubbard*, 803 F.3d 1298,

1313–14 (11th Cir. 2015) (holding that retaliation claims premised on "inquiry into the subjective motives of the legislators who supported enactment of a facially constitutional law" are not cognizable under the First Amendment); *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1224 (11th Cir. 2022) ("We have held—'many times'— that 'when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose.'" (quoting *Hubbard*, 803 F.3d at 1312)).

**4.** The above discussion resolves Plaintiffs' overbreadth claim as well. ECF 123 ¶ 131–135. A "law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted). But because the legislation does not restrict private speech at all, it certainly is not unconstitutional in "a substantial number" of applications. In other words, because the provision "does not regulate [private] speech, it does not violate the First Amendment rights of persons not before the court" and "Plaintiffs' 'overbreadth' argument is nothing more than a restatement of the First Amendment argument they make on their own behalf." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 (10th Cir. 2006) (en banc).

### C.   Count IV - First Amendment Right to Information

Plaintiffs also contend that HB 1557 violates their right to receive information, pointing to *Board of Education vs. Pico* for the plurality's statement that the State's discretion to select school library books may not be exercised "in a narrowly partisan or political manner." ECF 123 ¶ 121 (citing *Pico*, 457 U.S. at 870 (plurality op.)). But "[t]he listener's right to receive information is reciprocal to the speaker's right to speak." *Doe ex rel. Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015); *accord Pico*, 457 U.S. at 867 (plurality op.). And as discussed above, it is the State's right to determine what message to disseminate through its public schools, whether under the government speech doctrine or because it has a rational basis under *Hazelwood*.

*Pico* does not change that. First of all, as the Eleventh Circuit has explained, *Pico* was "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues." *ACLU of Fla., Inc.*, 557 F.3d at 1199–1200 (quotations omitted). In any event, Plaintiffs overread *Pico* on its own terms. The case was about the removal of books from a school library, and the plurality was clear that classroom instruction is different, expressing "full agreement" that States "must be permitted to establish and apply their curriculum in such a way as to transmit community values, and that there is a legitimate and substantial community interest in promoting respect for . . . traditional values be they

social, moral, or political." 457 U.S. at 864 (cleaned up). The plurality observed that States may well have "absolute discretion in matters of *curriculum*" given "their duty to inculcate community values." *Id.* at 869 (emphasis in original). *Pico* is therefore consistent with the State's position that classroom instruction is government speech and thus immune from First Amendment scrutiny. Even if that were not so, for the reasons discussed above, HB 1557 easily passes muster under *Hazelwood*. *See supra* pp. 35–37.

### D.   Counts II and III – Equal Protection of the Law

**1.** Count II alleges that HB 1557 violates the Equal Protection Clause because it "was enacted with a discriminatory purpose and results in discriminatory and disparate treatment of LGBTQ people." ECF 123 ¶ 107. Count III alleges selective enforcement in violation of the Equal Protection Clause. ECF 123 ¶¶ 114–115. As discussed above, both counts must be dismissed for lack of standing because Plaintiffs allege only exposure to an allegedly discriminatory government message (although even in message, the law is neutral), not differential treatment. *See supra* Part II.A.iv.

Counts II and III are legally insufficient on the merits for much the same reason. HB 1557 regulates only how public-school teachers will deliver the government's message in the classroom. Equal-protection claims challenging government speech are barred because "it is the very business of government to favor

and disfavor points of view," and "a government entity is entitled to say what it wishes and to select the views it wants to express," with a notable exception for the establishment of religion. *Am. Atheists, Inc. v. Port Auth. Of N.Y. & N.J.*, 760 F.3d 227, 246 (2d Cir. 2014) (cleaned up) (rejecting equal-protection claim alleging animus in the adoption of the September 11 Memorial at Ground Zero). Because the government can express the views it wants, it follows that "the Equal Protection Clause does not apply to government speech." *Fields v. Speaker of Penn. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019); *accord Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 (6th Cir. 2013); *Bloomberg v. Blocker*, 586 F. Supp. 3d 1251, 1258 (M.D. Fla. 2022).

