# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTIRCT OF FLORIDA
# TALLAHASSEE DIVISION

EQUALITY FLORIDA, et al.,

Plaintiffs,

v.

FLORIDA STATE BOARD OF
EDUCATION, et al.,

Defendants

Case No. 4:22-cv-134-AW-MJF

## BRIEF OF THE STATES OF TEXAS, ALABAMA, ALASKA, ARKANSAS, GEORGIA, INDIANA, KENTUCKY, LOUISIANA, MISSISSIPPI, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, VIRGINIA, AND WEST VIRGINIA AS AMICI CURIAE IN SUPPORT OF DEFENDANTS

**TABLE OF CONTENTS**

**Page(s)**

Table of Authorities.................................................................................ii

Introduction and Interest of Amici ........................................................1

Argument..................................................................................................4

    I.   States Have a Strong Interest in Protecting Parental Rights in Education and

        Rationally Using that Interest to Set Curriculum Standards........................4

        A.  Florida uses core state authority to govern curriculum for sensitive

            subjects for young children. .............................................................5

        B.  Teachers do not have a First Amendment right to override the

            State's curriculum choices. ............................................................. 8

    II.  Plaintiffs Fall Short of the Pleading Standard for Overcoming the Florida

        Legislature's Presumption of Good Faith. .................................................. 13

        A.  The Florida Legislature is entitled to a presumption of good faith. .14

        B.  Plaintiffs' allegations do not overcome the presumption of legislative

            good faith. ......................................................................................18

    III.  Florida's H.B. 1557 Is Not Unconstitutionally Vague. ..............................20

Conclusion................................................................................................ 25

Local Rule 7.1(F) Certification............................................................... 27

Certificate of Service ............................................................................. 28

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ............................................................................... 2, 15, 18

*Ambassador Books & Video, Inc. v. City of Little Rock*,
    20 F.3d 858 (8th Cir. 1994) ...................................................................... 17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 17

*Bannon v. Sch. Dist. of Palm Beach Cnty.*,
    387 F.3d 1208 (11th Cir. 2004) ................................................................ 13

*Bethel Sch. Dist. No. 403 v. Fraser*,
    478 U.S. 675 (1986) .............................................................................. 9, 22

*Bishop v. Aronov*,
    926 F.2d 1066 (11th Cir. 1991) ................................................................ 10

*Boring v. Buncombe Cnty. Bd. of Educ.*,
    136 F.3d 364 (4th Cir. 1998) (en banc) .................................................... 11

*Bradley v. Pittsburgh Bd. of Educ.*,
    910 F.2d 1172 (3d Cir. 1990) ................................................................ 9, 11

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321 (2021) ...................................................................... 3, 18, 19

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973) ................................................................................. 21

*Cameron v. Johnson*,
    390 U.S. 611 (1968) .......................................................................... 22

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) ............................................................. 13

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) .......................................................................... 21

*Davis v. Dep't of Labor & Indus.*,
    317 U.S. 249 (1942) .......................................................................... 18

*Day-Brite Lighting, Inc. v. Missouri*,
    342 U.S. 421 (1952) .......................................................................... 16

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) (Scalia, J., dissenting) ....................................... 2

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
    624 F.3d 332 (6th Cir. 2010) ............................................................. 13

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993) ............................................................................ 3

*Ferguson v. Skrupa*,
    372 U.S. 726 (1963) .......................................................................... 16

*Flemming v. Nestor*,
    363 U.S. 603 (1960) .................................................................... 14, 19

*Fletcher v. Peck*,
    10 U.S. (6 Cranch) 87 (1810) ...................................................... 15, 16

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) ............................................................. 15

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ............................................................. 5, 8, 12

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................... 21

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ............................................. 17, 19

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) .............................................. 4, 9, 10, 11, 13

*Hill v. Colorado*,
    530 U.S. 703 (2000) ................................................................... 22

*Hunter v. Underwood*,
    471 U.S. 222 (1985) .............................................................. 14, 18

*Johnson v. Poway Unified Sch. Dist.*,
    658 F.3d 954 (9th Cir. 2011) ..................................................... 12

*Johnson v. United States*,
    576 U.S. 591 (2015) ................................................................... 21

*Kirkland v. Northside Indep. Sch. Dist.*,
    890 F.2d 794 (5th Cir. 1989) ................................................. 7, 11

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ................................................................... 21

*Kovacs v. Cooper*,
    336 U.S. 77 (1949) ................................................................. 22-23

*Lacks v. Ferguson Reorganized Sch. Dist. R-2*,
    147 F.3d 718 (8th Cir. 1998) ..................................................... 12

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
  32 F.4th 1363 (11th Cir. 2022) ...................................................................2, 3, 15

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*,
  558 F.3d 1301 (11th Cir. 2009) ..........................................................................22

*Mayer v. Monroe County Community School Corp.*,
  474 F.3d 477 (7th Cir. 2007) ..............................................................................12

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) ..............................................................................................14

*Miles v. Denver Public Schools*,
  944 F.2d 773 (10th Cir. 1991) ............................................................................12

*Miller v. Johnson*,
  515 U.S. 900 (1995) ..........................................................................12, 15, 16, 18

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ........................................................................................20-21

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979) ..............................................................................................16

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
  391 U.S. 563 (1968) ................................................................................................9

*Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*,
  268 U.S. 510 (1925) ................................................................................................5

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ..............................................................................................15

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) ................................................................................................8

*S. Car. Educ. Ass'n v. Campbell*,
883 F.2d 1251 (4th Cir. 1989) .......................................................... 14

*Silano v. Sag Harbor Union Free School District Board of Education*,
42 F.3d 719 (2d Cir. 1994) .............................................................. 11

*Smith v. Doe*,
538 U.S. 84 (2003) ........................................................................ 17

*Teachers Ass'n v. State Bd. of Educ.*,
271 F.3d 1141 (9th Cir. 2001)........................................................22

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (Black, J., dissenting)........................................ 9, 11, 13

*Troxel v. Granville*,
530 U.S. 57 (2000) ...................................................................... 1, 4

*U.S. Dep't of Labor v. Triplett*,
494 U.S. 715 (1990)........................................................................ 15

*United States v. Nat'l Dairy Prods. Corp.*,
372 U.S. 29 (1963)........................................................................24

*United States v. O'Brien*,
391 U.S. 367 (1968) ............................................................ 14, 18, 19

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) (en banc) ..........................................20

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)................................................................ 14,16, 17

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .......................................................... 21, 22, 24

*Virgil v. Sch. Bd. of Columbia Cnty.*,
     862 F.2d 1517 (11th Cir. 1989) ................................................................4

*Ward v. Hickey*,
     996 F.2d 448 (1st Cir. 1993) ................................................................ 11

*Waters v. Churchill*,
     511 U.S. 661 (1994)................................................................................9

*Whole Woman's Health v. Lakey*,
     769 F.3d 285 (5th Cir. 2014), *vacated in part on other grounds*, 574
     U.S. 931 (2014) .................................................................................. 17

*Williamson v. Lee Optical of Okla., Inc.*,
     348 U.S. 483 (1955)............................................................................ 16

*Wisconsin v. Yoder*,
     406 U.S. 205 (1972) ...................................................................... 1, 4, 5

**Constitutional Provision and Statutes:**

U.S. Const.:
     amend. I................................................................5, 8, 9, 10, 11, 12, 13
     amend. X................................................................................................8

105 Ill. Comp. Stat. Ann. 5/27-9.1(b)(1) ..............................................23

Act of Sept. 2, 2021, 87th Leg., 2d C.S., ch. 9, § 5 (Tex. S.B. 3),
     Tex. Gen. Laws 3928 (codified at Tex. Educ. Code § 28.0022) .........................1

Cal. Educ. Code:
    § 51210.4 ................................................................................. 2
    § 51220.5(c) ........................................................................... 2
    § 51501 ................................................................................. 7
    § 51933(g) ........................................................................... 23
    § 60044 ................................................................................. 7
California's 2011 FAIR Education Act ...................................... 7

Colo. Rev. Stat. § 22-1-128(2)(b) ........................................... 7-8

Fla. Stat. § 1001.42(8)(c)(3) ............................................. 4, 13

N.J. Stat.:
    Law 18A:35-4.20 ............................................................... 8
    Law 18A:35-4.23a ............................................................ 23
    Law 18A:35-4.38 ............................................................... 8

Nev. Rev. Stat.:
    § 389.061(1) ........................................................................ 7
    § 389.525 ............................................................................. 7

Or. Rev. Stat.:
    § 336.455(2)(d) .................................................................. 8
    § 336.455(3) ........................................................................ 8

Tex. Educ. Code:
    § 28.002 ............................................................................... 1
    § 28.002(h-1) ...................................................................... 1
    § 28.004(i-2) ...................................................................... 5
    § 28.0022 ........................................................................ 2, 7

**Other Authorities:**

Amanda Prestigiacomo, *Self-Proclaimed Teacher Brags She Talks to Preschoolers About 'Sexuality,' 'Transness,' 'Pronouns'*, THE DAILY WIRE (Dec. 28, 2021), https://www.dailywire.com/news/watch-self-proclaimed-teacher-brags-she-talks-to-preschoolers-about-sexuality-transness-pronouns ..............................................................................6

Austin Indep. Sch. Dist., *Austin ISD Pride Week 2022*, https://www.austinisd.org/respectforall/pride (last visited Dec. 6, 2022) ................................................................................................6

Carlos Garcia, *Pennsylvania HS Teacher Hosted a Drag Show for Students at 'Genders Sexualities Alliance' Club and Didn't Notify Parents*, BLAZE MEDIA (Apr. 29, 2022), https://www.theblaze.com/news/pa-high-school-drag-show ................................................................................................6

The Federalist No. 78, at 467_ (Alexander Hamilton) (Clinton Rossiter ed., 1961) ................................................................ 16

Ill. H.B. 0246 at 2, 101st Leg., R.S. (2020) (enrolled version) .................................7

Jeremiah Poff, *Texas Elementary School Hosts Pride Week With 'Confidential' Community Circles,* WASHINGTON EXAMINER (Mar. 21, 2022), https://www.washingtonexaminer.com/restoring-america/community-family/texas-elementary-school-hosts-pride-week-with-confidential-community-circles ..............................................................................6

