# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

M.A., by and through his parent
AMBER ARMSTRONG; S.S., by
and through her parents; IVONNE
SCHULMAN and CARL
SCHULMAN; RABBI AMY
MORRISON and CECILE HOURY;
LOURDES CASARES and
KIMBERLY FEINBERG; ANH
VOLMER; SCOTT BERG; and
MYNDEE WASHINGTON,

      Plaintiffs,

   v.

FLORIDA STATE BOARD OF
EDUCATION; THOMAS R.
GRADY, BEN GIBSON,
MONESIA BROWN, ESTHER
BYRD, GRAZIE P. CHRISTIE,
RYAN PETTY, and JOE YORK, in
their official capacities as members
of the Board of Education;
FLORIDA DEPARTMENT OF
EDUCATION; BROWARD
COUNTY SCHOOL BOARD;
SCHOOL BOARD OF MANATEE
COUNTY; SCHOOL BOARD OF
MIAMI-DADE COUNTY;
ORANGE COUNTY SCHOOL
BOARD; and PASCO COUNTY
SCHOOL BOARD,

      Defendants.

Case No. 4:22-cv-00134 (AW) (MJF)

**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................1

RELEVANT BACKGROUND ...............................................................2

APPLICABLE STANDARD....................................................................15

ARGUMENT ..........................................................................................15

   I.  PLAINTIFFS HAVE ADEQUATELY PLEADED STANDING................15

      A. Injury-in-fact .............................................................................16

          1.  Right to receive information ...................................16

          2.  Free speech and vagueness ....................................20

          3.  Equal Protection and Title IX ................................26

      B. Traceability and redressability .........................................28

          1.  The State Defendants ..............................................29

          2.  The School Board Defendants .................................32

  II. H.B. 1557 VIOLATES THE DUE PROCESS CLAUSE ............................34

      A. H.B. 1557 fails to provide people of ordinary intelligence fair notice of what conduct it prohibits................................................35

      B. H.B. 1557 authorizes and encourages arbitrary and discriminatory enforcement ...........................................................43

  III.H.B. 1557 VIOLATES PLAINTIFFS' FIRST AMENDMENT RIGHTS...44

      A. The statute violates Plaintiffs' right to receive information and ideas................................................................................44

      B. H.B. 1557 violates Plaintiffs' right to speak and share ideas .............50

  IV. H.B. 1557 VIOLATES THE EQUAL PROTECTION CLAUSE...............51

      A. H.B. 1557 was motivated by discrimination .......................................51

      B. Defendants have enforced H.B. 1557 in a selective or discriminatory manner ................................................................................58

V. H.B. 1557 VIOLATES TITLE IX................................................................59

VI. DEFENDANTS' REMAINING ARGUMENTS LACK MERIT ..............60

CONCLUSION ...............................................................................................62

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*281 Care Comm. v. Arneson*,
766 F.3d 774 (8th Cir. 2014) ................................................................43

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ........................................... 19, 20, 46, 49

*Acosta v. Huppenthal*,
No. 10 Civ. 623, 2012 WL 12829991 (D. Ariz. Jan. 10, 2012) ................... 20, 47

*Allen v. Wright*,
468 U.S. 737 (1984) ........................................................... 26, 27

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ........................................... 19, 24, 46, 47

*Arnett v. Kennedy*,
416 U.S. 134 (1974) ................................................................42

*Axson-Flynn v. Johnson*,
356 F.3d 1277 (10th Cir. 2004) ..............................................49

*Banks v. Sec'y, Dep't of Health & Human Servs.*,
38 F.4th 86 (11th Cir. 2022) ................................................30

*Bd. of Educ. v. Pico*,
457 U.S. 853 (1982) ........................................................... 16, 21, 45

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................15

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................16

*Brown v. Board of Ed.*,
347 U.S. 483 (1954) ................................................................48

*Bush v. Holmes*,
919 So.2d 392 (Fla. 2006) ................................................................2

i

*C.M. ex rel. Marshall v. Bentley*,
　13 F. Supp. 3d 1188 (M.D. Ala. 2014)...................................................27

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
　271 F.3d 1141 (9th Cir. 2001)...............................................................42

*Campbell v. Tammany Parish School Board*,
　64 F.3d 184 (5th Cir. 1995).................................................................45

*Chiras v. Miller*,
　432 F.3d 606 (5th Cir. 2005)................................................................47

*City of S. Miami v. DeSantis*,
　424 F. Supp. 3d 1309 (S.D. Fla. 2019)............................................ 54, 56

*Cramp v. Bd. of Pub. Instruction*,
　368 U.S. 278 (1961) ............................................................................42

*Dep't of Commerce v. New York*,
　139 S. Ct. 2551 (2019) .................................................................. 24, 30

*Dream Defenders v. DeSantis*,
　553 F. Supp. 3d 1052 (N.D. Fla. 2021)........................................ passim

*Dream Defenders v. DeSantis*,
　559 F. Supp. 3d 1238 (N.D. Fla. 2021)........................................ 44, 51

*Edison v. Doublery*,
　604 F.3d 1307 (11th Cir. 2010).............................................................60

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
　624 F.3d 332 (6th Cir. 2010)................................................................46

*Falls v. DeSantis*,
　No. 22 Civ. 166, Order, ECF 68 (N.D. Fla. July 8, 2022) .............. 22, 36, 41

*F.C.C. v. Fox Television Stations, Inc.*,
　567 U.S. 239 (2012) ............................................................................34

*Fowler v. Bd. of Educ. of Lincoln Cnty.*,
　819 F.2d 657 (6th Cir. 1987)................................................................42

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) .............................................................................46

*Gonzalez v. Douglas*,
  269 F. Supp. 3d 948 (D. Ariz. 2017) ............................................ 46, 49

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ........................................ 52, 55, 56, 57

*Grimes ex. rel. Grimes v. Sobol*,
  832 F. Supp. 704 (S.D.N.Y 1993) ......................................................60

*Grimm v. Gloucester Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ..............................................................59

*Groden v. City of Dallas*,
  826 F.3d 280 (5th Cir. 2016) ..............................................................61

*Harrell v. Fla. Bar*,
  608 F.3d 1241 (11th Cir. 2010) ..........................................................22

*Hazelwood Sch. Dist. v. Kuhlmeier*,
  484 U.S. 260 (1988) ...........................................................................45

*Hollander v. Inst. for Research on Women & Gender at Columbia Univ.*,
  372 F. App'x 140 (2d Cir. 2010) ........................................................28

*Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*,
  430 F. Supp. 2d 1296 (S.D. Fla. 2006) ...............................................58

*Honeyfund.com, Inc. v. DeSantis*,
  No. 22 Civ. 227, 2022 WL 3486962 (N.D. Fla. Aug. 18, 2022) ........40

*Hunt v. Cromartie*,
  526 U.S. 541 (1999) ...........................................................................52

*Hynes v. Mayor & Council of Borough of Oradell*,
  425 U.S. 610 (1976) ...........................................................................24

*I.L. v. Alabama*,
  739 F.3d 1273 (11th Cir. 2014) ..........................................................25

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ............................................................................52

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ....................................................................................46

*King v. Governor of State of New Jersey*,
    767 F.3d 216 (3d Cir. 2014) ............................................................................40

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ........................................................................................45

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022) ................................................................... 55, 56

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*,
    558 F.3d 1301 (11th Cir. 2009) ......................................................................35

*Levine v. World Financial Network Nat'l Bank*,
    437 F.3d 1118 (11th Cir. 2006) ......................................................................15

*Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*,
    894 F.3d 959 (8th Cir. 2018) ..........................................................................25

*Mahanoy Area Sch. Dist. v. B.L. ex. rel. Levy*,
    141 S. Ct. 2038 (2021) ....................................................................................48

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007) ................................................................................. 31, 34

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ....................................................................................49

*Mayer v. Monroe Cnty. Comm. Sch. Corp.*,
    474 F.3d 477 (7th Cir. 2007) ..........................................................................46

*Monell v. Dep't of Social Serv.*,
    436 U.S. 658 (1978) ........................................................................................60

*Moore v. Bryant*,
    853 F.3d 245 (5th Cir. 2017) ..........................................................................27

iv

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ........................................................................7

*NIFLA v. Becerra*,
  138 S. Ct. 2361 (2018) ....................................................................41

*Penkoski v. Bowser*,
  486 F. Supp. 3d 219 (D.D.C. 2020) ................................................27

*Pernell v. Fla. Bd. of Governors of State Univ. Sys.*,
  No. 22 Civ. 304, 2022 WL 16985720 (N.D. Fla. Nov. 17, 2022) .......... 24, 31, 36

*Pinkston v. Univ. of S. Fla. Bd. of Tr.*,
  No. 15 Civ. 1724, 2016 WL 3196474 (M.D. Fla. June 9, 2016) ........................59

*Pittman v. Cole*,
  267 F.3d 1269 (11th Cir. 2001).........................................................34

*Pratt v. Ind. Sch. Dist. No. 831*,
  670 F.2d 771 (8th Cir. 1982)................................................ 11, 46, 49

*Quinn v. Monroe Cnty.*,
  330 F.3d 1320 (11th Cir. 2003)................................................. 60, 61

*Reeves v. Comm'r*,
  23 F.4th 1308 (11th Cir. 2022)..........................................................31

*Searcey v. Harris*,
  888 F.2d 1314 (11th Cir. 1989)..................................... 19, 46, 48, 49

*Shahar v. Bowers*,
  120 F.3d 211 (11th Cir. 1997)..........................................................10

*Shorter v. St. Cloud State Univ.*,
  No. 00 Civ. 1314, 2001 WL 912367 (D. Minn. Aug. 14, 2001).........................60

*Sierra v. City of Hallandale Beach*,
  996 F.3d 1110 (11th Cir. 2021)..........................................................26

*SisterSong Women of Color Reprod. Just. Collective v. Kemp*,
  472 F. Supp. 3d 1297 (N.D. Ga. 2020) .................................................39

*Speech First, Inc. v. Cartwright*,
  32 F.4th 1110 (11th Cir. 2022) .......................................................... 16, 22, 23, 24

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ................................................................24

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ...........................................................................44

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ...........................................................................43

*Sweezy v. State of N.H. by Wyman*,
  354 U.S. 234 (1957) .............................................................................2

*Thomas More Law Center v. Obama*,
  651 F.3d 529 (6th Cir. 2011) ................................................................7

*Tinker v. Des Moines Indep. Sch. Dist.*,
  393 U.S. 503 (1969) ....................................................................... 47, 51

*United States v. American Library Ass'n*,
  539 U.S. 194 (2003) ...........................................................................46

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ........................................................................34

*United States v. O'Brien*,
  *391* U.S. 367 (1968) ..........................................................................50

*United States v. Sailor*,
  2018 WL 278740 (N.D. Fla. Jan. 2, 2018) ...........................................46

*United States v. Thompson*,
  928 F.2d 1060 (11th Cir. 1991) ...........................................................25

*Vazzo v. City of Tampa*,
  No. 17 Civ. 2896, 2019 WL 1040855 (M.D. Fla. Mar. 5, 2019) .........40

*Vazzo v. City of Tampa*,
  No. 17 Civ. 2896, 2019 WL 1048294 (M.D. Fla. Jan. 30, 2019) ........40

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
  429 U.S. 252 (1977) .............................................................................57

*Virgil v. Sch. Bd. of Columbia Cnty., Fla.*,
  862 F.2d 1517 (11th Cir. 1989)................................................... passim

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) .............................................................................15

*Watts v. Fla. Int'l Univ.*,
  495 F.3d 1289 (11th Cir. 2007) ..................................................... 15, 19

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
  792 F.3d 1313 (11th Cir. 2015) ...........................................................61

*White v. Sch. Bd. of Hillsborough Cnty.*,
  No. 08-10922, 2009 WL 174944 (11th Cir. 2009)...............................33

*Wilding v. DNC Servs. Corp.*,
  941 F.3d 1116 (11th Cir. 2019) ..................................................... 16, 19

*Wollschlaeger v. Governor, Fla.*,
  848 F.3d 1293 (11th Cir. 2017) ...................................... 34, 35, 37, 43

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
  247 F.3d 1262 (11th Cir. 2001).............................................................35

