# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**M.A.**, et al.,

    *Plaintiffs*,

    v.                      No. 4:22-cv-134-AW-MJF

**FLORIDA STATE BOARD OF EDUCATION**, et al.,

    *Defendants*.

_____

## STATE DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

HB 1557 neutrally removes the subjects of "sexual orientation" and "gender identity" from Florida's public-school curricula for kindergarten through the third grade and, after that, leaves teachers free to instruct on those subjects in a manner that is "age-appropriate [and] developmentally appropriate for students in accordance with state standards." Fla. Stat. § 1001.42(8)(c)(3). Plaintiffs could hardly be more wrong that this modest curricular restriction is contrary to the Nation's governing charter. Plaintiffs have no right to dictate any message taught in Florida's public schools, let alone a message to the youngest schoolchildren that, as Plaintiffs admit, involves "sexual fantasy, romantic attractions, and erotic desires." ECF144 at 40 (cleaned up). It is the State's right, exercised through its democratically accountable officials, to determine its own message.

In insisting otherwise, Plaintiffs vacillate between, on the one hand, disbelief that anyone could possibly understand workaday terms like "'classroom instruction,' 'sexual orientation or gender identity,'" ECF144 at 36, and, on the other hand, certainty that the State is lying and that the statute in fact targets only gay and transgender individuals and "denies them the right to receive information and ideas, as well as the right to speak and share ideas," *id.* at 44. But the statute restricts "classroom instruction," not "discussion," and does so neutrally, limiting all classroom instruction on "gender identity" and "sexual orientation," not just instruction on transgender identity and homosexuality.

Plaintiffs mischaracterize their own allegations in arguing that the State has "applied H.B. 1557 exclusively and consistently to restrict only discussion of and instruction on LGBTQ-related issues" and has "not applied the law as to any non-LGBTQ matters." ECF144 at 58. The complaint does not allege a single instance where instruction on sexual orientation or gender identity was kept out of a K-3 classroom. Certainly, for instance, an alleged ban on students "dancing with others of the same gender," ECF123 at 50, does not qualify. Nor do Plaintiffs identify any "non-LGBTQ matters" within the ambit of the statute that have gone unaddressed. ECF144 at 58.

Plaintiffs once again fail to plead standing. Not least among their shortcomings is that every injury they allege is tied not to the actual words used by

the Legislature, but to the actions of third parties or to a baseless reading of the statute. Plaintiffs' claims also fail on the merits, as it was well within the State's constitutional discretion to keep age-inappropriate topics out of kindergarten classrooms and leave them to parents in the first instance. The complaint should be dismissed with prejudice.

## I.    PLAINTIFFS MISREAD THE STATUTE.

**1.** As a threshold matter, only the instructional restriction applicable to kindergarten through third grade has taken effect. Plaintiffs' argument—that "the statute expressly imposes a restriction on grades 4-12 now," ECF144 at 25—is atextual. The statute provides that, after grade 3, classroom instruction on sexual orientation and gender identity "may not occur . . . in a manner that is not age-appropriate or developmentally appropriate for students in accordance with state standards." Fla. Stat. § 1001.42(8)(c)(3). There is no freestanding prohibition on instruction that is not "age-appropriate or developmentally appropriate." Instruction is barred only if it is "not age-appropriate or developmentally appropriate *in accordance with state standards.*" Until such standards exist (and they do not), there can be no violation.

Plaintiffs disparage the State's interpretation as "mid-litigation assurances." ECF144 at 39 (cleaned up); *see id.* at 12, 44, 49. But since Plaintiffs filed this lawsuit the day after the statute was enacted—months before it even took effect—the State's

only opportunity to interpret the statute has been during litigation. The State has, moreover, been consistent in its position both in and out of court. *See* Memo from J. Oliva to School District Superintendents, *House Bill 1557, Parental Rights in Education, School District Responsibilities*, FLORIDA DEP'T OF EDUC. at 2 (June 6, 2022), https://info.fldoe.org/docushare/dsweb/Get/Document-9559/dps-2022-68.pdf.

**2.** Plaintiffs contend that HB 1557 restricts not only "curricular content" but also "community service projects," "advising LGBTQ student groups," "discussing same sex partners or wearing [certain] clothes," "the creation of safe spaces or even the placement of safe space stickers," and material "that references LGBTQ identity." ECF144 at 21. To get there, Plaintiffs point out that the word "instruction" has more than one definition, including not only "the action, practice, or profession of teaching," but also "the imparting of knowledge, skill, or information." *Id.* at 37 (cleaned up). But "[a]mbiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). The statute refers to "*classroom* instruction," *i.e.*, the kind of instruction that happens in a classroom, which is where "the profession of teaching" occurs. Moreover, the statute regulates not instruction *simpliciter* but "instruction *on*" two specified topics. "On," in that construction, refers to the "subject of study." ECF134 at 16–17.