**2.** Count II fails on the merits for the additional reason that Plaintiffs have not plausibly "plead[ed] animus." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). To do that, they "must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Id.*; *see also Common Cause v. DeSantis*, 4:22-cv-109, ECF 115 at 18 (N.D. Fla. Nov. 8, 2022) (Winsor, J., dissenting) (concluding that a plaintiff failed to plead an intent to discriminate). Here, that means ascertaining the underlying motivation for the decision of "the legislature as a whole," *Brnovich v. DNC*, 141 S. Ct. 2321, 2350 (2021), a task that is demanding because "determining the intent of the legislature is

a problematic and near-impossible challenge," *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1324 (11th Cir. 2021). Plaintiffs must also overcome "the presumption of legislative good faith" to which the Legislature is entitled when charged with invidious discrimination. *Id.* at 1325 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)).

Plaintiffs' allegations do not even approach that high bar.

As the Supreme Court has explained, "discrimination is not a plausible conclusion" from the allegations in a complaint where there are "'obvious alternative explanation[s].'" *Iqbal*, 556 U.S. at 682 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). Here, the challenged provision is "neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue." *Washington v. Davis*, 426 U.S. 229, 246 (1976). In response to concerns that schools were not respecting parental rights, *see supra* pp. 4–6, the Legislature adopted HB 1557 to safeguard parents' right to educate their children about two sensitive topics, irrespective of the parents' viewpoints. *See Greater Birmingham Ministries*, 992 F.3d at 1323 (crediting the state's account of intent). The statute does exactly that, prohibiting classroom instruction on those topics for the youngest children (those in kindergarten through third grade) and, thereafter, permitting such instruction if it is "age-appropriate [and] developmentally appropriate for students." *See* Fla. Stat. § 1001.42(8)(c)(3). Plaintiffs' charge of

animus is also irreconcilable with the fact that the statute evenhandedly restricts instruction that (for example) opposes same-sex marriage as much as instruction that embraces it.

The motive for the curricular restriction is underscored by the bill's structure. Plaintiffs articulate no constitutional quarrel with the bulk of the bill, which is designed to advance parental rights by ensuring that parents have transparency into the wellbeing of their children at school. *See* Fla. Stat. §§ 1001.42(8)(c)(1), (2), (5). The remedial scheme, too, is focused on parental rights, which is why it empowers only "parents" to seek relief when school boards establish policies or procedures that are inconsistent with the statute. *See id.* § 1001.42(8)(c)(7). Likewise, the title ("An Act Relating to Parental Rights in Education") and the staff analysis (which extensively discusses a "parent's fundamental right to make decisions") reinforce the focus on empowering parents, which was repeatedly echoed during debate in the House and Senate. *E.g.*, Fla. H., recording of proceedings, at 2:37, 2:41, 2:47, 2:51, 3:12, 3:13, 4:16 (Feb. 22, 2022);[7] Fla. H., recording of proceedings, at 2:18, 2:20, 2:45, 2:47–49, 2:51–52, 3:04, 3:11, 3:13, 3:17 (Feb. 24, 2022);[8] Fla. S., recording of proceedings, at :36–:37, :44–:45, 1:00–01, 1:02, 1:47, 2:07–09, 2:13–14, 2:19–21,

---

[7] https://thefloridachannel.org/videos/2-22-22-house-session/.

[8] https://thefloridachannel.org/videos/2-24-22-house-session-part-1/.

2:43, 2:46, 3:09, 3:11, 3:32 (Mar. 7, 2022);[9] Fla. S., recording of proceedings, at 1:53; 1:56; 2:26; 2:31 (March 8, 2022).[10] The curricular restriction—like the rest of the bill—was designed to protect parental rights, not to demean or disparage anyone.

When, as here, "there [a]re legitimate reasons for the . . . Legislature to adopt and maintain" a law, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 298–99 (1987). Accordingly, courts should "ordinarily defer to the legislature's stated intent," and "only the clearest proof will suffice to override" that consideration. *Smith v. Doe*, 538 U.S. 84, 92 (2003) (cleaned up).