Jeremiah Poff, *Texas School Told Teachers to Keep Parents in Dark if Students Came Out as Transgender*, WASHINGTON EXAMINER (Jan. 14, 2022), https://www.washingtonexaminer.com/policy/texas-school-told-teachers-to-keep-parents-in-dark-if-students-came-out-as-transgender ................................................................................5-6

Mairead Elordi, *Texas Teachers Instructed to Help Students Hide Gender Identity from Parents,* THE DAILY WIRE (Sept. 30, 2021), https://www.dailywire.com/news/texas-teachers-instructed-to-help-students-hide-gender-identity-from-parents ...............................................6

Nat'l Ctr. for Educ. Statistics, *Fast Facts*, https://nces.ed.gov/fastfacts/display.asp?id=372 (last visited Dec. 6, 2022) ...........................................................................................8

## INTRODUCTION AND INTEREST OF AMICI

States have the "high responsibility for education of its citizens," which includes the obligations to set standards for what children learn in school and to protect parents' rights to protect their children from inappropriate material. *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). States discharge these obligations by "impos[ing] reasonable regulations for the control and duration of basic education." *Id.* This is, in fact, "the very apex of the function of a State." *Id.* Florida's H.B. 1557 seeks to vindicate these principles by wresting primary responsibility for control over the education of children away from unelected teachers and local bureaucrats and returning it to parents. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (observing that "the interest of parents in the care, custody, and control of their children[ ] is perhaps the oldest of the fundamental liberty interests recognized by this Court").

Florida's law is consistent with that of its sister States. Every one of the 50 States has a robust set of education laws, and many regulations to guide and/or govern the curriculum choices of public schools in their States. Some of those codes include very specific requirements. For instance, Section 28.002 of Texas' Education Code has a long list of detailed curriculum requirements, including extensive lessons in Texas history with a detailed required reading list. Tex. Educ. Code § 28.002(h-1).

Texas also prohibits teaching "critical race theory" to schoolchildren in Texas public schools. *See* Act of Sept. 2, 2021, 87th Leg., 2d C.S., ch. 9, § 5 (Tex. S.B. 3), Tex. Gen. Laws 3928, 3930–32 (codified at Tex. Educ. Code § 28.0022). Likewise, many States' education codes delegate the details of curricula to regulatory bodies that make rules for and supervise education across their State. For example, California's Education Code regularly delegates to its Department of Education the responsibility to include specific topics in its "Curriculum Frameworks," which function as guides for school curricula. *See e.g.*, Cal. Educ. Code § 51210.4. Indeed, in 1993, it amended its code and gave its Department of Education roughly two years to develop a model curriculum for a traditional parenting course for middle and high schoolers. *Id.* § 51220.5(c).

Fundamentally, State education policy is driven by democratic processes. Particularly elections of legislators who are elected and then sent to their respective capitals to solve specific problems through the legislative process. When those legislators pass laws, and they are challenged, "the good faith of the state legislature must be presumed." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). Granted, discerning a legislature's intent can be a tricky business. Each

legislator votes for their own reasons, and every enacted statute reflects the consensus and compromise of hundreds of legislators on complex questions. Indeed, "[t]he number of possible motivations [for passing a statute] . . . is not binary, or indeed even finite." *Edwards v. Aguillard*, 482 U.S. 578, 636–37 (1987) (Scalia, J., dissenting).

Even so, the presumption of legislative good faith has often been ignored, with some courts failing to "meaningfully account[] for the presumption at all." *League of Women Voters*, 32 F.4th at 1373. As a result, the amici States regularly defend against challenges to State statutes brought by those with no grievance more substantial than opposition to the results of the legislative process. These litigants invite federal courts to substitute their own judgment for that of the legislature. Too often, courts accept the invitation to usurp the legislative role by ascribing invidious intent to legislative enactments, thereby legitimizing otherwise meritless challenges based on sheer policy disagreement by recasting those challenges as discrimination claims. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349–50 (2021). The Constitution forbids that, and for good reason. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). Federal courts are poorly positioned to weigh the many interests at stake. Their decisions are rendered without public debate. And, because they are not elected, they cannot be held accountable by the people.

Plaintiffs' claims are little more than after-the-fact complaints about the policy merits of Florida's law. This Court should respond to them accordingly. Florida's H.B. 1557 falls well within the scope of the "the very apex of the function of a State." *Yoder*, 406 U.S. at 213. Parents have a strong interest, and thus the State has a strong duty, in preventing children from being exposed to sexual instruction that is not age appropriate. The law does not violate anyone's right to expression or receive information, does not discriminate, and is not unconstitutionally vague.

## ARGUMENT

### I. States Have a Strong Interest in Protecting Parental Rights in Education and Rationally Using that Interest to Set Curriculum Standards

States have considerable latitude to create rules for public education that are "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). States also have a strong interest in ensuring that the rules they create for public education meets reasonable standards aligned with the age and maturity of students in particular grades. *See, e.g., Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1521–22 (11th Cir. 1989). Florida's H.B. 1557 satisfies this interest while also vindicating the fundamental right of parents to make decisions concerning the care, custody, and control of their child. Fla. Stat. § 1001.42(8)(c)(3); *see also Troxel*, 530 U.S. at 65

Florida is no outlier in its regulation of its curriculum for sensitive subjects for

young children. Indeed, it is exceedingly common for States to describe different curriculum requirements for different age groups. Plaintiffs' alternative—that teachers have a First Amendment right to override the legislature's will and to define their own curriculum requirements—has no basis in law. It is also irreconcilable with settled precedent holding that government employees have no First Amendment right to subvert the government's constitutional ends while on the job. *See e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006).