*Woodhull Freedom Foundation v. United States*,
  948 F.3d 363 (D.C. Cir. 2020) .............................................................43

*Zykan v. Warsaw Comm. Sch. Cop.*,
  631 F.2d 1300 (7th Cir. 1980).............................................................48

**Statutes**

20 U.S.C. § 1681(a) ...................................................................... 3, 59

Fla. Const. art. IX, § 4.........................................................................33

Fla. Const., art. IX, § 1(a) .....................................................................2

Fla. Stat. § 20.15 ......................................................................... 13, 29

Fla. Stat. § 1001.10 ..............................................................................13

Fla. Stat. § 1001.32 ...................................................................................60

Fla. Stat. § 1001.42 ...................................................................................57

Fla. Stat. § 1002.20 .....................................................................................2

Fla. Stat. § 1002.33 ...................................................................................33

Fla. Stat. § 1003.41 .............................................................................. 13, 37

Fla. Stat. § 1003.46 .....................................................................................4

Fla. Stat. § 1003.4995 ...............................................................................37

Fla. Stat. § 1003.49966 .............................................................................37

Fla. Stat. § 1008.32 ...................................................................................29

Fla. Stat. § 1012.795 .................................................................................30

Fla. Stat. § 1012.796 .................................................................................30

H.B. 1557 ...................................................................................... *passim*

U.S. Const., amend. I ...................................................................................3

U.S. Const., amend. XIV .............................................................................3

## Regulations

34 C.F.R. § 106.42 .....................................................................................60

Fla. Admin. Code Ann. r. 6A-10.081 ................................................... 2, 30

Fla. Admin. Code Ann. r. 6A-19.008. ..........................................................2

Fla. Dep't of State, Fla. Admin. Code Reg. R. 6A-10.081 (Nov. 22, 2022) .......... 13

## PRELIMINARY STATEMENT

H.B. 1557 took effect on July 1, 2022.  Since then, Plaintiffs have personally experienced substantial, concrete and particularized harms, including censorship, self-censorship, discrimination, and denials of access to information and educational opportunities concerning LGBTQ people and issues. These harms are the direct result of H.B. 1557 and would be redressed if that unconstitutional law were enjoined.

In response to this Court's order dismissing the prior Complaint for lack of Article III standing, Plaintiffs have added substantial, detailed allegations that unequivocally demonstrate their right to have this case decided on the merits. Defendants have responded to these new allegations in three ways: (1) by disagreeing with Plaintiffs' factual claims; (2) by bending inferences in their own favor; and (3) by asserting legal claims at odds with precedent.  None of these strategies entitles them to dismissal.  That is particularly true of Defendants' repeated claim that everybody in Florida has misunderstood H.B. 1557, which actually (in their view) has a clear meaning and a narrow scope.  A careful examination of the statute's text and history, as well as a review of enforcement measures, confirms that H.B. 1557 is a vague law that has been widely and reasonably understood to authorize all manner of discrimination and censorship targeting LGBTQ people (and their families) in Florida's schools.  Particularly at

the pleading stage, Plaintiffs' allegations of injury from H.B. 1557 are sufficient, and their account of its unconstitutionality warrants fact discovery.

## **RELEVANT BACKGROUND**

### A.   **Florida's commitment to a safe, equal, and nondiscriminatory education**

Florida has long recognized its "paramount duty" to educate the next generation in a manner that will prepare them to live in a pluralistic democratic society. *See, e.g.*, *Bush v. Holmes*, 919 So.2d 392, 402 (Fla. 2006) (quoting Fla. Const., art. IX, § 1(a) (1868)). Education, after all, "is absolutely essential to a free society under our governmental structure" and is "the very foundation of good citizenship." *Id.* at 405-06. The State is thus required to provide education "without discrimination on the basis of … gender." Fla. Stat. § 1002.20(1), (7). And it must ensure "Educational Equity" by valuing the "worth and dignity of every person," and similarly must value "freedom to learn" by protecting students against "conditions harmful to learning" (including harassment "on the basis of … sex … [or] sexual orientation") and by providing students with "access to diverse points of view." Fla. Admin. Ann. r. 6A-10.081(1)(a), 6A-10.081(2), 6A-19.008.

The United States Supreme Court has likewise recognized that education plays a "vital role in a democracy" and that "[t]eachers and students must always remain free to inquire, to study and to evaluate." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957). Florida's stated commitments to a free, equal, non-

discriminatory, and safe education are faithful to the federal Constitution's mandate of equal protection and freedom of speech, U.S. Const., amends. I, XIV, as well as Title IX's recognition that no one should be denied educational benefits and opportunities "on the basis of sex," 20 U.S.C. § 1681(a).

At least until recently, many Florida school districts—including Defendants here—sought to make these promises a reality. *See* ECF 123, Second Am. Compl. ("Complaint" or "Compl.") ¶¶ 26-31. To that end, they adopted educational standards that call for accepting the LGBTQ community, prohibiting discrimination, and incorporating LGBTQ persons and issues into the curriculum and broader school environment. *See id.* These measures have helped to create a safer environment for at-risk LGBTQ students (and their families). *Id.* ¶¶ 31 n.13, 96-98.

## B.    The legislative debate over H.B. 1557

With H.B. 1557, Florida lawmakers sharply turned course and relegated LGBTQ people to second-class citizenship. In the Senate, the law's sponsor explained that it was necessary because "parents are very concerned about the departure from the core belief systems and values" and about "kids trying on different kinds of things they hear about and different kinds of identities and experimenting." Compl. ¶ 40; *see also id.* ¶¶ 41-42. These statements did not reflect generalized concern about discussions of sexual orientation and gender identity. Rather, as the sponsor made clear, the "core belief systems and values" that gave

rise to H.B. 1557 were beliefs about the rightness of heterosexual and non-transgender identity—and beliefs about the wrongness or strangeness of LGBTQ identity.

Other legislators and supporters justified H.B. 1557 in the same terms, with one prominent group backing the law referring to it as the "Don't turn my son into a daughter bill." *See id.* ¶¶ 44-45, 49. Governor Ron DeSantis expressly justified H.B. 1557 as necessary to shut down discussion of LGBTQ issues and to erase LGBTQ identities in public schools. *Id.* ¶¶ 47, 50-51.

Even as lawmakers and other supporters of the bill repeatedly vilified LGBTQ people, none of them—not a single legislator who supported the enactment of H.B. 1557—expressed any concern with students identifying as heterosexual or non-transgender, or with teachers or students discussing such straight identities in public schools.

The drafting history of the law confirms this. When amendments to replace "sexual orientation or gender identity" with "human sexuality" were voted down, the Senate sponsor said they would "significantly gut" the law's purpose. *See id.* ¶ 56. Of course, that purpose was not to regulate instruction on human sexuality—which is already addressed by Fla. Stat. § 1003.46(2)(d)—but rather to prohibit any discussion or instruction about "departures" from the State's anti-LGBTQ view.

Another proposed amendment would have clarified that the prohibition on "classroom instruction" still allows "instruction or discussion" relating to "family structures," "objective historical events," "bullying prevention," "discussions between students," or "questions asked by students and any answer." *Id.* ¶ 57.  But consistent with the discriminatory purpose of the law, this amendment was voted down.  Lawmakers also rejected amendments to clarify that H.B. 1557 "does not apply to any discussion between a student who identifies as transgender, gender nonconforming, non-binary, or otherwise LGBTQ+ and their peers." *Id.* ¶ 58.  These amendments were rejected not because they were irrelevant to H.B. 1557, or because they addressed issues that would not arise in implementing H.B. 1557.  Rather, they were at odds with H.B. 1557's goal of creating a culture of fear, discrimination, and second-class citizenship for LGBTQ people in schools.

Not only did lawmakers reject amendments to clarify or narrow H.B. 1557, but they took advantage of every opportunity to make the law as broad and confusing as possible.  In direct contrast to the position that the State takes in this litigation, they proclaimed in the Preamble that the law prohibited "classroom *discussion* about sexual orientation or gender identity."  H.B. 1557 (emphasis added).  They made the prohibition on "classroom instruction" applicable to both "school personnel" and "third parties."   And they made the law's application to grades 4-12 unclear,

prohibiting classroom instruction that is not "age-appropriate or developmentally appropriate" according to unspecified "state standards."  H.B. 1557 § 1.

### C.      Passage of H.B. 1557

H.B. 1557 specifically prohibits (i) "classroom instruction" (ii) "by school personnel or third parties" (iii) "on sexual orientation or gender identity" (iv) in "kindergarten through grade 3 or in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards."  *Id.* None of these terms or phrases is defined in the statute.

Instead, in order to maximize the law's chilling effect, H.B. 1557 contains a diffuse—indeed chaotic—enforcement mechanism.  Any parent of a student who has a "*concern*" about a violation of H.B. 1557 is empowered to file a lawsuit against their school district and may recover money damages, as well as attorneys' fees.  *Id.* (emphasis added).  Lawmakers rejected an amendment that would have mitigated the law's chilling effects by allowing school districts to recover their costs and fees if they prevail against such a lawsuit.  Compl. ¶ 61.

The consequences of this unusual scheme are severe: school board officials know that *any* parent can inflict immense burdens—an investigation, a lawsuit, and potentially damages and attorneys' fees—if that parent believes anyone in the school has said or done something arguably inconsistent with H.B. 1557.  The intent and inevitable effect of this scheme, which is already on display throughout Florida, is

that schools will face immense pressure to censor anything that remotely touches on LGBTQ people or issues.  Indeed, that's exactly what is occurring.  While the State's lawyers assert that everyone else has it totally wrong—and there is no difference in how H.B. 1557 applies to (or affects) straight and gay people—that is not how others have interpreted the law, that is not how Florida officials described the law's purpose, and that is not how the law is being applied.

### D.    Effects and enforcement of H.B. 1557

H.B. 1557 went into effect on July 1, 2022.  Compl. ¶ 70.  Since then, it has caused concrete, particularized harm to students, families, and school personnel throughout Florida's schools, inside the classroom and out.  In many cases, school officials explicitly have cited H.B. 1557 as the reason for their actions; in others, it is reasonable (indeed obvious) to infer as much.  And these instances of censorship and self-censorship have uniformly and uniquely affected LGBTQ issues and people; we are unaware of any circumstances where H.B. 1557 was invoked by a school district to change circumstances in a manner targeting straight or non-transgender people.[1]

---

[1] Plaintiffs have removed certain parties and allegations—including all pre-effective-date harms—in light of the Court's Order, reserving their appellate rights.  Compl. fn. 1 (citing Order).  For the avoidance of doubt, while Plaintiffs do not press them here, Plaintiffs maintain that pre-effective date injuries satisfy Article III.  *See, e.g.*, *Thomas More Law Center v. Obama*, 651 F.3d 529, 535-39 (6th Cir. 2011) (permitting challenge to Affordable Care Act nearly three years before it went into effect, and rejecting arguments that court lacked jurisdiction under Article III), *abrogated on other grounds by Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012).

Take Pasco County.  There, school administrators have directed employees to remove safe space stickers based on their belief that such demonstrations of support and places of refuge for the LGBTQ community violate H.B. 1557.  *Id.* ¶ 81.  As a result, students and others have been deprived of information stating that "anti-LGBTQ language and harassment will not be tolerated and that LGBTQ students will be treated equally."  *Id.*  LGBTQ students have also been deprived of a space that enables them to feel "included, secure, and welcome in sometimes hostile school environments."  *Id.*; *see also id.* ¶¶ 90-95.  Moreover, in the high school where Plaintiff Washington's LGBTQ son is a student, officials have removed references to LGBTQ issues from musicals staged at the school out of concern that they will face liability under H.B. 1557 for including such references.  *Id.* ¶ 82.  As a result, Washington, her son, and others have been deprived of speech they wish to engage in and educational opportunities they wish to receive.  *Id.* ¶¶ 15, 81-82.