The limitation to "subjects of study" confirms that "classroom instruction" refers only to "the formal work of teaching that occurs in a classroom setting," ECF134 at 16, not to stickers, community service projects, student groups, clothing choices, or discussion among students, ECF144 at 21. It also shows that mere "references [to] LGBTQ identity," *id.*, do not violate the statute, as they are not "instruction on" sexual orientation or gender identity any more than a math problem asking students to add bushels of apples is "instruction on" apple farming.

The limited reach of "classroom instruction" also resolves Plaintiffs' concerns about the phrase "school personnel or third parties." ECF144 at 37 (quoting Fla. Stat. § 1001.42(8)(c)(3)). The statute prohibits only formal classroom teaching about sexual orientation and gender identity, either by school personnel or those to whom the school has delegated responsibility for such teaching. Nor are the terms "'sexual orientation' and 'gender identity'" "difficult to define." ECF144 at 40 (cleaned up). They are commonly used in the law without the fine-grained explanation Plaintiffs demand. *See, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739, 1742, 1747, 1749 (2020); *id.* at 1755 (Alito, J., dissenting).

Finally, the statute does not "target[] LGBTQ people." ECF144 at 1. It restricts classroom instruction on "sexual orientation" and "gender identity," not homosexuality and transgender identity.

**3.** Plaintiffs largely rest their interpretation on how they say "a wide range of actors"—members of the Legislature, local school boards, and other third parties—have interpreted the statute. ECF144 at 21. But Plaintiffs' narrative is simply untrue. Then-Senator Diaz, who is now the Commissioner of Education, explained on the Senate floor that the bill was about "planned, lesson-planned effectuated instruction," which "does not prevent the other role of the teacher . . . of working and dealing with individual students." Fla. S., recording of proceedings at 2:21:20–22:01 (Mar. 8, 2022).[1] The State's interpretation has also been echoed by a leading First Amendment scholar on a podcast on which he debated the constitutionality of the law with one of Plaintiffs' lawyers. *See* We the People Podcast, The Constitutionality of Florida's Education Bill (Apr. 14, 2022).[2]

In any event, when interpreting statutes, Florida courts "adhere to the supremacy-of-the-text principle," *Levy v. Levy*, 326 So. 3d 678, 681 (Fla. 2021), and "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest." *Bostock*, 140 S. Ct. at 1737. Indeed, in Florida, evidence of "the legislature's subjective intent" is irrelevant. *Enriquez v. Velazquez*, 350 So. 3d 147, 157 (Fla. 5th DCA 2022). And while Plaintiffs rely

---

[1] https://thefloridachannel.org/videos/3-8-22-senate-session/.

[2] https://constitutioncenter.org/interactive-constitution/podcast/the-constitutionality-of-floridas-education-bill.

heavily on how they claim various officials have implemented the statute, ECF144 at 21, Florida courts are constitutionally barred from deferring to the views of implementing officials, *see 1944 Beach Boulevard, LLC v. Live Oak Banking Co.*, 346 So. 3d 587, 593 (Fla. 2022) (citing Fla. Const. art. V, § 21). Here, moreover, the alleged actions "implementing" the statute are not acts of a central implementing body (the Department of Education), but instead decentralized administrative choices of local school boards, many of which run far afield of the statute's plain text.

## II.    PLAINTIFFS LACK STANDING.

### A. Plaintiffs Fail to Plead Injury-in-Fact.

**1.** Because Plaintiffs seek prospective relief against the operation of HB 1557, they must adequately plead "intended future conduct" that "is arguably proscribed by the statute." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 162 (2014) (cleaned up). And for their right-to-information claim, they must identity information arguably denied them by the statute. *See Falls v. DeSantis*, 4:22-cv-166, 2022 WL 2303949, at *8 (N.D. Fla. June 27, 2022). Plaintiffs have not done that.

For starters, the information Plaintiffs say they wish to receive is not arguably proscribed by HB 1557, which currently limits only classroom instruction on sexual orientation and gender identity for the youngest children. Plaintiffs instead raise concerns that have nothing to do with the statute. For example, they complain that

high school students "have been deprived of an environment where students can

. . . dance with students regardless of their LGBTQ identity." ECF144 at 8, 18–19.

Plaintiffs also allege that "various LGBTQ resources that [previously] could be used,

voluntarily, but not in the classroom" are no longer available. ECF123 ¶ 71 (cited in

ECF144 at 17). But the statute does not currently apply in high schools, does not

apply outside of classroom settings, and does not restrict dancing between students

or the general provision of "LGBTQ resources." It also does not bar "safe space

stickers" or mention of "same-sex partners." ECF144 at 18.