Plaintiffs respond with cherrypicked statements from the legislative record. But the statements of individual legislators do not "demonstrate discriminatory intent by the state legislature." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022). That is because "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents," *Brnovich*, 141 S. Ct. at 2350, so the allegations would be insufficient to support an inference of discriminatory purpose on the part of the Legislature as a whole. After all, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *O'Brien*, 391 U.S. at 384.

---

[9] https://thefloridachannel.org/videos/3-7-22-senate-session-part-3/.

[10] https://thefloridachannel.org/videos/3-8-22-senate-session/.

In any event, Plaintiffs' cherrypicked statements fail to evince animus. *See* ECF 123 ¶¶ 39–53. Instead, Plaintiffs' chosen statements reflect the desire to empower parents and ensure age-appropriate education. Representative Harding, for example, was concerned about schools "encourag[ing]" students to hide their identity from their parents. *Id.* ¶ 43. Senator Baxley talked about "parents" being "very concerned" about "departure[s] from the[ir] core belief systems" in schools. *Id.* ¶ 40. Governor DeSantis, too, spoke of restricting the concepts in schools, *id.* ¶ 36, because "parents" don't want them "injected into classroom instruction," *id.* ¶ 47.

Plaintiffs make much of Senator Baxley's statement about the "big uptick in the number of children who are coming out as gay" or transgender at school, going so far as to characterize his statements as invidious discrimination. ECF 123 ¶ 41. But the presumption of legislative good faith requires that such statements be taken at their best, not their "worst." *See League of Women Voters of Fla.*, 32 F.4th at 1373. HB 1557 was adopted against a background of Florida schools hiding from parents that their children had "come out" at school, *see supra* pp. 4–11, which is why, in context, Senator Baxley was talking about ensuring that parents "have a seat at the table" when their kids come out. Fla. S., recording of proceedings, at 3:53–56 (Mar. 7, 2022), https://tinyurl.com/58v787fy.

Plaintiffs also accuse Senator Baxley of harboring discriminatory intent because, they say, he failed to provide a fellow Senator with "'specific examples' of why HB 1557 was needed in response to 'lesson plans,'" instead inviting his colleague to "visit some of the websites." ECF 123 ¶ 53. But those websites, some of which Plaintiffs cite in their Complaint, ECF 123 ¶¶ 27–29 & nn.3–12, reveal (just as Senator Baxley indicated) that school boards in Florida were indeed encouraging teachers to instruct young students on the concepts of sexual orientation and gender identity and even to *hide it from parents*. Senator Baxley's response thus perfectly explained that the bill's stated purpose was to protect parental rights.

Plaintiffs next point to various proposed amendments to HB 1557 that were rejected but which Plaintiffs say would have "mitigate[d] the law's" alleged discriminatory effects. ECF 123 ¶¶ 54–62. The mere fact, however, that the "legislature did not include the alternative option[s] that Plaintiffs would have preferred" is not a persuasive allegation of discriminatory intent. *Greater Birmingham Ministries*, 992 F.3d at 1327. And Plaintiffs' argument is on even worse footing because they must cite (ECF 123 ¶ 56) bill opponents to make their claim. *See Veasey v. Abbott*, 830 F.3d 216, 233–34 (5th Cir. 2016) (en banc) (plurality op.) (noting that relying on bill opponents to show intent is improper). Regardless, many of the rejected amendments are not even logically relevant, as most of them would have altered the substantive reach of the bill. For example, Senator Brandes proposed

replacing "'sexual orientation or gender identity' with 'human sexuality or sexual activity.'" ECF 123 ¶ 56. Because such amendments would not have achieved the Legislature's objectives, rejecting them is not evidence of animus. *See Easley v. Cromartie*, 532 U.S. 234, 249 (2001) (demanding that alternatives satisfy the Legislature's "nonracial political goals"). Other proposed amendments were simply redundant because they would have excluded items like student-to-student speech, which the enacted bill does not prohibit. ECF 123 ¶ 58.