### A.   Florida uses core state authority to govern curriculum for sensitive subjects for young children.

When it comes to education, parental rights and responsibilities are strongly tied to the State's interest in educating citizens. *See, e.g.*, *Pierce v. Soc'y of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35 (1925); *Yoder*, 406 U.S. at 231–32. Protecting such parental rights in education requires rationally based laws that set standards for what children learn at school. *Yoder*, 406 U.S. at 213. This is "the very apex of the function of a State." *Id.*

Nonetheless, a growing contingent of teachers and school administrators are promoting sexual content to children and encouraging them to hide it from their parents.[1] Some educators even solicit these discussions with students while promising

---

[1] *See* Jeremiah Poff, *Texas School Told Teachers to Keep Parents in Dark if Students Came Out as Transgender*, WASHINGTON EXAMINER (Jan. 14, 2022),

that parents will be kept in the dark.[2] As a result, many state legislatures have clari-

fied that when it comes to sex education, parents—not school districts—are in

charge. For example, Texas Education Code section 28.004(i-2) requires that

"[b]efore a student may be provided with human sexuality instruction, a school dis-

trict must obtain the written consent of the student's parent." Such instruction

could occur, for example, at events such as a district-wide "Pride Week,"[3] a school-

hosted drag queen show,[4] or courses involving LGBTQIA+ instructional sessions.[5]

---

https://www.washingtonexaminer.com/policy/texas-school-told-teachers-to-keep-parents-in-dark-if-students-came-out-as-transgender; Mairead Elordi, *Texas Teachers Instructed to Help Students Hide Gender Identity from Parents,* THE DAILY WIRE (Sept.    30, 2021), https://www.dailywire.com/news/texas-teachers-instructed-to-help-students-hide-gender-identity-from-parents.

[2] *See* Jeremiah Poff, *Texas Elementary School Hosts Pride Week With 'Confidential' Community Circles,* WASHINGTON EXAMINER (Mar. 21, 2022), https://www.washingtonexaminer.com/restoring-america/community-family/texas-elementary-school-hosts-pride-week-with-confidential-community-circles.

[3] Austin Indep. Sch. Dist., *Austin ISD Pride Week 2022*, https://www.austinisd.org/respectforall/pride (last visited Dec. 6, 2022).

[4] Carlos Garcia, *Pennsylvania HS Teacher Hosted a Drag Show for Students at 'Genders Sexualities Alliance' Club and Didn't Notify Parents*, BLAZE MEDIA (Apr. 29, 2022), https://www.theblaze.com/news/pa-high-school-drag-show.

[5] Amanda Prestigiacomo, *Self-Proclaimed Teacher Brags She Talks to Preschoolers About 'Sexuality,' 'Transness,' 'Pronouns'*, THE DAILY WIRE (Dec. 28, 2021), https://www.dailywire.com/news/watch-self-proclaimed-teacher-brags-she-talks-to-preschoolers-about-sexuality-transness-pronouns.

Tex. Educ. Code § 28.0022. Florida's H.B. 1557 was motivated by similar concerns. *See* State's Second Motion to Dismiss at 4-10 (ECF No. 134).

Florida's HB 1557 fits well within the collection of State laws that regulate primary education curriculum by imposing restraints on what teachers can say. Indeed, many States have laws that go a great deal further in regulating what teachers may (or must) say in the classroom. *See, e.g.*, *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 795 (5th Cir. 1989) (upholding non-renewal of a teacher's contract who deviated from approved curriculum). And in the unique teacher-speech context, it is routine for States to forbid particular classroom content and even require teachers to express specific opinions. For example, California's 2011 FAIR Education Act includes a robust book ban. Cal. Educ. §§ 51501, 60044. Illinois bans textbooks that do not include mention of "people protected under the Illinois Human Rights Act," which means, among other things, those identifying as members of the LGBTQ community. Ill. H.B. 0246 at 2, 101st Leg., R.S. (2020) (enrolled version). Nevada effectively bans textbooks that do not include descriptions of the contributions of groups of individuals as varied as immigrants, Basques, "persons of marginalized sexual orientation or gender identity," and others. Nev. Rev. Stat. §§ 389.061(1), .525. Colorado forbids teachers who teach sex education from teaching abstinence only, or even teaching that abstinence is the primary way one should approach sex. Colo. Rev. Stat.

§ 22-1-128(2)(b). Oregon outright bans abstinence-only education. Or. Rev. Stat. § 336.455(2)(d), (3). And New Jersey, by contrast, compels teachers, when educating students on sex, to "stress abstinence." N.J. Law 18A:35-4.20; 18A:35-4.38.