Next consider Manatee County, where Plaintiff M.A. is an eleventh-grade student.  *Id.* ¶¶ 9, 77.  Historically, M.A.'s Gay-Straight Alliance ("GSA"), like others, has "create[d] a welcoming space for other LGBTQ student and their allies."  *Id.* ¶ 77.  Manatee itself has recognized the need to "assist faculty, staff, and students in fostering positive self-image" and "establishing safe and inclusive schools" for LGBTQ students.  *Id.* ¶ 27.  But this year, while other clubs have met as usual, M.A. and the other members were initially "barred from participating in a GSA," an

"activity they previously enjoyed and benefitted from and very much want to receive," because no teacher will serve as an advisor "due to fears of violating the law." *Id.* ¶ 78.[2]

The problems in Manatee County go beyond M.A.'s high school.  M.A. has also been told by a middle-school student about a new policy that would require students to wear clothing "consistent with their gender assigned at birth" and would prohibit dancing between students of the same gender. *Id.* ¶ 79.  When M.A. pressed for answers, his school administrators refused to disclaim the existence of the policy. *Id.*  Such sex-based prohibitions fly in the face of Manatee's recognition that everyone should be valued and celebrated, regardless of "gender, sex, gender identity, gender expression, [or] sexual orientation," *id.* ¶ 27, as well as federal law.

So, too, in Orange County.  There, the district spokesman invoked H.B. 1557 to instruct teachers they should not talk about their same-sex partners or wear clothing that could be seen as inviting discussions about LGBTQ issues. *Id.* ¶ 80.  As a result of these statements of policy, and the uncertainty they have wrought, Plaintiff Volmer's K-3 children and others in the district have been denied educational opportunities and speech they would like to receive. *Id.* ¶¶ 13, 80.[3]

---

[2] M.A. and other members of his GSA were eventually able to obtain a teacher advisor and began attending meetings on November 17, 2022.

[3] Orange County disputes this policy based on a memorandum issued the following day, in which its Office of Legal Services parroted the State's arguments in this case as to the scope of H.B. 1557.  ECF 133 at 8-11.  That memorandum is not cognizable on a motion to dismiss. *See, e.g.,*

Multiple school districts have also removed LGBTQ-related books (while *not* removing books that may be seen as instructing students on heterosexual relationships or "traditional" families).   In Broward County, where Plaintiff Berg teaches K-5 art, the school district removed some 100 children's books due to concerns—raised after H.B. 1557 went into effect—that the books contained "inappropriate" LGBTQ content.  *Id.* ¶¶ 14, 83.  LGBTQ-related books have also been removed in Seminole County and Palm Beach County.  *Id.* ¶ 84.

That brings us to Miami-Dade County, which oversees the third-largest school district in the nation.  Last year, by a 7-1 vote, the School Board passed a resolution recognizing October as LGBTQ History Month, thereby providing students of all grades with LGBTQ-related resources available outside the classroom (through activities directors and club sponsors).  *Id.* ¶ 71.  The School Board recognized the resolution as "an effective means of educating and calling to action our community to work together by fighting prejudice and discrimination in their own lives and increasing visibility and raising awareness." *Id.*   All of this was consistent with Miami-Dade's policy of ensuring that LGBTQ persons have "equitable access to all aspects of school life (academic, extracurricular and social)" and are "treated with respect." *Id.* ¶ 28.

---

*Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).  Further, Orange County has not shown that its memorandum establishes it did not have the policy its spokesperson described, or that its pronouncement erased the chilling effect created by that policy.

This year, however, as a direct result of H.B. 1557 and to avoid liability under that statute, the Board reversed course and rejected a similar resolution by a vote of 8-1.  Four members explicitly said on the record that they believed the resolution would violate H.B. 1557; three others raised similar concerns, and many in the audience cited the law as the basis for their opposition.  *Id.* ¶¶ 72-73.  Notably, the resolution this year not only would have recognized LGBTQ History Month and provided resources outside of the classroom, but also would have provided resources to 12th grade social studies classes so that they could cover Supreme Court precedents involving LGBTQ rights (like other landmark precedents that are already part of the curriculum).  *Id.* ¶ 72.  H.B. 1557 thus denied LGBTQ students, teachers, and families in Miami-Dade public schools access to substantial additional resources, and it discriminatorily blocked those schools from instructing students on landmark LGBTQ precedents.  As a result, students of all grades in Miami-Dade public schools—including Plaintiffs S.S. and the children of Plaintiffs Morrison, Houry, Casares, and Feinberg—have been denied educational opportunities and benefits they wish to receive, and S.S. has lost valuable curricular opportunities.  *Id.* ¶¶ 10-12, 74-75.

This message of disapproval of LGBTQ issues and persons "is not lost on students and teachers, and its chilling effect is obvious."  *Pratt v. Ind. Sch. Dist. No. 831*, 670 F.2d 771, 779 (8th Cir. 1982).  Indeed, following the enactment of H.B.

1557, one of S.S's classmates chose not to create a website dedicated to LGBTQ resources for her community service project, which is required as part of her International Baccalaureate ("IB") curriculum, after her coordinator suggested she should not do it because the project could violate H.B. 1557.  *Id.* ¶ 76.[4]

### E.   Enforcement developments at the State level

In its litigation filings—though apparently nowhere else—the State takes the view that everyone in Florida has misunderstood H.B. 1557.  According to the State, H.B. 1557 is drawn narrowly, limited to the classroom, and aimed only at school boards.  But the State itself has taken two steps that undermine these claims.

First, following H.B. 1557, the Commissioner of the Department of Education issued a memorandum to all school districts (including charter school governing boards) to disregard federal guidance recognizing that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation and gender identity.  Compl. ¶ 88.  That blanket prohibition extends well beyond "regulat[ing] sports teams designed for women," as the State has claimed, and even targets the Department of Agriculture's requirement that a non-discrimination posture be displayed in a prominent location in school for all to see.  *Id.* ¶¶ 88-89.[5]

---

[4] Similarly, in Palm Beach County, to avoid violating H.B. 1557, a teacher changed her lessons about the first American woman to fly in space to omit the fact that she was a lesbian.  *Id.* ¶ 85.

[5] The Commissioner (who has been removed as a Defendant but continues to play a role with respect to the Department and the Board) is responsible along with the Board for enforcing

Second, the State has made clear that penalties for violating the murky bounds of H.B. 1557 extend beyond the school districts themselves.  After the law went into effect, the Board passed a rule (effective November 22) that imposes penalties directly on teachers for intentional violations of H.B. 1557's proscription for grades K-3.[6]  At the hearing, Defendant Gibson described the rule as "simply" meant "to implement and execute the laws the legislature our elected officials [sic] passed." Compl. ¶ 87.  These actions reinforce the basic point that *everyone* in Florida's schools already understands: any speech or activity concerning LGBTQ people should be avoided upon pain of adverse consequences under H.B. 1557.

E.    **The prior motions to dismiss**

On September 29, 2022, the Court dismissed the First Amended Complaint in this case, mainly for lack of standing.[7]  Starting with traceability and redressability, the Court stated that "most of Plaintiffs' alleged harm [was] not plausibly tied to the law's *enforcement* so much as the law's very *existence*."  Order at 3-4.  The Court added that Plaintiffs had failed to allege that their school districts would allow the speech and instruction they identified in the absence H.B. 1557.  *Id.* at 6-7.  Turning

---

compliance with the mission and goals of the education system and overseeing the Sunshine State Standards.  Fla. Stat. §§ 20.15(5), 1001.10, 1003.41.

[6] *See* Fla. Dep't of State, Fla. Admin. Code Reg. R. 6A-10.081 (Nov. 22, 2022), https://www.flrules.org/gateway/ruleno.asp?id=6A-10.081.

[7] Miami-Dade has twice filed an answer.  ECF 64, 132.

to injury-in-fact, the Court stated that "Plaintiffs offer no indication—speculative or otherwise—about what might happen to students or parents who acted contrary to H.B. 1557." *Id.* at 10. The Court added that "as to teachers, whom Plaintiffs suggest might face discipline, that conclusion requires several levels of speculation." *Id.* Separately, the Court concluded that Plaintiffs had not identified any specific actions they wished to take that would be proscribed (or even arguably proscribed) by H.B. 1557. *See id.* at 10-14. Finally, the Court stated that Plaintiffs had not identified any "actual stigmatic injury" supporting an equal protection claim. *Id.* at 13-14.

The Court separately held that while the Commissioner of Education was entitled to Eleventh Amendment immunity, the Board of Education members were not because they admittedly "enforce[]" the statute. *Id.* at 21-22. The Board and Department also were not entitled to immunity with respect to Plaintiffs' Title IX claim. *Id.* at 20. The Court declined to reach Broward County's "passing reference" to immunity because its argument was not "fully develop[ed]." *Id.* at 22. Finally, the Court rejected several School Boards' venue arguments but concluded that the First Amended Complaint was a "shotgun pleading." *Id.* at 23-24. The Court offered Plaintiffs an opportunity to replead their claims so as to address all these concerns, which is exactly what Plaintiffs have done in the Second Amended Complaint.

## APPLICABLE STANDARD

A motion to dismiss may be granted only "when the movant demonstrates beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Levine v. World Financial Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006) (citation omitted). The "pleadings are construed broadly," and the factual allegations, "taken as true," must be "viewed in the light most favorable to the plaintiff." *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) (citations omitted). So long as the allegations are "enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007), dismissal is inappropriate.

## ARGUMENT

### I.   PLAINTIFFS HAVE ADEQUATELY PLEADED STANDING

Plaintiffs have standing to challenge H.B. 1557 if the Second Amended Complaint plausibly alleges that "at least one" of them has suffered "'(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision.'" Order at 2 (citation omitted). Moreover, in the First Amendment context, Plaintiffs are permitted to challenge H.B. 1557 on behalf of others, as "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988) (citation omitted).

15

### A.     Injury-in-fact

Plaintiffs have thoroughly satisfied their obligation to make "general factual allegations of injury" at this early stage of the case. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 168 (1997)).  That standard requires the Court to "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.*  As the Eleventh Circuit has emphasized, it is "most loosely applied … where [F]irst [A]mendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (citation omitted).

Plaintiffs have suffered First Amendment injuries through the deprivation of educational information and opportunities, and (separately) through the chilling of speech.  They have also alleged a bevy of specific injuries resulting from H.B. 1557's vagueness, as well as its discriminatory motivation and application.

### 1.     Right to receive information

The First Amendment guarantees "public access to discussion, debate, and the dissemination of information and ideas." *Bd. of Educ. v. Pico*, 457 U.S. 853, 866-67 (1982) (citation omitted).  In its Order, the Court concluded that Plaintiffs "never clarify what instruction would be denied" and "offer only speculation about what they might miss."  Order at 13-14.   Here, Plaintiffs have described specific

information and ideas that they would like to receive, and provided detailed allegations about how the enforcement of H.B. 1557 is affirmatively burdening that right.

The Complaint includes many examples of this point—any one of which is sufficient to support Article III standing.

- Students at Broward, Seminole, and Palm Beach Counties have been deprived of books that feature or discuss LGBTQ people. Compl. ¶¶ 83-84.

- Washington's son and others at his school have had musicals—which are part of their education—stripped of any LGBTQ references. *Id.* ¶ 82.

- S.S., the children of Morrison, Houry, Casares, and Feinberg, and others throughout Miami-Dade public schools (at all levels) have been deprived of important LGBTQ educational support resources, including the ideas and speech encompassed by those resources. *Id.* ¶ 71.

- S.S. and others in twelfth grade in Miami-Dade public schools have been deprived of resources and information concerning Supreme Court precedents affecting LGBTQ people. *Id.* ¶¶ 72-73.

- S.S. and others in her class have been deprived of speech they would like to hear from her classmate, who wanted to create an educational website about LGBTQ resources as part of a class project. *Id.* ¶ 76.

- Those in Pasco County schools, including Washington and her son, have been deprived of the assurance and educational message conveyed by the presence of safe space stickers in the schools. *Id.* ¶ 81.

- Volmer's children and others in Orange County schools have been deprived of an environment where teachers can speak about their same-sex partners or wear clothing expressing message about the LGBTQ community. *Id.* ¶ 80.

- M.A. and others at his school in Manatee County have been deprived of speech and information they wished to receive from the school's GSA, while middle school students have been deprived of an environment where students can wear clothing regardless of whether it

conforms with their gender assigned at birth and dance with students regardless of their LGBTQ identity. *Id.* ¶¶ 78-79.[8]

- Students, teachers, and others throughout the State are being deprived of official statements by their schools that discrimination against LGBTQ people will not be tolerated and is a violation of federal law according to federal agencies. *Id.* ¶¶ 88-89.