Plaintiffs also recognize that they must show that the information they want

to receive "would otherwise have [been] available to them," ECF144 at 20, but do

not make that showing. For example, Plaintiffs allege that S.S. has "been deprived

of resources and information concerning Supreme Court precedents affecting

LGBTQ people." ECF144 at 18 (citing ECF123 ¶ 71). But Plaintiffs do not allege

that such information was provided last year, before HB 1557. Because schools have

never been required to instruct on gender identity or sexual orientation, Plaintiffs

can only speculate that such information would be provided this year but for the

statute.

**2.** Plaintiffs acknowledge that to plead self-censorship they must adequately

allege that "the law is at least arguably vague as it applies to them." ECF144 at 20–

21 (cleaned up). But Plaintiffs' concerns—that officials will target student groups

and discussions, dancing, safe space stickers, and certain clothing—have nothing to do with the statute. *See supra* Part I.

Plaintiffs respond that Defendants "are not entitled to" the "inference" that the statute covers only what it says, because "H.B. 1557 has been construed by a wide range of actors to prohibit not only formal curricular content, but also a wide range of additional speech." ECF144 at 21–22. But Plaintiffs cannot simply rest on "officials . . . acting in line with whatever sentiment they thought was underlying H.B. 1557's passage." ECF120 at 5. Statutory interpretation is a question of law and, as discussed above, the statute applies only to classroom content, despite whatever misconceptions about the statute may exist.

In the alternative, Plaintiffs contend that "certain" of them "have also alleged that H.B. 1557 is violating their rights in the context of formal 'classroom instruction.'" ECF144 at 22–23. But none of their examples involve K-3 classroom instruction, much less instruction on the covered topics. *See* ECF123 ¶ 71 (non-classroom briefing about LGBTQ resources); *id.* ¶¶ 72–74 ("information and resources" for high-school seniors (cleaned up)); *id.* ¶ 85 (mention of Sally Ride's sexual orientation).

**3.** Plaintiffs have also failed to point to a "credible threat of enforcement" of the statute that might chill speech. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110,

1120 (11th Cir. 2022) (cleaned up). The statute may be enforced only against school districts, not plaintiffs. ECF120 at 6.

Plaintiffs cite *Speech First* for the idea that "a government actor can objectively chill speech—through its implementation of a policy—even without formally sanctioning it." *Speech First*, 32 F.4th at 1122. But *Speech First* involved a policy that permitted the defendant to refer a student "to other university actors for discipline" for alleged hate speech. *Id.* at 1122. Here, the statute does not regulate students or parents. To the contrary, it covers only "classroom instruction" and allows enforcement only against school districts. *See* Fla. Stat. § 1001.42(8)(c)(7).

Teachers, of course, might face discipline from their schools. But as this Court recognized, that was true before HB 1557. ECF120 at 9 n.2. And Plaintiffs have done nothing to allege that teachers face additional risks of enforcement because of HB 1557—they point to a separate rule that they do not challenge. *See* ECF134 at 24–25.

**4.** Finally, Plaintiffs claim that they have suffered discriminatory treatment sufficient to assert equal protection and Title IX claims. ECF144 at 26–28. But HB 1557 treats all students and teachers equally—everyone gets the same classroom instruction, *i.e.*, the same "governmental messaging." *Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017). Plaintiffs try to distinguish *Moore* by saying that HB 1557 "regulates their educational opportunities and expression in ways that have denied

them specific benefits and opportunities." ECF144 at 27. But to the extent the law regulates educational opportunities, it does so equally for all students. *See Moore*, 853 F.3d at 249.

### B. Plaintiffs Fail to Plead Traceability and Redressability.

**1.** Plaintiffs' alleged injuries are attributable not to the actual provision they challenge, but to a "fanciful, paranoid, [and] otherwise unreasonable" interpretation of it. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (citation omitted). The actions of which Plaintiffs complain thus are not traceable to the statute, which neither requires nor sanctions them. Moreover, district school boards must provide instruction on specific subjects, Fla. Stat. § 1003.42, use accurate materials, *id.* § 1006.35, that are appropriate for the grade level, *id.* § 1006.28(2)(a)(2)(b), and subject to review by parents, *id.* Teachers, in other words, cannot "teach whatever lessons they wish," irrespective of HB 1557. ECF120 at 5–6. And because they have limited time and resources, teachers cannot cover even the full range of subjects they are permitted to teach. Against that backdrop, one simply cannot infer that Plaintiffs' alleged injuries are traceable to HB 1557.