Plaintiffs' narrative about the amendment history is, in any event, seriously misleading. The Legislature *did* substantially amend the bill to address its opponents' concerns. The original version restricted anything that would "encourage classroom discussion" about gender identity or sexuality. *See* Kirby Wilson, *Republicans made changes to 'don't say gay' bill. LGBTQ advocates aren't buying it*, TAMPA BAY TIMES (Feb. 18, 2022), https://www.tampabay.com/news/florida-politics/2022/02/17/republicans-made-changes-to-dont-say-gay-bill-lgbtq-advocates-arent-buying-it/ (cited at ECF 123 ¶ 43 n.20). Representative Harding acknowledged that "some might find the word 'encourage' to be vague" and amended the bill to restrict only "classroom instruction." *Id.* Against that backdrop, the Court "cannot say that the legislature failed to consider . . . alternatives that would lessen any potentially discriminatory impact," *Greater Birmingham Ministries*, 992 F.3d at 1327—indeed, it *adopted* one such alternative.

Plaintiffs' effort to link HB 1557 to other allegedly discriminatory laws and actions is no more persuasive. Plaintiffs allege that "Governor DeSantis's administration took down a Department of Education web page" with links to resources for LGBTQ youth. ECF 123 ¶ 65. But Plaintiffs do not allege that the page was redesigned out of animus. If anything, the change was consistent with the stated purpose of HB 1557, as the site previously recommended that teachers not "discuss sexual identity issues with parents." *See* Brody Levesque, *Florida's DeSantis attacks LGBTQ youth by removing website resource*, LOS ANGELES BLADE (Dec. 6, 2021), https://www.losangelesblade.com/2021/12/06/floridas-desantis-attacks-lgbtq-youth-by-removing-website-resource/ (cited at ECF 123 ¶ 65 n.43). And it bespeaks the weakness of their animus claim for Plaintiffs to attach constitutional significance to the fact that Governor DeSantis line-item vetoed LGBTQ-related funding from the budget. ECF 123 ¶ 66. Those few line items out of $1.5 billion worth of budget cuts, *see* 2021 Veto List, *available at* https://www.flgov.com/wp-content/uploads/2021/06/2021-Veto-List-Final.pdf, have no constitutional relevance, and nothing whatsoever to do with HB 1557.

Taken together, Plaintiffs' allegations amount to (1) legislative statements that neither legally nor logically support their animus claim, (2) rejected amendments that are irrelevant because they were either redundant or would have changed the substantive scope of the bill, and (3) other governmental acts relating to

LGBTQ individuals that neither evince discriminatory intent nor, in any event, have anything to do with HB 1557. Those allegations are plainly insufficient to state an equal-protection claim given (1) the legislative presumption of good faith, (2) a recent history of Florida schools cutting parents out of decision-making regarding their children, (3) the bill's stated purpose of safeguarding parental rights, (4) statutory text that restricts only "classroom instruction" and does so neutrally as to sexual orientation and gender identity, (5) language that expressly *allows* classroom instruction on those topics after the third grade, (6) a remedial scheme that, consistent with the bill's stated objective, is limited to parents, and (7) a legislative history full of statements consistent with that objective.

There is nothing to Plaintiffs' charges of discriminatory purpose, and the claim should be dismissed.

**3.** Plaintiffs' selective-enforcement claim fails too. They allege that Defendants are applying "HB 1557 solely to restrict discussion of and instruction on LGBTQ sexual orientations, gender identities, and issues" "while failing to restrict discussion and instruction of non-LGBTQ sexual orientations, gender identities, and issues." ECF 123 ¶ 114. Plaintiffs thus admit that all students are receiving the same education; their beef is with the curriculum. That is not differential treatment and thus cannot violate the Equal Protection Clause. *Cf. Moore*, 853 F.3d at 250.

Plaintiffs also allege that "students have been unable to participate in LGBTQ-related student clubs; books featuring LGBTQ-related protagonists have been removed from school libraries; students have been discouraged from pursuing LGBTQ-related research projects; and students have been prohibited from dancing with others of the same gender." ECF 123 ¶ 117. But those allegations have nothing to do with HB 1557, which restricts only "classroom instruction . . . on sexual orientation [and] gender identity." Fla. Stat. § 1001.42(8)(c)(3); *see supra* Part I. Nor do they have anything to do with the State Defendants. Accordingly, such allegations are no basis to enjoin the operation of the statute, much less a basis to enter judgment against the State Defendants.