Plaintiffs' unfounded First Amendment theory would jeopardize all of these laws, impairing every State's authority to regulate on these uniquely local subjects of concern. *See* U.S. Const. Amend. X. As explained below, however, H.B. 1557, just like many other education laws governing the content of curriculum, is manifestly constitutional. There is no need for this court to throw the States' public-school apparatuses into disarray, which yearly provide critical educational services to almost 50 million American children.[6]

## B. Teachers do not have a First Amendment right to override the State's curriculum choices.

When they are engaged in classroom instruction, teachers are agents of the State and "are not speaking as citizens for First Amendment purposes." *Garcetti*, 547 U.S. at 421. The State retains the power to "regulate the content of what is or is not expressed when it is the speaker" and "take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995). Thus, though a teacher's out-of-class

---

[6] Nat'l Ctr. for Educ. Statistics, *Fast Facts*, https://nces.ed.gov/fastfacts/display.asp?id=372 (last visited Dec. 6, 2022).

speech is typically protected by the First Amendment, *see Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968), in-class speech is generally not. *See e.g.*, *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990) (teacher had no First Amendment right to choose a classroom management technique banned by her school). After all, teachers are "not paid to go into school and teach subjects the State does not hire [them] to teach." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 522 (Black, J., dissenting).[7]

Part and parcel of regulating teachers' classroom speech is making sure they are actually imparting a quality education at the State's direction. *See e.g.*, *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986). "[W]here the government is employing someone for the very purpose of effectively achieving its goals . . . restrictions may well be appropriate." *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality op.). The relevant inquiry is instead whether a teacher's speech could be perceived as school-sponsored: if it can, a teacher's speech is not protected by the First Amendment. On this, *Hazelwood* is instructive. 484 U.S. at 267. In *Hazelwood*, the Supreme Court considered whether the censorship of a student-run high school

---

[7] Although a teacher ordinarily cannot assert the Speech Clause as a ground to resist the state's curriculum decisions, the Free Exercise Clause could require the recognition of religious exemptions from some school policies in at least some circumstances.

newspaper produced as part of a journalism class violated the First Amendment. *Id.*

at 262. The Court decided it did not because the newspaper was school-sponsored,

and the government has an interest in what messages are associated with itself. *Id.* at

272.

Though *Hazelwood* involved school-sponsored student speech, many circuits, in-

cluding the Eleventh Circuit, have applied *Hazelwood* to cases involving teachers in

classrooms or supervising school-sponsored events. Specifically, the Eleventh Cir-

cuit addressed restrictions on teachers' in-classroom speech in *Bishop v. Aronov*, a

case deciding whether a university—where First Amendment rights are typically at

their zenith for teachers—may restrict a professor's classroom expression. 926 F.2d

1066, 1068–70 (11th Cir. 1991). The Eleventh Circuit explained that "during instruc-

tional periods the . . . classrooms are 'reserved for other intended purposes,' *viz.*,

the teaching of a particular . . . course for credit." *Id.* at 1071 (quoting *Hazelwood*,

484 U.S. at 267). Reasoning that the crucial question was whether the purportedly

protected speech was in the classroom, the Eleventh Circuit determined that the

professor's speech departing from the authorized curriculum was not protected, and

the professor's classroom expression could be reasonably restricted. *Id.* at 1071, 1077.

The other courts of appeals have likewise determined that teachers do not possess a sweeping First Amendment veto over a State's or school's mandatory curriculum.

Relying on *Tinker* and *Hazelwood*, the First Circuit observed that it is "well-settled that public schools may limit classroom speech to promote educational goals," which includes prohibiting a biology teacher from discussing abortions targeting children with Downs Syndrome. *Ward v. Hickey*, 996 F.2d 448, 452 (1st Cir. 1993). Likewise, the Second Circuit in *Silano v. Sag Harbor Union Free School District Board of Education* determined that a teacher, who showed his high school class a video with topless women and a man, did not have an unfettered free speech right to select his classroom content. 42 F.3d 719, 722 (2d Cir. 1994). The Third Circuit in *Bradley* ruled that a teacher had no First Amendment right to choose classroom management techniques expressly banned by her school. 910 F.2d at 1176. The en banc Fourth Circuit held that a teacher's selection of a play for students to perform was not protected by the First Amendment. *Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 370–71 (4th Cir. 1998) (en banc). In *Kirkland*, the Fifth Circuit determined that a high school history teacher selecting his own reading list for his class was not protected speech under the First Amendment. 890 F.2d at 795. The Sixth Circuit held that an English teacher's curriculum choices were subject to school control, that her

selection of objectionable material, such as a first-hand account of a rape and a story about a young boy who murdered a priest and desecrated a church, were not protected free speech, and her in-class speech was not protected by the First Amendment under *Garcetti*. *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 343 (6th Cir. 2010). In *Mayer v. Monroe County Community School Corp.* the Seventh Circuit held that the First Amendment did not entitle a high school teacher to "depart from the curriculum adopted by the school system" and advocate her own negative viewpoints on the Iraq war. 474 F.3d 477, 480 (7th Cir. 2007). The Eighth Circuit upheld the termination of a teacher who chose an assignment that allowed "a student to read aloud a poem that describes sexual encounters in the most graphic detail." *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998). The Ninth Circuit has upheld the firing of a high school teacher over posting banners in his classroom because such classroom decorations are government speech and not protected by the First Amendment. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 970 (9th Cir. 2011). Lastly, the Tenth Circuit in *Miles v. Denver Public Schools* held that a high school teacher's comment about how the quality of the school had declined since the 1960s was not protected by the First Amendment. 944 F.2d 773, 774 (10th Cir. 1991).