These are quintessential examples of First Amendment violations experienced by Plaintiffs and others in their schools who wish to receive the specified speech and ideas. *See, e.g.*, *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1201-02, 1219-20 (11th Cir. 2009) (removal of books from library); *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1521-25 (11th Cir. 1989) (removal of textbooks from curriculum); *Searcey v. Harris*, 888 F.2d 1314, 1319-22 (11th Cir. 1989) (access to Career Day forum); *see also Arce v. Douglas*, 793 F.3d 968, 983-84 (9th Cir. 2015) (removal of class offering).

The State argues that these deprivations do not count because the provision of such information or speech is "not proscribed by HB 1557." Br. 25. This argument apparently refers to the standard that governs pre-enforcement free-speech claims,

---

[8] Manatee County argues M.A. fails to allege "that an advisor is required to participate in the GSA." ECF 131 at 11. But that is apparent from his allegations, *see* Compl. ¶ 78, which must be construed with all reasonable inferences drawn in his favor and to embrace the specific facts necessary to support the claim, *Wilding*, 941 F.3d at 1124; *Watts*, 495 F.3d at 1295.

and also appears to confuse the Article III injury-in-fact requirement with traceability. Regardless, it is the wrong legal standard for assessing whether Plaintiffs have suffered injury-in-fact for purposes of their right-to-receive-information claims: Plaintiffs have *already* been deprived of information and speech that they (and others) would like to receive and would otherwise have available to them, and that is all they need to show. *See, e.g.*, *ACLU of Fla., Inc.*, 557 F.3d at 1194-95 (parent's son could not check out particular book because library planned to remove it); *Acosta v. Huppenthal*, 2012 WL 12829991, at *7 (D. Ariz. Jan. 10, 2012) (students alleged removal of "certain texts and materials from the [Mexican-American Studies] curriculum, which represent 'willing speakers' to which the students would have otherwise been exposed") (citation omitted).

### 2. Free speech and vagueness

Plaintiffs separately raise free-speech and vagueness challenges to H.B. 1557 and have properly alleged injury-in-fact with respect to those claims. Plaintiffs can establish injury for their free-speech claims if "the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights." Order at 12 (citation omitted). The analysis for Plaintiffs' vagueness claim is "similar" and requires Plaintiffs to show only that "they seriously wish to undertake action that 'would arguably be affected by the law but the law is

at least arguably vague as it applies to them." *Id.* at 8-9 (cleaned up) (emphasis omitted).

A review of the Complaint makes clear that Plaintiffs have alleged injury-in-fact under these standards. H.B. 1557 has been construed by a wide range of actors to prohibit not only formal curricular content, but also a wide range of additional speech and conduct: community service projects related to providing LGBTQ resources, Compl. ¶ 76; advising LGBTQ student groups, *id.* ¶ 77; discussing same-sex partners or wearing clothes that could bring up similar discussions, *id.* ¶ 80; the creation of safe spaces or even the placement of safe space stickers, *id.* ¶ 81; the inclusion of any content in musicals that references LGBTQ identity, *id.* ¶ 82; the possession or provision to students of books with LGBTQ characters or content, *id.* ¶ 83; and even compliance with federal guidelines requiring schools to display a poster ("And Justice for All") concerning the federal prohibition on discrimination based on sexual orientation and gender identity, *id.* ¶ 88. In light of these interpretations, and to avoid violating H.B. 1557, Defendants have censored speech and Plaintiffs (and third parties) have engaged in self-censorship. That is all it takes to establish Article III standing for Plaintiffs' claims. *See* Order at 8-13.[9]

---

[9] Plaintiffs have alleged that they and others "seriously wish" to engage in speech in these contexts. Indeed, all of Plaintiffs' allegations concerning the deprivation of information and speech also affect Plaintiffs' and others' "inherent corollary" right of free speech. *Pico,* 457 U.S. at 866-68. For example, shutting down references to LGBTQ people and issues in musicals affects not just the listeners' right to receive information, but also the participants' right to speak. *Id.* ¶ 82. And

The State resists this straightforward conclusion on three grounds, none of which succeeds.  *First*, the State argues that H.B. 1557 applies only to "classroom instruction."  Br. 21.  The implication of this claim is that a great many people, in a great many settings throughout Florida, have read the exact same statutory text and arrived at an understanding so utterly unreasonable that any ensuing chill cannot be blamed on H.B. 1557.  Particularly at the pleading stage, Defendants are not entitled to that inference: the question is not whether H.B. 1557 is vague—which is a "legal question[s] at the center of the case," *Falls v. DeSantis*, No. 22 Civ. 166, Order, ECF 68 (N.D. Fla. July 8, 2022), at 19—but whether it is arguably vague as to the injuries alleged.  For the reasons given above and below, Plaintiffs have plausibly alleged that the statutory text (on its face and as understood by actors throughout Florida) at least "seem[s] to proscribe" the protected speech at issue."  *Id.* at 8; *see also Speech First*, 32 F.4th at 1120-21; *Harrell v. Fla. Bar*, 608 F.3d 1241,1255-60 (11th Cir. 2010).  Moreover, certain Plaintiffs have also alleged that H.B. 1557 is violating their rights in the context of formal "classroom instruction," where the State

---

removing LGBTQ resources, like safe spaces and GSAs, chills those who wish to speak in those settings or about those issues. *Id.* ¶¶ 71, 78-79, 81.

The State asserts that Berg does not allege that "but for the statute, he would use those books to instruct his students on the concepts of sexual orientation or gender identity," and he could not plausibly do so as an "elementary school art teacher." Br. 22-23.  But Berg need not allege that he would use those books to teach an art class; he can bring claims on behalf of others.  So it is sufficient as a matter of law that he alleges "LGBTQ (and other) students have been denied educational opportunities that Berg and many others in his school want to be made available in order to foster a non-discriminatory environment." Compl. ¶ 83.

concedes that H.B. 1557 has full application.  *See, e.g.*, Compl. ¶¶ 71-74, 85; *see also* Br. 34.

*Second*, the State claims that Plaintiffs cannot establish injury-in-fact because H.B. 1557 is "enforced against school districts and not individuals."  Br. 19 (quoting Order at 9).  But this is "not dispositive."  Order at 12; *see also id.* at 10 (similar).  In the speech context, while "the threat of formal discipline or punishment is relevant to the inquiry," the court must ask whether the "operation *or* enforcement" of the law "would cause a reasonable would-be speaker to self-censor—*even where* the policy falls short of a direct prohibition against the exercise of First Amendment rights."  *Speech First*, 32 F.4th at 1120 (citations and quotation marks omitted) (emphases added).  That principle forecloses the State's position.  Indeed, in *Speech First*, there was no true "enforcement mechanism" for one of the two challenged policies at issue—students accused of violating the policy could voluntarily engage in training and discussion.  *Id.* at 1117.  But the court still held that the "operation or enforcement" standard was met because "the average college-aged student would be intimidated [by the policy]—and thereby chilled from exercising her free-speech rights."  *Id.* at 1124 (citation and quotation marks omitted); *see also Hynes v. Mayor*

*& Council of Borough of Oradell*, 425 U.S. 610, 620 (1976); *Arce*, 793 F.3d at 987-88.[10]

That is reason enough to reject the State's argument that Plaintiffs have not been injured by H.B. 1557 because it is enforced only against school boards.  But there is more.  For starters, the State Board has enacted a rule that directly applies H.B. 1557's prohibitions to teachers, who risk losing their license if they violate the law.  This coercive regime directly expands H.B. 1557's blast radius.  *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 2022 WL 16985720, at *22-27 (N.D. Fla. Nov. 17, 2022) (professors had standing to challenge Individual Freedom Act, even though it is not directly enforced against them, because non-compliance could result in deprivation of funding to university).  Indeed, the State acknowledges that H.B. 1557 imposes "restriction[s]" on "students, parents, and teachers."  Br. 2.  Those restrictions may not all flow directly from the statute, but Plaintiffs have alleged fairly and comprehensively that they flow from its "indirect pressure" in predictable and intentional ways.  *Speech First*, 32 F.4th at 1123; *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) (upholding standing based on the "predictable effect of Government action on the decisions of third parties"); *Speech*

---

[10] Of course, the students subject to H.B. 1557 are even younger than the college-aged students in *Speech First* and thus even more susceptible to pressure.

*First, Inc. v. Fenves*, 979 F.3d 319, 330-34 (5th Cir. 2020) (fear of investigative process sufficient to confer standing).

*Finally*, with respect to Plaintiffs in fourth grade or above, the State argues that injury-in-fact is lacking because H.B. 1557's prohibition does not apply until June 2023.  Br. 22-23, 25-26.[11]  But as explained *infra* at 42-43, the statute expressly imposes a restriction on grades 4-12 now; it is at least arguably vague on this point.  The State fares no better in arguing that any injury after fourth grade turns on the "contingency of legislative action."  Br. 22.  In *I.L. v. Alabama*, cited by the State, the court held students *had* alleged injury-in-fact in the form of "impediments to public education funding," before dismissing for an absence of redressability— again, a distinct element from injury-in-fact—because it was unclear whether removing a constitutional limitation on property tax rates would lead to higher tax rates, which were contingent on legislative action.  739 F.3d 1273, 1278-81 (11th Cir. 2014).  Nevertheless, here, the Legislature has already acted.[12]

At bottom, this isn't complicated.  Actors all over Florida have interpreted H.B. 1557 as requiring censorship of speech about LGBTQ people and issues.  As a

---

[11] The State does not dispute that the parent Plaintiffs who bring claims on behalf of their children may do so.  *See Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of City of St. Louis*, 894 F.3d 959, 965-66 (8th Cir. 2018).  Pasco County's contrary statement is incorrect.  ECF 137 ¶ 9.

[12] The State's other authority, *United States v. Thompson*, is inapposite.  It analyzed whether a treaty created privately enforceable rights.  928 F.2d 1060, 1066 (11th Cir. 1991).

result, Plaintiffs have suffered injuries, which they filed this lawsuit to redress. Article III does not require any more for Plaintiffs to be heard on the merits.

### 3.     Equal Protection and Title IX

With respect to their claim under the Equal Protection Clause and Title IX, Plaintiffs have suffered "stigmatic injury" because they "personally experienced … discrimination."  Order at 13-14 (quoting *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1113 (11th Cir. 2021)).  This standard is satisfied where the plaintiff has a "concrete interest in equal treatment" (as when they are within the protected class) and has been "personally and directly subjected to discriminatory treatment" by the defendant's action.  *Sierra*, 996 F.3d at 1114.  Here, Plaintiffs who assert equal protection claims are all part of the LGBTQ community (or, in the case of Washington, have a child who is LGBTQ), and they all identify ways in which they (or the children on whose legal behalf they are suing) have been subjected to discriminatory treatment in the provision of educational benefits. *See* Compl. ¶¶ 71-73, 76, 78-79, 81-82.  Their personal experience of a "diminished ability to receive an education" in schools, as compared to their non-LGBTQ peers, is a classic stigmatic injury. *Allen v. Wright*, 468 U.S. 737, 756, 757 n.22 (1984).[13]

---

[13] Plaintiffs' claims under Title IX are subject to a similar analysis. *See, e.g.*, *Sierra*, 996 F.3d at 1113.

To escape that logic, the State analogizes this case to *Moore v. Bryant*, 853 F.3d 245 (5th Cir. 2017), which found that an African American man had not plausibly alleged stigmatic injury where he claimed he was "unavoidably exposed to the state flag and that the flag's message is 'painful, threatening, and offensive' to him." *Id*. at 249 (quoting *Allen*, 468 U.S. at 755). But this case is easily distinguishable. Plaintiffs do not claim they are harmed by the mere existence of H.B. 1557; they claim that they have been harmed because that law regulates their educational opportunities and expression in ways that have denied them specific benefits and opportunities. *See C.M. ex rel. Marshall v. Bentley*, 13 F. Supp. 3d 1188, 1200-02 (M.D. Ala. 2014) (denial of ability to transfer from failing to nonfailing schools).[14]

The State falls back on a claim that H.B. 1557's application "'solely to restrict discussion of and instruction on LGBTQ sexual orientation, gender identities, and issues' … may not be the education Plaintiffs prefer (and is not required by HB 1557, which is neutral), but all students are receiving the same education…." Br. 29 (quoting Compl. ¶ 114). This contention is meritless. For starters, the Complaint includes detailed factual allegations that all students are *not* receiving the same education as a result of H.B. 1557. Moreover, the Complaint alleges at length that

---

[14] *Penkoski v. Bowser* is distinguishable for the same reason: this is not a challenge to "discriminatory displays." 486 F. Supp. 3d 219, 228 (D.D.C. 2020).