**2.** Plaintiffs also cannot establish redressability. Plaintiffs contend that their alleged injuries are redressable by relief against the State Board because the Board implements Florida's educational policies and can withhold funding from school districts. ECF144 at 29 & n.16. That is true in the abstract. But the crux of Plaintiffs'

argument is that "school districts are seeking to structure the behavior of school personnel, students, and everyone else who comes into contact with the school system so as to avoid litigation." ECF123 ¶ 86. Assuming that is correct, an injunction against the State Defendants would have no effect whatsoever on that "structuring," because it would not preclude parents from suing under HB 1557, which is what plaintiffs say is causing their alleged injuries. Plaintiffs concede as much in arguing that the "private-cause-of-action provisions . . . render toothless the State's representations in this litigation that *it* does not believe the law should apply beyond curricular speech." ECF144 at 43–44.

Plaintiffs respond that they need not show complete redress. ECF144 at 31. True, but redress must be "likely, as opposed to merely speculative." *Support Working Animals*, 8 F.4th at 1201 (citation omitted). If the State Board is enjoined as an avenue of administrative relief for aggrieved parents, those parents will be funneled into the other avenue of relief provided by the statute—litigation in state court—subjecting school districts to potential awards for damages and legal fees. That would make Plaintiffs' alleged injuries worse, not better.

Plaintiffs point to two actions by the State Defendants that they say would be addressed by the injunction they seek. ECF144 at 30–31. But the teacher licensure rule adds a mens rea requirement to the statute's restrictions and therefore operates to teachers' benefit, not their detriment. The rule is, in any event, a separate

regulation that Plaintiffs do not challenge here. *Cook v. Stewart*, No. 1:13-cv-72, 2014 WL 12521335, at *7 (N.D. Fla. Apr. 22, 2014). And the Title IX letter simply tells school districts that they should ensure that non-binding federal guidance that misconstrued Title IX, *see Adams v. Sch. Bd. of St. Johns Cnty.*, 18-13592, 2022 WL 18003879, at *18 (11th Cir. Dec. 30, 2022) (en banc), is not applied in ways that violate Florida law. That has nothing to do with HB 1557.

### III.    PLAINTIFFS FAIL TO STATE A CLAIM.

#### A. Count I - Vagueness

Plaintiffs' void-for-vagueness claim is easily dispatched because HB 1557 is clear in its proscription, as discussed above. Were there any question on that score, the Court would have a "duty to give the law a construction that would avoid constitutional doubt" and can adopt any construction that, like the State's proposed interpretation, is "reasonable," "readily apparent," and resolves any "constitutional doubt." *Stenberg v. Carhart*, 530 U.S. 914, 941–44 (2000) (cleaned up). Plaintiffs' claim thus fails no matter the applicable legal standard.

Plaintiffs are, nevertheless, mistaken that HB 1557 is subject to a "heightened" clarity requirement because "First Amendment rights are at stake." ECF144 at 34. In the education context, the Supreme Court has held that the "flexibility" required in managing public schools and the lesser threat of mere "disciplinary" measures rather than "criminal sanctions" warrant an even more

lenient standard than applies to other civil statutes. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986).

It "makes even greater sense that where—as here—a statute regulates "only *classroom instruction*," the statute "need not meet the more stringent" vagueness standard. *Cal. Tchrs. Ass'n v. Davis*, 64 F. Supp. 2d 945, 956 (C.D. Cal. 1999) (emphasis added), *aff'd sub nom.* 271 F.3d 1141 (9th Cir. 2001). The reasons are several: (1) curricular decisions reflect only the government's own messaging, *see infra* pp. 15–18, (2) a teacher's decisions about what to teach are not "expressive or communicative" within the meaning of the First Amendment, *see Fowler v. Bd. of Educ. of Lincoln Cnty.*, 819 F.2d 657, 664 (6th Cir. 1987), and (3) open-textured regulation of instruction is necessary if schools are to function at all, *see, e.g.*, Fla. Stat. § 1003.46(2)(d) (providing for "instruction and material" on sexuality that is "appropriate for the grade and age"). Consistent with those principles, courts have upheld provisions that provide little guidance at all—for example, a ban on "conduct unbecoming a teacher." *Fowler*, 819 F.2d at 664–66.

Judged by that standard—or any standard, really—HB 1557 passes muster. As discussed more fully above, the statute is clear in its proscription. Plaintiffs raise, at most, questions about marginal applications of the statute that simply do not rise to the level of constitutional significance. Plaintiffs' other concern—that HB 1557 "invites arbitrary and discriminatory enforcement," ECF144 at 43—collapses into

their worries about the statute's clarity, *see Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc) (cleaned up), and is mistaken for the same reasons.