### E.    Count VII – Title IX

Plaintiffs also claim that HB 1557 violates Title IX of the Education Amendments of 1972 (ECF 123 ¶¶ 136–41), which provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

**1.** Title IX has no application here. As explained above, the challenged provision of HB 1557 regulates only "classroom instruction"—*i.e.*, curricular materials. Under longstanding regulatory authority, however, Title IX does not "require[] or prohibit[] or abridge[] in any way the use of particular textbooks or

curricular materials." 34 C.F.R. § 106.42. To conclude otherwise would lead to absurd results, as "permitting lawsuits against school districts on the basis of the [allegedly discriminatory] content of [curricula] to proceed past the complaint stage could have a significant chilling effect on a school district's willingness to assign books with themes, characters, snippets of dialogue, or words that might offend the sensibilities of any number of persons or groups." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1030 (9th Cir. 1998). Title IX thus does not speak to state laws like HB 1557.

That interpretation is consistent with how courts have interpreted Title IX's sister statute—Title VI. For example, in *Grimes ex rel. Grimes v. Sobol*, the plaintiff sued New York school officials alleging that "the curriculum of the New York City public schools injure[d] African Americans because it [wa]s systematically biased against them." 832 F. Supp. 704, 706 (S.D.N.Y. 1993). Given the parallels between Title VI and Title IX, the court requested briefing on Title IX's implementing regulations. *Id.* at 711. It then dismissed the complaint, concluding that Title VI "do[es] not encompass the regulation of curricular content." *Id.* at 713. Likewise, in *Shorter v. St. Cloud State University*, the plaintiff alleged that "he suffered a hostile educational environment created by" his school's "Euro-centric curriculum." No. 00-cv-1314, 2001 WL 912367, *10 (D. Minn. Aug. 14, 2001). Analogizing to Title IX, the court explained that "a Title IX claim stemming from the school's choice of

curriculum materials is not actionable." *Id.* at \*10. Applying the same rule to Title VI, the court dismissed the claim. *Id.* at \*11; *see also Monteiro*, 158 F.3d at 1032 (dismissing Title VI claim premised on the assignment of *Huckleberry Finn*).

Background principles of statutory interpretation confirm that Title IX does not supersede state curricular decisions. For one thing, states have historically enjoyed an "undoubted right to prescribe the curriculum for [their] public schools." *Epperson v. Arkansas*, 393 U.S. 97, 107 (1968). "Congress normally preserves 'the constitutional balance between the National Government and the States,'" and must speak clearly if it wishes to upset the balance. *Bond v. United States*, 572 U.S. 844, 862 (2014). Moreover, "if Congress intends to impose a condition on the grant of federal moneys," as it did in Title IX, "it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (footnote omitted). At a minimum, Congress must speak clearly enough that a funding recipient can "voluntarily and knowingly accept[]" Congress' "terms." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002).

**2.** In any event, as discussed above, HB 1557 is scrupulously neutral and thus does not discriminate "on the basis of sex." *See supra* Parts II.A.iv, III.D. To the extent Plaintiffs contend that HB 1557 is not being implemented neutrally, they have not alleged discriminatory actions by any of the State Defendants. Plaintiffs point only to a memorandum issued by the Florida Commissioner of Education directing

school districts to follow Florida law in the event it conflicts with non-binding Title IX guidance from the USDA. ECF 123 ¶¶ 88, 140. But the guidance has nothing to do with elementary school curricular choices and is therefore irrelevant. ECF 95.

**CONCLUSION**

For the foregoing reasons, the Second Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Daniel William Bell*
Daniel William Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Bilal Faruqui (FBN 15212)
ASSISTANT ATTORNEY GENERAL

Anita Patel (FBN 70214)
ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
daniel.bell@myfloridalegal.com

*Counsel for the Florida State Board of Education,*
*Thomas R. Grady, Ben Gibson, Monesia Brown, Esther*
*Byrd, Grazie P. Christie, Ryan Petty, Joe York, and the*
*Florida Department of Education*

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 7.1(F) and the contemporaneously filed unopposed motion to expand the word limit, this motion contains 11,633 words.

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ Daniel William Bell
Chief Deputy Solicitor General