Against this uniform nationwide backdrop, plaintiffs' First Amendment theory stands alone.[8] As the Sixth Circuit observed, though teachers do not "shed their constitutional rights . . . at the schoolhouse gate," *Tinker*, 393 U.S. at 506, "that does not transform them into the employee and employer when it comes to deciding what" is or is not taught in class. *Evans-Marshall*, 624 F.3d at 340. Neither teachers nor students have an unfettered right to say or do as they will in the classroom. *See Hazelwood*, 484 U.S. at 273. Florida's law falls well within the bounds of common practice with the nature and extent of the guidance it provides schools regarding sensitive topics. Plaintiffs' claims (at 51–56) that Florida's H.B. 1557 violates the First Amendment fail.

## II. Plaintiffs Fall Short of the Pleading Standard for Overcoming the Florida Legislature's Presumption of Good Faith.

Plaintiffs assert two claims alleging that H.B. 1557 violates the Fourteenth

---

[8] And plaintiff's cursory assertion of First Amendment overbreadth (at 55–56) misinterprets Florida's law. As to the student plaintiffs, the law does not restrict their speech as it only restricts "classroom instruction . . . on sexual orientation [and] gender identity." Fla. Stat. § 1001.42(8)(c)(3). And regardless, "where the [State] is selecting textbooks for use in the classroom, students have no constitutional right to compel the [State] to select materials of their choosing." *Chiras v. Miller*, 432 F.3d 606, 620 (5th Cir. 2005). To the extent that any teacher plaintiff raises an overbreadth challenge, such as plaintiff Washington (at 55), their speech is not private but government speech. *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004) (per curiam) ("[E]xpression delivered directly through the government or indirectly through private intermediaries" is government speech in which the "government is free to make subject-matter-based choices.").

Amendment's Equal Protection Clause on the ground that it intentionally discriminates against, and has a disparate impact on, LGBTQ persons. Compl. 47–51 (ECF No. 123). Because nothing in the text of H.B. 1557 draws classifications based on the sexual orientation or gender identity of any persons, plaintiffs seek to establish this position primarily on the basis of a handful of statements by state legislators, Governor DeSantis, and the Governor's Press Secretary. Compl. 16–29. But plaintiffs' approach runs headlong into the presumption of legislative good faith, which cannot be so cavalierly jettisoned.

### A.    The Florida Legislature is entitled to a presumption of good faith.

In a wide "variety of contexts," the Supreme Court has established that proof of "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). But inquiries into the motivations for legislative acts are a "sensitive" undertaking. *Id.* at 266. Indeed, "[p]roving the motivation behind official action" has been described as "a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and "a hazardous matter," *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also S. Car. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1262 (4th Cir. 1989) ("Determining the subjective intent of legislators and the collective motivation of legislatures is a perilous enterprise indeed."). Consequently, "[o]nly the

clearest proof could suffice to establish the unconstitutionality of a statute" on the ground of an improper legislative purpose. *Flemming v. Nestor*, 363 U.S. 603, 617 (1960). Moreover, where there are "legitimate reasons" for a law, courts "will not infer a discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 299 (1987).

A corollary to these principles is that the legislature is presumed to act in good faith when enacting legislation. *See Perez*, 138 S. Ct. at 2324–25; *Miller v. Johnson*, 515 U.S. 900, 916 (1995). As a consequence, a legislature is presumed to have acted to advance any constitutionally permissible reasons apparent on the face of a statute unless there is unmistakable evidence to the contrary. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 318–19 (1978) ("good faith would be presumed in the absence of a showing to the contrary"); *League of Women Voters*, 32 F.4th at 1373; *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020). The Supreme Court has long held that a "heavy presumption" of constitutionality and good faith applies in the context of a legislature's enactments. *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990). And this presumption traces its origins at least as far back as Chief Justice Marshall's 1810 opinion in *Fletcher v. Peck*, a case, like this one, where plaintiffs sought to have their case turn on the motives of those who enacted a challenged law, 10 U.S. (6 Cranch) 87, 131 (1810). The Chief Justice made clear that such an inquiry was "a

question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." *Id.* at 128; *accord Arlington Heights*, 429 U.S. at 268 n.18 (citing *Fletcher*).

These principles safeguard federalism. Every time legislatures act, they must "exercise the political judgment necessary to balance competing interests." *Miller*, 515 U.S. at 915. Disputes about whether a law is "undemocratic and unwise" should remain in the statehouse, not the courthouse. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 280 (1979); *see also Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955) (federal courts do not hold laws unconstitutional because they find them, "unwise, improvident, or out of harmony with a particular school of thought"). Federal "courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963); *see also Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421, 423 (1952) ("we do not sit as a super-legislature to weigh the wisdom of legislation"). In short, the presumption of legislative good faith helps to ensure that the judiciary stays out of the political fray and avoids "substitut[ing] their own pleasure to the constitutional intentions of the legislature." The Federalist No. 78, at 467_ (Alexander Hamilton) (Clinton Rossiter ed., 1961).