H.B. 1557 has been interpreted and applied *non-neutrally* with respect to LGBTQ students.  Finally, to the extent the State suggests that erasing all references to one identity group in an educational system is "neutral," that is a scary and baseless claim: an educational system that forbade any discussion of women, or immigrants, or disabled persons, or Muslims would not be "neutral," even if every student in that system received the same education (namely, one that pretended certain groups don't exist).  Here, Plaintiffs have offered specific allegations to show that H.B. 1557 is causing them to personally suffer discrimination; the State's only real response is to deny those factual allegations.  So its motion should be denied.[15]

**B.      Traceability and redressability**

In addition to properly alleging injury-in-fact, Plaintiffs have alleged a "plausible causal chain … linking [their] injur[ies] to the challenged action of the defendant[s]."   Order at 3 (emphasis omitted) (citations and quotation marks omitted).  Whereas the previous Complaint concerned pre-enforcement claims, here Plaintiffs advance claims based on harms they have suffered since H.B. 1557 took effect—and each harm is traceable to enforcement of the law.  Moreover, consistent with the Court's Order, Plaintiffs now allege in detail that they would receive (or

---

[15] *Hollander v. Institute for Research on Women & Gender at Columbia Univ.*, 372 F. App'x 140 (2d Cir. 2010), is inapposite.  Unlike the plaintiff there, who merely alleged speculative harm based on the absence of a "Men's Studies Program," *id.* at 141, Plaintiffs allege specific resources— either previously available or actually proposed—that are being denied.

provide) materially different classroom instruction or educational opportunity in the absence of H.B. 1557. *See, e.g.*, Compl. ¶¶ 71-89. Accordingly, Plaintiffs have established standing.

### 1. The State Defendants

To try to evade being held to account for its role, the State points the finger at parents, teachers, school districts—anyone but itself. But the Court already held, at the State's insistence, that H.B. 1557 "is enforced by the State Board of Education," including the Board Members through which it acts. Order at 22 (quoting ECF 68 at 22).[16] Similarly, the State's Department of Education is tied to the enforcement of the statute because it is "the administrative agency that is responsible for implementing Florida's education policies and programs, under the implementation direction of the Board of Education." Compl. ¶ 18 (quoting Fla. Stat. §§ 20.15, 1001.20). The State cannot avoid its admitted enforcement role by pointing to third parties who have "react[ed] in predictable ways" to the statute and the State's own

---

[16] *See also* Fla. Stat. § 1008.32(4) ("State Board of Education oversight enforcement authority") (providing Board may withhold funding, among other things, for violations of the law and Board rules); ECF 133 at 15-16 (Board of Education can "penalize local school boards such as OCSB, pursuant to § 1008.32(4), Fla. Stat., if the local school boards fail to implement the law," and has previously exercised authority against Orange County to enforce mask opt-out mandate).

enforcement role. *Banks v. Sec'y, Dep't of Health & Human Servs.*, 38 F.4th 86, 95-96 (11th Cir. 2022) (quoting *Dep't of Commerce*, 139 S. Ct. at 2566).

Indeed, the case against the State has only grown since the law went into effect. The Board passed a rule that directly applies H.B. 1557's prohibition in grades K-3 to teachers, and as a result the State can take away their license. Fla. Admin. Code Ann. r. 6A-10.081(2). The State claims without explanation or citation that "the rule is independent of HB 1557." Br. 31. But both legally and practically, Rule 6A-10.081(2) is literally "dependent" on H.B. 1557: it quotes H.B. 1557's proscription and exists only to extend it to teachers. This imposition of penalties directly on teachers renders Plaintiffs' injuries even more clearly traceable to and redressable by an order enjoining the State. *See* Order at 6.[17]

The State next argues that another direct action it has taken to enforce HB 1557—the Commissioner's memorandum barring schools from following federal guidance under Title IX to not discriminate on the basis of sexual orientation or gender identity—is not about H.B. 1557. Br. 31. The State asserts that this memo "does not even mention HB 1557" and concerns only the participation of transgender

---

[17] The State tries to distance itself from the new rule it adopted by arguing that "license revocation requires the vote of the Educational Practices Commission, which under Florida law is an independent, quasi-judicial agency." Br. 24 (citing Fla. Stat. § 1012.795). But if the Educational Practices Commission is the arbiter, it is the Board itself that is the prosecutor. Fla. Stat. § 1012.796(1)(a) (Department "shall cause to be investigated" any complaint for revocation or suspension of license). In other words, exactly as the State said and the Court held, the Board "enforces" H.B. 1557, including the new rule implementing it directly against teachers.

students in sports.  *Id*.  But that is a factual dispute, not a legal defense: the Complaint offers particularized factual allegations that must be accepted as true, and that offer a different interpretation of the memorandum, which was promulgated very shortly after H.B. 1557 went into effect, sweeps miles past a limited focus on athletic participation in public schools, and reasonably appears to be part of the State's broader efforts to enforce H.B. 1557's statutory scheme.  Compl. ¶ 89.

Finally, the State asserts that Plaintiffs cannot satisfy traceability or redressability because "[a]n injunction against Defendants would leave parents free to enforce the statute" and "would not diminish the incentive for school districts to do so."  Br. 31.   This argument rests on legal error.  Traceability and redressability do not require a showing that the requested relief would fully alleviate the alleged injury-in-fact.  They are satisfied where the "risk" of such injury "would be reduced to some extent if [Plaintiffs] received the relief they seek." *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007); *see also Pernell*, 2022 WL 16985720, at *30 ("[R]edress need not be total to satisfy Article III, and enjoining these Defendants will provide at least partial redress." (citing *Reeves v. Comm'r*, 23 F.4th 1308, 1318 (11th Cir. 2022))).  Here, an injunction against the State would provide at least partial redress and would reduce the risk of injury to Plaintiffs.  That is sufficient.  Indeed, the State cites no authority holding that Article III prohibits a lawsuit against public officials whenever the enforcement of a statutory scheme includes both public and private

components—and adopting that unprecedented holding here would be unwarranted, disruptive, and mistaken as a matter of Article III first principles.

### 2.    The School Board Defendants

Plaintiffs have also plausibly alleged injuries that are traceable to and redressable by an order against the School Boards.  To offer just one example, Miami-Dade's School Board cited H.B. 1557 as the basis for rejecting a resolution that would have provided resources to LGBTQ educational opportunities outside of the classroom and (for twelfth graders) inside the classroom.  Compl. ¶¶ 72-73. Similarly acting in reliance on H.B. 1557, Pasco County school administrators ordered the removal of safe space stickers and safe spaces, *id.* ¶ 81, while Orange County's district spokesman said district policy was that teachers not talk about same-sex partners or wear LGBTQ-related clothing, *id.* ¶ 80.  Other districts, including Broward County, have carted away LGBTQ books, *id.* ¶ 83, or at least allowed or refused to disclaim discriminatory policies and practices, *id.* ¶¶ 76-79, 82, 85.  An injunction that prevents the school districts from enforcing H.B. 1557 will provide redress to Plaintiffs and others who are suffering harm, given that the school districts are the ones who are subject to liability under the law.  Br. 20

(Plaintiffs' alleged injuries "would support challenges to the administrative acts of the school districts behind the alleged 'structuring' scheme") (alterations adopted).

Manatee County and Pasco County argue that M.A. and Washington cannot establish traceability or causation because they are members of charter schools, and the School Boards do not "operate[]" the charter schools.  ECF 131 at 12-17; ECF 137 at 4-5.  But Florida's Constitution expressly requires that school boards "shall operate, control and supervise all free public schools within the school district," which includes charter schools.  Fla. Const. art. IX, § 4; Fla. Stat. § 1002.33(1); *see also White v. Sch. Bd. of Hillsborough Cnty.*, 2009 WL 174944, at *3 (11th Cir. 2009).  Moreover, charter schools are subject to "statutes pertaining to student health, safety, and welfare." Fla. Stat. § 1002.33(16)(a). H.B. 1557 is such a statute: it appears in a statutory section on "Student Welfare" and purports to govern students' "mental, emotional, or physical health or well-being."  At this stage of the case, it is certainly plausible that M.A. and Washington's injuries are causally connected to Defendants' actions and would be redressed by an injunction against them.[18]

---

[18] Section 1002.33(5)(b)(1)(d) is inapposite as the school board has the power to terminate a charter if it finds the school has committed a "[m]aterial violation of law."  Fla. Stat. § 1002.33(8)(a)(3). Similarly, Section 1002.33(5)(b)(1)(i), which says that a school board's duties to monitor do not "constitute the basis for a private cause of action," means H.B. 1557 does not establish a private action for violations of its provisions.  In any event, Section 1002.33(5)(b)(1)(i) says nothing about enforcement by government actors like the Board.

At bottom, Defendants all play a role in implementing, administering, and enforcing H.B. 1557; every one of them is therefore a partial contributor to Plaintiffs' injuries; and an injunction against any of them would mitigate at least some of Plaintiffs' ongoing constitutional injuries. *See Massachusetts v. EPA*, 549 U.S. 497, 526 (2007); *Pittman v. Cole*, 267 F.3d 1269, 1284-85 (11th Cir. 2001).[19]

## II.     H.B. 1557 VIOLATES THE DUE PROCESS CLAUSE

"Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019) (citations omitted).  By vesting officials with too much discretionary authority, "[v]ague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect." *Id.*   Because the dangers of a vague law are heightened when First Amendment rights are at stake, "a more stringent vagueness test applies" and the state may regulate only "with narrow specificity." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc) (citations marks omitted); *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) ("rigorous adherence" required).

---

[19] Although two School Boards contend otherwise, ECF 131 at 17; ECF 133 at 17-20, Plaintiffs' claims are ripe for the same reasons. *See, e.g.*, *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc).  And although Broward County previously made "passing reference to its having Eleventh Amendment immunity," Order at 22, neither it nor any other Defendant invokes such immunity now.

The State argues that as a civil statute, H.B. 1557 can be vague only if it is "so indefinite as 'really to be no rule or standard at all.'"   Br. 32 (quoting *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009)). But *Leib* did not involve First Amendment rights.   And in this context, courts exercise greater scrutiny because "potential speakers [will] steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked, thus silencing more speech than intended."   *Wollschlaeger*, 848 F.3d at 1320 (citations and quotation marks omitted).

H.B. 1557 flunks both parts of the due process test.   Indeed, the law's implementation has removed any doubt that its ambit is unclear, and actors everywhere are taking advantage of that lack of clarity to singularly and disproportionately target LGBTQ persons and issues.

### A.   H.B. 1557 fails to provide people of ordinary intelligence fair notice of what conduct it prohibits

The State argues that H.B. 1557 is not vague because the Court previously concluded in its standing analysis that H.B. 1557 it is not "'arguably vague as to Plaintiffs.'"   Br. 32.   But as the Court noted in the same breath, standing and the merits are "different inquiries."   Order at 9 n.1.   While "some overlap may be inevitable, standing doctrine was not intended to provide a vehicle for resolution at the threshold of fundamentally merits issues."   *Wooden v. Bd. of Regents of Univ.*

*Sys. of Ga.*, 247 F.3d 1262, 1281 n.16 (11th Cir. 2001); *see also Falls* at 19 (distinguishing analyses).