### B. Count IV - First Amendment Right to Information

**1.** All the challenged provision does is limit "classroom instruction" on two subjects in Florida's public schools. And as the Eleventh Circuit has explained, in public schools, "expression delivered directly through the government or indirectly through private intermediaries" is government speech in which the "government is free to make subject-matter-based choices." *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213 (11th Cir. 2004). That is the end of Plaintiffs' "right to information" claim.

Plaintiffs' argument—that binding precedent forecloses the application of the government-speech doctrine to choices about classroom content—ignores both the context in which Plaintiffs' cases arose and subsequent developments in the law. Contrary to their assertions, *Hazelwood School District v. Kuhlmeier* and *Searcey v. Harris* simply do not concern classroom content. *Hazelwood* applies a form of rational-basis review to student speech during "activities [that] may fairly be characterized as part of the school curriculum," 484 U.S. 260, 271, 273 (1988), and *Searcey* applies the same standard to restrictions on a high school career day comprised of activities outside the classroom, 888 F.2d 1314, 1319 (11th Cir. 1989).

The Eleventh Circuit has subsequently explained that *Hazelwood* and *Searcey* establish that "school-sponsored expression" (like a student newspaper) is an "intermediate category" between "pure student expression and government expression." *Bannon*, 387 F.3d at 1213–14; *see also Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038, 2044–45 (2021) (*Hazelwood* involves a "categor[y]" of "student speech").

Plaintiffs also point to *Virgil v. School Board*, in which the Eleventh Circuit applied *Hazelwood*'s rational-basis scrutiny to uphold a school's decision to remove a textbook from an elective course's curriculum. 862 F.2d 1517, 1521 (11th Cir. 1989). In subjecting that decision to judicial review, *Virgil* does not discuss, let alone reject, the government-speech doctrine, which would have supplied a separate doctrinal basis to reach the same result. *See Chiras v. Miller*, 432 F.3d 606, 617 (5th Cir. 2005) (discussing *Virgil*). *Virgil* itself notes that the panel worked with the best "guidance" it had in 1989—*Hazelwood*—reinforcing that the opinion does not reject alternative, unaddressed grounds for the same decision. *Virgil*, 862 F.2d at 1520–21.

It of course makes sense that *Hazelwood*, *Searcey*, and *Virgil* do not address government speech even peripherally: Those cases were decided between 1987 and 1989 and predate the Supreme Court's clarification of "the government's authority over its own message" during the 1990s and 2000s. *Chiras*, 432 F.3d at 617. And consistent with that clarification, in 2004, the Eleventh Circuit found *Virgil* no

obstacle to its explanation that *Searcey* and *Hazelwood* require review (albeit deferential review) in the "intermediate category" of "school-sponsored expression" while "the government is free to make subject-matter-based choices" for the separate category of government speech, which consists of "expression delivered directly through the government or indirectly through private intermediaries." *Bannon*, 387 F.3d at 1213.

Even if Plaintiffs' cases were as represented, Plaintiffs readily admit that they must yield to subsequent changes in the law. ECF144 at 46. And just last term, the Supreme Court held in *Kennedy v. Bremerton School District* that a coach praying at a football game was engaged in private speech, while "instructing players" would have been government speech. 142 S. Ct. 2407, 2424 (2022). The Eleventh Circuit has indeed made clear that government speech reaches well beyond classroom instruction and includes even student activities with an instructional component, such as cheerleading and student counseling practica. *See Dean v. Warren*, 12 F.4th 1248, 1265–66 (11th Cir. 2021); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 877 (11th Cir. 2011). That resolves this case because HB 1557 regulates only "classroom instruction."

Plaintiffs purport to distinguish *Kennedy* and certain other decisions on the ground that they concern teacher speech, not a student's right to receive information. *See* ECF144 at 46–47. But "[t]he listener's right to receive information is reciprocal

to the speaker's right to speak." *Doe v. Governor of N.J.*, 783 F.3d 150, 155 (3d Cir. 2015); *accord Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality op.). Were it otherwise, "a student" could "assert a right to have the teacher control the classroom when the teacher herself does not have such a right." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1307 (7th Cir. 1980).

Plaintiffs respond with a parade of horribles. They say that if the message students receive in school is not subject to judicial review, then states can teach even that "one race is superior to another." ECF144 at 47. Florida, of course, prohibits such instruction. *See* Fla. Stat. § 1000.05(4)(a)1. But if Plaintiffs' position prevails, Florida schools would have a constitutional obligation to accelerate the teaching of highly sensitive, controversial topics to schoolchildren without citizen participation. That invites, rather than prevents, the outcomes Plaintiffs fear. And well beyond this case, "permitting lawsuits . . . on the basis of the [allegedly discriminatory] content of [curricula] to proceed past the complaint stage" will render impossible the task of "assign[ing] books with themes, characters, snippets of dialogue, or words that might offend the sensibilities of any number of persons or groups." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1030 (9th Cir. 1998).