To be sure, parties may overcome the presumption of legislative good faith through a highly persuasive showing of direct and circumstantial evidence. *Arlington Heights*, 429 U.S. at 266–68. Such evidence might be gleaned by an assessment of the traditional *Arlington Heights* factors: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021). The Eleventh Circuit has articulated three other non-exclusive factors bearing on this analysis: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.*

But surmounting the presumption of good faith requires the "clearest proof" that a legislature enacted a facially neutral law for improper reasons. *Smith v. Doe*, 538 U.S. 84, 92 (2003); *see Whole Woman's Health v. Lakey*, 769 F.3d 285, 295 (5th Cir. 2014) (applying the "clearest proof" standard to charges that the Texas Legislature enacted a law "for the purpose of imposing an undue burden on women seeking abortions"), *vacated in part on other grounds*, 574 U.S. 931 (2014); *Ambassador Books & Video, Inc. v. City of Little Rock*, 20 F.3d 858, 863 (8th Cir. 1994) (applying

the standard to purpose-based First Amendment challenges). Proving an illicit purpose is difficult enough when evaluating the decisions of a single government official. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009). But it is all the more daunting when evaluating the motives of the state legislature as a collective whole. *Hunter*, 471 U.S. at 228. After all, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *O'Brien*, 391 U.S. at 384. And "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich*, 141 S. Ct. at 2350.

### B. Plaintiffs' allegations do not overcome the presumption of legislative good faith.

The allegations in plaintiffs' complaint do not rise to anywhere near the level necessary to dispatch the presumption of legislative good faith afforded to H.B. 1557. At the motion-to-dismiss stage, the presumption requires that the facts alleged to "give rise to . . . an inference that is strong enough to overcome the presumption of legislative good faith." *Perez*, 138 S. Ct. at 2328–29. What is "strong enough"? *Id.* Because this presumption requires courts to exercise "extraordinary caution" when considering claims that a legislature enacted a statute with an unlawful purpose, *Miller*, 515 U.S. at 916, and to "resolv[e] all doubts in favor of" a law's validity, *Davis v. Dep't of Labor & Indus.*, 317 U.S. 249, 258 (1942), only factual allegations that, if true,

would constitute "the clearest proof" of impermissible motive can survive a motion to dismiss, *Nestor*, 363 U.S. at 617.

Plaintiffs do not supply such allegations. They instead rely on a handful of statements from four legislators, including the bill's House and Senate sponsors, and from Governor DeSantis's Press Secretary. These they collectively characterize as reflecting hostility towards LGBT persons. Compl. 16–23. Setting aside that plaintiffs' descriptions of these statements are inaccurate—itself a fatal flaw—the statements of a few legislators cannot serve as a basis for imputing the motivations of all 160. *Cf. Greater Birmingham Ministries*, 992 F.3d at 1324 ("It is also questionable whether the sponsor speaks for all legislators. The vote of a sponsor is only one vote of the 105 votes in the Alabama House of Representatives."). After all, "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich*, 141 S. Ct. at 2350. And besides "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *O'Brien*, 391 U.S. at 384.

Nor can plaintiffs' nod to various amendments that were rejected during the legislative process, Compl. at 23–26, without more, provide proof of discriminatory intent sufficient to overcome the presumption of good faith. There is nothing out of the ordinary or unusual about the rejection of amendments proposed by the bill's

opponents. And plaintiffs' oblique reference to a "longer history" of discrimination against LGBTQ people, Compl. 28, does nothing to demonstrate a history of official discrimination *by the State of Florida*. *See Veasey v. Abbott*, 830 F.3d 216, 257 (5th Cir. 2016) (en banc). Put simply, no individual legislator's statements can "demonstrate discriminatory intent by the state legislature." *League of Women Voters. v. Fla. Sec'y of State*, 32 F.4th at 1373.

Because plaintiffs' sparse allegations of discriminatory intent are legally insufficient, the Court should apply the long-established presumption of legislative good faith to dismiss the Equal Protection Clause claims.

## III.   Florida's H.B. 1557 Is Not Unconstitutionally Vague.

H.B. 1557 is also not unconstitutionally vague. Plaintiffs' facial vagueness challenge faces a heavy burden, particularly because it is a challenge to a civil, rather than criminal, law governing a unique area where the State's interests are at their apex—public education. Plaintiffs come nowhere near satisfying that burden. This Court already concluded that HB 1557 is not even "arguably vague" as to the plaintiffs, Orders on Motion to Dismiss at 10 (ECF No. 120), and nothing about plaintiffs' case has changed in a way that would undermine that conclusion.

"Facial invalidation 'is, manifestly, strong medicine' that has been employed by the Court sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*,

20

524 U.S. 569, 580 (1998) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). To warrant this strong medicine in a facial vagueness challenge, a plaintiff must show that a statute's language suffers such "hopeless indeterminacy" that reasonable persons lack "fair notice of the conduct it punishes." *Johnson v. United States*, 576 U.S. 591, 595, 598 (2015). That is a particularly high bar. Statutes are not facially vague merely because they have some uncertain applications. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language"); *Kolender v. Lawson*, 461 U.S. 352, 361 (1983) ("[D]ue process does not require 'impossible standards' of clarity.") (citation omitted). Instead, it is only the rare law, such as one that proscribes "annoying" conduct, *Coates v. City of Cincinnati*, 402 U.S. 611, 612 (1971), that is facially vague.