Consistent with this fundamental distinction, the Court's previous injury-in-fact analysis was not even based on an interpretation of the statute: it simply construed and applied one part of the statute—"classroom instruction"—to the specific injuries alleged in the previous complaint and found that Plaintiffs had not "alleged any future actions that would lead someone of ordinary intelligence to guess as to whether the law applies." Order at 9, 10, 13-14; *see also Pernell*, 2022 WL 16985720, at *42-48 (conducting separate vagueness analysis on merits after determining certain plaintiffs had standing). And even as to the single phrase "classroom instruction," the Court did not affirmatively define that term, but rather held that it did not arguably cover the specific actions Plaintiffs identified. *See* Order at 10-11.

As Plaintiffs previously explained, each of H.B. 1557's key, undefined terms—"classroom instruction," "sexual orientation or gender identity," "school personnel or third parties," and "state standards"—is impermissibly vague, and that vagueness is amplified when the terms are taken together. Indeed, the State has shifted its position on their meaning, and if not even the State can keep straight the statute's "plain" meaning, it cannot demand that everyone else should.

36

Start with "school personnel or third parties."  Given its ordinary meaning, *Wollschleager*, 848 F.3d at 1320, "school personnel" encompasses any employee of the school—from teachers to principals to nurses to guidance counselors.  Many such individuals do not typically participate in curricular instruction, contrary to the State's position.  And "third parties" seemingly captures anyone who does not work for the school, such as students and parents.  On the last point, the State previously admitted as much, saying that the law's coverage of "students and parents" simply means "schools cannot evade the bill's limits by delegating 'classroom instruction' on the prescribed [sic] topics."  Prior Br. 20.  Now, however, the State claims that the law does not apply to "parents or students acting in the ordinary course" (which means it does apply if they act in an extraordinary course, whatever that means).  Br. 18.  Even the State thus struggles to clarify whose conduct is governed by H.B. 1557.

The wide range of persons to whom the law may apply only magnifies the interpretive morass that arises upon consideration of "classroom instruction."  The word "instruction" encompasses not only "the action, practice, or profession of teaching," but also "the imparting of knowledge, skill, or information."  Oxford English Dictionary, "Instruction" (online ed. December 2022).  Applying these definitions, "classroom instruction" is most certainly not limited solely to the "curriculum," a term the legislature knows how to use, but did not use here. *See, e.g.*, Fla. Stat. §§ 1003.41, 1003.4995, 1003.49966.  Given its ordinary sense,

"classroom instruction" could reasonably be interpreted to include informal lessons in any classroom or fieldtrip setting.  It could equally reasonably be interpreted to cover any conduct in any educational setting that is meant to or simply happens to inform students about LGBTQ persons and issues in a manner that might bear the school's imprimatur.  Compl. ¶¶ 71-83, 88-89.  This is where the law's vagueness is most obvious: any definition beyond "curriculum" fails to provide fair notice of what is prohibited and what is not, since all manner of routine activity in classrooms or schools might reasonably qualify—indeed, this is exactly why schools (and their members) have understood H.B. 1557 to potentially impact their policies, practices, and activities in virtually every aspect of the school setting.

The State claims "classroom instruction" is apparent to any reasonable person, and it means "the formal work of teaching that occurs in a classroom setting."  Br. 16.  Reasonable persons might take issue with that contention, given that the State never offered this supposedly obvious interpretation in its prior brief.  *Compare* Prior Br. 17-19.  But it is not surprising that the State changes gears now: looking to the very same dictionary it cites, H.B. 1557 prohibits "discussion" or "consideration" of the covered topics.  Br. 16.  The State's position also faces a difficulty in the legislative history: legislators not only rejected proposals to clarify that classroom "discussion" was permitted, but also wrote the word "discussion" in the Preamble in describing what is *banned*.  *See supra* at 4-6.  And legislators made clear that they

wanted to block students from even "hear[ing] about" "different kinds of identities" in schools, Compl. ¶ 40, a goal that extends far beyond the official curriculum.

Yet even if the Court were to credit the State's "mid-litigation assurances," *contra SisterSong Women of Color Reprod. Just. Collective v. Kemp*, 472 F. Supp. 3d 1297, 1317-18 & n.18 (N.D. Ga. 2020), those assertions collapse upon inspection. For instance, the State previously contended that a teacher could respond to student-led discussions on LGBTQ families and identities so long as they do not "handle these situations by teaching the subjects of sexual orientation or gender identity." Prior Br. 19. It reasoned that mere "references" to LGBTQ persons and issues, "without more," are not "instruction." *Id.* But what does that mean, really? In truth, it isn't an answer at all, just a different statement of the problem. If a child were to come home and tell their parents that there was a discussion about LGBTQ families and identities, there would be no threading of the needle over whether it was "teaching" or "discussion" or something else; H.B. 1557 may be triggered at the slightest hint that children are hearing about LGBTQ people.[20]

Recognizing all of this, the State no longer tries to parse the distinction between a teacher providing "classroom instruction" on sexual orientation or gender identity and a teacher referencing and responding to LGBTQ issues. But that merely

---

[20] The State also overlooks the fact that legislators voted down an amendment that would have permitted teachers to respond to student questions. Compl. ¶ 57.

goes to show that the artificial demarcation between "instruction" and "discussions" and "references" is untenably vague.  *See also Honeyfund.com, Inc. v. DeSantis*, 2022 WL 3486962, at \*13-14 (N.D. Fla. Aug. 18, 2022) (finding Individual Freedom Act is impermissibly vague based on, *inter alia*, provision allowing "discussion" of prohibited concepts if "given in an objective manner without endorsement").

H.B. 1557's proscription is also vague insofar as it turns on classroom instruction "on sexual orientation or gender identity."  In relevant part, the *American Heritage Dictionary* defines "on" to mean "concerning" or "about," which connotes an extremely broad relation.  *See also* Br. 16-17 (offering an equally broad definition of "on" that addresses the "subject of study, *discussion*, or *consideration*") (emphases added).  So what does it mean to engage in "classroom instruction" on such contested concepts as "sexual orientation" or "gender identity"?  As another court recently held in allowing a vagueness challenge to a law banning conversion therapy, "sexual orientation and gender identity are difficult to define and encompass a number of factors, including behavior, practices, identity, attractions, sexual fantasy, romantic attractions, and erotic desires."  *Vazzo v. City of Tampa*, 2019 WL 1048294, at \*9 (M.D. Fla. Jan. 30, 2019), *rep. and rec. adopted sub nom. Vazzo v. City of Tampa*, 2019 WL 1040855 (Mar. 5, 2019).  And here, that ambiguity is exacerbated by the fact that H.B. 1557 does not provide any examples of what is intended to be covered.  *See King v. Governor of State of New Jersey*, 767 F.3d 216,

240-41 (3d Cir. 2014), *abrogated on other grounds by*, *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018); *Falls* at 19-20. As a result, and accounting for the many related forms of ambiguity described above, the law is irredeemably vague with respect to many of the key issues that must be answered in schools on a daily basis.

Finally, the statute's proscription on classroom instruction in grades 4-12 that is not "age-appropriate or developmentally appropriate for students in accordance with state standards" is also vague.  H.B. 1557 § 1.  The State says the statue does not apply to those grades now because it is required to adopt by June 2023 any new "school counseling frameworks and standards; educator practices and professional conduct principles; and any other student services personnel guidelines, standards, or frameworks."  Br. 22; H.B. 1557 § 2.  But none of that mentions "classroom instruction."  Nor does it mention "curricul[um]," which is all the State says the "classroom instruction" proscription covers.  Br. 34, 50.  Moreover, H.B. 1557 contains other substantive provisions (not at issue here) requiring "transparency with parents regarding the health and wellbeing of their children," Br. 11-12, which are a much clearer fit for, e.g., "school counseling frameworks."  Therefore, a reasonable observer could well conclude that H.B. 1557 explicitly reaches grades 4-12 now,

prohibiting "classroom instruction" on the disfavored topics that is not age or developmentally appropriate in accordance with unspecified state standards.[21]

The State seeks to downplay the statue's vagueness by comparing it to other laws that have withstood scrutiny.  Br. 33.  But for the reasons given above, H.B. 1557 is much vaguer based on its text, structure, and history—and its vagueness is less tolerable, both because it implicates the First Amendment and because there are no interpretive principles that would allow a reasonable interpreter to clarify how the law works on a day-to-day basis in  public schools.  *See Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) (prohibition on employee speech); *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1152 (9th Cir. 2001) (requiring "teaching personnel" to instruct "curriculum" in English); *Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 665-66 (6th Cir. 1987) (teacher allowed student to show "controversial, highly suggestive and somewhat sexually explicit movie").  At bottom, the State has no statutorily grounded answer to how teachers and others may lawfully address run-of-the-mill situations—and the "very absurdity of these possibilities brings into focus the extraordinary ambiguity of the statutory language."  *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286 (1961).  For this reason, H.B. 1557 fails to provide

---

[21] That H.B. 1557's proscription has already been applied above third grade is hardly surprising in light of the avowed purpose of the law.  Indeed, during an interview, Governor DeSantis stated in response to a question about whether H.B. 1557 would apply beyond third grade: "Well here's the thing.  Things like woke gender ideology have no place in the schools period" and are "just not appropriate."  Compl. ¶ 36.

fair notice to a person of ordinary intelligence about what is forbidden and what is permitted, and so it is unlawful.

**B.     H.B. 1557 authorizes and encourages arbitrary and discriminatory enforcement**

An independent basis for finding that H.B. 1557 offends due process is that it invites arbitrary and discriminatory enforcement.  Indeed, it does so much more than the law struck down in *Wollschlaeger*, which exposed doctors to "punishment according to the arbitrary whims of annoyed patients."  848 F.3d at 1323.  Not only are parents authorized to commence litigation against schools whenever they believe someone said or did something unlawful, but they are authorized to do so based on a mere "concern."  Thus, they are not at all "constrained by explicit guidelines or ethical obligations," and "there is a real risk of complaints from, for example, political opponents." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). Similarly, the law all but invites one-sided and arbitrary enforcement by those whose goal is to silence, erase, and discriminate against LGBTQ people and their families. *See Woodhull Freedom Foundation v. United States*, 948 F.3d 363, 373-74 (D.C. Cir. 2020); *281 Care Comm. v. Arneson*, 766 F.3d 774, 790 (8th Cir. 2014).

The Complaint demonstrates how H.B. 1557 has in fact been implemented and enforced in a discriminatory manner.  Indeed, every single example of its enforcement has been targeted at LGBTQ persons and their related speech.  *See supra* at 7-13.  H.B. 1557's private-cause-of-action provisions also render toothless

the State's representations in this litigation that *it* does not believe the law should apply beyond curricular speech. *See, e.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 939-40 (2000). Under the irregular regime Florida has created, "individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than regulation by law." *Dream Defenders v. DeSantis*, 559 F. Supp. 3d 1238, 1281-82 (N.D. Fla. 2021) (Walker, C.J.) (quotation marks and citation omitted). While state court judges may not uphold parental claims, that has never been enough to rescue a vague law: the law's invitation to arbitrary enforcement extends to courts as well as parents, and has already made a mockery of the State's litigation-driven claim that H.B. 1557 does not impose disparate impacts or burdens on LGBTQ people.

## III. H.B. 1557 VIOLATES PLAINTIFFS' FIRST AMENDMENT RIGHTS

H.B. 1557 also burdens Plaintiffs' First Amendment rights because it improperly denies them the right to receive information and ideas, as well as the right to speak and share ideas.

### A. The statute violates Plaintiffs' right to receive information and ideas

On its face, H.B. 1557 forbids certain speech in schools. The State's principal constitutional defense is a restatement of its claim (described and refuted above) that H.B. 1557 applies only to curricular content—which, in its view, is not subject to the First Amendment. Br. 34. The first flaw with this theory is that it rests on a

faulty premise: H.B. 1557 does not apply only to school curricula, and so it reaches non-government speech that enjoys constitutional protection. *See infra* Part II.A.