**2.** Even indulging constitutional scrutiny, HB 1557 easily passes muster. Under *Hazelwood*, the statute need only be "reasonably related to legitimate

pedagogical concerns," which can include avoiding sensitive topics, 484 U.S. at 273, 271.

Plaintiffs cast aspersions on the State's position "that sexual orientation and gender identity are 'sensitive' topics of 'political controversy,' which should be taught by parents." ECF144 at 48. But the Supreme Court has sided with the State on that one. *See Janus v. AFSCME*, 138 S. Ct. 2448, 2476 (2018). Plaintiffs indeed refute themselves on this point by conceding that "sexual orientation and gender identity . . . encompass a number of factors, including . . . sexual fantasy, romantic attractions, and erotic desires." ECF144 at 40 (citation omitted).

Plaintiffs' argument seems to be that the State does not have a legitimate interest in shielding the views of Plaintiffs' political opponents on those subjects because those views are illegitimate. But Plaintiffs' views are no more protected than are the "religious and philosophical objections" to them, *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018), which is why HB 1557 protects the interests of *all* Floridians by leaving such topics to parents in the first instance, regardless of viewpoint.

Plaintiffs are likewise mistaken to demand that the State produce evidence to "justify its choice" of policy. ECF144 at 48. Even under heightened scrutiny, the State does not need "evidence"; it can "rest solely on history, consensus, and simple common sense[.]" *Falanga v. State Bar of Ga.*, 150 F.3d 1333, 1341 (11th Cir. 1998)

(quotation omitted). It follows with even greater force that evidence is not required under *Hazelwood*'s rational-basis standard. That is why courts often dismiss *Hazelwood* claims on the pleadings. *See, e.g.*, *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 288–90 (4th Cir. 2021); *Keeton v. Anderson-Wiley*, 110-cv-099, 2012 WL 13163578, at *21–22 (S.D. Ga. June 22, 2012); *Williams v. Vidmar*, 367 F. Supp. 2d 1265, 1273–74 (N.D. Cal. 2005); *see also Chiras*, 432 F.3d at 617 (*Pico* claim).

*Searcey* is not to the contrary. That case concerns limits on who may enter a school-created limited public forum, not choices about core curriculum. 888 F.2d at 1320; *Bannon*, 387 F.3d at 1218 (Black, J., concurring) (distinguishing *Searcey* on that ground). Moreover, as the Eleventh Circuit has subsequently explained, "*Searcey* did not . . . hold that reasonableness *must* be supported by record evidence." *Uptown Pawn & Jewelry, Inc. v. City of Hollywood*, 337 F.3d 1275, 1280 (11th Cir. 2003) (emphasis in original). On the contrary, because "common sense . . . is sufficient in this Court to uphold a regulation under reasonableness review," additional evidence is not required where the State's rationale is "intuitively obvious." *Id.* (cleaned up).

**3.** In Plaintiffs' view, HB 1557 does not advance a legitimate interest because it is rooted in animus. ECF144 at 49. As discussed more fully below, Plaintiffs have not come close to showing that the Legislature acted out of animus. *See infra* pp.

24–28. But the argument fails for a more basic reason: The First Amendment does not authorize the courts to "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *see also In re Hubbard*, 803 F.3d 1298, 1312–15 (11th Cir. 2015); *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1224 (11th Cir. 2022). And Plaintiffs offer no principled basis for a different rule in cases involving a claim to "the right to receive information." ECF144 at 50 n.25. Indeed, the Supreme Court has declined to probe legislative motive even in criminal cases, *see O'Brien*, 391 U.S. at 383, where constitutional review ordinarily is most stringent, *see Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982).

Plaintiffs point to dicta in *Virgil* noting that "[c]ourts have not hesitated to look beyond the stated reasons for school board action." 862 F.2d at 1523 n.6. But the *Virgil* court offered no authority for that proposition and did not itself "look beyond" the parties' stipulation as to motive. In any event, this case involves a legislature, not a school board. *Compare NetChoice, LLC*, 34 F.4th at 1224 (no inquiry into legislature's motives), *with Masterpiece Cakeshop, Ltd.*, 138 S. Ct. at 1731–32 (inquiry into commission's motives). And Plaintiffs are wrong that *Hazelwood* "looked to underlying motive." ECF144 at 50 n.25. To the contrary, like other rational-basis cases, *Hazelwood* asks in plain terms not what the State's actual

motive was, but what legitimate motives the State "could reasonably have" had. 484 U.S. at 274–75.