Plaintiffs' bar is even higher here because Florida's law imposes only civil consequences, and then only for conduct that occurs in the schools. "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Civil laws impose penalties that are "qualitatively less severe," and vagueness challenges are accordingly even more difficult to make in the civil context. *Id.* at 498-99. Likewise, the subject matter of the law is highly relevant when evaluating

imprecision, *id.*, and the Supreme Court has recognized that the education context calls for a particularly forgiving standard when evaluating a State's decisions because "maintaining . . . order" in the educational setting requires rules of great "flexibility." *See, e.g.*, *Bethel Dist.*, 478 U.S. at 686.

H.B. 1557 is plainly constitutional under this standard. H.B. 157's core proscriptive phrase applies to "classroom instruction . . . on sexual orientation or gender identity." But statutes a great deal less determinate have been upheld as not vague. For example, the Ninth Circuit upheld a law against a facial challenge that required teachers to "overwhelmingly" use the English language in their classroom instruction. *Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1145 (9th Cir. 2001); *see also Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310-11 (11th Cir. 2009) (licensing regulation failing to define the limits of its terms not unconstitutionally vague). And the Supreme Court has repeatedly upheld laws with imprecise scope, such as a law making it a crime to non-consensually "approach" someone to engage in "oral protest, education, or counseling" near a health facility, *Hill v. Colorado*, 530 U.S. 703, 732 (2000), a prohibition on protests that "unreasonably interfere" with public building access, *Cameron v. Johnson*, 390 U.S. 611, 616 (1968), and a proscription on vehicles that emit "loud and raucous" noises. *Kovacs v. Cooper*, 336

U.S. 77, 87 (1949). H.B. 1557 is at least as precise, if not substantially more, than these valid laws.

Indeed, if H.B. 1557's core language failed for vagueness, it would doom numerous other State education laws. Illinois, for example, requires that all classes teaching "personal health and safety and comprehensive sexual health education" must be "age and developmentally appropriate, medically accurate, complete, culturally appropriate, inclusive, and trauma informed." 105 Ill. Comp. Stat. Ann. 5/27-9.1(b)(1). New Jersey requires "age appropriate" "dating violence education" that includes instruction on "behavior where one person threatens to use, or actually uses physical, sexual, verbal, or emotional abuse to control a dating partner." N.J. Stat. § 18A:35-4.23a. And California's "Healthy Youth Act" requires that teachers "provide pupils with knowledge and skills they need to form healthy relationships that are based on mutual respect and affection." Cal. Educ. Code § 51933(g). All of these laws have significant ambiguities and are susceptible to multiple interpretations. For example, does a teacher comply with California's law when it gives students "knowledge" on how to show "affection" in relationships through physical touch? Or would that physicality be inconsistent with the law's parallel purpose of instruction for "mutual respect"? Teachers sort out these applications, as they do with an

innumerable number of other State education laws. None of that imprecision, however, dooms the law's facial constitutional validity.

Plaintiffs' attempt to summon fanciful applications of the law also fails to show that the law is unconstitutionally vague. For example, one student, S.S., alleges that a friend was not allowed to "create a website" regarding LGBTQ resources because the friend was told it "might violate H.B. 1557." Compl. 32. Plaintiff M.A. alleges that teachers will not "serve as an advisor" for an LGBTQ club because of the law. *Id.* at 33. And M.A. claims that another student informed M.A that students would be required to wear clothing consistent with their biological sex because of the law. *Id.* at 34. It is not apparent how H.B. 1557 would apply to any of this conduct. And "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). Moreover, even if this conduct did fall within the statute's reach, Plaintiffs would run headlong into another problem that dooms their facial-vagueness claim: one who "engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests.*, 455 U.S. at 495. That third-party vagueness complaint would thus necessarily fail.

## CONCLUSION

The Court should grant the motion to dismiss.


Respectfully submitted.


KEN PAXTON                                    /s/ Judd E. Stone II
Attorney General of Texas                     JUDD E. STONE II*
                                              Solicitor General
BRENT WEBSTER
First Assistant Attorney General              Counsel for the State of Texas

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

DECEMBER 2022
*Admitted in the U.S. District Court of
the Northern District of Florida

On behalf of:

STEVE MARSHALL
*Attorney General*
State of Alabama

LESLIE RUTLEDGE
*Attorney General*
State of Arkansas

TODD ROKITA
*Attorney General*
State of Indiana

JEFF LANDRY
*Attorney General*
State of Louisiana

DOUGLAS J. PETERSON
*Attorney General*
State of Nebraska

ALAN WILSON
*Attorney General*
State of South Carolina

PATRICK MORRISEY
*Attorney General*
State of West Virginia

TREG R. TAYLOR
*Attorney General*
State of Alaska

CHRIS CARR
*Attorney General*
State of Georgia

DANIEL J. CAMERON
*Attorney General*
State of Kentucky

LYNN FITCH
*Attorney General*
State of Mississippi

JOHN M. O'CONNOR
*Attorney General*
State of Oklahoma

JASON MIYARES
*Attorney General*
State of Virginia

## LOCAL RULE 7.1(F) CERTIFICATION

As required by Local Rule 7.1(F), the undersigned counsel certifies that this

brief contains 5952 words.

<u>/s/ Judd E. Stone II</u>
JUDD E. STONE II

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2022, a copy of the foregoing was filed

electronically. Notice of this filing will be sent to all parties for whom counsel has

entered an appearance by operation of the Court's electronic filing system.

/s/ Judd E. Stone II
Judd E. Stone II