The second and more fundamental problem with the State's position is that it is foreclosed by binding precedent. The Supreme Court has recognized that the "right to receive information and ideas" is "nowhere more vital than in our schools and universities." *Kleindienst v. Mandel*, 408 U.S. 753, 762-63 (1972) (quotation marks omitted). Because that right is "a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom," it may not be restricted "in a narrowly partisan or political manner" or "simply because [officials] dislike the ideas … and seek by their removal to 'prescribe what shall be orthodox….'" *Pico*, 457 U.S. at 867, 870-72 (1982) (citations and emphases omitted). Similarly, in *Hazelwood School District v. Kuhlmeier*, the Supreme Court held that the government's exercise of its discretion over curriculum must be "reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273 (1988).[22]

Consistent with this precedent, the Eleventh Circuit has held that curricular decisions must comport with the guarantees of the First Amendment. *Virgil*, 862 F.2d at 1521-25) (applying *Hazelwood* to removal of textbooks from curriculum);

---

[22] While the State casts doubt on Pico's precedential value, *Pico* offers "useful guidance." *Campbell v. Tammany Parish School Board*, 64 F.3d 184, 189 (5th Cir. 1995).

*see also Searcey*, 888 F.2d at 1319-22 (applying *Hazelwood* to invalidate curricular restrictions on access to Career Day forum).  *Cf. ACLU of Fla., Inc.*, 557 F.3d at 1201-02, 1219-20 (citing *Virgil* and *Searcey* approvingly and applying *Pico*, *arguendo*, to removal of books from library).  Many other courts have embraced the same view.  *See, e.g.*, *Arce*, 793 F.3d at 983-84; *Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 972-74 (D. Ariz. 2017); *Pratt*, 670 F.2d at 777-78.

Ignoring these cases, the State contends that curricular content is government speech beyond constitutional review.  Br. 34-35.  But this Court must apply precedent until a decision is issued "that actually changes the law."  *United States v. Sailor*, 2018 WL 278740, at *1 (N.D. Fla. Jan. 2, 2018).  The governing precedent here consists of *Hazelwood*, *Pico*, *Virgil*, and the other authorities cited above.

In any event, most of the State's authorities do not consider students' right to receive information, nor do they mention *Hazelwood* or *Pico*.[23]  *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022) (coach's right to pray on football field after a game); *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 340-41 (6th Cir. 2010) (teacher claim for retaliation based on curricular choices); *Mayer v. Monroe Cnty. Comm. Sch. Corp.*, 474 F.3d 477, 479-

---

[23] Even as to teacher's speech rights, the Supreme Court has left open the question of whether *Garcetti v. Ceballos*, 547 U.S. 410 (2006), applies to classroom instruction. *Id.* at 425.  And *United States v. American Library Ass'n*, 539 U.S. 194 (2003), concerns public libraries, not public-school libraries (or public schools more generally).

80 (7th Cir. 2007) (similar).  *Cf. Acosta*, 2012 WL 12829991, at *5-7 (agreeing with *Evans-Marshall* as to teacher's claim but finding student stated right-to-receive-information claim).[24]

There is good reason why neither the Supreme Court nor the Eleventh Circuit has adopted the State's view: were schools not subject to constitutional limitations in setting curricular content, they could adopt a curriculum that teaches that one race is superior to another, that women belong at home rather than the workplace, or that any other constitutionally protected group should be despised and discriminated against.  That would defy the very concept of equal protection; it would also invite each generation to imbue prejudice in the next through a public institution, so long as local or state officials with sufficient power over curricula wished to do so.

A wall of precedent stands against that threat.  The Supreme Court has thus affirmed that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," and "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 506, 512 (1969)

---

[24] The sole exception is *Chiras v. Miller*, which rejected a textbook author's challenge to Texas's refusal to approve his textbook because that decision was government speech (at odds with *Virgil*) and went on to reject the student's right to receive information claim (at odds with *Hazelwood*). 432 F.3d 606, 614-19 (5th Cir. 2005).  That decision is non-binding.  *See Arce*, 793 F.3d at 982 (declining to follow *Chiras* because analysis did not involve "a *student's* First Amendment rights" and was "accordingly inapplicable" to restriction of curricular courses).

(citation omitted).  As the "nurseries of democracy," schools must protect even "unpopular ideas."  *Mahanoy Area Sch. Dist. v. B.L. ex. rel. Levy*, 141 S. Ct. 2038, 2046 (2021).  They cannot be used to single out disfavored groups and "generate[] a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone."  *Brown v. Bd. of Educ.*, 347 U.S. 483 at 493-94 (1954).

As a fallback, the State asserts that even if H.B. 1557 is subject to judicial review, such review amounts to a rubber stamp.  Br. 34.  But that grossly "overstates the deference a court must pay to [education-related] decisions."  *Searcey*, 888 F.2d at 1321.  The State must come forward with "evidence" to explain and justify its choice, and a lack of evidence can "support the inference that the [law] was … intended to suppress [a disfavored] viewpoint."  *Id.* at 1322 (citation omitted).

H.B. 1557 is not based upon a legitimate pedagogical interest.  The State claims that sexual orientation and gender identity are "sensitive" topics of "political controversy," which should be taught by parents.  Br. 35-36 (citations omitted).  But even if that were true, a blanket ban on any discussion or acknowledgment of LGBTQ people is not reasonably related to the State's asserted pedagogical interest.  *See, e.g.*, *Virgil*, 862 F.2d at 1525; *Zykan v. Warsaw Comm. Sch. Cop.*, 631 F.2d 1300, 1308 (7th Cir. 1980).  There are many LGBTQ students, teachers, families, and parents in Florida's public school system, and they will remain in that system

regardless of whether their very existence is deemed "sensitive."  The Constitution protects their right to do so. *See Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018).  As alleged, however, H.B. 1557 is at odds with that promise; it was intended to impose (and has in fact imposed) a near-categorical ban on addressing LGBTQ people and issues in virtually every aspect of the life of Florida's schools.  Even the State does not defend the idea that Florida has an interest in prohibiting teachers from opposing the bullying of LGBTQ children, or in preventing references to gay or transgender people in literature, or in censoring students when they speak about their families.  But that is what H.B. 1557 (shorn of the State's litigation-driven interpretation) does.  It is thus massively overinclusive relative to any asserted state interest.

Regardless, the State's asserted interest paints a false picture.  As alleged in the Complaint, H.B. 1557 was motivated by key lawmakers' hostility to LGBTQ people—and by their intent to suppress speech about LGBTQ issues in hopes of advancing their own preferred "core belief systems and values."  *See supra* at 4. That is not a legitimate pedagogical interest, nor is it a legitimate use of state power over public schools.  *See, e.g.*, *ACLU of Fla., Inc.*, 557 F.3d at 1227; *Searcey*, 888 F.2d at 1319 n.7; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1300 (10th Cir. 2004); *Pratt*, 670 F.2d at 779; *Gonzalez*, 269 F. Supp. 3d at 973-74.  Any doubt on this score is dispelled by legislators' repeated decision to reject amendments that would

have clarified the law, avoided a chilling effect, and limited its foreseeable and significant damage to LGBTQ people in Florida.  Federal courts "have not hesitated to look beyond the stated reasons for" education-related decisions.  *Virgil*, 862 F.2d at 1523 n.6.  The Complaint plausibly alleges (and the legislative history shows) that H.B. 1557 was motivated at least in part by illegitimate interests.[25]

### B.   H.B. 1557 violates Plaintiffs' right to speak and share ideas

Plaintiffs separately allege a violation of their own rights to free speech.  To the extent that Plaintiffs' speech is curricular (*i.e.*, school-sponsored), it is subject to *Hazelwood*, and H.B. 1557 violates the First Amendment for the reasons above. Indeed, the State previously conceded that H.B. 1557 prohibits student speech in a curricular setting, because the law applied to "classroom instruction" whether by a "parent, student, guest lecturer, or anyone else."  Prior Br. 20.  The State now pivots and claims that H.B. 1557 prohibits "only formal classroom teaching" by "school personnel" or "those to whom the school has delegated responsibility for such teaching," *not* "parents or students acting in the ordinary course."  Br. 18.  But as the State itself previously admitted, and as now evidenced by the examples of H.B. 1557 in real-world operation, the law has in fact already infringed student curricular speech.

---

[25] The State's reliance on *United States v. O'Brien*, 391 U.S. 367 (1968), is misplaced.  That case dealt with a claim based upon freedom of speech and did not mention the right to receive information or *Pico* or *Hazelwood*, both of which looked to underlying motive.

Independently, H.B. 1557 covers a substantial amount of non-curricular student speech. This is confirmed by the law's reference to "third parties" and "discussion," and by legislators' rejection of amendments that would have carved out student-to-student discussions, *see* Compl. ¶¶ 33-34 & n.14, ¶¶ 57-58.  H.B. 1557 thus encompasses "pure speech." *Tinker*, 393 U.S. at 508.  As a matter of law, such speech must be permitted unless there are "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id.* at 514.  The State has not even attempted to show that it meets this standard—and so H.B. 1557 is facially unconstitutional with respect to this substantial set of applications.[26]

## IV.    H.B. 1557 VIOLATES THE EQUAL PROTECTION CLAUSE

As lawmakers admitted while drafting it, H.B. 1557's discriminatory effects are a feature, not a bug.  The law thus violates the Equal Protection Clause. Moreover, Defendants have engaged in discriminatory enforcement of the law, which is an independent violation.

### A.    H.B. 1557 was motivated by discrimination

The Complaint alleges with particularity that sexual orientation and gender identity were at least "motivating factor[s]" behind H.B. 1557's passage under the

---

[26] H.B. 1557 is overbroad because it "prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits." *Dream Defenders*, 559 F. Supp. 3d at 1283.

eight-factor test in *Greater Birmingham Ministries v. Secretary of State of Alabama*,

992 F.3d 1299, 1327 (11th Cir. 2021) ("*GBM*").  That test looks to:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departure; … (5) the contemporary statements and actions of key legislators[;] … (6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives.

*Id.* at 1321-22.  Determining motivation is a "fact intensive examination of the

record," *GBM*, 992 F.3d at 1322 n.33, which "does not lend itself to dismissal in the

pleading stages where the record is not fully developed," *Dream Defenders v.

DeSantis*, 553 F. Supp. 3d 1052, 1094 (N.D. Fla. 2021) (Walker, C.J.); *see also Hunt

v. Cromartie*, 526 U.S. 541, 549 (1999).[27]  The presence of even a single *GBM* factor

can suffice to defeat a motion to dismiss. *See, e.g.*, *Jean v. Nelson*, 711 F.2d 1455,

1489-90 (11th Cir. 1983).

Here, the *GBM* factors powerfully indicate, and at least plausibly show, that

sexual orientation and gender identity were "motivating factors" behind H.B. 1557.

The law's impact, and the foreseeability and knowledge of that impact.  The

Complaint alleges at length how H.B. 1557 has already had (and will continue to

have) a disparate impact on LGBTQ people.  Simply put, LGBTQ students, parents,

and teachers are hearing loud and clear that they are not welcome, that any

---

[27] Contrary to the State's contention, H.B. 1557 is not government speech for purposes of the Equal Protection Clause either.  Br. 40; *see supra* Part III.A.

discussion of their existence (or their needs) is dangerous, and that schools are increasingly unsafe for them if they face bullying, hostility, or discrimination. Moreover, that message is being directed at LGBTQ people—and *not* at straight or non-transgender people—from every single level of government in Florida.  And in reality, it is more than just a message: it is a lived reality of being treated worse in very concrete ways. These disparate impacts are especially unnerving because LGBTQ students already face heightened mental and physical risks in Florida's schools, many of which have responded to H.B. 1557 by removing safe spaces, student groups, and anti-bullying measures.  *See* Compl. ¶¶ 90-98.

Against all this, the State offers the conclusory response that H.B. 1557 does not subject "[Plaintiffs] (or anyone else) to differential treatment."  Br. 29.  That is a factual claim, not a legal one, and Plaintiffs are entitled to test it in discovery and dispute it at trial.  To the extent that the State's position is that H.B. 1557 is incapable of uniquely disadvantaging LGBTQ people, or subjecting them to a disparate impact, the Complaint (and the lived experience of people throughout Florida, including Plaintiffs) stands against that blithe assertion.

The law's historical background, and the specific sequence of events leading up to passage.  The events surrounding H.B. 1557's enactment further support a finding of discriminatory motive.  The Complaint identifies statements from Governor DeSantis, legislators, and other supporters in the lead-up to the law's

passage that focused directly on LGBTQ persons and identities—and not at all on heterosexuality or non-transgender identity.   Compl. ¶¶ 40-49; *see, e.g.*, *Dream Defenders*, 553 F. Supp. 3d at 1094.  These statements include the Senate Sponsor's comments that the law was needed because parents are "very concerned about the departure from the core belief systems and values," and specifically about kids "coming out" or hearing about "different kinds of identities."  *Id.* ¶ 40.