Nor is classroom content subject to review "for narrowly partisan or political" motives under *Pico*. ECF144 at 45. First of all, *Pico* was "a badly fractured decision" that is "of no precedential value as to the application of the First Amendment to these issues." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1199–1200 (11th Cir. 2009) (quotations omitted). Plaintiffs also badly overread *Pico* on its own terms. The case was about the removal of books from a school library, and the plurality was clear that classroom instruction is different, expressing "full agreement" that States "must be permitted to establish and apply their curriculum in such a way as to transmit community values, and that there is a legitimate and substantial community interest in promoting respect for . . . traditional values be they social, moral, or political." *Pico*, 457 U.S. at 864 (cleaned up). The plurality observed that States may well have "absolute discretion in matters of *curriculum*" given "their duty to inculcate community values." *Id.* at 869 (emphasis in original).

### C. Counts V and VI – First Amendment Expression and Overbreadth

**1.** Plaintiffs' free-speech claim fails because, as discussed above, the State's decisions about its message in public schools are not subject to First Amendment scrutiny. *See supra* pp. 15–18. Nor does the statute restrict "student speech in a curricular setting." ECF144 at 50. It limits only "classroom instruction." To be sure,

22

that might include a teacher's delegation of student-led instruction on the proscribed topics. But that is not a restriction on private speech; rather it is a limit on teachers' authority to delegate responsibility for instruction. Put differently, the argument fails because government speech includes not only "expression delivered directly through the government," but also expression delivered "*indirectly through private intermediaries*." *Bannon*, 387 F.3d at 1213. Even if that were not so, the statute would easily pass muster under *Hazelwood*, for the reasons discussed above.

**2.** The above discussion also resolves Plaintiffs' overbreadth claim, which they mention only in passing. *See* ECF144 at 51 n.26. Because HB 1557 "does not regulate [private] speech, it does not violate the First Amendment rights of persons not before the court" and "Plaintiffs' 'overbreadth' argument is nothing more than a restatement of the First Amendment argument they make on their own behalf." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 (10th Cir. 2006) (en banc).

### D. Counts II and III – Equal Protection of the Law

**1.** As discussed above, Plaintiffs lack standing to assert an equal protection claim because "exposure to a discriminatory message" is not the "denial of equal treatment" and therefore "is insufficient to plead injury." *Moore*, 853 F.3d at 250; *see also Penkoski v. Bowser*, 486 F. Supp. 3d 219, 228–29 (D.D.C. 2020). The claim fails on the merits for much the same reason—the statute regulates only the

government's own message, *i.e.*, government speech. *See, e.g.*, *Fields v. Speaker of Penn. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019); *Freedom from Religion Found., Inc. v. City of Warren*, 707 F.3d 686, 698 (6th Cir. 2013); *Bloomberg v. Blocker*, 3:21-cv-575, 2022 WL 485225, at *5 (M.D. Fla. Feb. 17, 2022). Plaintiffs' only response is to repeat their assertion that "H.B. 1557 is not government speech." ECF144 at 52 n.27. That is wrong for the reasons discussed above. *See supra* pp. 15–18.

**2.** Even putting that aside, Plaintiffs have not pleaded that the Legislature acted with discriminatory intent. As a threshold matter, Plaintiffs say that they can do that by meeting just one of the eight *Arlington Heights* factors. ECF144 at 51–52. To the contrary, the Eleventh Circuit has found a showing on "several factors" legally insufficient. *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1322 & n.33 (11th Cir. 2021). The Supreme Court has done the same. *See Abbott v. Perez*, 138 S. Ct. 2305, 2329 (2018). The ultimate question is whether Plaintiffs have pleaded sufficient facts to raise a plausible inference of animus. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020). And in making that showing, Plaintiffs do not dispute that they must overcome a presumption of legislative good faith that "only the clearest proof will suffice to override." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (cleaned up); *see* ECF134 at 44; ECF140-1 at 18–19.

Plaintiffs fail on that score. They have no constitutional quarrel with the bulk of the law, which largely ensures that parents have transparency into the well-being of their children at school. Beyond that, Plaintiffs never explain why a legislature intent on discriminating against gay and transgender kids and their families would pass a scrupulously neutral law. And even crediting the notion that gay and transgender students suffer when "gender identity" and "sexual orientation" are not taught, Plaintiffs never explain why a hateful legislature would permit instruction on those topics after the third grade. That alone defeats their claim because "discrimination is not a plausible conclusion" when there are "obvious alternative explanation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quotation omitted).

At any rate, Plaintiffs' efforts to tick through the *Arlington Heights* factors fall short of the necessary showing:

*Impact*. To show that HB 1557 has a discriminatory impact, Plaintiffs must establish that the law, although neutral, will have a discriminatory effect. But again, the law is neutral and there is no plausible allegation that it will nonetheless affect anyone unequally. *Greater Birmingham Ministries*, 992 F.3d at 1321.