But there is more.  H.B. 1557 uses tired tropes of "depravity" and "grooming" to try to justify discriminating against LGBTQ people in the academic environment, *id.* ¶¶ 48, 68, and it follows directly in the footsteps of decades of previously invalidated "No Promo Homo" laws that accomplished expressly what H.B. 1557 seeks to do under cover of "neutrality," *id.* ¶ 98; *see, e.g.*, *City of S. Miami v. DeSantis*, 424 F. Supp. 3d 1309, 1344 (S.D. Fla. 2019).  Moreover, the Complaint explains how H.B. 1557 is part of a persistent pattern of efforts by the Florida Legislature and Governor to harm LGBTQ people.  *See* Compl. ¶¶ 50, 64.

The State does not even try to defend most of these discriminatory statements, and its efforts to sanitize the legislative record fall short.  It relies heavily on general references to a "presumption of legislative good faith"—a presumption that belongs mainly to the redistricting context (given the unique deference owed to states in that

field).[28]  Br. 42, 45.  The State also complains that Plaintiffs rely on "cherrypicked statements." *Id.* 45.

Both arguments miss the mark.  In contrast to *League of Women Voters of Florida, Inc. v. Florida Secretary of State*, this is not an instance of a "statement by a single legislator." 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam).  Nor is this case like *GBM*, where the plaintiffs relied on statements by the sponsor about a separate bill.  992 F.3d at 1324-25.  Plaintiffs' claims are supported by a stream of comments from the House Sponsor, the Senate Sponsor, the Governor, and the Governor's spokesperson.  And they are bolstered by many additional considerations—including a legislative pattern of rejecting proposed amendments to H.B. 1557 that makes no sense without reference to discriminatory purpose, the absence of any legislative effort to assess the burden of the law on LGBTQ people, the stark over-inclusiveness of the law relative to its stated purpose, the consistency of legislative statements with the law's discriminatory effects, and the State's retaliation against entities that have dared to criticize H.B. 1557.  It is also striking that State is apparently content to sit idly by—without making any statements or issuing any guidance—while LGBTQ people throughout Florida experience discrimination and suffering under an interpretation of H.B. 1557 that the Solicitor

---

[28] The State does not cite any authority applying the presumption outside of that context, and authorities cited by the State in other contexts do not mention any such presumption.  *See* Br. 43.

General has supposedly deemed so absurd that he thinks it cannot even support Article III standing in this very litigation.

Simply put, the "contemporary statements and actions of key legislators"—as well as conduct and statements by others involved in the enactment of H.B. 1557— make clear that this law was passed with discriminatory motives. *League of Women Voters*, 32 F.4th at 1373 (quoting *GBM*, 992 F.3d at 1322); *City of S. Miami*, 424 F. Supp. 3d at 1345.   At the pleading stage, Plaintiffs' allegations are more than sufficient, particularly since Plaintiffs need only show that discrimination is "a motivating factor" behind H.B. 1557, not "the dominant or primary one." *Dream Defenders*, 553 F. Supp. 3d at 1093 (cleaned up).

Substantive departure.  In addition, Plaintiffs have plausibly alleged that H.B. 1557 amounts to a departure from substantive principles embodied in existing law. *See, e.g.*, *City of S. Miami*, 424 F. Supp. 3d at 1343.  The State here opted to pass a total ban on classroom instruction on certain disfavored topics—and to single out a protected class for discriminatory treatment—in defiance of the State's longstanding commitments to providing a meaningful education and diverse points of view to all children.  The State also acted in a manner contravening federal cases recognizing that LGBTQ persons are at home in our constitutional order.  These departures, especially when viewed along with the legislative record, further indicate an illicit

motive.  *Village. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252

at 267-68 (1977).

The availability of less discriminatory alternatives.  Finally, the Complaint—

and H.B. 1557 itself—make clear that there were less-discriminatory alternatives

short of a ban on classroom instruction on LGBTQ issues and identities.  Again, the

State insists that the primary motive for the law was not discrimination, but rather

ensuring parents had adequate information about their children's well-being.  Br.

42-43.  But another provision of the law already addresses that concern.  *See* Fla.

Stat. § 1001.42(8)(c)(1).  And the State's alternative formulation of its interests are

inconsistent with (a) the breadth of H.B. 1557 as understood by everybody except

the State Defendants in this case; (b) legislators' repeated rejection of amendments

that would have far more effectively, and less painfully, accomplished these

supposed purposes; and (c) the experience of many other States, which have

managed to protect core interests without such discriminatory attacks on LGBTQ

people.  The State maintains that H.B. 1557 applies *only* to the curriculum and

describes its interests by reference to that view, but if H.B. 1557 does apply much

more broadly (as it seems to), the State has no credible explanation for why less-

discriminatory alternatives were not available.[29]

---

[29] The State has not tried to and cannot satisfy its burden "to demonstrate that the law would have
been enacted without this [improper] factor."  *GBM*, 992 F.3d at 1321; *see also Dream Defenders*,
553 F. Supp. 3d at 1095.

**B.    Defendants have enforced H.B. 1557 in a selective or discriminatory manner**

Even if H.B. 1557 were "neutral," its selective and discriminatory enforcement would independently violate the Equal Protection Clause. *See, e.g.*, *Hollywood Cmty. Synagogue, Inc. v. City of Hollywood*, 430 F. Supp. 2d 1296, 1322 (S.D. Fla. 2006).  To date, Defendants have applied H.B. 1557 exclusively and consistently to restrict only discussion of and instruction on LGBTQ-related issues, and to prohibit other LGBTQ-related educational opportunities.  They have not applied the law as to any non-LGBTQ matters.  And this differential treatment was based on impermissible considerations rooted in discriminatory animus toward LGBTQ individuals. *See supra* Part IV.A.  Plaintiffs have thus shown (1) that they were "treated differently from other similarly situated [persons]," and (2) that Defendants unequally applied H.B. 1557 "for the purpose of discriminating against Plaintiff[s]." *Hollywood Cmty. Synagogue*, 430 F. Supp. 2d at 1322.

Defendants do not deny that Plaintiffs have suffered discriminatory harm in the instances alleged.  *See* Br. 49-50.  Their instead say "those allegations have nothing to do with HB 1557," because, at least as far as the State's litigation position is concerned, the law applies only to the curriculum. *See id.*  But whatever Defendants may claim the law means, and however neutral they claim it is, these are real-world examples of H.B. 1557 being applied exclusively in a discriminatory manner.  And even as to H.B. 1557's impact on curriculum, Defendants err.  They

argue that "all students are receiving the same education" (even if it is not "the education Plaintiffs prefer"). *See* Br. 29. But Defendants' assertion is contradicted by the allegations in the Complaint, which show that students' education differs meaningfully as a direct consequence of H.B. 1557. *See infra* Part V.

## V.    H.B. 1557 VIOLATES TITLE IX

H.B. 1557 violates Title IX for similar reasons: it discriminates on the basis of sexual orientation and gender identity in the provision of educational benefits.  20 U.S.C. § 1681(a).  The Complaint plausibly alleges that the student Plaintiffs are part of a protected class, *see, e.g.*, *Grimm v. Gloucester Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020); that they have been (and will substantially likely be) subjected to adverse educational actions; that heterosexual and non-transgender students who are similarly situated have been (and will be) treated more favorably; and that Plaintiffs are qualified to receive educational benefits on the same terms as their non-LGBTQ peers, *see Pinkston v. Univ. of S. Fla. Bd. of Tr.*, 2016 WL 3196474, at *3 (M.D. Fla. June 9, 2016).[30]

Once again, the State contends that Title IX has no application because H.B. 1557 applies only to "'classroom instruction'—*i.e.*, curricular materials," and "Title IX does not 'require or prohibit or abridge in any use the use of particular textbooks

---

[30] The Department of Education and Board of Education do not dispute that they are recipients of federal funds and "covered institutions" under Title IX.  Compl. ¶ 137; *see also* Br. 51-53.

or curricular materials.'"  Br. 50-51 (quoting 34 C.F.R. § 106.42) (cleaned up).  But while the federal government may not regulate *formal* or *written* curricular materials under Section 106.42,[31] H.B. 1557 applies well beyond such materials and therefore collides with the proscriptions of Title IX.  Under settled precedent interpreting Section 106.42's limited restriction, the State cannot rely on that provision to justify a broad denial of educational benefits on equal terms.

## VI.   DEFENDANTS' REMAINING ARGUMENTS LACK MERIT

Several School Board Defendants raise two additional arguments, neither of which has merit.

Orange County argues that the district spokesperson's statement of its policy cannot support liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because his "statements were subject to meaningful review" by "the management head of the school district," the Superintendent.  ECF 133 at 10, 13-14 (citing Fla. Stat. § 1001.32(3)).  Orange County's reliance on *Quinn v. Monroe County*, 330 F.3d 1320 (11th Cir. 2003), is misplaced and ignores the allegations in the Complaint.  Plaintiffs do not allege that the media office district spokesperson was "delegate[d] decisionmaking discretion."  *Id.* at 1325 (citation omitted).  The Washington Post article upon which Plaintiffs rely, Compl. ¶ 80, is clear that the

---

[31] *See* 34 C.F.R. § 106.42; *Edison v. Doublery*, 604 F.3d 1307, 1309 (11th Cir. 2010); *Shorter v. St. Cloud State Univ.*, 2001 WL 912367, at *1, 10 (D. Minn. Aug. 14, 2001); *Grimes ex. rel. Grimes v. Sobol*, 832 F. Supp. 704, 707, 712-13 (S.D.N.Y 1993).

district spokesperson is *conveying* district policy to teachers—not making it, *see, e.g.*, *Groden v. City of Dallas*, 826 F.3d 280, 286 (5th Cir. 2016).

Orange and Manatee County also continue to argue that the Complaint is an impermissible "shotgun pleading" because it "suggests that every single one of the Plaintiffs are suing [both] School Board[s]." ECF 131 at 19; ECF 133 at 5. Looking to the Complaint's allegations, it is apparent that only Plaintiffs who are members of those respective school districts are suing them. *See* Compl. ¶¶ 20, 22, 79-80. Indeed, both parties stress as much in seeking dismissal on other grounds. *See* ECF 131 at 3; ECF 133 ¶¶ 3-4. Like the other Defendants, who do not raise a shotgun pleading defense, Orange and Manatee County plainly have "adequate notice of the claims against them and the grounds upon which each claim rests," *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015), as they can discern from the allegations incorporated into each Count (i) the actions they are responsible for, and (ii) the Plaintiff who asserts claims against them based on those allegations, *see, e.g.*, *Dream Defenders*, 553 F. Supp. 3d at 1092.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

Dated: December 20, 2022
      New York, New York

Roberta A. Kaplan (NY #2507093)*
John C. Quinn (NY #4965000)*
Kate L. Doniger (NY #5128251)*
D. Brandon Trice (NY #5140017)*
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel.: (212) 763-0883
rkaplan@kaplanhecker.com

Joshua Matz (DC #1045064)*
KAPLAN HECKER & FINK LLP
1050 K Street, NW, Suite 1040
Washington, D.C. 20001
Tel.: (212) 763-0883
jmatz@kaplanhecker.com

Christopher Stoll (CA #179046)
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, California 94102
Tel.: (415) 392-6257
CStoll@nclrights.org

Joseph M. Wasserkrug (FL #112274)
MCDERMOTT WILL & EMERY LLP
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
jwasserkrug@mwe.com

Elizabeth F. Schwartz (FL #114855)
ELIZABETH F. SCHWARTZ, P.A.
3050 Biscayne Blvd., Suite 600
Miami, Florida 33137
liz@elizabethschwartz.com

*Attorneys for Plaintiffs*

*\*admitted pro hac vice*

## <u>CERTIFICATE OF WORD COUNT</u>

Consistent with Local Rule 7.1(F) and the contemporaneously filed unopposed motion to expand the word limit, this motion contains 14,997 words.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of December 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.


*/s/ Brandon Trice*
Brandon Trice