Plaintiffs cite accounts of scattered school-district implementation. ECF144 at 52–53. But even if those accounts are correct, the fact that third parties are misinterpreting the law does not show that the law is having a discriminatory impact, let alone one the Legislature could have foreseen.

25

*Historical background and statements.* Plaintiffs continue to cherry-pick statements from the legislative record that they say reflect animus. ECF144 at 53–54. But they do not dispute that the legislative record as a whole reflects an overriding intent to empower parents to control the upbringing of their children. *See* ECF134 at 43–44. The statements Plaintiffs cite are best understood as rooted in the same desire to protect and empower parents. *See id.* at 43–44. Indeed, the statements must be read that way because of the presumption of legislative good faith. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam).[3]

Plaintiffs also point to "decades" of supposed generalized "discrimination," most of which has nothing to do with Florida. ECF144 at 54. The charges are false, and the Supreme Court has rejected the theory that past discrimination infects future laws in the manner of "original sin." *Abbott*, 138 S. Ct. at 2324 (quotation omitted).

*Substantive departure.* Plaintiffs claim that HB 1557 represents a "substantive departure" from then-existing policy, which they believe evinces discrimination. ECF144 at 56–57. But there was no "change"; ensuring a role for parents and

---

[3] Plaintiffs contend that the presumption applies mainly in redistricting cases. ECF144 at 54–55. That makes no sense: the presumption is a recognition of the sovereign status of state legislatures. Courts have therefore applied the presumption outside of redistricting. *E.g.*, *League of Women Voters*, 32 F.4th at 1373. That includes the Supreme Court which, when it sourced the presumption in *Miller v. Johnson*, cited an affirmative-action case. *See* 515 U.S. 900, 915 (1995).

promoting age-appropriate education have long been features of Florida law. *E.g.*, Fla. Stat. §§ 1002.20, 1003.41, 1003.42. Nor does HB 1557 "contravene[e] federal cases recognizing that LGBTQ persons are at home in our constitutional order," ECF144 at 56—the law is neutral for all grades and permits instruction on "sexual orientation" and "gender identity" in the later grades.

*Less discriminatory alternatives*. Finally, Plaintiffs complain that HB 1557 is "discriminatory" because legislators rejected certain amendments. ECF144 at 57. But the fact that "the legislature" failed to adopt "the alternative option that Plaintiffs would have preferred" is "unpersuasive" evidence of discriminatory intent. *Greater Birmingham Ministries*, 992 F.3d at 1327. And Plaintiffs never come to grips with the fact that the Legislature *did* adopt a "less discriminatory alternative." The original version of the bill restricted classroom "discussion." ECF134 at 47. The bill was amended to limit only classroom "instruction." Again, Plaintiffs cannot explain why a legislature motivated by the sort of animus they describe would adopt such a limiting amendment.

**3.** Plaintiffs rehash their argument that HB 1557 has been selectively enforced to deny "LGBTQ-related educational opportunities." ECF144 at 58. But as discussed above, the statute operates equally on all classrooms and thus treats everyone equally. And Plaintiffs have failed to identify a single instance in which "LGBTQ-related" instruction on sexual orientation or gender identity was denied, while

equivalent "non-LGBTQ" instruction was permitted. In any event, selective enforcement untied to the statutory text and unrelated to the State Defendants is not a basis to enjoin the statute. *See* ECF134 at 50.

### E. Count VII - Title IX

Plaintiffs' brief argument that they have stated a Title IX claim, ECF144 at 59–60, does little more than reprise their mistaken arguments that the law is discriminatory in other respects. As they recognize, however, their argument faces the additional hurdle that Title IX does not regulate "curricular materials." 34 C.F.R. § 106.42. If it did, Title IX would represent an unprecedented intrusion into the State's traditional role in setting classroom agendas, which would require an unmistakably clear statement nowhere present in the federal statute. *E.g.*, *Bond v. United States*, 572 U.S. 844, 862, 865 (2014).

### CONCLUSION

For the foregoing reasons, the complaint should be dismissed with prejudice.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Daniel William Bell*
Daniel William Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Anita Patel (FBN 70214)
ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
daniel.bell@myfloridalegal.com

*Counsel for the Florida State Board of Education, Thomas R. Grady, Ben Gibson, Monesia Brown, Esther Byrd, Grazie P. Christie, Ryan Petty, Joe York, and the Florida Department of Education*

29

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 7.1(F) and this Court's order, this brief contains 6,432 words.

*/s/ Daniel William Bell*
Chief Deputy Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

_/s/ Daniel William Bell_
Chief Deputy Solicitor General